1
2   UNITED STATES DISTRICT COURT
    EASTERN DISTRICT OF NEW YORK
3   ----------------------------------------------x
    NEW YORKERS FOR RELIGIOUS LIBERTY, INC.,
4   GENNARO AGOVINO, CURTIS CUTLER, LIZ
    DELGADO, JANINE DEMARTINI, BRENDAN
5   FOGARTY, SABINA KOLENOVIC, KRISTA O'DEA,
    DEAN PAOLILLO, DENNIS PILLET, MATTHEW
6   RIVERA, LAURA SATIRA, FRANK SCHIMENTI
    and JAMES SCHMITT, individually and on
7   behalf of all others similarly situated,
8                        Plaintiffs,
9              -against-
10  THE CITY OF NEW YORK, ERIC ADAMS, in his
    official capacity as Mayor of the City of
11  New York, DAVE CHOKSHI, in his official
    capacity as Health Commissioner of the
12  City of New York, AND ROBERTA REARDON, in
    her capacity as new York State Commissioner
13  of Labor,
14                       Defendants.
15  Case No.:  1:2022-cv-00752
    ----------------------------------------------x
16
                    (Via Zoom Videoconference)
17
                    May 24, 2022
18                  9:11 a.m.
19
20          Video-recorded Videoconference
21    Deposition of ERIC EICHENHOLTZ, before Kristi
22    Cruz, a Stenographic Reporter and Notary
23    Public of the State of New York.
24
25

1

2  A P P E A R A N C E S :

3

4  NELSON MADDEN BLACK LLP

5  Attorneys for Plaintiffs

6        475 Park Avenue South, Suite 2800

7        New York, New York 10016

8  BY:   JONATHAN R. NELSON, ESQ.

9        SARAH E. CHILD, ESQ.

10       jnelson@nelsonmaddenblack.com

11

12  THE GIBSON LAW FIRM PLLC

13       407 North Cayuga Street, Suite 201

14       Ithaca, New York 14850

15  BY:   SUJATA SIDHU GIBSON, ESQ.

16       sujata@gibsonfirm.law

17

18  NEW YORK CITY LAW DEPARTMENT

19       Attorneys for Defendant

20       100 Church Street

21       New York, New York 10007

22  BY:   BILAL H. HAIDER, ESQ.

23       LORA MINICUCCI, ESQ.

24       ANDREA M. O'CONNOR, ESQ.

25       bhaider@law.nyc.gov

1
2   A P P E A R A N C E S (cont'd):
3
4   ALSO PRESENT:
5           DEAN PAOLILLO
6           BARRY BLACK
7           KRISTA O'DEA
8           FRANK SCHIMENTI
9           SABINA KOLENOVIC
10          LIZ DELGADO
11          GENNARO AGOVINO
12          BRANDON BABWAH, Paralegal
13          ROCCO MERCURIO, Videographer
14
15
16
17
18
19
20
21
22
23
24
25

1                    PROCEEDINGS

2          THE VIDEOGRAPHER:  We are now going

3     on the record.  Today is May 24, 2022, and

4     the time is approximately 9:11.  Please

5     note that this deposition is being

6     conducted virtually.  Quality of the

7     recording depends on the quality of the

8     camera and internet connection of the

9     participants.  What is heard from the

10    witness and seen on the screen is what

11    will be recorded.  Audio and video

12    recording will continue to take place

13    until all parties agree to go off.

14          This is the remote video deposition

15    of Eric Eichenholtz in the matter of New

16    Yorkers For Religious Liberty Inc. et al.

17    versus the City of New York et al., filed

18    in the U.S. Eastern District Court of New

19    York, case number 1:2022cv00752.  My name

20    is Rocco Mercurio, and the court reporter

21    is Kristi Cruz, and we are from Veritext.

22          Will counsel please introduce

23    yourselves and who you represent for the

24    record.

25          MR. NELSON:  For the plaintiffs,

```
1                    E. EICHENHOLTZ
2          Jonathan Nelson of Nelson Madden Black
3          LLP.
4               MS. CHILD:  For the plaintiffs, this
5          is Sarah Child from Nelson Madden Black LLP.
6               MR. NELSON:  Sujata, will you please
7          introduce yourself?  Perhaps you will do
8          so later on; perhaps she's away.
9               Defendants' counsel?
10              MR. HAIDER:  Bilal Haider for the
11         defendants on behalf of the Corporation
12         Counsel.
13              MS. MINICUCCI:  Lora Minicucci for
14         defendants.
15              MS. O'CONNOR:  Andrea O'Connor for
16         defendants.
17              THE VIDEOGRAPHER:  Okay.  Will the
18         court reporter please swear the witness.
19 E R I C   E I C H E N H O L T Z,
20         called as a witness, having been duly
21         sworn by a Notary Public, was examined
22         and testified as follows:
23 EXAMINATION BY
24 MR. NELSON:
25         Q.   Good morning, Mr. Eichenholtz.
```

1           E. EICHENHOLTZ

2       A.    Good morning.

3       Q.    Thank you for being here, although

4    your here is not here; it's where you are in

5    your office, I suppose.

6       A.    Virtually, yes.

7       Q.    So you're here for the deposition,

8    the 30(b)(6) deposition on behalf of the City

9    defendants in this lawsuit.  And you're an

10   attorney; is that correct?

11      A.    That's correct.

12      Q.    And have you ever taken part in

13   depositions before?

14      A.    Never as a witness, but as counsel,

15   I've taken part in many depositions, yes.

16      Q.    Okay.  So you know the rules.

17      A.    Yes.

18      Q.    Very good.  We can dispense with

19   those, I think.

20            One thing we should discuss is

21   breaks.  There's a very important aspect with

22   respect to breaks, and that is that breaks

23   should not occur between the question that is

24   posed and the answer that's given, and I would

25   ask, also, that that extend to communications

1            E. EICHENHOLTZ
2    between the witness and counsel.  You have
3    counsel sitting right next to you.  There's
4    potential for passing notes, and I would
5    direct you not to do that, please.
6        A.    Understood.
7        Q.    Any time somebody needs a break in
8    this matter, then please raise that for the --
9    you know, raise that on the record and, you
10   know, we'll be very generous with respect to
11   that.  Anybody who needs a bathroom break gets
12   it.  And we will be breaking for lunch, if we
13   continue that long.  So we can certainly
14   negotiate the amount of time that's necessary
15   for lunch, but I would say it should be at
16   least probably 45 minutes.  Is that acceptable
17   to City counsel?
18           MR. HAIDER:  Bilal Haider, yes, it
19       is acceptable.
20           MR. NELSON:  Very good.
21       Q.    So, Mr. Eichenholtz, what is your
22   position?
23       A.    I am the Chief Assistant Corporation
24   Counsel for employment policy and litigation.
25       Q.    Okay.  And how long have you been

1                    E. EICHENHOLTZ

2      doing that?

3           A.    Since October of 2021.

4           Q.    You know, that's fairly recent.

5      What were you doing before then?

6           A.    Before then, I was the Division

7      Chief of The Labor and Employment Law Division

8      here at the New York City Law Department.

9           Q.    And how long did you do that?

10          A.    Since February of 2013.

11          Q.    And you are testifying as a Rule

12     30(b)(6) witness on behalf of all of the City

13     defendants; is that correct?

14          A.    Correct.  On behalf of the corporate

15     entity, the City of New York, yes.

16          Q.    Now, do you have a personal

17     knowledge of the matters that are to be

18     covered by today's deposition by order of the

19     magistrate judge?

20          A.    Some, I'd imagine.

21          Q.    Okay.  And what is the basis for the

22     personal knowledge that you have with respect

23     to the topics that have been mentioned in the

24     judge's order?

25          A.    I was involved with the formation

1                    E. EICHENHOLTZ
2    and have served on the Citywide Appeals Panel
3    for the New York City employee vaccine
4    mandate.
5        Q.    And how were you involved in the
6    formation of the panel?
7        A.    I was consulted and a part of the
8    team that put the panel together, and worked
9    through the reasonable accommodation process
10   with respect to the commissioner of health's
11   order, I believe, in October, October 20th of
12   2021.
13       Q.    And who else was on that team that
14   put the panel together?
15       A.    Various individuals.  We worked --
16   there were several agencies that worked
17   collaboratively together, and at different
18   stages, different people would weigh in.  But
19   it was primarily the New York City Law
20   Department, the New York City Department of
21   Citywide Administrative Services, the New York
22   City Mayor's Office of Labor Relations, as
23   well as the New York City Department of Health
24   and Mental Hygiene, as well as those working
25   in City Hall to coordinate, you know, the

1          E. EICHENHOLTZ
2    interagency policy issues that were going on
3    with respect to the COVID-19 public health
4    emergency.
5        Q.    So were there any other persons from
6    the New York City Law Department that were
7    involved in that process, then, just the
8    putting together of the panel?
9        A.    Yes.
10       Q.    And who were they?
11       A.    Georgia Pestana.
12       Q.    And who was involved on behalf of
13   DCAS, the Department of Citywide
14   Administrative Services?
15       A.    It varied, but primarily Sanford
16   Cohen, their general counsel, Barbara
17   Dannenberg, who was the Deputy Commissioner of
18   Human Capital, and Stella Xu, she's in an
19   executive role then.  I'm sorry, I don't know
20   her precise title.  Those were the individuals
21   who were working on employee policy and
22   implementation with respect to the COVID-19
23   emergency, so they were involved in the
24   discussion.  And certain also -- at various
25   points we also consulted with Silvia

1              E. EICHENHOLTZ
2   Montalban, who is the Deputy Commissioner for
3   Citywide Equity and Inclusion.
4        Q.    Who was on that group that put
5   together the panel from the Mayor's Office of
6   Labor Relations?
7        A.    It was Renee Campion, the
8   Commissioner of Labor Relations, as well as
9   Steven Banks, who at the time was the first
10  deputy commissioner.  They were both involved
11  in the discussions.
12       Q.    And who was involved from the
13  Department of Health and Mental Hygiene?
14       A.    I do not recall at this time.  They
15  were -- I don't recall the name of the
16  individual.  They were primarily involved when
17  it came to the commissioner's order.  I spoke
18  primarily with Lisa Landau, who was their
19  general counsel, but I know that there were
20  doctors and medical policy people who Lisa
21  consulted with as needed.  Their involvement
22  was more about the order than it was the
23  reasonable accommodation and appeal process,
24  however.  So they were not as involved in
25  discussions about the appeal panel and the

1                    E. EICHENHOLTZ

2      appeal -- and the reasonable accommodation

3      process.

4          Q.    Okay.  And then, you mentioned that

5      there were people who were involved from City

6      Hall in the coordination, I guess, of

7      interagency kinds of policies and that sort of

8      thing.  Who were they?

9          A.    I'm trying to remember who was --

10     Molly Schaeffer is -- was and remains someone

11     over there who coordinates between the

12     agencies.  I don't believe there was anyone

13     directly involved as we were discussing

14     matters of the panel and the composition.

15     That was done primarily discussions between

16     the various agencies.  But when we would have

17     our structure set up, we would obviously check

18     in with, it would have been the first deputy

19     mayor's team at City Hall, and the first

20     deputy mayor at the time was Dean Houlihan.

21         Q.    Thank you.

22               Now, you've mentioned that Georgia

23     Pestana was also involved from the Law

24     Department.  What was her role in that process

25     of the formation of the panel?

1           E. EICHENHOLTZ

2       A.    At the time, Georgia Pestana was the

3   Corporation Counsel of the City of New York,

4   so she was serving as the City's chief legal

5   officer.  This obviously a legal

6   compliance issue, so she as well as I were

7   actively involved in that regard.

8       Q.    And she is also a person who is

9   representing the City departments in the

10  lawsuit in which you're involved.  Is that

11  true?

12      A.    No, that's not accurate.  As she

13  is -- as Corporation Counsel, when she was

14  Corporation Counsel, she no longer is, she was

15  obviously listed as the primary counsel of

16  record in the same way, you know, a firm's

17  headline would appear in every case.  But

18  Ms. Pestana was not personally involved in

19  those representations, outside of an executive

20  and supervisory role.

21      Q.    So what was your role in this

22  process of putting the panel together?

23      A.    Basically, to be a part of the

24  discussion, to provide my thoughts on what the

25  legal requirements were, the needs were, and

1          E. EICHENHOLTZ
2    how we could go about putting together a
3    structure to satisfy that, what resources the
4    City might have to bring to bear to make sure
5    that we were able to perform those functions
6    well.  That was really my involvement in the
7    discussion, as really, quite frankly, was
8    everyone who was involved in that discussion.
9         Q.   Now, are you familiar with the
10   standards for adjudicating religious and
11   medical accommodation requests that were set
12   forth in the various decisions that were
13   issued by an arbitrator in the arbitration in
14   the Department of Education that related to
15   religious accommodation requests?
16        A.   I'm aware of the arbitration award
17   and generally aware of the process that
18   resulted from that award, yes.
19        Q.   And were the standards that were set
20   forth in that process for the decision-making
21   on religious accommodation requests considered
22   by the persons who were involved in the
23   formation of the appeals panel that you formed
24   in late October?
25        A.   The citywide vaccine mandate that

```
 1                    E. EICHENHOLTZ
 2    we're discussing here, that October 20th
 3    mandate, was a different mandate, a different
 4    discussion, a different process.  And when we
 5    were discussing how to put together the panel
 6    and the standards that it would apply, that
 7    arbitration award was not a consideration, no.
 8         Q.    Did you discuss it in the course of
 9    the formation of the panel, or it simply was
10    never mentioned?
11         A.    I -- I don't recall it ever being
12    discussed when it came to how we were going to
13    go about a citywide appeal panel process.  Our
14    focus and our discussion was both the legal
15    standards, as well as the City's existing
16    Equal Employment Opportunity, or EEO policy,
17    as well as our Reasonable Accommodation
18    policies, and how we could adapt those
19    policies to effectively address this
20    circumstance in the public health emergency.
21    That was our consideration in designing and
22    discussing the panel.
23         Q.    And what adaptations did your group
24    decide it was necessary to make in order to
25    serve those needs?
```

1                    E. EICHENHOLTZ

2        A.    Well, we had received I think two,

3    what I would describe as, broad policy-based,

4    whether you want to call them, requests or

5    considerations for what was desired from

6    policy perspective.  What was desired was that

7    this mandate be and the reasonable

8    accommodations be implemented in a uniform

9    manner such that we were not going to have

10   appeals of denials dependent on agency by

11   agency, as well as to have a process that

12   could both, you know, that could handle a

13   large number of appeals that we anticipated

14   would be coming from the agency EEO officer's

15   determinations, so do it uniformly and be able

16   to handle the volume, and of course to do it

17   with effectiveness and proper consideration.

18   Those were really the policy asks.

19             And ultimately, our determination

20   was that we wanted to use -- the City had

21   significant internal resources in many of

22   these agencies that provided a unique

23   perspective based on that agency's work and

24   mission, and that we wanted to bring those

25   resources to bear to create a citywide

1                    E. EICHENHOLTZ
2      process, and that's ultimately the process the
3      panel evolved from.
4          Q.    Was part of this discussion a desire
5      to have uniform decisions at the agency level,
6      also, as well as at the Citywide Appeals Panel
7      level?
8          A.    No.  I think the concern was more,
9      you know, the reasonable accommodation --
10     reasonable accommodations were essentially
11     going to be an exception, but an important
12     legal exception to the vaccine mandate, and
13     obviously our focus was on making sure that
14     employees who were denied at the agency level
15     had that opportunity for additional review and
16     to bring that perspective and experience to
17     bear in that review.  It is, as it's named,
18     intended to be an appellate review process
19     much like, you know, a court of appeals would
20     be.
21         Q.    So in the process of putting this
22     panel together and organizing the City's
23     response to a request for exemptions from the
24     citywide mandate, did your panel discuss or
25     were you personally involved in speaking with

1          E. EICHENHOLTZ

2     the agencies about the processes that they

3     would go through to process their own original

4     reasonable accommodation requests?

5          A.     So agencies were -- we had meetings

6     in the lead-up to the implementation of the

7     mandate with, what we call, agency personnel

8     officers, those are your HR leads, as well as

9     EEO officers, where we gave very high-level

10    instructions, as well as answered questions in

11    a group setting.  I was involved -- I should

12    also say, we also had meetings with agency

13    general counsel to discuss the legal issues

14    and implications.  I was involved in all of

15    those meetings as, you know, as an executive

16    at the Law Department overseeing employment

17    policy and overseeing sort of that legal

18    advice as one of the people who had been

19    paying very close attention to the law and

20    legal developments with respect to vaccine

21    mandates and human resources, employee issues,

22    including, of course, reasonable

23    accommodations.

24          Q.     Now, at any time in those

25    discussions with the agencies or in the

1                     E. EICHENHOLTZ
2      formation of the panel, did you or anyone else
3      discuss Mayor de Blasio's desires with respect
4      to the implementation of the mandates and with
5      respect to limitation of the number of people
6      who should benefit from them, from the
7      exemptions, or with respect to the limitation
8      with respect to the religions to which they
9      should -- to which they belonged?
10         A.    No.
11         Q.    No one?
12         A.    No.  That was not a subject of our
13     discussion, no.
14         Q.    Did you talk about Mayor de Blasio's
15     desires at all in those meetings?
16         A.    Quite frankly, Mayor de Blasio's
17     desires were irrelevant.
18         Q.    And why were they irrelevant?
19         A.    Because what we were discussing was
20     a public health order issued by the
21     Commissioner of Health; not the Mayor of the
22     City of New York; a reasonable accommodation
23     process that is mandated by the laws of
24     federal, state, local level, and a citywide
25     policy.  And the mayor's opinions on what

1                    E. EICHENHOLTZ
2       should happen there were not relevant to the
3       issue of what was required under the law, what
4       was required under policy, and what the
5       vaccine mandate allowed for.
6            Q.    Who else was involved from the
7       people who were putting the panel process
8       together and implementing the RA exception
9       policy in the sort of high-level meetings that
10      you discussed having at the various agencies
11      of the meeting?
12           A.    Yeah, the primary -- the actual
13      compensation of the panel primarily was
14      myself, Ms. Pestana, Commissioner Campion,
15      First Deputy Commissioner Banks, in terms of
16      what agencies would serve on it.  The nuts and
17      bolts of how the reasonable accommodation
18      process would be implemented, the process of
19      you have X days to appeal and you would get
20      interim accommodation if you timely appealed,
21      those sorts of policy calls were those two
22      agencies, as well as the Department of
23      Citywide Administrative Services.
24           Q.    And did the -- was the Department of
25      Citywide Administrative Services involved in

1                    E. EICHENHOLTZ
2      the sort of agency-to-agency process that you
3      went through to, you know, make sure that
4      there was some understanding at the high level
5      of those agencies of the processes that were
6      going to be involved and the standards?
7          A.    Yes.  Actually, DCAS, which is the
8      acronym for that agency, I'll use it so that
9      we can -- we don't need to say the whole term
10     the whole time.
11         Q.    I accept that.
12         A.    Yeah.  DCAS was the one who
13     organized those agency personnel officer and
14     EEO officer meetings and calls.  And I would
15     say that they weren't -- yes, those were
16     actually regular calls dealing with pandemic,
17     COVID pandemic and public health emergency
18     related issues that had been ongoing obviously
19     before the health commissioner had issued a
20     vaccine mandate.  So they were sort of --
21     those were the topics that were covered in the
22     lead-up to implementation.
23         Q.    And those calls were telephone calls
24     or Zoom calls?
25         A.    They were -- yeah, I don't remember

1               E. EICHENHOLTZ

2     the medium.  It was a virtual video call much

3     like this one.

4          Q.    Now, were those conversations of

5     those meetings, were they recorded?

6          A.    Not that I'm aware of, no.

7          Q.    And why not?

8          A.    Because there was no need to.  There

9     was no -- there was no need to record it.  We

10    had all the agencies in attendance.

11         Q.    And could you make an inquiry,

12    please, as to whether or not there are any

13    recordings of those calls?

14         A.    Yes, we will do so.

15         Q.    Thank you.

16 RQ          MR. NELSON:  And if there are, we

17         ask that you produce those.

18              MR. HAIDER:  We ask that you just

19         put that request in writing.  Thank you.

20         Q.    Were any documents produced for any

21    of these agency meetings?

22         A.    Yes.  Those meetings, generally

23    there was a high-level PowerPoint that DCAS

24    prepared with just some basic bullets about

25    what was going on and what agencies needed to

1                    E. EICHENHOLTZ

2      do.

3  RQ          MR. NELSON:  Okay.  We are also

4          going to make that document request with

5          respect to that, but I will put it in

6          writing.

7          Q.    Now, and what about, how were the

8      meetings set up?  Were they set up by email or

9      some other written method?

10         A.    DCAS has both on the agency

11     personnel officer and on the EEO officer side

12     contact lists that they maintain, and excuse

13     me, an invitation, I believe, Outlook

14     invitation was sent out to either the APOs,

15     the EEO officers, or both, as the

16     circumstances warranted.

17         Q.    Were you personally involved in the

18     drafting of any standards for the individual

19     City agency's consideration of RA requests

20     from employees?

21         A.    I'm sort of working on the word

22     "standards" there.  I was involved in the

23     drafting of sort of a FAQ policy document.  My

24     recollection, it was really more about the

25     nuts and bolts.  There was some very

1                    E. EICHENHOLTZ
2     high-level guidance, I think, put in there,
3     but it wasn't like this is, you know, how you
4     decide an RA request.  I mean, those sorts of
5     documents already existed, you know, in terms
6     of general applicability in the City's various
7     EEO and Reasonable Accommodation policies.
8          Q.    So that was an FAQ that was for the
9     Citywide Appeals Panel?
10         A.    Not just the Citywide Appeals Panel;
11    it was, as I remember, it was all aspects of
12    implementation of the vaccine mandate,
13    including both reasonable accommodations and
14    the RA process.  Obviously the Citywide
15    Appeals Panel is just one phase of the RA
16    process, so it would have been there to the
17    extent we discussed the RA process.
18         Q.    Now, are you going to be giving any
19    testimony today which is not from personal
20    knowledge?
21         A.    I couldn't tell you at the moment,
22    but obviously as we go along, if you'd like to
23    inquire as to the source of my knowledge on
24    anything, I'd be happy to respond to you.
25         Q.    Of course.

1              E. EICHENHOLTZ

2              Did you review any documents or

3      other, you know, either virtual or physical

4      writings in order to prepare for today's

5      testimony?

6          A.    Yes.  I reviewed the Complaint in

7      this action, I reviewed four declarations that

8      I prepared over the course of the last six

9      months or so in response to various litigation

10     to describe the Citywide Appeal Panel and its

11     process.  I also reviewed the EEOC's --

12     re-reviewed, I should say, I reviewed it many

13     times, the EEOC's guidance on COVID-19, and

14     specifically I believe it's sections K and L

15     which dealt with COVID-19 vaccinations and

16     reasonable accommodation requests.

17         Q.    And in order to prepare for today's

18     deposition, did you speak with anyone to

19     obtain information that you needed from them?

20         A.    No.

21         Q.    Going back to the question I was

22     asking about, your meetings with the agencies

23     to prepare them for their role:  In the course

24     of those meetings or afterward concerning the

25     topic of those meetings, were any other

1                     E. EICHENHOLTZ
2    documents shared or exchanged, or were there
3    any follow-up emails that were involved with
4    respect to those meetings?
5        A.    I'm certain there were.  My
6    recollection is the follow-up documents were
7    usually links to the posted FAQ, guidance on
8    various topics that DCAS was preparing for
9    review by agency personnel officers, EEO
10   officers, etcetera.  There was no, at least
11   that I can recall, there was never any email
12   or document that said, oh, in addition
13   to what [audio interruption].
14       Q.    We've lost you.
15       A.    Sorry, yeah, I accidentally pressed
16   the space bar.
17            In addition -- there was no
18   documents of, like, sort of, in addition to
19   the guidance at the meeting, here's additional
20   guidance.  It was generally to point people to
21   the resources that were available that were
22   referenced at the meetings.
23       Q.    You used the word "generally" there.
24   Specifically, were there any other follow-up
25   emails or documents that you shared or

1                           E. EICHENHOLTZ
2       exchanged that refer to other -- that were of
3       another nature or that referred to other
4       materials or contained other discussions than
5       what you just testified?
6           A.      None that I can recall.
7           Q.      And in the prior -- in affidavits
8       that you've submitted that you referenced, you
9       also mentioned that you had relied upon books
10      and records of the City of New York in the
11      course of preparing them.
12          A.      Yes.
13          Q.      And can you please, you know, tell
14      us what the nature was of those books and
15      records?  Which books, which records?
16          A.      Generally, of -- it would generally
17      be, like, things like the FAQ document; it
18      would be, for example, if in a few of them
19      I've had to discuss, like, we've done X number
20      of appeals and Y number of, you know,
21      decisions and we have -- and there were
22      similar documents about the statistics, the
23      number of RAs that had been requested, and I
24      have access to the number of appeals filed
25      with the panel, how many they've decided and

1          E. EICHENHOLTZ
2    the like, I would often consult with those.
3    If it was a specific case, I might review, to
4    understand what the panel's votes were, I
5    might review the panel votes and notes from
6    that case, and that would be a book and
7    record, obviously.  So it's those sorts of
8    things that I would be reviewing in
9    preparation of that, of those declarations and
10   affirmations.
11       Q.    And are you familiar at this time
12   with the numbers involved with the -- well,
13   I'll ask it in a different way.
14            How many religious accommodation
15   requests were lodged with, you know, putting
16   all of the City agencies together?
17       A.    So offhand, I don't know the number
18   of requests.  I can tell you the number of
19   requests that made it to appeal, that were
20   filed with either the Citywide Panel -- and
21   this, I should mention, very important, as I
22   mentioned this earlier, but I don't want us to
23   get confused, as you mentioned, the Department
24   of Education was under a separate set of
25   rules, and it is -- while there is mayoral

1                    E. EICHENHOLTZ
2       control in the Department of Education, it is
3       a separate entity for many purposes.  So when
4       I talk citywide here, I am excluding the
5       Department of Education, right?
6                    So I know that there were roughly
7       about I believe between 6,500 and 7,000
8       appeals filed.  I do not know, I'm not privy
9       to the current numbers as to how many total
10      religious reasonable accommodations were
11      requested.  I know it approached 10,000, I
12      don't know if it reached there, but I could
13      tell you with respect to those, those are the
14      approximate numbers with respect to religious
15      reasonable accommodation appeals.
16          Q.    And so, when you refer to about
17      10,000 requests, that's at the agency level,
18      the initial level, or at some other level?
19          A.    That is at the agency level, yes.
20          Q.    How many cases have been adjudicated
21      to date by the Citywide Panel?
22          A.    To date, it is roughly I believe
23      somewhere around, fully adjudicated, 3,200
24      cases.  Partially adjudicated at this point,
25      another 1,015.

1          E. EICHENHOLTZ

2     Q.    And what does it mean to be

3  "partially adjudicated"?

4     A.    So the panel is composed of three

5  different agencies, so those are cases in

6  which one or two agencies have voted --

7  actually two agencies have voted.  If we do

8  one agency, I think we're somewhere around

9  7,000.  But there are three agencies.  And so,

10  partial adjudications are one of the agencies

11  has reviewed and voted on that case, and one

12  or two agencies has not, so it is not ready

13  for us to issue our final decision.

14     Q.    And do you have an estimate as to

15  when all these decisions will be finally

16  adjudicated?

17     A.    I -- because I can't really, you

18  know, predict the time it takes for -- I've

19  very much gotten out of the prediction

20  business.  We are working as promptly and

21  efficiently as we can, but we also want to

22  make sure we do our review correctly.

23     Q.    So is the Citywide Panel created by

24  a regulation or ordinance?

25     A.    No.

1                    E. EICHENHOLTZ

2        Q.      And why not?

3        A.      I think the context that's really

4    important here is that it has two

5    characteristics.  One is that it is created in

6    response to a order issued in the context of a

7    public health emergency for which there was a

8    compelling public health reason that there be

9    quick and lawfully compliant implementation.

10   So it was a matter of just creating the

11   structure, advising of the structure.  And the

12   other piece is that it is very limited in its

13   scope and function.  It is, although we've

14   added on, as you are well aware, several

15   hundred Department of Education appeals, but

16   our primary focus is to hear appeals of the

17   Department of Health mandate that affected

18   existing City employees on October 20, 2021.

19   It's a very limited function in that regard.

20       Q.      Sure.  Just getting a little more of

21   the statistics involved with the panel's

22   burden, how many cases to date have been

23   denied, requests for religious accommodation?

24       A.      I cannot break it out between

25   religious and medical.  I don't have access to

1          E. EICHENHOLTZ
2    those numbers.  I can -- I know denials and I
3    know approvals, but I don't know how many of
4    them would be religious or how many of them
5    would be medical.
6         Q.    So then how many in total
7    religious -- not religious, I'm sorry.
8              How many in total accommodation
9    requests or appeals have been denied by the
10   Citywide Panel to date?
11        A.    First off, with the context that
12   these numbers literally change by the day,
13   obviously --
14        Q.    Well, I get it.
15        A.    -- we are -- and that's why I'm
16   going to give you a rough number.  Were
17   roughly around 3,200 appeals that were denied.
18        Q.    And how many were granted?
19        A.    Roughly 100.
20        Q.    And do you know the statistics with
21   respect to what percentage of the appellants
22   in these appeals had raised religious
23   accommodation requests and what percentage had
24   raised medical accomodation requests?
25        A.    It fluctuates as the appeals came

1                    E. EICHENHOLTZ

2    in, but the vast majority were religious.  It

3    was somewhere between 80 to 85 percent of

4    appeals were religious reasonable

5    accommodations.

6         Q.    And in terms of the grants, do you

7    know the numbers of religious versus medical

8    accommodation cases that were involved, either

9    specifically or at a reasonable estimate?

10        A.    As I say, I can't.  I don't have

11   that break down.  I can tell you a substantial

12   number of our grants were religious reasonable

13   accommodations.  Whether it's 85 percent or

14   something -- you know, or somewhere around

15   there, I couldn't say that for certain.

16        Q.    Now, 100 as opposed to 3,200, it

17   seems like a small percentage of the appeals

18   were granted.  And how do you explain that?

19        A.    I think context here is very

20   important.  We are not getting every

21   reasonable accommodation request submitted,

22   right?  We are getting virtually 100 percent

23   because most people appealed, but every single

24   accommodation we get has already been denied

25   by an EEO officer.  Certainly, if we also --

1          E. EICHENHOLTZ
2     for example, the agencies have the right to
3     appeal a grant of a reasonable accommodation,
4     I'm certain our grant rate would be higher
5     than it is.  So you're taking something that's
6     100 percent denial, and it's already been
7     reviewed and information gathered and
8     carefully considered, you would expect that a
9     substantial number -- you'd expect the sort of
10    numbers we have, right?  If they were
11    significantly higher than these sorts of
12    numbers, it would be a question as to what the
13    EEO officers were doing or not doing.  So
14    it's, you know -- I think of it like an
15    appellate reversal rate.  You wouldn't expect
16    appeals courts to reverse even, you know, even
17    a third or a majority of cases.  Then
18    something would be wrong.
19         Q.    Who has to -- who can provide us
20    with current accurate statistics with respect
21    to the number of grants and denials and the
22    percentages that were religious and medical
23    accommodation matters?
24         A.    Well, certainly that data exists.  I
25    think the question really would be how we

1                    E. EICHENHOLTZ
2      would go about cutting it in the way you'd
3      want to cut it there, because it is not -- at
4      least I do not have access to data cut in that
5      particular way.
6           Q.    And who in your organization would
7      be the person who would be performing that
8      function?
9           A.    Well, is this in regard to appeals,
10     or is this in regard to reasonable
11     accommodations overall?
12          Q.    With respect to appeals.
13          A.    With respect to appeals, generally
14     we would -- it wouldn't necessarily be a
15     person.  We would generate a report from the
16     system we are using to facilitate the appeal
17     process, the database system we're using.
18          Q.    And who would be able to provide
19     that information with respect to all
20     accommodation requests?
21          A.    We have -- the Department of
22     Information Technology and Telecommunications
23     would do it, host the database, I believe they
24     have a vendor working with them, and we would
25     put the request in to that vendor, and the

1                  E. EICHENHOLTZ

2    vendor would run the reports, as we needed it.

3        Q.    Now, is the Citywide Appeals Panel

4    within the organizational structure of any of

5    the departments or agencies or other organized

6    entities that are a part of the City?

7        A.    No, it's -- I view it, and I think

8    structurally it is sort of a collaboration

9    between the agencies that vote, and there

10   are -- when it comes to citywide personnel

11   policy and various citywide matters, there are

12   agencies that oversee various, you know,

13   aspects of that.  So the Law Department

14   obviously is the City's legal oversight.  The

15   Department of Citywide Administrative Services

16   is personnel, EEO policy oversight.  So those

17   agencies basically have responsibility to make

18   sure this is implemented properly.  The panel

19   itself essentially steps into the shoes of the

20   agency head of the various City agencies who,

21   under the City's EEO policy, would ordinarily

22   decide the appeal of a reasonable

23   accommodation request.

24       Q.    So, I'm sorry, but I don't

25   understand that answer at all.

1                    E. EICHENHOLTZ

2          A.    Okay.  I'll try and explain it.  If

3     you ask me a clarifying question, I would be

4     happy to clarify.

5          Q.    So, first of all, who's in charge of

6     the Citywide Appeals Panel?

7          A.    As I said, it's collaborative.

8     Obviously, I've been doing, as the Law

9     Department representative, I've been doing a

10    lot of the work in organizing the meetings and

11    moving the panel process forward.  I have

12    worked with Sanford Cohen, who is the general

13    counsel at DCAS, who is also working with me

14    on sort of oversight and quality control work

15    on the process.  And other than that, it is a

16    collaborative effort of the various agencies,

17    and particularly the panel members, to move

18    the appeals process forward.  So, you know, I,

19    as well as Mr. Cohen will review the stats,

20    the cases, we'll confirm when the cases are

21    ready to go out, things like that, and move

22    the process forward in that administrative

23    respect.

24          Q.    So is no one, then, in charge of the

25    Citywide Appeals Panel?

1              E. EICHENHOLTZ

2        A.    No one individual?  No, there's no

3   one individual in charge of the Citywide

4   Appeals Panel.  We obviously report to our

5   respective agency heads, but there is -- and

6   obviously, there's a mandate and a directive

7   that we do our work.  But we all report, with

8   respect to our work, to our respective

9   supervisors at the agency.  So with respect to

10  my work in the panel, I would report to the

11  Corporation Counsel of the City of New York,

12  and Mr. Cohen would report to the Commissioner

13  of the Department of Citywide Administrative

14  Services.

15       Q.    So your personal authority is

16  limited to the work that is performed by the

17  members from the Law Department, and Mr. Cohen

18  has authority over the persons who come from

19  DCAS, and other administrative heads have

20  authority over the CCHR, you know, component?

21  Is that your testimony?

22       A.    Yes.  And in terms of

23  process-related questions and decisions, we'll

24  discuss them collaboratively at the various

25  agencies.  So there's never been a need sort

1                    E. EICHENHOLTZ

2     of to have one final decision-maker in the

3     process.  You know, again, we function the way

4     I envision it, we function very much like an

5     appellate court.  And while there is a chief

6     judge who has an administrative role, all the

7     judges have both the authority and discretion

8     to review cases and exercise their -- that

9     level of discretion as they see appropriate,

10    given the mandate and the constraints of the

11    law and the policies we're talking about.

12         Q.    So you would oversee and give

13    quality control with respect to the decisions

14    that are -- votes that are made by members of

15    the Law Department?

16         A.    Oh, okay, now I understand where the

17    confusion is.

18              No, I will -- Mr. Cohen and I have

19    an additional oversight role where we will

20    review every case after all three votes are in

21    for administrative and quality control

22    purposes, and basically confirm they are ready

23    to go out and, you know, they're in regular

24    form and order and things like that.

25         Q.    And so, you personally have reviewed

1          E. EICHENHOLTZ
2     every case that has gone out with a grant or a
3     denial of an appeal?
4          A.    Well, in the oversight role, I
5     review half of them; Mr. Cohen reviews half of
6     them?
7          Q.    So when you have done that, on the
8     average, how much time have you spent on each
9     case?
10         A.    In the oversight role or in
11    reviewing and deciding a case?  I just want --
12         Q.    In the oversight role.
13         A.    In the oversight role, it doesn't
14    take very much time.  Sometimes, you know, a
15    minute or two.  What you're doing in the
16    oversight role is just making sure that the
17    votes and the comments are in order, assigning
18    a decision code and confirming the case is
19    ready to be sent out.  So it doesn't --
20    doesn't take very long at all.
21         Q.    So do you review the substance of
22    the work that is done by the persons who cast
23    the votes?
24         A.    No.  The people responsible for the
25    substance of that review are the individuals.

1                    E. EICHENHOLTZ

2       The review of that work -- so if I see, for

3       example, a decision or a vote that I

4       personally might disagree with, given the

5       facts and circumstances of the case, that's

6       not my function in the oversight role to say,

7       hey, I wouldn't vote the way you voted in this

8       case.  My job is to make sure that the

9       agencies voted, the agency reps voted, and

10      that their votes are properly recorded and

11      that we are, you know, properly sending out

12      the case as a denial or an affirmance and that

13      that's accurate.  It's more of an

14      administrative, ministerial role at that

15      stage.

16           Q.     What does that --

17           A.     To be clear, if there was some

18      substantive issue I would flag, I would speak

19      with the panel member and say, for example,

20      and this has happened on occasion, you know,

21      their notes don't seem to match their vote.

22      So, you know, you see a rejection and the

23      notes suggest that they're approving, I would

24      go back to that panel member and say, please

25      review this to confirm it's accurate before we

1            E. EICHENHOLTZ
2    send it out.  But I wouldn't, like, say, oh, I
3    think you meant to do what you said in your
4    comments, or I think you meant to do what you
5    said in the vote.  That's up for them to
6    review and to confirm whether it's accurate or
7    not.
8        Q.    What if the vote or the comment that
9    supported the vote was purely inconsistent
10   with the evidence of the case?  Would you flag
11   that?
12       A.    Generally, I'm not doing that level
13   of review because that is the function of the
14   three agency voters on any given appeal.  I
15   am -- you know, and I perform that function,
16   as you're aware, in many cases.  But it is
17   their job to review the evidence and to make a
18   determination based on their review of the
19   evidence and the record that's been presented
20   to us.
21       Q.    Mr. Eichenholtz, just stepping aside
22   for a second, at times it looks as if you are
23   reading something when we are -- when you're
24   answering a question, and I'm wondering, are
25   you reading something as you answer these

1                    E. EICHENHOLTZ
2     questions, or have you been?  And have you
3     been typing notes to anybody?
4          A.    Absolutely not.  I think what you
5     are seeing is the camera is oriented higher
6     than my face.  I'm looking at the screen, not
7     the camera, so the angle of the camera has my
8     eyes looking at the computer screen.  I'm
9     actually looking right at you, Mr. Nelson,
10    when you're asking questions, and I have my
11    Zoom in gallery view, so you're sort of off to
12    the right-hand, top corner of my screen.
13         Q.    Thank you for that explanation.
14         A.    No problem.
15         Q.    You mentioned also that the panel is
16    reviewing DOE denials as a result of the
17    second circuit decision.  And have you been
18    reviewing them with the same appellate style
19    review that you described, taking into account
20    the fact that all of those cases were denied
21    prior to coming to the Citywide Appeals Panel?
22         A.    Those cases were -- what we've done
23    in those cases, there was a slightly different
24    approach.  When we got those cases -- and when
25    I say "those cases" right now, I'm talking

1                    E. EICHENHOLTZ

2      about the first 14 named plaintiffs which we

3      were assigned following decision of the second

4      circuit.  You know, it was clear to us that

5      what the DOE and the award there had done did

6      not exactly mimic what the agencies had done.

7      But we reached out both to the employees and

8      to the Department of Education to get more

9      information about the nature of their appeals

10     to try and make sure that the records were

11     more fulsome.  So the employees -- those 14,

12     the employees were asked a series of questions

13     about their requests to give us some more

14     information.  Sometimes it duplicated material

15     they had already provided the arbitrator,

16     sometimes it did not.  And the Department of

17     Education was asked to give more information

18     about why they were denying the request.  We

19     reviewed that record so that we could do more

20     of an appellate style review.

21          Q.    Now, with respect to the information

22     you got in that process from the DOE, did you

23     provide that information to the appellants?

24          A.    No.

25          Q.    Why not?

1          E. EICHENHOLTZ

2      A.    Because the purpose of obtaining

3   that information was to allow the panel to

4   understand the relevant facts of the case.

5      Q.    Would it not have been useful to the

6   appeals panel to also understand or to receive

7   the point of view of the plaintiffs with

8   respect to the accuracy or completeness or,

9   you know, correct interpretation of the

10  material that the Department of Education was

11  providing?

12     A.    Yes.

13          MR. HAIDER:  Objection.

14          THE WITNESS:  Thank you.  Sorry

15     about that.

16     A.    Yes, and that is why we made inquiry

17  of the individuals.

18     Q.    So you made inquiry of the

19  individuals after you received materials from

20  the DOE?

21     A.    No, we made inquiry from both

22  parties.

23     Q.    So did you examine whether or not

24  due process required you to get input from the

25  plaintiffs with respect to the information

1                    E. EICHENHOLTZ

2       that's being provided to you by the DOE?

3    DI           MR. HAIDER:  Objection.  Objection.

4             This question appears to be outside the

5             scope of the order here.  We're at --

6             we're getting into legal questions with

7             respect to the DOE appeals, specifically.

8             This is not within the scope of the

9             Citywide Panel's process of reviewing or

10            the standards that it applies.

11                 So I'm going to instruct my witness

12            to not answer -- the witness to not answer

13            this question.

14            Q.    So how did the process that the

15       panel followed with respect to the other DOE

16       employees, some -- at least one or two of

17       which are involved in the instant lawsuit,

18       differ, if it did differ in any way, from the

19       treatment that the panel gave to the 14 from

20       the Kane and Kyle lawsuit?

21            A.    So other than that a lot of those

22       inquiries became a more standard part of the

23       process, and I think it was gathered by the

24       DOE and sent to the panel rather than the

25       panel needing to reach back out to everyone

```
 1                    E. EICHENHOLTZ
 2      and say, please do this.  That was a
 3      significant difference.
 4           Q.    So the DOE provided additional
 5      information with respect to those persons?
 6           A.    Yes, both on behalf of the DOE and
 7      based on information they collected from those
 8      persons.
 9           Q.    And those persons were not
10      confronted with that information or given an
11      opportunity to rebut it?
12           A.    Confronted in what way?
13           Q.    Well, did you send the information
14      that you had received from the DOE to the
15      other appellants from the DOE to get their
16      comments?
17           A.    No.  This isn't a litigation, you
18      know, an adversarial litigation.  It's a
19      cooperative dialogue, it's a reasonable
20      accommodation process.
21           Q.    So if it's a dialogue, did you reach
22      out orally or in some other way to the
23      appellants to get their views with respect to
24      the information you received from DOE?
25           A.    So just to be -- we're talking about
```

1                    E. EICHENHOLTZ
2      the 500-and-so DOE individuals who were doing
3      their -- they're having essentially the review
4      of the earlier denial from the arbitration
5      ordered by the panel?  That's what we're
6      talking about here?
7           Q.    I don't think you captured it quite
8      correctly.
9           A.    Okay.  I want to hear from you
10     what -- because I want to make sure I'm
11     accurate.
12          Q.    So in tandem with the Second
13     Circuit's order sending the 14 Kyle and Kane
14     plaintiffs to the Citywide Appeals Panel, the
15     Law Department agreed that access to the
16     Citywide Appeals Panel would also be provided
17     to those persons who not only went through the
18     initial stage, but also filed an appeal and
19     were denied in the DOE reasonable
20     accommodation process.
21          A.    Uh-huh.
22          Q.    So with respect to those add-on
23     persons, the persons who were not plaintiffs,
24     not named plaintiffs in the other litigation,
25     did the Citywide Appeals Panel engage in a

```
1                    E. EICHENHOLTZ
2     dialogue with them with respect to the
3     information that the panel received from the
4     DOE?
5          A.    The Citywide Appeals Panel reviewed
6     the appellate record that it was provided by
7     the DOE with the information from the DOE and
8     from the employee.
9          Q.    But you'd indicated that the DOE
10    also was provided additional information that
11    had not been a part of the proceeding below?
12         A.    Right.  Not -- general -- not
13    always, but yes, they had the opportunity to
14    do so.
15         Q.    And did the panel members engage any
16    kind of a dialogue, whether written or oral,
17    with the other 500 or so appellants from the
18    DOE?
19         A.    Yes, we received responses to
20    queries in writing that the DOE gathered.
21    What follow up the DOE did or did not do, I
22    could not tell you before providing the
23    records to us on the panel.
24         Q.    So I'm not understanding.  I thought
25    that you had said that the panel engaged in a
```

1                    E. EICHENHOLTZ
2      dialogue; not the DOE engaging in a dialogue
3      with the appellants.
4                MR. HAIDER:  Objection.
5          Q.    So I'm asking you to clarify this.
6          A.    Okay.  So what I said was, a
7      reasonable accommodation is a cooperative
8      dialogue; it is not an adversarial process.
9      So I would not ordinarily -- it is not a
10     standard part of a reasonable accommodation
11     cooperative dialogue to have, you know --
12     generally, the person gathering the facts will
13     speak with the employee, will gauge the needs
14     of the employer, and reach a determination.
15     It's not like this, you know, confrontational
16     back and forth, and that's what you were
17     describing, so that's what I was trying to
18     express there.  And I was really talking more
19     about the information-gathering stage, which,
20     as I said, is generally the agency level.  And
21     with respect to DOE employees, we were asking
22     DOE to query their employees to gather that
23     information so that we had as full a record as
24     possible for our review.
25         Q.    Okay.  With respect to appellants

1                    E. EICHENHOLTZ

2      who are not from the DOE, did the Citywide

3      Appeals Panel reach out to any of them to

4      obtain information that was not in the record

5      below?

6          A.    So I'm going to say, because I

7      think -- so the panel will ask the agency to

8      do that.  Again, the panel is performing an

9      appellate function, and so if we believe

10     additional cooperative dialogue is necessary,

11     we would essentially, in essence, remand to

12     the agency for cooperative dialogue, which

13     means we will send, and any one panel member

14     can request this, a request that the agency

15     engage the employee in a specific way with a

16     specific question or a specific issue.  The

17     employee would then have that dialogue and

18     then report back to the panel, generally

19     upload any documentation of that exchange for

20     our review so that we can consider it when

21     rendering a final decision on the appeal.

22         Q.    And in how many cases did any panel

23     engage in making that request and sending the

24     matter back on rematch of the agency?

25         A.    Hundreds.

1                    E. EICHENHOLTZ

2        Q.     I'm sorry?

3        A.     Hundreds.

4        Q.     Hundreds.  Okay.

5               MR. HAIDER:  Mr. Nelson, just could

6        we take a ten-minute break at this point?

7               MR. NELSON:  That's fine, sure.

8        Thank you.  We'll reconvene in ten

9        minutes.

10              THE VIDEOGRAPHER:  We're now going

11       off the record.  The time is 10:14.

12              (Recess was taken.)

13              THE VIDEOGRAPHER:  Back on, the time

14       is 10:25.

15   BY MR. NELSON:

16       Q.     So welcome back, Mr. Eichenholtz.

17       A.     Thank you.

18       Q.     So we were just talking about

19    contrasting the DOE people who were not in the

20    Kane/Kyle named plaintiffs and those other 14

21    people.  And there's a series of concepts with

22    which I'm absolutely certain you're familiar,

23    as an experienced lawyer, with respect to the

24    appellate review standards that are not the

25    kind of standards we're talking about in

1          E. EICHENHOLTZ

2    terms, you know, of how do you get a religious

3    accommodation, but rather, what approach does

4    the person who is deciding a case on appeal

5    take toward the decision below.  So for

6    example there, there is an abuse of discretion

7    standard which is used in some kinds of cases.

8    There is a de novo standard which is used in

9    other kinds of cases.  And there's a range of

10   other sort of intermediate kinds of standards.

11           So what appellate review standard

12   does the Citywide Appeals Panel utilize in

13   its -- in the cases that are not the Kane/Kyle

14   cases?

15       A.    It uses -- yeah, and I agree with

16   you, Mr. Nelson, you can't exactly get

17   precisely the same analogy, but it is akin to

18   a de novo standard.  We are reviewing and

19   doing sort of an independent and open-minded

20   review of the record, mindful of the agency's

21   grounds, excuse me, for denying the reasonable

22   accommodation that we're seeing on appeal.

23       Q.    And so, how much consideration --

24   sorry.  Strike that question.

25           And why is it -- I mean, can you

1                    E. EICHENHOLTZ

2       explain why on a de novo standard only

3       100 cases would have been granted out of the

4       more than 3,000 before you to decide or --

5                    MR. HAIDER:  Objection.

6           Q.     -- not quite that many?  Just to see

7       if I got the numbers --

8           A.     Right.  I refer you to my earlier

9       answer.  100 percent of the cases the panel

10      sees was -- were denied after a conscientious

11      review by a trained EEO professional.  I would

12      not imagine a much more significant amount of

13      reversals there because we, in the City of New

14      York, train our EEO officers and our

15      Disability Rights Coordinators and the various

16      personnel who review reasonable accommodation

17      requests how to do it.  So if they're reaching

18      a conclusion of denial, generally there is a

19      basis for that; obviously not in every case,

20      but generally there is.

21          Q.     Now, in some of the cases that were

22      decided at the agency level, the agency

23      instructions gave two options to the employees

24      who were asking for accommodations.  They have

25      an option to go to an arbitration using the

1                    E. EICHENHOLTZ
2     arbitration standards that were referenced in
3     Kane and Kyle, and they had an option to go to
4     the appeals panel.  So did the appeals panel
5     review any of the cases that were decided by
6     arbitrators outside of the Kane/Kyle cases?
7          A.     And when you say "the Kane/Kyle
8     cases," again, I don't want us to get
9     confused, you're talking about the 14
10    plaintiffs or the additional 500-and-so that
11    the panel reviewed?  You're talking about that
12    whole universe when you say "the Kane/Kyle
13    cases," or are you talking about the 14?
14         Q.     In this question, yes, the whole
15    universe.
16         A.     The whole universe.  So outside the
17    whole universe of those cases -- I hate to do
18    this, Mr. Nelson, I'm sorry, what was the
19    question?  I lost it.  I'm trying to figure
20    out what universe we were talking about.
21         Q.     Understood.
22                So in some of the cases from many of
23    the agencies, the employees are given the
24    option either to go through an arbitral
25    proceeding using the Kane/Kyle standards, that

1          E. EICHENHOLTZ
2     is to say the arbitral standards on the one
3     hand, or they were given an option to pursue
4     an appeal to the Citywide Appeals Panel.  So
5     outside of the people from the Department of
6     Education, did the appeals panel consider any
7     appeals from decisions that had been rendered
8     by an arbitrator under the arbitral process?
9          MR. HAIDER:  Objection.
10        A.    Yeah, and that's not quite how they
11    worked on the non-DOE basis.  The arbitral
12    process was not, even though it was the
13    same -- there were arbitrators that made that,
14    the arbitrators were essentially the option
15    for appeal.  In all cases with respect to the
16    October 20, 2021 Commissioner of Health order
17    that concerned City employees, the agency made
18    a determination in the first instance.  So you
19    didn't -- you know, you couldn't skip the
20    agency level by going to arbitration.  It's
21    when you were denied by the agency and you
22    were covered by a union that had reached an
23    arbitration agreement through collective
24    bargaining, you could appeal to an arbitrator
25    rather than the Citywide Panel.

1                    E. EICHENHOLTZ

2        Q.    And so, you're saying that after the

3    arbitrator decided, there was no further

4    recourse to the Citywide Appeals Panel for

5    those people?

6        A.    No, no, no, no, you had to decide

7    after it was denied which path you wanted to

8    take, whether you wanted to appeal to the

9    Citywide Appeals Panel or whether you wanted

10   to appeal to the arbitrator.  The arbitrator,

11   arbitration by its definition is binding.

12   There was no appeal after the arbitrator back

13   to the Citywide Appeals Panel.  So it was, you

14   know, it ended with the -- that path ends with

15   the arbitrator.

16       Q.    Now, the DOE people who -- the 500,

17   let's say that number which is an estimate for

18   all the people who are named plaintiffs in the

19   Kane/Kyle matter, all of those 500 had had

20   their denials below adjudicated under a set of

21   standards that the second circuit had found to

22   be faulty.

23       A.    Correct.

24             MR. HAIDER:  Objection.

25       A.    Correct.

1                    E. EICHENHOLTZ
2                MR. NELSON:  Just as a predicate for
3          the question I'm about to ask, Mr. Haider.
4          I think I understand your objection
5          though.
6          Q.    So did the Citywide Appeals Panel
7     treat the record below or the decisions that
8     were made below in respect of those 500 or so
9     DOE employees any differently than it treated
10    the appeals from the other City agencies?
11         A.    No.  That was -- the whole point was
12    our, function when we got those cases was to
13    look at the record and review and resolve them
14    under the standards set forth by Title VII,
15    the State Human Rights Law and the City Human
16    Rights Law, rather than whatever standard had
17    been set forth in the arbitration process that
18    the arbitrators used.  It was precisely to
19    give that fresh look, and we understood that,
20    and we did not take into account any standard
21    or qualification or whatever you want to
22    characterize it as that was present at the
23    arbitration stage of the process.
24         Q.    So you were -- Citywide Appeal Panel
25    members, then, did not take into account the

1                    E. EICHENHOLTZ

2    fact that the standards that had been applied

3    below to DOE cases were [inaudible]?

4              MR. HAIDER:  Objection.

5         A.    I don't -- we didn't -- we -- we

6    were -- we reviewed it as if we were getting

7    the record from the agency and we were making

8    the appellate determination; that the agency

9    was denying the request and that we were

10   making the appellate determination of whether

11   or not the agency was right to deny it.  And

12   we applied the same standard in those cases

13   that we applied to all of the other appeals

14   that we reviewed.

15        Q.    Were the individual members of the

16   Citywide Appeals Panel who were adjudicating

17   DOE cases given any information about the

18   different standards that had been employed

19   below in the DOE religious accommodation

20   determinations than had been applied below to

21   accommodation requests made to the other

22   agencies?

23              MR. HAIDER:  Objection.  And I just

24        want to note as to the form, the use of

25        the word "below" here, are we referring to

1              E. EICHENHOLTZ
2         the agency or the arbitration?
3              MR. NELSON:  So you know what?  I'm
4         going to rephrase that question.
5              THE WITNESS:  Okay.
6              MR. NELSON:  So I withdraw it.
7         Q.    At the agency level, which in terms
8    of an appeal, I would characterize sometimes
9    as being the level below, at the agency level,
10   were the initial decisions being made on the
11   basis of the arbitral standards or on some
12   other basis?
13        A.    On the basis, as I understand it, of
14   the Title VII standards, and that was one of
15   the reasons we asked the Department of
16   Education to advise us what their basis for
17   denial was, because it could not and would not
18   be that the arbitrator had previously denied
19   the case.
20        Q.    And in the conversations that you
21   had with agencies prior to their making
22   initial decisions with respect to the
23   religious accommodation requests, did you
24   instruct them with respect to the Title VII
25   standards?

1                    E. EICHENHOLTZ

2        A.      In the sense that -- and when I say

3     "you," by the way, I'm going to be a little

4     more generic here.  I don't know if the words

5     came out of my mouth or someone else's mouth.

6     We pointed the agency officers to the EEOC

7     Guidance that existed, as well as the FAQs

8     that DCAS had prepared.  Those were their

9     resources.

10               Again, I think it's important to

11    remember that the crowd we're talking to are

12    people who are EEO professionals, who do this

13    for a living, who are trained in reasonable

14    accommodation and adjudicative processes and

15    other related staff who are under the

16    supervision and instruction of those

17    individuals.  So it was not really necessary

18    to sort of give a Reasonable Accommodation 101

19    to the group.  It was sort of to say, here's

20    sort of how the standard is being -- here's

21    the guidance for how to apply the standard in

22    the context of COVID-19 vaccination.

23        Q.      Do you have any records of the

24    meetings in which these instructions with

25    respect to Title VII or other standards were

1                    E. EICHENHOLTZ
2      being given to agency personnel, you know, in
3      connection with the formation of this citywide
4      appeals process and RA process for COVID-19?
5           A.    That was --
6                MR. HAIDER:  Objection.
7           A.    Yeah, that was the FAQ I was
8      describing.  And I -- it's challenging for me,
9      I will say, just generally because, again, I
10     hear you severing off the Citywide Appeals
11     Panel.  I'll say it again:  The Citywide
12     Appeals Panel is the appellate stage of a
13     broader process.  We did not at any point,
14     that I can recall, focus EEO officers,
15     agencies on the appeal panel in its process.
16     But overall, the overall process and how it
17     was going to work mechanically was what was
18     being discussed.
19          Q.    And did you discuss routinely with
20     the agency personnel, with whom you were
21     discussing the first stage of this process,
22     the heightened standards that are provided in
23     the New York State and New York City Human
24     Rights Laws for the determination of religious
25     accommodation requests?

1          E. EICHENHOLTZ

2          MR. HAIDER:  Objection.

3     A.     We were following the guidance of

4     those agencies.  They had, in the context of

5     this public health emergency, being, adopting

6     the guidance provided by the EEOC.  But the

7     City's EEO policy, obviously since the City

8     Human Rights Law is our law, makes great note

9     of the different standards and things like

10    that.  But in terms of the guidance of the

11    application with respect to COVID-19

12    vaccination, my understanding is that both at

13    the state and city level was that they were

14    adopting the policy guidance provided by the

15    United States Equal Employment Opportunity

16    Commission.

17    Q.     And how did you learn that?

18    A.     In conversations with the agencies,

19    and I believe they had posted that guidance

20    publicly at various stages, but I don't

21    recall, specifically.

22    Q.     And is it your understanding that

23    the New York State and New York City Human

24    Rights Laws were altered or modified in some

25    way with respect to the way in which undue

1                        E. EICHENHOLTZ
2      hardship for the agency had to be determined?
3          A.    Not that I'm aware of.
4          Q.    So the way the law is written is the
5      way that it should have been applied.  You
6      would agree with that?
7          A.    Well, I think the City Commission on
8      Human Rights, in discussing how to apply it in
9      this context, you know, was referring back to
10     the EEOC.  But yes, I mean, the law as it's
11     written applied.  There was no suspension of
12     the law or anything like that.
13         Q.    So with whom did you have
14     discussions about these questions in the New
15     York City Human Rights Law Department?
16         A.    What's the New York City Human
17     Rights -- I'm not familiar with that.
18         Q.    You're not familiar with the New
19     York City Human Rights Law?
20         A.    I'm familiar with the New York City
21     Human Rights Law.  You're asking if I had
22     conversations with the law.  I don't know
23     what you mean.
24         Q.    I used the word department, I'm
25     sorry.

1          E. EICHENHOLTZ
2          Did you have discussions concerning
3     the way that the New York City Human Rights
4     Law ought to be applied consistent with the
5     equal opportunity law of the federal
6     government, did you have those conversations
7     with people from the City Commission on Human
8     Rights or other human rights officials with
9     the City?
10        A.    Yeah, I'm certain either directly or
11    indirectly.  I either directly had a
12    conversation or I was advised indirectly that
13    the commission had been consulted at some
14    phase by DCAS or some other agency.  I could
15    not tell you, as I sit here today, how that
16    came about.
17        Q.    And can you identify any individuals
18    with whom you spoke from those human rights
19    departments of the City?
20        A.    On that topic, no, I could not, as I
21    sit here today, tell you I spoke with this
22    specific person or that specific person.
23        Q.    But your understanding with respect
24    to how the Citywide Appeals Panel ought to
25    decide issues of undue burden, after

1               E. EICHENHOLTZ
2    conversation with those persons from the
3    City's human rights departments, what was your
4    understanding that you had after those
5    conversations?
6               MR. HAIDER:  Objection.
7        A.     Again, that we would follow the EEOC
8    Guidance with respect to specific
9    applicability of the COVID-19 vaccine mandate,
10   that we still, in the City, had an EEO policy
11   and reasonable accommodation guidance that was
12   generally applicable.  That was always my
13   understanding.  It remains my understanding to
14   this day.
15       Q.     So with respect to the issue of
16   undue hardship, what did you understand the
17   EEOC Guidance to be in the context with
18   COVID-19?
19       A.     Well, I understood that in order --
20   I view undue -- generally, I would expect that
21   if -- undue hardship is something that the
22   employer will raise in the context of a
23   reasonable accommodation request if it
24   determines that there is some greater than
25   de minimus burden on the agency's operations

1                    E. EICHENHOLTZ
2      that would articulate in some manner that
3      would prevent it from granting a religious
4      reasonable accommodation.  In a nutshell,
5      that's my understanding.
6          Q.    So was it your understanding that
7      the agency did not have to show a significant
8      hardship or burden --
9          A.    Yes.
10              MR. HAIDER:  Objection.
11          Q.    -- from the granting of an
12      individual's religious accommodation request?
13   DI         MR. HAIDER:  Objection.  I'd just
14          note that this question is directing the
15          witness' understanding rather than the
16          Citywide Panel's standards and process.
17          It's outside the scope.
18              So I would direct the witness to not
19          answer the question as to his
20          understanding.
21          Q.    Okay.  I'll ask the same question
22      with respect to what standard the Citywide
23      Appeals Panel was expected to apply.
24          A.    And I don't have the precise letter
25      and number in front of me, but it is -- there

1                    E. EICHENHOLTZ

2       is a discussion of undue burden with respect

3       to religious reasonable accommodations and the

4       COVID-19 vaccination in the EEOC Guidance, and

5       they were instructed to both review, apply,

6       and follow that guidance, the specific request

7       of vaccination exemption reasonable

8       accommodation request.

9          Q.    And with respect to the level of

10      burden that the agency needed to show, was it

11      something simply greater than the de minimus

12      or was it a substantial burden?

13             MR. HAIDER:  Objection.

14         A.    As I sit here today, I don't

15      remember the precise words; I don't remember

16      if it was substantial appears or not.  I do

17      not want to create a greater or lesser burden

18      than what the EEOC Guidance says by saying one

19      word or omitting a word.  Obviously, there had

20      to be some substance to the burden, whether

21      there was a legal term of art of substantial

22      or something in that regard.  As I sit here

23      today, it needed to be something and we needed

24      to see a, you know -- some sort of burden that

25      they were articulating and to evaluate whether

1                    E. EICHENHOLTZ
2    it was of substance, which we've done.  I
3    don't remember if the word "substantial" is in
4    that.  And again, I don't want to put words
5    that don't exist or remove words that do
6    exist.
7         Q.    So did you ever have any discussions
8    with or exchanges of correspondence with
9    individual panel members in which you
10   discussed the amount of burden that an agency
11   might be required to show?
12              MR. HAIDER:  Objection.
13        A.    I know in our regular check-ins, we
14   had discussed some issues with substantial --
15   with undue burdens -- no, substantial -- undue
16   burden and evaluating them in the context of
17   the various agencies that were making that
18   argument.  We had discussions, certainly, that
19   some agencies were not making that argument
20   and that we were proceeding to evaluate based
21   on, you know, the information the agencies
22   were giving us.  You know, but I can't tell
23   you specifically, like, that category, this
24   was said about that category.  We had general
25   discussions about undue hardship claims in

1                    E. EICHENHOLTZ
2       appeals during our check-ins.
3           Q.    I'll take just a moment of silence
4       while I find out where I am in my outline --
5           A.    Sure.
6           Q.    30-second-or-so delay that we're
7       going to have here.
8                 Did you ever discuss this issue of
9       how to evaluate undue burden in any emails
10      with individual panel numbers or with all the
11      membership of the Citywide Panel?
12          A.    No.  It would have been at our
13      weekly check-ins we were discussing it.
14          Q.    And were your weekly check-ins
15      recorded in any manner?
16          A.    No.
17          Q.    And why not?
18                MR. HAIDER:  Objection.
19          A.    Again, because the panel members
20      were there and were participating in the
21      discussion, and there was no identified need
22      to go back and review those discussions
23      afterward.
24          Q.    You spoke of "weekly check-ins."
25      And did you have a check-in weekly with

```
 1                    E. EICHENHOLTZ
 2     respect to the work with the Citywide Appeal
 3     Panel?
 4          A.    Yes.  It was weekly until roughly
 5     early to mid March.
 6          Q.    And who participated in these
 7     check-ins?
 8          A.    All the members of the Citywide
 9     Appeal Panel, so all the people who were
10     reviewing and voting on cases.
11          Q.    And these check-ins took place by
12     Zoom?
13          A.    Like I said, a videoconference.  I
14     can't recall at the moment whether it was
15     Zoom.  It may have been Microsoft Teams.
16          Q.    And were these conferences recorded?
17          A.    No.
18          Q.    And were notes taken?
19          A.    No.
20          Q.    And why not?
21               MR. HAIDER:  Objection.
22          A.    Again, as I mentioned a few moments
23     ago, these check-ins were meant to be somewhat
24     informal opportunities for the panel members
25     to confer, to discuss any questions, concerned
```

1                    E. EICHENHOLTZ

2       trends they had.  I also would often review

3       our progress in deciding cases, go through

4       some of the metrics and statistics.

5              The purpose of it really was to

6       bring the group together because a lot of the

7       cases -- obviously the cases, because we want

8       each panel member and each agency to bring

9       their own unique perspective, when they're

10      reviewing cases, they're reviewing them

11      individually.  So we wanted to have these

12      opportunities for everyone collectively, you

13      know, to share announcements, you know,

14      important developments, and to have the

15      opportunity to talk at a higher level about

16      various issues.

17          Q.    And among the things that you did in

18      these weekly check-ins, did you discuss how to

19      adjudicate cases in, you know, various kinds

20      of situations that had been presented in

21      individual applications?

22          A.    So generally, it wasn't one -- like,

23      in this individual case, you know, I

24      encountered this.  It was more about trends

25      and issues that people had encountered and may

1                        E. EICHENHOLTZ

2       have said, hey, I wanted to see what you all

3       thought, here is my thought process when I

4       encountered this issue.  And we'd have

5       conversations, respectful of the fact, as I

6       said, that everyone is entitled to their own

7       independent opinion and judgment on the

8       application of the [inaudible] fact and the

9       assessment of credibility, things like that.

10      So we would have those sorts of higher-level

11      conversations.

12                  Generally, the conversations about

13      specific cases were more procedural; I would

14      like more information on this issue or, you

15      know, from the agency, I would like more

16      cooperative dialogue on this; there seems to

17      be a missing document in this case, can you --

18      you know, someone follow up with the agency

19      and see what it is, more so than a discussion

20      of the individual panel member's assessment of

21      the merits of the appeal.

22          Q.    Were there also situations in which

23      the three persons who were assigned to vote on

24      a particular case, you know, spoke to each

25      other?

1                    E. EICHENHOLTZ
2          A.     Yes, that's happened.
3          Q.     And how frequent is that?
4          A.     That's rare.
5          Q.     Okay.  And what about engaging in
6     email communication?
7          A.     We will on occasion engage in email
8     communication, as well as, you know, Microsoft
9     Teams, we will send a message to the group.
10    You can do that, there's a function in Teams
11    that does that.  Our protocol is that when we
12    do so about a specific case, we include the
13    case number so that we can identify later on
14    if it's relevant to any inquiry that we
15    received, whether it's litigation related,
16    what have you, we can identify those
17    communications easily.
18         Q.     You used the word "protocol."
19         A.     Uh-huh.
20         Q.     Are there any protocols that are in
21    writing that are, you know, established by
22    your Citywide Appeals Panel?
23         A.     No.  As I've said, and I think I've
24    been, you know, as direct as I can about it,
25    this was a process developed in the context of

1                    E. EICHENHOLTZ
2       a public health emergency.  I can see in an
3       ideal world where we were spending months or
4       even years building it up and preparing it,
5       there would be manuals, protocols, you know,
6       rules and regs.  That's not how this went.
7               This was something where we had to
8       build the foundation off of the structure, you
9       know, make sure we're firm on the standards,
10      and then as we went along, as we encountered
11      things, we would discuss as a panel, you know,
12      we should do this in this situation or that.
13      In that situation, one of the things that
14      developed early on was that we generally were
15      working out of our database, but there were
16      times where we needed to communicate outside
17      the database and wanted to make sure those
18      communications were assessable, should we ever
19      need them moving forward.
20          Q.    What database are you using?  What
21      database program?
22          A.    Yeah, sure.  It's called SalesForce.
23          Q.    SalesForce?
24          A.    Yes.
25          Q.    Now, in one of your affidavits,

```
1                    E. EICHENHOLTZ
2       Mr. Eichenholtz, you used the word
3       "guidelines," and you applied it to consist of
4       two documents that you specifically
5       referenced.  One was the FAQ on New York City
6       Employees Vaccine Mandate, and you've already
7       referred to that document in this deposition,
8       and we could call it the FAQ.  And the other
9       was applying for a reasonable accommodation
10      from the COVID-19 vaccine mandate.
11           A.    Uh-huh.
12           Q.    You indicated that you had been at
13      least one of the people involved in drafting
14      the FAQ.
15           A.    Yes, yes.
16           Q.    And who else participated in that
17      drafting?
18                 MR. HAIDER:  Objection.
19           A.    Yeah, and like I said, I can tell
20      you the agencies rather than the individuals.
21      It would have been DCAS and OLR, the Native's
22      Office of Labor Relations would have been
23      involved in those drafts.
24           Q.    And so, they were also involved in
25      the applying for a reasonable accommodation
```

                            E. EICHENHOLTZ

1

2   document?

3        A.    Yes.

4        Q.    And you were involved in that, also?

5        A.    Yes.

6        Q.    Okay.  Now, have these guidelines

7   changed at all since the creation of the

8   Citywide Panel?

9        A.    I -- with respect to the Citywide

10  Panel, which is really what I'm here to

11  discuss, I don't believe so.  I could not tell

12  you if there were other elements of the

13  process that were altered, that were less,

14  shall we say, relevant to directly to my work.

15  I could not say for certain, as I sit here

16  today, whether other elements of it were

17  altered outside the scope of what we're here

18  to discuss today.

19       Q.    And both elements of the guidelines

20  appear on the internet.

21       A.    Uh-huh, yes.

22       Q.    How has information about the

23  existence of these guidelines been

24  disseminated?

25            MR. HAIDER:  Objection.

1    E. EICHENHOLTZ

2        A.    As I've said earlier, generally we

3    were disseminating it to the agency personnel

4    officers, the EEO officers, the general

5    counsel of the agencies, so those managers who

6    have responsibility in the areas that that

7    guidance covers, and how the agencies took

8    those, that guidance and directives, and that

9    was really up to the individual agencies and

10    how the individual agencies operated.

11        Q.    And you disseminated them by email

12    or by some other means?

13        A.    By email, by email.  I'm certain

14    there was an email, multiple emails probably

15    to the different groups, but there were

16    emails.

17        Q.    Aside from the quality control

18    review that you and Sanford Cohen give to

19    decisions, is there any oversight of the work

20    of the City Panel from anyone?

21            MR. HAIDER:  Objection.

22        A.    Yeah, I'm trying to, you know --

23    generally, no, because there is no -- you

24    know, there is general oversight of the

25    overall process by Department of Citywide

1                    E. EICHENHOLTZ

2      Administrative Services Law with respect to

3      legal or compliance, Office of Labor Relations

4      with respect to compliance with agreements,

5      but there's no sort of, like, super appeal

6      panel that reviews the work of the appeal

7      panel or, you know, an appeal panel manager or

8      something like that.

9           Q.    Do panelists on the individual

10     panels ever change their minds or their

11     comments in the course of deciding an appeal?

12          A.    Yes.

13          Q.    And is that reflected anywhere in

14     the record of the appeal?

15          A.    Yes.  As I understand it, all

16     changes to the comments would be logged in the

17     database.

18          Q.    So there is a spreadsheet that has

19     been provided to us that provides the

20     information from the database with respect to

21     the individual clients that we have in this

22     lawsuit.  There's a column that says Old

23     Value.  And is that column for the purpose of

24     providing comments that had been superceded?

25               MR. HAIDER:  Objection.

1         E. EICHENHOLTZ
2      A.    Yes.  As I understand it, that is
3   listing comments that have since been changed.
4      Q.    And if the column is blank, does
5   that mean that there's been no change in
6   position or that some material has been
7   deleted, or does it mean something else?
8      A.    Well, I -- so I just want to go --
9   if it is blank, it means the comment has not
10  been changed.  A change in a comment does not
11  necessarily reflect a change in position.
12  Most frequently, a change in a comment will be
13  because the Comment field is being used to
14  flag that there's been a follow-up request of
15  some kind so that a different reviewer doesn't
16  go in and vote and we wait -- and then it's
17  also flagged so the reviewer can go back in
18  and know -- and check to see whether the
19  agency has uploaded material in response to
20  the follow-up request.  So it's not
21  necessarily that, oh, I'm putting in one
22  position in the comment, now I'm changing my
23  position.  Comment field also is used for
24  flags as the case is being -- the appeal is
25  being decided.

1                    E. EICHENHOLTZ

2        Q.    How many individual members does the

3    Citywide Panel have at this time?

4        A.    So let me walk through it.  So there

5    are currently five people voting for the Law

6    Department, there are four people voting for

7    DCAS, there are two people actively voting on

8    the City Commission in Human Rights, and I

9    believe we just added one more person from the

10   Department of Health and Mental Hygiene, so

11   they're up to three.

12       Q.    Up to three now?

13       A.    Yeah.

14       Q.    Okay.

15       A.    They've gone back and forth because

16   they've had some personnel changes.

17       Q.    So you've indicated that the

18   personnel who are involved on behalf of the

19   Department of Health and Mental Hygiene has

20   changed.  What about from the other

21   departments?  Are the same people providing

22   votes now from law, DCAS, and CCHR that were

23   involved at the very start?

24       A.    Yes.  And the fifth person in DCAS

25   was added fairly recently in response to the

1                    E. EICHENHOLTZ
2      fact that we had a large number in February, I
3      think it was, of appeals filed with our panel
4      from the New York City Police Department.  By
5      large, I mean I think it doubled the numbers
6      of appeals we had.
7           Q.    What was the procedure for choosing
8      panel members?
9           A.    The agencies were asked to -- told
10     what the panel was and what its function was,
11     and they were asked to supply qualified and
12     appropriate personnel to review these cases,
13     and they would report back to us with, you
14     know -- report back with name and email, and
15     at one point I, you know, after the agencies
16     reported in, I put together a meeting invite
17     to the group, and that was the panel.
18          Q.    And that meeting invite was for sort
19     of a founding meeting for the Citywide Panel?
20          A.    It was an orientation meeting, yes,
21     yes.
22          Q.    And when was the orientation?
23          A.    November 1, 2021.
24          Q.    And how long did it take place?
25          A.    I can't recall.  It was between a

```
 1                    E. EICHENHOLTZ
 2      half an hour and an hour.
 3          Q.    And was it recorded?
 4          A.    No.
 5          Q.    And is there any kind of a
 6      transcript or notes that relate to the
 7      meeting?
 8          A.    No.
 9          Q.    Do you know whether or not any of
10      the people who attended took notes or recorded
11      it?
12          A.    I don't believe so, but I wouldn't
13      know for 100 percent certainty.
14          Q.    What does it mean to say that
15      somebody is qualified to work on the Citywide
16      Appeals Panel?  That's a word that you used,
17      "qualified and appropriate."
18          A.    So --
19               MR. HAIDER:  Objection.
20               THE WITNESS:  Sorry.
21          A.    Yeah, so the -- I think that that's
22      someone who understands the reasonable
23      accommodation process, someone who is capable
24      of reviewing a record, applying law to the
25      policy, and capable of understanding and, you
```

1                   E. EICHENHOLTZ
2       know, and reaching a determination.  So, you
3       know, primarily most of the agencies assign
4       lawyers to do it by and large.  There may be
5       one or two who are nonlawyer EEO
6       professionals, but obviously experienced with
7       EEO process.  Yeah, so that's what I mean by
8       "qualified."
9            Q.    So the people who are on the panel,
10      what percentage of them have participated in
11      the initial stage of religious accommodation
12      reviews for various agencies?
13               MR. HAIDER:  Objection.
14           A.    Okay.  "Initial stage" -- so you're
15      talking about making a determination for their
16      agency.  Two members of laws panel, the
17      DOHMH -- one of the DOHMH representatives, and
18      that's it.  I don't think any of the other
19      panel members were involved in the agency EEO
20      review, the actual sort of reasonable
21      accommodation process that took place
22      pre-appeal.
23           Q.    And is there a procedure or a
24      protocol that the Citywide Panel has to make
25      sure that people who engaged in agency level

1                    E. EICHENHOLTZ
2      initial reviews of reasonable accommodation
3      requests, are not also involved in
4      determination of their appeals to the Citywide
5      Appeals Panel?
6          A.    Yeah, so, like, on the law side, as
7      I said, the only people involved at
8      agency-level determinations were two panel
9      members who are attorneys for the New York
10     City Housing Authority, and they do not vote
11     on any matters regarding the New York City
12     Housing Authority.  The Department of Health
13     and Mental Hygiene, same sort of process.  If
14     someone made the decision, they're not going
15     to turn around and then review the decision on
16     appeal.
17         Q.    And is that protocol in writing?
18         A.    No.
19         Q.    How is it communicated to persons?
20         A.    It was discussed -- when the various
21     agencies organized themselves, they discussed
22     how they were going to handle that, and so I
23     had that discussion with the two NYCHA Panel
24     members and DOHMH have that discussion amongst
25     their panelists.

1                    E. EICHENHOLTZ

2        Q.    And does anything, any record in

3    writing in the City, you know, a video record

4    or audio record, is there any record that

5    relates to those conversations?

6        A.    No.

7              MR. HAIDER:  Objection.

8              THE WITNESS:  Sorry.

9        A.    No.

10       Q.    What subject matter expertise do the

11   individual panel members of the Citywide Panel

12   have with respect to medical and religious

13   accommodation requests?

14             MR. HAIDER:  Objection.

15       A.    As I said, by and large generally,

16   they are individuals who have either done one

17   of two things.  Primarily, they're individuals

18   either legal or nonlegal who have been

19   involved in EEO reasonable accommodation and

20   compliance work and are familiar in that

21   regard.

22             Or with respect to the law panel

23   members, we have two attorneys on the panel

24   who are in our appeals division, and we sought

25   some assistance and support from the appeals

                        E. EICHENHOLTZ

1
2    division because they may not have as direct
3    EEO experience, but they have extensive
4    expertise in reviewing records and applying,
5    you know, factual and legal standards.  And so
6    we wanted to tap into especially the law
7    panel, because if you think about our
8    perspective, our perspective is more the legal
9    compliance perspective, it seemed like that
10   would be good value added for the law panel.
11       Q.    So from the standpoint of the law
12   panel, the two who are in the appeals division
13   who are members of the panel, they've had
14   experience in litigation, I presume?
15       A.    Yes.
16       Q.    And what about the other persons who
17   are -- the other three Law Department members
18   of the Citywide Appeals Panel?  Do they also
19   have litigation experience?
20       A.    So I am one of them, and yes, I have
21   litigation experience.  The two members who
22   come from us, from the NYCHA General Counsel's
23   Office, I know at least one does; I don't know
24   if the other one does.  There's one who's the
25   Head of NYCHA's Appeals Division, so same sort

1                    E. EICHENHOLTZ
2       of concept, and then the other is an attorney
3       in their general couple's office who handles
4       the employment issues, but I don't know if
5       that's in an in-house capacity or a litigation
6       capacity.
7            Q.    Now, you used the word "NYCHA," and
8       I'm presuming that is N-Y-C-H-A, a shorthand
9       for the New York City Housing Authority?
10           A.    That is correct.  I apologize for
11      not defining it.  Yes, it is the New York City
12      Housing Authority.
13           Q.    You see, I'll define it for you, if
14      you don't.
15           A.    Thank you.
16           Q.    So you spoke of the two who are in
17      the Appeals Division of the City Law
18      Department.  Did they specifically have
19      experience with appeals involving matters that
20      are related to religion?
21           A.    They don't focus on it, but they
22      have had -- I don't know religion
23      specifically, but they've worked on employment
24      matters in the past.  I don't know whether
25      there was a religious reasonable accommodation

1                    E. EICHENHOLTZ
2      at issue in any of their cases.
3          Q.    So is there any kind of a firewall
4      that the Citywide Appeals Panel or the Law
5      Department puts in place to make sure that the
6      people who are deciding religious
7      accommodations and medical accommodations have
8      not also been directly involved in litigating
9      issues related to, you know, persons who are
10     making religiously-related claims against the
11     City or who are making medical accomodation
12     kinds of claims against the City?
13              MR. HAIDER:  Objection.
14         A.    So the answer is yes.  Our EEO
15     officer and her staff are not on the panel,
16     and they handle the Law Department's agency
17     determinations pre-appeal.  And obviously,
18     none of the attorneys or personnel in The
19     Labor and Employment Law Division are on the
20     panel because their function will be to defend
21     the mandate and defend individual cases in
22     litigation.
23         Q.    I understand what you've said with
24     respect to the people who are not acting on
25     the panel.  But with respect to the people who

1          E. EICHENHOLTZ

2    are on the panel, is there any kind of a

3    firewall set up to make sure that they have

4    not litigated issues that are, you know,

5    relevant to the determination of whether or

6    not a claim is religious in nature in the

7    religious accommodation appeals?  That's the

8    end of the question.

9          A.    I mean --

10               MR. HAIDER:  Objection.

11         A.    Yeah, other than if, for example,

12   there's a review of a case and this is a case

13   that someone's either been involved with in

14   litigation or something like that, which is

15   almost, you know, would be virtually

16   impossible outside of me, and I can tell you

17   in the context of me, if I was reviewing a

18   case, and this did happen on at least one

19   occasion that I can think of, and I understood

20   the fact pattern and the agency to be

21   something not that I litigated, but that I

22   provided legal advice to the agency, I would

23   not vote on it, and I would not, you know,

24   talk with any -- we don't talk with each other

25   about the merits, for example.

1                    E. EICHENHOLTZ

2          You know, so I think that's what you

3    mean by "firewall."  It wouldn't -- you know,

4    if we had some first-level involvement or

5    litigation involvement with a particular

6    individual or their issue, we wouldn't be

7    influencing any panel member in any way on how

8    it goes.  We might have to have a procedural

9    discussion, but, I mean, we wouldn't be

10   discussing substance at all.

11        Q.    So with respect to yourself, it's

12   kind of a personal understanding of what your

13   responsibilities are; is that correct?

14        A.    I think the -- I -- the remaining

15   panel has the same understanding.  We all

16   understood we should not be -- the reason I

17   say me personally is because I cannot think of

18   a member of the panel serving who -- the other

19   members of the panel, that are outside of the

20   NYCHA example and the Department of Health, I

21   cannot think of another member of the panel

22   who is dealing with religious, reasonable

23   accommodation issues with respect to the

24   individuals whose appeals we're hearing.

25   Obviously, broadly speaking, we have members

1              E. EICHENHOLTZ
2      of Citywide Equity & Inclusion on the panel,
3      so they deal with it broadly speaking, but not
4      with respect to any individual case.
5          Q.    Well, okay.  I understand that you
6      all individually feel a duty not to
7      participate in a case in which you're
8      personally involved.  But, you know, there is
9      also an issue of subject matter and whether or
10     not a person has worked on that subject matter
11     in litigation in a way that may be contrary to
12     the religious -- the nature of the religious
13     claim that is being raised in an accomodation
14     request.  Do you have any kind of a subject
15     matter firewall in place to prevent people who
16     have formed legal opinions about religious
17     issues from participating in decision-making
18     with respect to religious accommodation claims
19     that are made by employees?
20  DI          MR. HAIDER:  Objection.  I'm going
21          to instruct my witness not to answer, most
22          importantly because it's outside the scope
23          of the order for the Rule 30(b)(6).
24              At this point we've allowed a lot of
25          background questions and foundational

1                    E. EICHENHOLTZ
2        questions to get to the two topics, which
3        is the Citywide Panel's process and the
4        standards used by the Citywide Panel.
5              The composition of the Citywide
6        Panel, while we have allowed some
7        questions, is certainly not at issue here,
8        so I would instruct the witness to not
9        answer that question.
10             MR. NELSON:  I'll ask -- I think I
11       am entitled to know with respect to the
12       issues into which I am inquiring with
13       respect to standards and also with respect
14       to procedures.
15       Q.    Specifically, with respect to
16   procedures, is there any written firewall
17   policy that the Law Department has that
18   relates to the Citywide Panel participation?
19             MR. HAIDER:  Objection.
20             And just to get to the point of
21       whether that's in the scope, can you
22       define what you mean by "firewall"?  I
23       think that's a little confusing here, and
24       then perhaps I will allow it even, maybe
25       it's within the scope.  At this point, I

```
 1                    E. EICHENHOLTZ
 2         don't see how it is.
 3              MR. NELSON:  So firewall is a pretty
 4         well understood concept which creates a
 5         bar for people who have a prior knowledge
 6         with respect to a subject matter or other
 7         kind of involvement with a subject matter
 8         from participating in matters that might
 9         be thought to be kind of a conflict which
10         would involve the same subject matter.
11         And so, that's my definition of firewall.
12         So --
13              MR. HAIDER:  Can you repeat the
14         question?  With that understanding of that
15         definition?
16              MR. NELSON:  I can't repeat it
17         exactly, no, but I will ask it again.
18    BY MR. NELSON:
19         Q.    Does the Law Department have any
20      kind of a firewall, written or oral, that
21      relates to the participation of Law Department
22      members on the Citywide Panel?
23              MR. HAIDER:  Objection.
24         A.    So I think we're mindful of -- and I
25      know there have been courts that have weighed
```

1                    E. EICHENHOLTZ
2       in on this issue that someone's legal work as
3       an advocate for a client is not disqualifying
4       in any way from their ability to be a neutral
5       adjudicator.  So I think as I understand the
6       premise of the question, it's if someone has,
7       for example, defended a religious -- a denial
8       of a religious reasonable accommodation in
9       religion, that somehow we should be
10      disqualifying them from serving on the panel.
11      No, we did not do that.
12                  I think the whole point here, and I
13      talk about the different perspectives of the
14      agency, is to bring in -- different
15      perspectives of the agency, is to bring in
16      multiple areas of knowledge and perspective
17      and people who have dealt with, be it in an
18      EEO capacity or in a litigation capacity on
19      either side of the V, religious reasonable
20      accommodation requests, EEO matters,
21      employment discrimination, the duty to
22      reasonably accommodate, have knowledge that
23      can improve our reasonable accommodation
24      process.  So no, there would not be a policy
25      that if someone has expertise in that area

1                    E. EICHENHOLTZ

2      owing from litigation generally, that we would

3      remove them or screen them off from the panel.

4          Q.    And have you ever had any

5      discussions with other members of the Law

6      Department about whether or not it would be

7      appropriate for them to participate either in

8      the Citywide Panel process as a whole or on an

9      individual panel relating to a specific

10     appeal?

11              MR. HAIDER:  Objection.  I'm going

12         to instruct my witness to limit his answer

13         to things that are not covered by the

14         attorney/client privilege.

15              THE WITNESS:  Right.

16         A.    And I would say that I think I've

17     covered the substance of any discussion I've

18     had on that with why we engage certain groups

19     of people and did not engage certain groups of

20     people.  Obviously, our EEO officer in our

21     staff would be highly qualified, but they had

22     to handle all the individual cases in the

23     first instance, all the individual requests

24     that the Law Department received.  And The

25     Labor and Employment Law Division was having a

1                    E. EICHENHOLTZ
2      function where they would actually defend
3      these decisions and mandate any reasonable
4      accommodation and employment discrimination
5      issues that arose from it in litigation, and
6      that was the substance of how we decided to
7      choose -- or where we drew members of the
8      panel from.
9           Q.    Now, at the -- withdrawn.
10                The Citywide Appeals Panel members
11     were chosen, as I understand your testimony to
12     be, in part because of their prior experience
13     with issues that relate to religious
14     accommodation.  And what materials, if any,
15     were provided to these members of the Citywide
16     Appeals Panel that related to or trains them
17     on the nature the religious accommodations and
18     on the way in which adjudicators of religious
19     accommodation claims, you know, should
20     consider such questions?
21                MR. HAIDER:  Objection.  Again,
22          outside the scope.
23                I'll allow the witness to answer.
24          A.    Yeah, I -- again, you have to
25     remember we're dealing with people who have

1                    E. EICHENHOLTZ
2     extensive knowledge and expertise of that.
3     There was not a particularly strong need to
4     train people on things they were already
5     familiar with.  We did refer the entire panel
6     to the EEOC Guidance specific to COVID-19
7     vaccination, and the two documents, the FAQ
8     document, I believe the reasonable
9     accommodation process document, so that they
10    can familiarize themselves with the
11    particulars of our work.  But every member of
12    the panel came to the panel with an
13    understanding of the law of reasonable
14    accommodations, both religious and medical
15    generally, and how those processes work at a
16    city agency level and the legal level.
17        Q.    Have you personally discussed or
18    participated in the Kane/Kyle case or the
19    NYFRL case, the instant case in which we're
20    deposing you in?
21        A.    Yeah.
22   DI          MR. HAIDER:  Objection.  I'm going
23          instruct the witness, well, not to answer
24          with respect to questions related to the
25          Kane and Kyle litigation.

 1              E. EICHENHOLTZ
 2          I believe the second part of the
 3      question, you were directing him about
 4      this litigation; is that correct,
 5      Mr. Nelson?
 6          MR. NELSON:  This litigation, yes.
 7          MR. HAIDER:  You can answer with
 8      respect to this litigation.
 9      A.    So with respect to this litigation,
10  I've participated essentially in a --
11  primarily in a position fairly unique to me,
12  which is as someone who is more of a client
13  resource than as an attorney overseeing and
14  directing litigation.
15          MR. NELSON:  What is the nature of
16      the objection with respect to the Kane and
17      Kyle question?
18          MR. HAIDER:  Again, outside the
19      scope of the two fact -- the two topics
20      that are subject to this 30(b)(6), which
21      is the Citywide Panel's process in
22      reviewing and the standards used by the
23      Citywide Panel.
24          MR. NELSON:  So referring to
25      standards, Mr. Eichenholtz's repeatedly

```
 1                E. EICHENHOLTZ
 2        referred to the EEOC's Guidance with
 3        respect to COVID-19.
 4        Q.    Do you understand -- withdrawn.
 5              Does that guidance, in the view of
 6    the panel, alter the sort of nonCOVID-19 EEOC
 7    Guidance with respect to how cases should be
 8    adjudicated?
 9              MR. HAIDER:  Objection.
10        A.    I understand it to be guidance
11    applying those standards to a specific and
12    very unique set of circumstances.
13        Q.    And is there any way in which the --
14    when which the guidance is to be applied or is
15    applied by the Citywide Panel to COVID-19
16    circumstances and applications made during
17    COVID-19 that relate to the vaccination that
18    is different from the way that the EEOC
19    standards would be applied in other contexts?
20              MR. HAIDER:  Objection.
21        A.    Not that I'm aware of.
22        Q.    All right.  So all the definitions
23    that are in the EEOC Guidance would remain the
24    same, so far as the panel is concerned as, you
25    know, in the nonCOVID-19 context?
```

1                    E. EICHENHOLTZ

2           A.    Yes.  Again, the understanding that

3     we're talking about an area of the law that

4     turns on very specific and individualized

5     facts and circumstances, right, so yes, but

6     I'm trying to also make space for the fact

7     that we are -- you know, this is not your

8     run-of-the-mill, nonemergent EEO reasonable

9     accommodation request.  So I just wanted to

10    make that distinction.  That's one of the

11    reasons the EEOC issued specific and detailed

12    guidance on this topic.

13          Q.    In what percentage of the cases that

14    have been decided to date by the Citywide

15    Panel have you acted as one of the voters?

16          A.    I do not have those numbers.

17          Q.    In about how many cases have you

18    acted as a voter?

19          A.    I don't have that -- we don't break

20    it down -- I don't have access to numbers --

21    direct access to numbers to break it down by

22    voter.  So I can't say that Eric Eichenholtz

23    voted on X number of appeals thus far.  I

24    could tell you how many the Law Department

25    voted on, but how many of those Law Department

```
 1                    E. EICHENHOLTZ
 2    votes are mine personally, I could not tell
 3    you.
 4         Q.    But you are a voter, of course?
 5         A.    Yes.
 6         Q.    And you've voted on some cases that
 7    are involved in NYFRL obviously, we know that?
 8         A.    Yes, of course.
 9         Q.    So my question about your
10    involvement in the Kane/Kyle litigation
11    relates to the question of conflict of
12    interest.  You know, very similar issues are
13    raised in both matters, and so, you know,
14    we're really entitled to know whether or not
15    you've been involved in the City's defense in
16    that litigation.
17              I ask the question again:  Have you
18    been involved or participated in any way in
19    the Kane and Kyle cases?
20 DI         MR. HAIDER:  Objection.  At this
21         stage of limited discovery and the order
22         that provided for this 30(b)(6) witness,
23         Mr. Eichenholtz's potential conflict that
24         you are articulating for how many votes he
25         has done, whether it's in this litigation,
```

1          E. EICHENHOLTZ

2          the Kane and Kyle litigation, or all

3          Citywide Panel, is not subject to this

4          30(b)(6) witness testimony here today, and

5          I'm instructing my witness to not answer

6          that question.

7          Q.     Do the DCAS or DOHMH or CCR agencies

8      have any firewall policies relating to

9      participation of their employees in the

10     Citywide Appeals Panel process?

11          MR. HAIDER:   Objection.

12          A.     Yes.   The City Commission on Human

13     Rights does not involve its Law Enforcement

14     Bureau in the Citywide Appeals Panel process

15     because the Law Enforcement Bureau of the City

16     Commission on Human Rights is charged with

17     reviewing and potentially prosecuting charges

18     of discrimination that could involve denials

19     of reasonable accommodations from City

20     employees or otherwise.   The Department of

21     Citywide Administrative Services -- oh, and

22     also, CCHR similarly does not involve its

23     in-house EEO officer and their staff on these

24     matters.

25          The Department of Citywide

1                     E. EICHENHOLTZ
2     Administrative Services, again, their panel
3     members are citywide policy -- Citywide Equity
4     & Inclusion and general counsel office policy
5     makers, not members of their EEO office, who
6     would be asked in the first instance to review
7     these request for reasonable accommodations so
8     that you don't have the issue of someone whose
9     been involved in these cases below, to use
10    your word, Mr. Nelson, are then voting on
11    these cases on appeal.
12         Q.    Just to clarify, this is not a
13    question, but below has no qualitative or, you
14    know, there's no disparagement in saying that
15    a person in this context is someone who is --
16         A.    As someone who has practiced my
17    entire legal career in terms of litigation in
18    trial courts, I can tell you that below does
19    not have any negative connotations.
20         Q.    Right.  We'll agree on that.
21              So in this context of the formation
22    of the Citywide Panel, was there ever any
23    discussion of the Kane and Kyle case?
24         A.    No.
25         Q.    And in subsequent communications

```
 1                    E. EICHENHOLTZ
 2      among the Citywide Panel, has there been any
 3      discussion of developments in the Kane/Kyle
 4      case?
 5   DI           MR. HAIDER:  Objection.  Again, I'm
 6           going to instruct the witness not to
 7           answer.
 8                This question does not touch on the
 9           Citywide Panel's process nor the standard
10           that the Citywide Panel applies.
11                MR. NELSON:  But it does go to the
12           question of the panel, since one of the
13           major issues involved in Kane/Kyle was the
14           unconstitutionality of the standards that
15           are being applied by the Department of
16           Education.  So I would ask you to waive
17           your objection and permit the client --
18           the witness to answer.
19   DI           MR. HAIDER:  I will at this point
20           direct him not to answer.
21                However, I am open if the question
22           is rephrased in a manner that is on point
23           as more similar to the way you just
24           phrased it to me.
25           Q.   So Mr. Eichenholtz, was the decision
```

1              E. EICHENHOLTZ
2     of the second circuit or the question of
3     standards applied in the Kane/Kyle case ever
4     discussed among members of the Citywide Panel,
5     to your knowledge?
6          A.    In the context of when we received
7     the DOE cases that we were receiving, the
8     background of the decision and the fact that
9     we were to be applying the legal standards we
10    had been applying to City cases were
11    discussed.  Certainly the 14 plaintiffs, there
12    was a discussion of the fact that we were
13    being court ordered to do so, so the panel was
14    aware of why we were -- you know, we would
15    sort of go through cases in the order we
16    received them, we were given a short time
17    frame there, so we had to discuss the time
18    frame and things like that.  So those sorts of
19    discussions were had with the panel.
20         Q.    And what about the nature of the
21    standards that had been used at Kane and Kyle
22    for the agency adjudications?
23         A.    Other than the standard -- we
24    discussed the standards we were going to be
25    using based on what the Court had told us we

1                    E. EICHENHOLTZ
2       were going to be using, which was essentially
3       what we had been using, so -- you know, I
4       don't think there was a discussion of, well,
5       there was this arbitration award that applied
6       this standard, and we're not going to use this
7       standard because, you know, when it was being
8       discussed, you wouldn't muddy the issue in
9       that way.  The important thing was what we
10      were getting, when we had to decide, and what
11      standard we, the Citywide Appeal Panel, needed
12      to decide.  It didn't matter what happened
13      before the arbitration, other than we were
14      going to disregard that and apply the
15      standards that we were applying.
16          Q.    So, just to clarify and follow up,
17      the Second Circuit's decision sending cases to
18      the panel also severely criticized certain
19      standards that had been applied to those
20      decisions -- the agency decisions in the Kane
21      and Kyle cases.  And are you saying, then,
22      that the panel members were never instructed
23      to stay away from the standards and methods of
24      decision-making that were criticized by the
25      Second Circuit Panel?

1                    E. EICHENHOLTZ

2              MR. HAIDER:  Objection.

3      A.     We were never using, nor would we

4    use those standards and methods of

5    decision-making that the Second Circuit

6    criticized in that case.  We were applying the

7    legal standards, the guidance provided, and

8    that has been, at least in my understanding,

9    consistently affirmed in subsequent cases and

10   litigation.  So we wanted to do what we were

11   doing because the judicial feedback, the legal

12   research we were doing, we were doing the

13   right thing.  So we're not going to start

14   discussing other standards and saying, well,

15   there's other standard used in this other

16   circumstance and that's wrong.  We were

17   talking about the standards we were using and

18   how we were applying it in our work.

19              MR. HAIDER:  Mr. Nelson, I would

20        request another ten-minute break.

21              MR. NELSON:  That's fine.  We're

22        almost up to noon.  Would you like to

23        break now for 45 minutes to have lunch?

24              THE WITNESS:  It's --

25              MR. HAIDER:  It's a little on the

```
 1                    E. EICHENHOLTZ
 2        early side.
 3               THE WITNESS:  I don't know how much
 4        more you have to go, but, you know, if
 5        we're going to go deep into the afternoon,
 6        I'd rather go a little further,
 7        personally.
 8               MR. NELSON:  That's fine.  Let's
 9        take ten minutes, then.
10               THE WITNESS:  Okay.
11               THE VIDEOGRAPHER:  We're now going
12        off the record.  The time is 11:41.
13               (Recess was taken.)
14               THE VIDEOGRAPHER:  We are now back
15        on.  The time is 11:53.
16               MR. NELSON:  Very good.
17     BY MR. NELSON:
18        Q.    Do you recall the last question that
19     I asked you, Mr. Eichenholtz?
20        A.    Not at all, Mr. Nelson, I apologize.
21        Q.    Oh, okay.
22               MR. NELSON:  I'll ask the court
23        reporter to read back the last question,
24        please.
25               (Record read.)
```

                    E. EICHENHOLTZ

1

2      Q.    Okay.  So my follow-up question,

3   Mr. Eichenholtz, is:  Can you give a yes or no

4   answer to that question?

5      A.    The answer's yes.  Oh, wait, and I

6   apologize, because there was a double

7   negative.  I need to -- the answer is -- let

8   me just phrase it.

9           They were instructed not to apply

10  that standard when they were instructed to

11  apply the Title VII standard.

12     Q.    Were they given the negative

13  instruction not to use the standards that were

14  used in the Kane and Kyle adjudications?

15     A.    Yes.

16     Q.    So they were told, these were the

17  standards that were used in Kane and Kyle,

18  they are the wrong standards, you are not to

19  use these, or words to that effect?

20     A.    I don't know if it was words to that

21  effect, but they were told that the

22  arbitrators utilized this standard, that we

23  were to disregard that, and to apply the

24  standards we've been applying in our cases.

25     Q.    And were they told what the

1              E. EICHENHOLTZ
2    standards were that they were not to apply?
3         A.    I don't recall if we -- I -- like I
4    said, certainly we did not go into detail as
5    to what that arbitration award standard was,
6    no.
7         Q.    So you didn't go into detail as to
8    the specific standards that they were not to
9    apply that had been applied by the
10   arbitrators; is that correct?
11            MR. HAIDER:  Objection.
12        A.    I don't recall the extent to which
13   those standards were referenced.  The
14   important information that was conveyed to the
15   panel was the standards they were to apply.
16        Q.    How were the members of the agencies
17   that were making the decisions below, the
18   decisions that were being reviewed by the
19   Citywide Appeals Panel, how were the
20   decision-makers in those agencies trained with
21   respect to the applications of law or
22   standards to religious accommodation requests?
23 DI            MR. HAIDER:  Objection.  I would
24        instruct my witness not to answer.
25              That question is outside the scope

1                    E. EICHENHOLTZ
2          of the 30(b)(6) witness.  The topics are
3          the Citywide Panel's process and
4          standards; not the agencies below or, you
5          know, any other City agency's process or
6          standard.  So I'm going to instruct my
7          witness not to answer.
8          Q.    How were the Citywide Appeals Panel
9     members trained with respect to the standards
10    that they were to apply to religious
11    accommodation requests?
12         A.    So I think I've addressed this a few
13    times now.  They were -- most of the members
14    of the panel came to us with significant EEO
15    and reasonable accommodation employment
16    discrimination experience and were very
17    familiar with how a reasonable accommodation
18    process works.  We provided the EEOC Guidance.
19    We discussed generally as we went along any
20    big-picture issues at our check-in.  Obviously
21    if there were legal developments, we -- the
22    legal developments were shared with all the
23    panel members.  And so, the panel members were
24    kept abreast of the standard, but they came in
25    with a base of knowledge regarding the work

1                    E. EICHENHOLTZ
2      that they were doing.
3          Q.    Do you know how these individual
4      panel members were trained with respect to the
5      application of standards to religious
6      accommodation claims?
7   DI            MR. HAIDER:  Objection.  Again, I'm
8              going to instruct the witness not to
9              answer.
10             You know, the training is certainly
11             not a topic here.  Again, the two topics
12             are the Citywide Panel's process of
13             reviewing and the standards used by the
14             Citywide Panel in its review.  Although we
15             allowed some questions about the
16             formation, the formation and training of
17             the Citywide Panel is not subject to this
18             30(b)(6).
19             MR. NELSON:  Well, it is, because
20             the testimony has been so far that the
21             reason why these persons are members of
22             the panel in the first place is that they
23             have experience and are familiar and they
24             have -- you know, that they've done this
25             before.  You know, and so presumably the

1                    E. EICHENHOLTZ

2          people are relying upon that experience

3          and their familiarity with rules in making

4          their decisions on the panel, which are

5          not reviewed in substance at the

6          quality-control level.  So the entire

7          framework of this depends upon the

8          training and the understanding that these

9          people had before they became members of

10         the panel because they never got it on the

11         panel.

12               MR. HAIDER:  You know, whether or

13         not their training of the panel members is

14         relevant, I'm not really going to argue at

15         this point.  The only thing I will point

16         to is that the training of the Citywide

17         Panel is not a topic here.

18               MR. NELSON:  It goes strictly to the

19         standards.

20    DI         MR. HAIDER:  Yeah, Mr. Eichenholtz

21         can testify to the standards that the

22         Citywide Panel was asked to apply, which

23         he has done numerous times.  You know, the

24         panel members' history, you know, prior to

25         this being put on the panel is actually

1                    E. EICHENHOLTZ
2          not relevant.  Admittedly, we allowed some
3          of these questions for foundational
4          purposes so as to, you know, allow the
5          depositions to go smoothly to provide some
6          context.  However, training or, you know,
7          experience is not -- the panel members'
8          experience is not subject to this 30(b)(6)
9          witness.
10              And so I'm instructing the witness
11         not to answer.
12              MR. NELSON:  Well, you know, we know
13         from the information we've been given
14         about the structure of the panel and the
15         procedure that the panel follows that
16         these persons, each of them is essentially
17         acting as independent decision-maker,
18         independent judge, and, you know, since
19         that's the procedure, you know, and it
20         sounds like there's no enforcement of
21         whether they follow one set of guidelines
22         or another, I think it's very important to
23         know, you know, what these persons had
24         been trained to do, because clearly, you
25         know, I think the whole purpose for

1                    E. EICHENHOLTZ

2          bringing them on to the panel was to have

3          them use their training.  We don't know

4          what the training is.  And we know very

5          little about what each of these panel

6          members is bringing to the process of

7          making these votes, these sovereign votes.

8               MR. HAIDER:  So we have allowed

9          questions and answers about what was

10         discussed during the Citywide Panel

11         meeting as to the standards being used,

12         how that message was conveyed.  You are

13         now asking, the previous question was

14         about prior training as to the subject

15         matter here.  Again, that's outside the

16         scope.  So we've already allowed the

17         questions as to what information they

18         received from the Citywide Panel or, you

19         know, Mr. Eichenholtz or other members of

20         the panel discussed as relates to the

21         standards.

22    BY MR. NELSON:

23         Q.   Mr. Eichenholtz, do you at least

24      know what training they received?

25    DI          MR. HAIDER:  Objection.  Again, I'm

```
 1                     E. EICHENHOLTZ
 2          instructing the witness not to answer
 3          based on the previous stated grounds.
 4               MR. NELSON:  Well, this goes to the
 5          basis of his knowledge.
 6   DI          MR. HAIDER:  Okay.  Again, this is
 7          knowledge to questions that are not
 8          relevant.  We can flag this, we can call
 9          the Court now, we can flag it to call the
10          Court.
11               But I am going to instruct the
12          witness to not answer any questions about
13          training that panel members may have
14          received prior to the formation of the
15          panel.  It's not relevant to this
16          testimony at this stage of the litigation.
17   BY MR. NELSON:
18          Q.   Mr. Eichenholtz, did you or anyone
19      else involved in the panel have any direct
20      communications with Bill DeBlasio about the
21      panel?
22          A.   No.
23          Q.   And did you have any such
24      conversations with him about the nature of
25      religious accommodations or the process for
```

```
 1              E. EICHENHOLTZ
 2    religious accommodations or the standards?
 3        A.    I've never spoken with Bill DeBlasio
 4    in my life about any topic.
 5        Q.    All right.  And what about Mayor
 6    Adams?
 7        A.    I have had discussions with the
 8    mayor about the vaccine mandate generally, not
 9    about the citywide appeal process or how cases
10    are adjudicated.
11        Q.    And please tell us the sum and
12    substance of those conversations.
13        A.    I --
14              MR. HAIDER:  Objection.
15              THE WITNESS:  Yeah.
16              MR. HAIDER:  You can answer.
17        A.    I cannot do so due to
18    attorney/client privilege.  I was in the
19    function of conveying legal advice to the
20    mayor.
21        Q.    Do you know whether or not any of
22    the panelists were aware of former Mayor de
23    Blasio's statements that he made, while he was
24    mayor, regarding what criteria would be
25    acceptable for religious exemptions?
```

1                    E. EICHENHOLTZ

2              MR. HAIDER:   Objection.

3        A.    I would have no independent way of

4     knowing that other than our discussions, and

5     it never came up in those discussions when we

6     talked about standards and how they were to be

7     applied.

8        Q.    Did you ever discuss with anyone on

9     the panel about, you know, Pope Francis having

10    a view that there's nothing in the scripture

11    that suggests people shouldn't get the

12    vaccine?

13       A.    We had discussions in discussing

14    various cases and how to handle them, that

15    Pope Francis, in his capacity as the

16    institutional leader of the Catholic Church,

17    had made such pronouncements and that the fact

18    that he did so was not dispositive in any

19    given case.

20       Q.    And did you ever discuss in

21    conversations with members of the Citywide

22    Appeals Panel the assertion that two

23    well-established religions, Christian Science

24    and Jehovah's Witnesses, have a history of

25    religious opposition to vaccination?

1                    E. EICHENHOLTZ

2        A.    I don't remember specifically having

3    those discussions.  With respect to all

4    religions, we discussed we were going to

5    review the facts and the documentation before

6    us to understand the source of the employees'

7    belief and whether or not there's a conflict

8    between that belief and the vaccine

9    requirement.

10        Q.    Did you have any discussion with

11   anyone on the Citywide Appeals Panel as to

12   whether or not Pope Francis' views were

13   relevant to the determination of anyone's

14   religious accommodation, even if they were not

15   dispositive?

16        A.    Certainly the fact that

17   institutionally, the church was permitting

18   vaccination could potentially be relevant in

19   particular fact patterns.  Beyond that, no, we

20   were -- we review these requests based on the

21   information the employee provides us about the

22   nature of their religious belief, their record

23   as a whole, and all of the facts underpinning

24   that belief.

25        Q.    And in any of these discussions, you

1                    E. EICHENHOLTZ
2    know, what fact patterns did you discuss, if
3    any, were ones in which Pope Francis' views
4    might be relevant?
5         A.    No particular fact patterns;
6    however, it isn't to say it isn't this fact
7    pattern or that fact pattern.  There are cases
8    in which the employee would say sort of as a
9    blanket statement, as a Catholic, I should be
10   exempt from this vaccine, without more detail
11   or explanation even after interaction, for
12   example, you know, that that might not be
13   enough because there is no -- we're not
14   stereotyping Catholicism one way or the other,
15   right?  We're not stereotyping Catholicism
16   based on the Pope's pronouncement, we're not
17   stereotyping Catholicism based on the fact
18   that some Catholics would have a contrary view
19   to the Pope.  We were looking at -- with
20   Catholics, we would have to look at the nature
21   of the employee's belief, the source, and
22   whether the beliefs the employee was
23   articulating were conflicting with the vaccine
24   requirement.
25        Q.    And what if one of the voters failed

1            E. EICHENHOLTZ
2     to do that?  Was there any control that you or
3     anyone else would have that, you know, would
4     empower you to bring that voter back to look
5     again at the facts if the voter had failed
6     to -- apparently failed to see or to reflect
7     upon the existence of facts that would support
8     having such an objection to vaccines, despite
9     the contrary opinion of someone in authority
10    in the faith?
11              MR. HAIDER:  Objection.
12              You can answer.
13         A.    I'm not aware of any such
14    circumstance.  So I do know that when there's
15    a potential issue that's flagged either
16    because we've had a change of information or a
17    whole host of reasons, and we may need a panel
18    to review what they did, we will do that.  I'm
19    not aware of any circumstance where a panel
20    member did not properly apply the standard in
21    reviewing the reasonable accommodation
22    request.
23         Q.    But would it be fair to say that
24    that wasn't one of the objects of your quality
25    control review, that you take two minutes on

1                    E. EICHENHOLTZ
2       the average to perform for each case?
3                MR. HAIDER:  Objection.
4           A.      So it wouldn't be a primary focus,
5       but, you know, a lot of the -- yeah, I mean,
6       no.  Like I said, we would flag substantive
7       issues if they were raised when we were doing
8       quality control.  But in doing that work, I
9       have never seen a substantive issue raised
10      with respect to the application of the
11      standard.
12          Q.      On how many occasions did you raise
13      a substantive issue with a voter, aside from
14      just a conflict between a vote and the
15      comment, in your experience?
16          A.      It's rare.  Like I said, maybe a
17      dozen times.  It's usually some sort of
18      irregularity, and it may often not be the
19      voter's fault.  For example, a medical appeal
20      routed to the religious, you know, CCHR.  You
21      know, things like that.  So generally, it is
22      rare.
23          Q.      But that wasn't something you were
24      specifically looking for in the course of your
25      quality control; is that correct?  Because as

1              E. EICHENHOLTZ

2    I recall your testimony about quality control,

3    it had more to do with procedural things than

4    substantive questions.

5         A.    Yeah.  Again, but if there's a

6    substantive issue that stood out to me, you

7    know, let's say it's, you know, it's a

8    Catholic requesting a reasonable accommodation

9    and there's some comment about the Muslim

10   religion, obviously, I would flag that.

11   That's never happened.

12              But I'm not -- I guess the best way

13   I can put it for you is, I'm not there to

14   second guess the judgment, the factual -- the

15   balancing of the various facts and the

16   credibility assessments of each individual

17   panelist.  That's why we have three panelists

18   from three different agencies.

19        Q.    You indicated that the cooperative

20   dialogue process was something that ought to

21   occur or was -- if it were to occur, it should

22   have occurred at the agency level.  If that

23   was a process that -- well, I'll withdraw the

24   second sentence there.

25              Did you observe that there were some

1                    E. EICHENHOLTZ
2       agencies that engaged in the cooperative
3       dialogue process more than other agencies?
4    DI            MR. HAIDER:  Objection.  I'm going
5            to instruct the witness to not answer that
6            question as it's outside the scope as to,
7            you know, comparing the agencies.
8                 Again, the scope here is the
9            Citywide Panel's process in reviewing and
10           the standards used by the Citywide Panel.
11       Q.    Mr. Eichenholtz, in review of an
12      agency's decision, did the Citywide Appeal
13      Panel members have a practice of giving the
14      same standards and process of review for
15      decisions that were made by agencies which
16      engaged frequently in the cooperative dialogue
17      process as opposed to those that did not do
18      so?
19                MR. HAIDER:  Objection.
20                You can answer.
21       A.    So agencies generally went about
22      going through the cooperative dialogue process
23      in different ways.  Agencies went about
24      gathering the information and engaging the
25      employees in different ways.  I would not say

1                    E. EICHENHOLTZ
2      it was a competition where one did a better
3      job than the other.
4                There were times where we would
5      have, you know, them be very brief cooperative
6      dialogue, but it would be very relevant and
7      salient, and there would be times where there
8      may be a longer one where there wasn't.  So
9      what we would do is, we would look at the
10     materials that the agency had done, the
11     cooperative dialogue they had engaged in, and
12     we'd review it.  And if we felt that
13     additional questions, cooperative dialogue
14     usually was very targeted when we do so, if it
15     was necessary, we would make that inquiry of
16     the agency.
17          Q.    Do all the members of the Citywide
18     Panel work full time and exclusively on
19     matters related to the Citywide Panel?
20          A.    No.
21          Q.    Then what percentage of the work
22     time of panel members is devoted to Citywide
23     Panel matters?
24          A.    That is heavily dependent on the
25     panel members, you know, and what percentage

1                    E. EICHENHOLTZ
2      of the agency's cases they're reviewing,
3      things like that.
4           Q.    And is there is a range of the
5      amount of time that people spend or the
6      percentage of time that they spend?  Does
7      every panel member, for example, work at least
8      50 percent of the time?  Does no panel member
9      work more than 80 percent of the time on, you
10     know, panel matters?
11          A.    It's --
12               MR. HAIDER:  Objection.
13               THE WITNESS:  Yeah, okay.  Sorry.
14          A.    It's tough to quantify in that way
15     because, to be quite frank, I think everyone
16     on the panel member are City managers, and the
17     obligation of City managers is to work the
18     time needed to get the work done.  So, for
19     example, if I have or any panel member has an
20     insufficient amount of time in that workweek
21     to get the work that they wanted to get done
22     on the panel work done, then they're working
23     on it maybe over the evening or over the
24     weekend.  So it's not like you're there 9 to 5
25     and you're spending three hours a day on

```
1                    E. EICHENHOLTZ
2       average on it, so it's tough to quantify in
3       that way.
4              And like I said, given the work
5       obligations and the involvement of various
6       panel members, the amount of cases they need
7       to review are different.  Obviously DOHMH, as
8       you can tell from the numbers we discussed
9       earlier, have far less cases to review than
10      DCAS for the Law Department, for example.
11      Q.     On average, how many appeals is each
12      panelist expected to decide each week?
13      A.     There is no expectation.  The
14      agencies divide the work amongst the panel
15      members as they best -- as best fits that
16      agency's needs and to keep the workflow going.
17      Q.     Now, do you know whether or not
18      there was ever a meeting in which you did not
19      participate in any of the agencies in which
20      the procedures or standards that the voters
21      from that agency would be expected to follow
22      in performing their work as voters on the
23      Citywide Appeals Panel?
24             MR. HAIDER:  Objection.
25             Just seeking clarification.  Are you
```

1                    E. EICHENHOLTZ
2          referring to the Citywide Panel meetings?
3          You did reference agency meetings.
4                    MR. NELSON:  So what I'm referring
5                to is some meeting at which the panel
6                members from a particular department met
7                to discuss how they were going to handle
8                their work on the panel.
9                    MR. HAIDER:  Objection.
10                   You can answer.
11         A.    So I obviously can't definitively
12     rule out any discussions, but I can tell you
13     from my work with the individual panel members
14     and my discussions with the different agency
15     panel members, agency-specific discussions
16     were primarily on issues of dividing up cases,
17     case management, etcetera.  They were not
18     focused -- because again, we work generally --
19     we were all working off the same standards and
20     we discussed them as a group.  You know, I
21     generally, when there were questions about
22     standards, they were brought up in the group,
23     you know, and sometimes even panel members
24     from other agencies would raise the issue to
25     me and I'd say, well, let's discuss it at our

1                     E. EICHENHOLTZ

2      next check-in, for example.  So based on my

3      understanding, if it was happening, it was

4      exceptional and rare, that generally we were

5      discussing standards together.

6          Q.    But you don't know whether there

7      were such meetings or not?

8          A.    Right, I can't rule it out

9      definitively because I'm not in the room with

10     every panel member all the time, so no, I

11     can't rule it out definitively.

12         Q.    And that sort of raises the question

13     of:  What is the basis of your knowledge for

14     how the other departments, not the Law

15     Department, handle the reviews that their

16     panel members conduct of the appeals?

17         A.    Because we've had both in check-ins

18     and myself with each agency-specific

19     discussions with those agencies on how they

20     are handling the cases.  So I'm aware of how

21     every agency is handling the appeals.

22         Q.    Now, previously you've indicated,

23     you know, that so far as you know, there are

24     no notes that had been taken at the various

25     kinds of meetings we've been discussing.  The

1                 E. EICHENHOLTZ
2       answer is really, though, with respect to
3       that, that if there were some there, you just
4       don't know about them, right?
5                 MR. HAIDER:  Objection.
6            A.    Yes, that's entirely possible.
7            Q.    Okay.  So in reviewing appeals from
8       the City agency's denial decisions, how much
9       weight were panel members instructed to give
10      to the reasoning or analysis of the agency?
11           A.    In terms of weight, you know, no
12      more or less than any other fact that we had.
13      We were looking at why the agency did what it
14      did, right?  And so, it was relevant because
15      we needed to understand why it was denied.
16      But if the agency didn't have a basis for
17      denial or the agency had multiple bases for
18      denial and the panel member says it thinks --
19      if you have one really strong basis here and a
20      bunch that are questionable, the panel member
21      doesn't have to say, follow what the agency
22      did.  So it's, you know, like I said, it's
23      close in our appellate review spectrum that we
24      discussed before, it was closest to de novo
25      review as it was described to the panel

1                    E. EICHENHOLTZ

2     members.

3          Q.    Did the City have a policy of asking

4     only vaccinated people to serve as panelists

5     on the Citywide Appeals Panel?

6          A.    No.

7                THE WITNESS:  Sorry.

8                MR. HAIDER:  Objection.

9          A.    No.

10         Q.    Are there any unvaccinated persons

11    who are serving on the Citywide Appeals Panel?

12  DI          MR. HAIDER:  Objection.  I would

13          instruct the witness not to answer as it's

14          outside the scope of the order.

15              MR. NELSON:  It does relate to the

16          ability of the panelists to serve their

17          function objectively, so I think it's

18          pretty important.

19         Q.    I would ask you to answer.

20  DI          MR. HAIDER:  Again, objection.  I'd

21          instruct the witness not to answer.

22              It's outside the scope of the

23          Citywide Panel's process or the standards

24          used by the Citywide Panel.

25         Q.    Can service on the Citywide Panel be

```
 1                  E. EICHENHOLTZ
 2    performed remotely?
 3         A.    Yes.
 4         Q.    Again, I apologize for being quiet.
 5    I've got a number of questions that have been
 6    answered already and I'm scrolling through
 7    them to get to one that hasn't been answered.
 8              To your knowledge, has any panel
 9    member ever received an instruction from
10    anyone else as to how to consider any specific
11    appeal?
12         A.    A specific appeal?  No.
13         Q.    Now, in the production of documents
14    in this case, we received an email that you
15    had sent to I think somebody else in the Law
16    Department in connection with procedures for
17    deciding certain kinds of religious
18    accommodation questions.  Are you familiar
19    with that email?
20         A.    I am.
21         Q.    Okay.  Now, have you or Mr. Sanford
22    ever sent any other email to any panelist
23    that, you know, discussed how to deal with any
24    specific or hypothetical situation arising in
25    appeals to the Citywide Panel?
```

1               E. EICHENHOLTZ
2        A.    No, not that I'm aware of.
3        Q.    So that's the only email you ever
4    sent to any panelist that discussed a
5    hypothetical situation?
6        A.    In email?  Yes, in email.
7        Q.    Uh-huh.  And when you say -- when
8    you distinguish email from something else, was
9    there any situation -- other than a --
10       A.    Now, a hypothetical -- I apologize
11   for cutting you off.
12       Q.    Sure.
13       A.    Hypotheticals, as I said, sometimes
14   would be part of our broad, big-picture
15   check-in discussions.  If there was a pattern
16   we were seeing or an issue, we might want to
17   talk it through as a group.  Certainly that
18   was the form where we did it.  Communication
19   such as emails were generally case-specific.
20       Q.    And so, with respect to
21   case-specific situations, did you send any
22   emails to any panelists about how to deal with
23   it?
24       A.    Procedurally?  Yes.  On the
25   substance, no.  So we might have an agency

1                 E. EICHENHOLTZ

2       uploading more documents, the employee

3       approaches the EEO officer and says, I have

4       more information, the EEO wants to reconsider,

5       so I might say, hold off, or, we have more

6       information for you to consider.  Those sorts

7       of procedural matters generally I've been lead

8       point for the panel.  So I will email panel

9       members and say, you know, this is going on,

10      so could you, you know, take another look

11      again.  But I'm very conscientious that those

12      emails are kept to procedural discussions

13      because, again, I want to have the three

14      separate perspectives on every appeal and

15      everyone exercising their independent judgment

16      on the appeal.

17                 MR. NELSON:  I've just received some

18           communication from some of the other

19           people in the firm here that we need to

20           take a lunch break.  So it's 12:30, or

21           it's 12:29, soon going to be 12:30.  Let's

22           take a lunch break now.  I'm indifferent

23           as to whether we take a one hour or a

24           45-minute break.  I think --

25                 THE VIDEOGRAPHER:  Let me just go

1                    E. EICHENHOLTZ

2          off.

3                    We're now going off record.  The

4          time is 12:29.

5                    (Lunch recess taken at 12:29 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    E. EICHENHOLTZ
2            A F T E R N O O N   S E S S I O N
3                 (Time noted:  1:18 p.m.)
4                 THE VIDEOGRAPHER:  We're now back
5        on.  The time is 1:18.
6    E R I C   E I C H E N H O L T Z,
7        resumed and testified as follows:
8    CONTINUED EXAMINATION
9    BY MR. NELSON:
10        Q.    Good afternoon, gentlemen.
11        A.    Good afternoon.
12        Q.    So, Mr. Eichenholtz, at this point
13    I'd like to introduce an exhibit, and it's the
14    part of defendants' production that was
15    labelled DEF with a number of zeros and then 1
16    and a 2 and a 3.  And it appears to be an
17    email from Eric Eichenholtz dated November 30,
18    2021, and it's to someone at the Law
19    Department, and it's regarding new law agency
20    panel users.  We're going to get the -- we're
21    going to ask the videographer to -- so Brandon
22    will be pulling that up.  Brandon is our
23    paralegal who is part of our team who is
24    admitted to this session.  So I guess we'll
25    wait for that to be pulled up by Brandon and
```

```
 1                    E. EICHENHOLTZ
 2      then we'll ask for the court reporter to mark
 3      it.
 4                  (Exhibit 1, Email chain of
 5           November 2021, marked for identification,
 6           as of this date.)
 7           Q.    Are you able to see that marked
 8      exhibit?
 9           A.    Yes, I am.
10           Q.    Okay, very good.  Let's proceed with
11      that, then.
12           A.    Oh, sure.
13           Q.    Okay.  So, Mr. Eichenholtz, what is
14      this exhibit, please?
15           A.    This is an email exchange between
16      myself and actually two of the law panel
17      members going up from the bottom of the
18      exchange.  This is when we were getting them
19      set up with the SalesForce system to be able
20      to vote, and then the chain continued into a
21      discussion about the standards to be applied,
22      and that's what the remainder of the chain is.
23           Q.    So the start of this chain predates
24      the use of the SalesForce system for the
25      panel; is that correct?
```

Page 139

1                    E. EICHENHOLTZ

2        A.    It predates these individuals voting

3    on the panel.  The sort of the timeline here

4    is we added -- we had added -- we had had

5    these two individuals on the panel, but we had

6    not yet set them up and got them ready to

7    vote, and we were in the process of doing so

8    here.

9        Q.    Well, were there some votes that

10   were, then, performed on the SalesForce system

11   that you have prior to November 24, 2021?

12       A.    Yes, oh, yes, yes.

13       Q.    Okay.

14       A.    Just to be clear, not by these two

15   individuals.

16       Q.    Sure.  Now, the exhibit indicates

17   that you'd had verbal conversations with one

18   or more of the panelists.  What was the

19   substance of those conversations?

20       A.    So when these individuals were

21   brought on board to help out with the project,

22   I was telling them a little about the panel

23   and its work and the standards and sort of the

24   different sources that I wanted them to review

25   before they began voting, including the EEOC

1                    E. EICHENHOLTZ
2      Guidance and the DCAS document, which you see
3      listed in this chain.
4           Q.    Were there any other sources that
5      you were instructing them to view?
6           A.    Not at that time.
7           Q.    And is there anything inconsistent
8      with the testimony you've given so far that
9      you told them with respect to the procedures
10     and standards that they were to follow?
11          A.    No.
12          Q.    Did you give them any other
13     instructions in addition to the ones you've
14     told us about so far?
15          A.    Yes.  I explained to them how we
16     were going about dividing up the work, how we
17     would go about dividing up the work, I give
18     them instructions on that.
19          Q.    In the email, one of the panelists
20     asked you for two or three examples of the
21     kind of fact pattern where the panel would
22     grant a religious accommodation, and you wrote
23     back, quote, "Given that all we see on appeal
24     is agency denials, there aren't too many,"
25     close quote.  What did you mean by this?

1                    E. EICHENHOLTZ

2        A.      Precisely what I said to you this

3    morning, that we don't -- that the reversal in

4    the agency was not a particularly frequent

5    occurrence, so I had far more examples at that

6    moment of specific denials than I did of

7    grants.  But I wanted to make sure if -- you

8    know, you cut that quote off mid sentence, the

9    full quote is, "Given that all we see on

10   appeal is agency's denials, there aren't too

11   many, but there are definitely some."  And

12   then, I provided a specific case example.  I

13   was concerned because I could not provide a

14   broader array of case examples that also

15   wanted to give, as it says in the next

16   paragraph, the general gist of the fact

17   pattern that thus far I had encountered and

18   the panel had encountered in which we would

19   approve on a religious ground, and you see

20   that described in the next paragraph.

21       Q.      And why did you provide the specific

22   example that you gave to the people who had

23   addressed you in their email, and how does

24   that differ from others?

25       A.      Again, these were -- these two panel

1                    E. EICHENHOLTZ
2       users were coming in after we had sort of had
3       a big-picture orientation discussion and the
4       check-ins, so they were sort of getting caught
5       up, in a sense, and asking some questions that
6       I think we had talked through as a panel, you
7       know, previously.  And so, what was happening
8       here was we'd had that sort of discussion and
9       there were these follow ups as these two -- or
10      one of the two panelists was thinking through
11      what we discussed, and in particular, I think
12      this one panelist was not clear on a couple of
13      things and wanted some clarification and
14      clarity.
15           Q.    So my reading of the November 30th,
16      4:12 p.m. email from this one identified
17      panelist.  It starts off, "I think it would be
18      helpful to have two or three examples of the
19      kind of fact pattern where we would," and
20      "would" is emphasized by being in italics,
21      "grant a religious RA."  And I'm curious about
22      that because it sounds to me like he was
23      mostly getting instruction with respect to the
24      kinds of fact patterns where he would not
25      grant a religious, you know, accommodation

1                    E. EICHENHOLTZ
2     requests.
3              What -- you know, what examples of
4     fact patterns had this panelist been given
5     before he wrote this email?
6         A.    That's -- what you said is not
7     accurate.
8         Q.    Well, it's certainly accurate with
9     respect to the text that I read, right?
10        A.    No, no.
11        Q.    I'm sorry.  What was incorrect in
12    the text?
13        A.    You specifically gave an explanation
14    that was your explanation as to why the word
15    "would" was italicized.  That is not an
16    accurate explanation as to why he was
17    italicizing that word and the context for
18    which the panel member was italicizing that
19    word.
20        Q.    So what personal knowledge do you
21    have with respect to the reason for the
22    italicization?
23        A.    Having spoken with that panel
24    member, the other panel member who was on the
25    chain, and being involved in their onboarding

1                    E. EICHENHOLTZ
2       process.
3            Q.    Well, I'm sorry, but that's a --
4       those -- the thing you just described all
5       would have preceded, I think, would it not,
6       the date, Tuesday, November 30th, on which
7       this email was sent?
8            A.    Correct, and that's why I'm in a
9       position to say that word "would" was not
10      italicized for the reasons you stated in your
11      earlier question.
12           Q.    And did you discuss specifically
13      with the person who sent this email why
14      "would" was italicized?
15           A.    Not that specific issue, but again,
16      I was sent this email, I responded to this
17      email, and I understand the context in which
18      this email was sent.
19           Q.    And so, you are making assumptions
20      about what the word "would" means in this
21      email?
22           A.    No.
23           Q.    I don't understand.  You said that
24      from the context, you were deriving meaning.
25      But if you do it from context, then it's your

1                    E. EICHENHOLTZ
2      judgment, correct?
3           A.    It's my judgment.  I was the
4      intended recipient.  I understand what I was
5      being asked here.
6           Q.    But you're not the seller, correct,
7      and you can't testify with respect to the
8      seller's intention from personal knowledge?
9           A.    I believe I have the context and the
10     understanding to be able to understand what
11     was being asked here, and it was not what you
12     were saying, that the instructions that were
13     given were about how to deny reasonable
14     accommodations.
15          Q.    Well, was this panelist given a list
16     of examples or a set of examples of fact
17     patterns where a religious accommodation
18     appeal would be denied?
19          A.    They were given -- we went through
20     as a group, the three of us, one maybe two
21     cases that I pulled up in completely random
22     order, they were the next two cases to come,
23     and we talked them through together, as I did
24     the vote on those cases.  Both of those cases
25     turned out to be denials, and that is why this

1                    E. EICHENHOLTZ
2      question was asked, because in our discussion,
3      in our onboarding process, we'd not yet gone
4      through a case or he'd not yet seen a case
5      where there would be a grant of a religious
6      reasonable accommodation, and as he was
7      beginning his voting, he was asking for the
8      fact pattern so he could make sure that he was
9      seeing both sides as he went through the
10     process.  That was my understanding of what
11     was going on here, and based on the context of
12     when it was sent and what we had done thus
13     far.
14          Q.    So generally, in the instructions
15     that you were giving to the panelists and the
16     panelists were supposed to follow, what types
17     of factors would you have needed to see in
18     order to grant an application?
19          A.    Generally, what you would need to
20     see is a sincerely-held religious belief that,
21     either through the belief itself or the way
22     the employee practiced the belief, would
23     conflict with the vaccination requirement.
24     That's what we were looking for.
25          Q.    Doesn't the EEOC Guidance state that

1                    E. EICHENHOLTZ
2    you should start by assuming that the employee
3    has a sincerely-held religious belief rather
4    than assuming that he or she does not?
5         A.    Did anyone say that there was an
6    assumption that an employee does not have a
7    religious belief?  I certainly did not.
8         Q.    Did you -- and were you --
9         A.    And I never -- in fact, when I
10   review these, I presume what the employee's
11   saying is accurate and what the employee's
12   saying is sincere, unless I have objective
13   facts in the record that say that that's not
14   the case.
15        Q.    What kind of objective facts would
16   accomplish that result?
17        A.    Inconsistencies.  Sometimes either
18   inconsistencies, explanations of how the
19   employee practiced.  There are a whole host of
20   factors, I couldn't possibly list them all,
21   because it really -- you have to review the
22   specifics of every individualized case, and it
23   is, you look at the entire record, you look at
24   all these various things, and you look for
25   that, what I described before --

1          E. EICHENHOLTZ

2     Q.    So --

3     A.    -- which is a sincerely-held

4     religious belief which conflicts with the

5     vaccination requirement.

6     Q.    So what kinds of inconsistencies

7     would you -- would the members of the panel

8     have been instructed to view as being

9     inconsistent with sincerely-held religious

10    belief of that type?

11    A.    We did not instruct people in that

12    way.  These are -- the panel is composed of

13    knowledgeable individuals who, as I said, you

14    can have experience in reasonable

15    accommodations and EEO and the subject matter

16    experience or exposure to this area,

17    experience or exposure to appellate work, and

18    whose job it is to review records and apply

19    standards, especially when those standards

20    have to be applied in a highly individualized

21    and a highly fact-specific way.

22              It would, in my view, have run

23    contrary to what the law requires us to do to

24    have engaged overly in discussion of, well,

25    this type of person or this type of case is

1                    E. EICHENHOLTZ
2      always going to be a yes and this is always
3      going to be a no, because you can't review
4      these appeals and these requests in that
5      manner.  So we -- that's not the way we had
6      instructed the panel to go about their work.
7           Q.    So in this kind of a situation, you
8      expected each panelist to rely on the
9      panelist's prior experience and instruction
10     with respect to these kinds of issues?
11          A.    Right.  And as I've said previously,
12     we had discussions on trends and particular
13     issues that people find troubling that we
14     would discuss as a group during our check-ins
15     to balance the need to remain current to make
16     sure that we're all, you know, being able to
17     rely on each other in our thoughts and shared
18     experiences in a general sense, versus
19     maintaining our independent and our
20     appropriately-varied perspectives based on the
21     missions of our agencies when it comes to our
22     individual thoughts.
23          Q.    Now, in your November 30, 2021
24     response to the requests made in this email,
25     you give an example of the case the appeals

1                    E. EICHENHOLTZ
2      panel approved, a number of zeros and then
3      there's 1452.
4   RQ              MR. NELSON:  We would request a
5           redacted copy of this model acceptance so
6           that we have an idea of how it reads.  You
7           can redact all the personal, specific
8           information about them.
9                MR. HAIDER:  We ask that you follow
10          up in writing.
11          Q.    Now, how are cases distributed to
12     individual panelists?
13          A.    As I said, each agency handles it
14     differently.  I'm aware of how each agency
15     does -- would you like me to go through each
16     one, or how would you like me to do this?
17          Q.    I'll ask you to go through each one.
18          A.    Okay.  We'll start with law.  The
19     Law Department, as I said, has five reviewers.
20     When a reviewer goes into our SalesForce
21     system, they will, generally speaking, just go
22     to the case with the lowest -- appeal with the
23     lowest case number first and work their way
24     through as many cases as they can get through
25     in the time allocated.  And when another panel

1                    E. EICHENHOLTZ
2      member comes in, they pick up from there.
3                With some exception, as I mentioned
4      earlier, you know, the New York City Housing
5      Authority people wouldn't vote on their cases.
6      You know, if I encountered a case I'd given
7      legal advice to at one time, I would leave it
8      alone and leave it empty so that it would be
9      ready for another panel member to review.  And
10     we'd just go through it in that general way.
11               For the Department of Citywide
12     Administrative Services, they have divided up
13     the work using the last digit of the case
14     number.  So someone gets 0, 1, and 2, someone
15     else gets 3, 4, 5, someone else gets 6, 7, 8.
16     I don't know if it's consecutive like that,
17     but they divided it up based on the last digit
18     of the case number.
19               The City Commissioner on Human
20     Rights, there's one individual who has done
21     the primary work there, and so that individual
22     does most of the voting.  But when other
23     individuals have voted, they've just done the
24     same thing; they've come in and voted as
25     appropriate.  And the --

1                    E. EICHENHOLTZ
2          Q.     I'm sorry.  You're saying they've
3     just come in and voted as appropriate, you
4     mean on the --
5          A.     Picked up the next case, right.
6          Q.     Okay.  Thank you.  So give me your
7     answer.
8          A.     Right, right, I apologize.  They
9     will pick up the next case that needs to be
10    voted on.  There is one exception across the
11    board to this process, in that I will on a
12    weekly basis distribute a report to the
13    committee -- to the panel on cases that have
14    two out of three votes registered, by case
15    number and by agency that needs to vote for
16    the third vote.  The reason for that is
17    because we're hoping that we can move as many
18    cases to completion as promptly as possible,
19    so they may go out of order to do what they
20    call those two-vote cases so that we can get
21    more decisions out and someone doesn't -- you
22    know, two agencies very quickly vote on
23    something and someone doesn't have to wait an
24    overly extensive period of time for the third
25    agency to vote.  So we will provide that

1              E. EICHENHOLTZ
2    information to the panel on a weekly basis.
3    We do not provide in that report how the other
4    panel members voted, obviously.  Just, they
5    get a number of a case and that that agency is
6    an agency that needs to vote on the case.
7         Q.    Okay.  And these reports are
8    written; is that correct?
9         A.    Yes.
10         Q.    Okay.  What other information is in
11    these reports?
12         A.    That is literally it.  It is a
13    series of numbers segmented by agency, and an
14    additional column for DCAS's use that allows
15    you to sort by the last number so they can
16    figure out whose cases are whose
17    responsibility.  That is what the document is.
18         Q.    Are there any other reports that are
19    issued, from time to time, within or by the
20    Citywide Appeals Panel?
21         A.    Not within.  Obviously in
22    requests -- in litigation requests and things
23    like that, like this case, we will -- the
24    attorneys will pass those along and we will
25    get the relevant documents pulled.  The panel

1                    E. EICHENHOLTZ
2       does not have the ability, including me, to
3       access the data in the database in terms of
4       downloading it.  We can hear it when we're
5       reviewing a case, but I can't, for example,
6       download a series of documents or a series of
7       information.  Only the SalesForce
8       administrators can do that, and then they will
9       send that to either me or litigation counsel
10      in the litigation request.
11           Q.    When a denial is issued on a case to
12      the appellant, does the denial list a reason
13      for the denial?
14           A.    Initially, there was no reason
15      listed on the email.  Eventually, we did split
16      it up into very broad categories, and those
17      categories were listed on the emails sent to
18      both the employee, as well as the agency.
19           Q.    When was that change effective?
20           A.    Probably sometime in late November,
21      early December 2021, as we were sort of
22      reviewing sort of the process and how it was
23      working and talking with the SalesForce team,
24      we added that feature.
25           Q.    So why did you add that feature?

1                    E. EICHENHOLTZ

2        A.    Just to allow for a bit more clarity

3    in the -- not necessarily in the email, but

4    just in the decision when it was issued, that

5    it would at least be a broad category of the

6    sort of decision that we were issuing.

7        Q.    Is there any written record that

8    reflects the or explains this decision to

9    change the way in which denials were drafted?

10        A.    It wasn't changing the way in which

11    denials were drafted.  It was adding a feature

12    that allowed us to do some broad case

13    categories.  It wasn't -- we added it to the

14    denials, but that wasn't, like, you know -- we

15    weren't like, oh, we need to change how our

16    denials were.  We just wanted to have a -- for

17    a whole host of reasons, we wanted to add that

18    broad case category.  There may have been

19    communications; I don't know in what medium

20    they were.

21        Q.    So there may have been some

22    communications.  We would like to find out, of

23    course, if there were, and if they're in

24    writing and/or if they're oral, whether the

25    writing's an email or a memo or something.  Do

1           E. EICHENHOLTZ

2    you have any information about that?

3        A.    Not as I sit here today, no.

4        Q.    And were you the one who made that

5    communication, if one was made?

6        A.    I honestly do not remember whether

7    it was me or whether it was someone else.  I

8    remember the discussions, and I remember the

9    admission, but I don't remember who

10   communicated it to who.

11       Q.    And if there was such a

12   communication that was made in writing, where

13   would we look to see a record of it or find a

14   record?

15       A.    If there's something in writing, it

16   would almost certainly be via email, and so,

17   obviously, it could -- you know, if

18   appropriate and directed by my counsel, I

19   would conduct or we would conduct a search of

20   that to be able to figure that out.

21       Q.    So aside from the database, is there

22   a repository of records that relate to the

23   workings of the committee -- of the panel, I

24   mean?

25       A.    Just the database.  Yeah, just the

1                    E. EICHENHOLTZ

2    database.

3        Q.    Does the database also contain the

4    denial and grant letters that are sent by the

5    panel?

6        A.    No, the City -- it's not done in

7    such a way that the City would retain a copy,

8    you know, with respect to -- I mean, agencies

9    would receive a copy of it, but that is -- the

10   database automatically generates that email,

11   so it's not like something, someone does it

12   from Outlook and it's in a sent folder.  That

13   email is generated out, and it's sent out to

14   the recipients, so the recipients would have

15   those emails.

16       Q.    And no one in the City would have

17   those emails?

18       A.    Well, the agencies, when they are

19   the recipients, would have those emails.

20       Q.    What are the broad categories that

21   are, you know, among the choices that can be

22   put into those automatically-generated denial

23   letters?

24       A.    So there's does not meet criteria,

25   there is insufficient documentation, which I

1                   E. EICHENHOLTZ

2       would mention parenthetically is for medical

3       appeals, other, and reason meets criteria, as

4       well as failure to engage in cooperative

5       dialogue.

6           Q.    How are people who received denial

7       letters that contain either the does not meet

8       criteria or the others, you know, broad

9       category listings in the denial letter, how

10      are they supposed to understand what it was in

11      their application that was deficient in the

12      minds of the appeals panel?

13              MR. HAIDER:  Objection.

14          A.    They would know that from their

15      proceedings before the agency.  You know, that

16      is, they have engaged in cooperative dialogue

17      prior to at that point, they generally would

18      receive a denial letter notification, they

19      have interacted with the agency's EEO officer,

20      Disability Rights Coordinator, or whatever

21      agency personnel was handling their request on

22      multiple occasions, and we are providing

23      basically an affirmance or denial after

24      appellate review, and that's really all we are

25      attempting to convey in that email, is whether

1                    E. EICHENHOLTZ

2       after appellate review, the RA's been affirmed

3       or denied -- the decision has been affirmed or

4       denied, sorry.

5            Q.    So having read the complaint in this

6       matter carefully, you are aware, are you not,

7       that the complaint alleges that the denials

8       below did not contain specific reasons for the

9       rejection of the religious accommodation

10      requests?

11           A.    Uh-huh.  Yes, I'm aware of the

12      allegation.

13           Q.    Okay.  So in that circumstance,

14      isn't it the truth that if, in fact, they were

15      not aware of the reason for the rejection of

16      the application by the agency, that receiving

17      either a does not meet criteria or an other

18      designation in the appeals denial letter is

19      not going to give them any further information

20      with respect to why they were denied?

21           A.    That's -- I -- there were a bunch of

22      things in there that I cannot factually agree

23      with, so I can't really answer that.

24           Q.    So how are they supposed to know

25      under those circumstances why their religious

```
 1                    E. EICHENHOLTZ
 2      application was denied?
 3           A.    So you're talking about, you're
 4      saying a hypothetical employee who's made it
 5      through the interactive -- the cooperative
 6      dialogue, the interactive process with their
 7      agency EEO, is aware of the agency's decision,
 8      has chosen to appeal the agency's decision,
 9      and is now receiving a decision on appeal, and
10      that employee has not, at any point in that
11      process, understood the basis for their
12      reasonable accommodation or why it might be
13      wanted, is what you're -- is the hypothetical
14      you're exploring?  I'm not aware of a case
15      where that would have happened.
16           Q.    No, the hypothetical is they're not
17      aware of why their religious accommodation was
18      denied.  Not why it was wanted.  Why it was
19      denied at both levels.
20           A.    Right.  I'm not aware of an occasion
21      where -- at least that I'm aware of, where
22      that's -- and I certainly -- if I -- you know,
23      yeah, I can't -- I just don't understand the
24      hypothetical.  I'm sorry.  I'm trying to, but
25      I don't.
```

1                     E. EICHENHOLTZ

2          Q.     And so, it's your understanding that

3     the appeals panel was not under any legal

4     obligation to provide more reasons than this?

5          A.     Yes, that's my understanding, that's

6     correct.

7          Q.     Are there any statistics with

8     respect to the amount of -- to the average

9     time that each panelist on the Citywide

10    Appeals Panel spends in adjudicating the cases

11    before the panel?

12         A.     No, there are no such statistics.

13         Q.     So no one keeps statistics of that

14    kind, so far as you're aware?

15         A.     Not unless panel members are timing

16    themselves and writing it down, but I do not

17    understand that to be happening.

18         Q.     And do you know whether or not the

19    CCHP or DCAS or the Department of Health and

20    Mental Hygiene, you don't know whether or not

21    they keep statistics of that kind?

22         A.     No.  I -- no, no.  I -- I don't see

23    why they would.

24         Q.     But you don't know?

25         A.     I don't.  I assume not, but yes, I

1                    E. EICHENHOLTZ
2      would -- I could not tell you for a hundred
3      percent certain, as we sit here today, that
4      they did.
5           Q.    Okay.  Thank you.
6           A.    No problem.
7           Q.    Now, does the Citywide Appeals Panel
8      have a procedure for determining whether or
9      not someone is eligible to file an appeal?
10          A.    You mean after we've received it?
11     Sorry, so we have an appeal before us?
12          Q.    No.  Some people are permitted to
13     file an appeal, as I understand it, other
14     people are not permitted to file an appeal.
15     Do you have some way of determining whether or
16     not an appeal -- whether or not a person who
17     files an appeal is eligible to do so?
18          A.    I know of no circum- -- perhaps
19     there other circumstances you're thinking of
20     where someone is not permitted to file an
21     appeal?
22          Q.    No --
23          A.    I can't --
24          Q.    Let me just name a couple of
25     circumstances.

1                    E. EICHENHOLTZ
2        A.    Sure.  I just don't know -- I don't
3    know what that describes.  I --
4        Q.    Sure.  There are two or three -- let
5    me just throw them out one, two, three.
6        A.    Sure.
7        Q.    Situation number 1 might be a person
8    who -- from the Department of Education, for
9    example, who attempted to file an appeal to
10   the arbitration appeal, but they were never
11   given an opportunity actually to speak to an
12   arbitrator or have an arbitral decision of the
13   appeal, and so therefore, you know, they might
14   have been interested in filing with the
15   Citywide Appeals Panel.  That's situation 1.
16            Situation 2 might be those people
17   who in another department opted to file an
18   appeal with the arbitration panel and were
19   denied by the arbitration panel.
20            Situation 3 might be that there
21   are -- that there was a person who filed an
22   appeal with the arbitration panel in the
23   Department of Education, and I think did so
24   outside the window of a few days in which they
25   were, you know, permitted to make that appeal,

1                    E. EICHENHOLTZ
2    and so were not -- and they got a denial based
3    on that, or perhaps they got no decision at
4    all from that arbitral panel.
5              So those are three different
6    options.  If each one of these persons wants
7    to file an appeal with your panel, how would
8    you determine whether or not they were
9    eligible to do so?
10   DI          MR. HAIDER:  Objection.  Outside the
11        scope.
12              I've been reading the topics, and
13        there's a subsequent sentence in the order
14        from the judge which states that, "A
15        plaintiff may inquire as to the Citywide
16        Panel's general practices, to the extent
17        they exist, as a foundation for acquiring
18        as to the practices applied to the
19        individual plaintiffs' appeals."  The
20        scenarios of the examples that you
21        provided are not applicable here because
22        they don't apply to any of the individuals
23        in this litigation's appeal.
24              So given the order and the
25        explanation by the Court as to what the

1                    E. EICHENHOLTZ
2        purpose of this is, these hypotheticals
3        that are posed are outside the scope, and
4        thus I instruct the witness not to answer
5        that question.
6        Q.    Has anyone associated with the
7    Citywide Panel expressed a goal for a
8    percentage of the number of appeals that
9    should be granted or a limit on the number of
10   them?
11       A.    No.
12       Q.    And do you know by personal
13   knowledge that no one has ever done so, or are
14   you assuming so?
15            MR. HAIDER:  Objection.
16       A.    Based on my personal knowledge, no
17   one has done so, and my understanding, as I've
18   gone through this process, is we could affirm
19   100 percent of the appeals.  That's our
20   prerogative as we review them, if the facts
21   and circumstances justified those decisions.
22   No one's ever framed this in a, oh, you have
23   to deny this amount or affirm this amount.  If
24   they were all denied, if they were all
25   affirmed, as long as the panel was doing its

```
 1              E. EICHENHOLTZ
 2   job, the panel was doing its job.
 3      Q.    So what was the policy of the
 4   Citywide Appeals Panel with respect to
 5   applicants for religious accommodation who had
 6   received vaccinations at a previous time?
 7      A.    There is no blanket policy.  We
 8   would consider that as one of many possible
 9   objective facts to evaluate whether or not the
10   individual had a sincerely-held religious
11   belief that conflicted with the vaccination
12   requirement, and those facts, along with the
13   employee's explanation of those facts, could
14   be relevant to a bunch of levels of that
15   analysis.
16      Q.    So what was the policy of the
17   Citywide Appeals Panel with respect to
18   employees who had experienced a religious
19   conversion and had been vaccinated prior to
20   the conversion and were no longer vaccinated
21   after the conversion?
22      A.    So that is an example of what I said
23   a moment ago, right?  That is an example of in
24   employee had been vaccinated, let's say,
25   throughout their life and in 2017, for
```

1                    E. EICHENHOLTZ

2      example, they converted, they became a

3      born-again Christian, they converted to

4      another religion, what have you, as a result

5      of that conversion, they took on a set of

6      religious values presumably they had been

7      developing prior to that, then they have a

8      sincerely-held religious belief, and if some

9      of those values that they've explained

10     conflict with the vaccine requirement, then

11     they would be entitled to a reasonable

12     accommodation.  So in that case, that sort of

13     fact would, you know, compel a grant of an

14     accommodation notwithstanding that fact that,

15     like, standing alone the fact they had

16     vaccines in the past might mitigate against

17     that accommodation.

18          Q.    Now -- oh, sorry.

19          A.    Sorry.  One last thing.  As you said

20     moments ago, you're going to review what the

21     employee said there, and obviously, you know,

22     absent some reason not to, you're going to

23     accept the employee's explanation.

24          Q.    Well, and so, accepting the

25     employee's explanation, if those two facts

1          E. EICHENHOLTZ

2     were expressed in the application, are there

3     other factors that would, you know, reasonably

4     cause a panel member to vote to deny the

5     application, despite the fact that the person

6     had no vaccination after the conversion?

7          A.    Yes.  And it could be a whole host

8     of factors that either, as I said,

9     demonstrates an inconsistency, that something

10    about the employee's description may also

11    suggest that even though they haven't been

12    vaccinated, their religious beliefs that they

13    have developed after the conversion don't

14    conflict with the vaccine requirement.  There

15    are a whole host of reasons that

16    notwithstanding that conversion and

17    notwithstanding the fact the employee's not

18    been vaccinated since the conversion, that a

19    reasonable accommodation might not be

20    appropriate.

21               And again, this is why when you say,

22    do you have a policy, this factual scenario or

23    not, you know, and having seen several

24    thousand now, Mr. Nelson, I can tell you with

25    certainty, there are all different

1                    E. EICHENHOLTZ

2      permutations and combinations of these facts,

3      so it is very challenging to generalize in the

4      way you were generalizing a moment ago.

5           Q.    So given all of these different

6      permutations, is there anybody who has

7      authority to restrict the ability of the

8      decision-maker of the voter to decide one way

9      or as opposed to another?

10          A.    Generally, no.  Absent some -- you

11     know, anything that would be a judgment call

12     is left to the judgment of the voter.  The

13     check that we have on that, again, is the fact

14     that we have three agencies individually

15     reviewing these cases, right?  So that if you

16     have one voter who just really reads it, maybe

17     gets the wrong feel, and the other two voters,

18     you know, seem to have a, you know, different

19     view on it, you know, that employee has a

20     chance, you know, obviously then the employee

21     would get the accommodation.

22               In order to be denied an

23     accommodation, the employee has to go through

24     at least three people who are knowledgeable in

25     the process; the agency EEO officer or EEO

1               E. EICHENHOLTZ

2     personnel or whoever in the agency was

3     designated to review it, the Disability Rights

4     Coordinator, for example, and two of the three

5     panel members at least.  And then other

6     occasions I think that are in this case, as

7     well, sometimes it's everyone who's reviewed

8     the request has determined the RA is not

9     appropriate or is appropriate, you know, other

10    circumstances.

11         Q.    Just talking about that at the

12    Citywide Appeal Panel level, supposed you have

13    a situation where you have a person who had a

14    vaccination as a child, had a religious

15    conversion, had no vaccinations after

16    religious conversion, you get one vote for a

17    grant, and you get two votes for no grant for

18    reasons that are perhaps not, you know,

19    clearly explained in the comments.  You know,

20    is that a situation that is acceptable to the

21    Citywide Appeals Panel, first of all?  Is that

22    an acceptable way to decide, with two to one,

23    despite the fact that you've got a religious

24    belief which is presumed or assumed to be

25    valid?

1          E. EICHENHOLTZ

2          A.    So I'm not aware of that scenario

3     you've described ever coming up, where there

4     were two voters who had infirm justifications

5     on a record that was very clear purely at a

6     religious conversion.  You know, again, it

7     would have to be had a religious conversion,

8     the religious belief conflicts with the

9     vaccine requirement in this way, and, you

10    know, and all the other factors, all the other

11    facts that are in the record point to the

12    grant of the RA, and two voters disregarded

13    that entirely -- you know, that's not

14    really -- that's a very out-there scenario,

15    from my experience working on these cases.

16         Q.    Well, is it possible that -- are

17    there situations, for example, in which the

18    panel members disagree with each other,

19    without regard to whether one side wins or the

20    other side loses, whether it's a grant or a

21    denial, where it's possible that both

22    positions can reasonably be taken by the panel

23    members on the basis of the material that is

24    provided to the panel?

25         A.    Yes.  And, in fact, you know, I've

1          E. EICHENHOLTZ
2    seen every permutation and combination that
3    exists.  I've seen unanimous grants, unanimous
4    denies, two to one with the different -- all
5    the various agencies at various times being
6    the two, some of agencies at various times
7    being the one, and those generally do occur,
8    as I think you succinctly stated there, in a
9    case where the factual record might -- where
10   there is support for both conclusions
11   depending on how you balance the various
12   things, if there may be some contradictory or
13   conflicting information that needs to be
14   reconciled, and that two agencies reconciled
15   it in one direction and one agency reconciled
16   it in another.
17        Q.    SO it's fair to say, then, that each
18   voter has discretion with respect to the
19   decision that the person makes?
20        A.    Between the bounds of the legal
21   framework and the analysis that, you know,
22   they're supposed to be applying, yes, for
23   things like, you know -- for things like, you
24   know, balancing of factors, things like
25   credibility assessments to the extent those

1                    E. EICHENHOLTZ
2      come up with respect to objective reasons to
3      be concerned of credibility, things like that,
4      yes.  The individual panel members exercise
5      that discretion as the law allows and as
6      individuals considering these requests are
7      permitted to do.
8          Q.    What was the policy of the Citywide
9      Appeals Panel with respect to applicants who
10     only objected to the COVID-19 vaccine based
11     upon religious objections, but it didn't
12     object to any other vaccines?
13         A.    So this is going to sound familiar.
14     There is no uniform blanket policy because
15     that is a factual determination.  There can
16     certainly be a basis for granting of
17     reasonable accommodation.  I'm sure if we put
18     a series of facts together, you may have some
19     ready to go, where an RA might be granted, and
20     there are many scenarios where if someone is
21     objecting solely to the COVID-19 vaccine,
22     where the RA would be denied, I think, you
23     know, there -- so there's no rule that, oh, if
24     they just said COVID, you've got to deny, or
25     they just said COVID, you've got to grant.

1          E. EICHENHOLTZ

2     There's no rule or policy like that.

3         Q.    So again, each voter is left to his

4     or her own discretion with respect to that

5     analysis?

6         A.    Yes and no.  I mean, I think it's

7     not fair to say it's some, you know, shoot a

8     dart at the dartboard discretionary call here.

9     What the panel members are doing is looking at

10    the objective facts provided in the request

11    and weighing those and coming to a reasonable

12    conclusion, right?  These -- you know, or if

13    they need additional cooperative dialogue,

14    there have been some cases roughly along that

15    line that you just said where you might need

16    some additional cooperative dialogue if it's

17    not in the record already.  But they're

18    applying their reasoning and their judgment to

19    facts.  They're not just saying, well, this is

20    the factual scenario, so it's totally up to

21    me, yes or no.  They are applying the facts in

22    a reasonable manner, and if they are competing

23    facts on the record, some people, you know,

24    might -- the balance might tip one way for one

25    person, it might tip the other way for the

1                    E. EICHENHOLTZ
2    other person.
3        Q.    So among other things, you're saying
4    that that particular scenario is not
5    necessarily dispositive?
6        A.    Yes.   There's very -- there is -- I
7    cannot think of something that would
8    dispositive in all cases, and I'm sort of
9    laughing, other than maybe someone coming in
10   and saying, I have no religious belief that is
11   the basis of this request.   That might be
12   dispositive.   Surely no one has done that,
13   that I'm aware of, short of that.   It is,
14   you're really looking at the record and having
15   to look at all the different facts that are
16   presented by it.
17       Q.    So if an applicant was silent on
18   whether or not he or she had taken other
19   vaccines, was there a policy of the panel as
20   to how that would affect the analysis of
21   whether the person's religious objection to
22   taking the COVID-19 vaccine was sincerely
23   held?
24       A.    So there was no policy of the panel.
25   That factor would be looked at amongst --

1                        E. EICHENHOLTZ

2       you'd have to look at the other facts in the

3       record, the information that the employee

4       provided, the circumstances presented in the

5       appeal, and make a determination as to whether

6       you want to grant or deny, or if necessary,

7       seek additional cooperative dialogue, if it

8       was felt it was needed.

9            Q.    Did the Citywide Panel have a policy

10      as to how an applicant's children might affect

11      the analysis of an appellate's sincere

12      religious belief?  For example, if the

13      children were vaccinated but the appellant was

14      objecting to a COVID-19 vaccine?

15           A.    Again, you would consider that --

16      the panel would consider that in the context

17      of all the facts presented in the case.  As I

18      sit here today, I can think of factual

19      scenarios where that might be, you know,

20      relevant and compel a grant and there are

21      factual scenarios where it might not be

22      relevant and/or it might be denied, but

23      obviously, if it's something the employee

24      offers or provides, it can be and it will be

25      considered by the panel members when weighing

1              E. EICHENHOLTZ
2    all those different competing facts to
3    determine whether a reasonable accommodation
4    is appropriate.
5         Q.    And is the same answer appropriate
6    to the question of whether, you know, the
7    question of a situation in which an applicant
8    fails to mention whether his or her children
9    are vaccinated?
10        A.    I mean, not -- no, it's not -- you
11   know, there's no implication by silence,
12   right?  You know, there's no -- so yes, the
13   answer is:  You look at the facts, and if the
14   fact's not there, it's one of the factors
15   you're weighing.  You're not saying, oh, you
16   know, I'm going to imply through this employee
17   silence that their children are vaccinated or
18   they even have children, right?  So what would
19   happen in that scenario is that would not be a
20   factor of how this person's family has been
21   vaccinated or not vaccinated when you're
22   weighing the various factors.
23        Q.    Now, if a person was not scrupulous
24   in their observance of their professed
25   religious belief with respect to vaccines,

```
 1                    E. EICHENHOLTZ
 2      would that be a basis for, a potential basis
 3      for a panel number to decide against granting
 4      a religious accommodation against the use of
 5      the COVID-19 vaccine?
 6               MR. HAIDER:  Objection.
 7               You can answer.
 8               THE WITNESS:  Okay.
 9          A.    It could potentially be a factor one
10      way or the other the panel would consider, be
11      considered in connection with what the
12      employee is saying and all the other factors.
13      Obviously, I think this is a good example, you
14      used the word unscrupulous.  One may feel it
15      was, you know, someone just hasn't been, you
16      know, that there's -- you know, that that may
17      not be a dispositive factor in one case, and
18      depending on that record, it may be a
19      highly-relevant factor decision in another
20      case.
21          Q.    Well, of course I used the words
22      "not scrupulous."
23          A.    Yes.
24          Q.    Rather than "unscrupulous."
25          A.    Sorry.  I heard unscrupulous.  So I
```

1              E. EICHENHOLTZ

2      heard that through my computer.  So if you

3      used "not scrupulous," I will substitute not

4      scrupulous into my answer.

5          Q.    Are all the members of the Citywide

6      Panel familiar with that portion of the EEOC

7      Guidance that says that employees need not be

8      scrupulous in their observance of their

9      religious belief?

10         A.    Yes.

11         Q.    Okay.  And in your observation of

12     the decisions that you've reviewed in your

13     quality control responsibility, have you seen

14     decisions or votes by members of the Citywide

15     Panel that rely upon the unscrupulous, if you

16     will, or not scrupulous observance of vaccine

17     objections by applicants to deny the religious

18     accommodation request?

19         A.    In cases where there are a variety

20     of factors that compel denial or cause someone

21     to question the sincerity, it is entirely

22     possible that there may be an inconsistency

23     that is unexplained and does not -- and the

24     other factors that are provided by the

25     employee in the circumstances don't mitigate

1                    E. EICHENHOLTZ
2    to a degree where one of two things may become
3    true dependent on the facts and the
4    circumstances.  One, the belief may not be
5    seen as sincere, or two, that the employee's
6    practice of that particular belief does not
7    extend to the sort of practice that would
8    conflict with the vaccine requirement, but --
9        Q.    And -- go ahead, please finish your
10   answer.
11       A.    So I was going to say, so it's not
12   necessarily -- the conclusion there isn't
13   necessarily, oh, it's not scrupulous, right?
14   But there may be related issues where the
15   frequency or the consistency of practice
16   becomes a factor.
17       Q.    Could the lack of scrupulous
18   observance of objection to vaccines be the
19   sole basis for denying religious accommodation
20   request?
21       A.    There is generally -- that would
22   presume, and this is why I'm pausing here for
23   a moment, that would presume that's the only
24   thing presented either by the employee or the
25   agency on the record, and that is almost

1                    E. EICHENHOLTZ
2      never -- you know, I don't see how that
3      would -- like, I haven't encountered that
4      situation where someone just says, I need an
5      RA because I abstained from some vaccines but
6      not others, you know, period, please consider
7      my request.  That's another one of those I put
8      in the bucket of, to me, comes off as a highly
9      unusual fact pattern.
10          Q.    Have you ever seen such a fact
11     pattern?
12          A.    Not that -- certainly not where
13     there weren't other things to examine about
14     the employee's request beyond that statement.
15          Q.    Have you seen situations in which an
16     applicant's conduct pursuant to their
17     religious beliefs has changed over time.  A
18     degree of appearance, for example, that
19     increases so that one's current observation of
20     a religious belief has become more stringent,
21     even though it might be different earlier on?
22     Have you seen situations like that?
23          A.    Yes.
24          Q.    And how should -- does the Citywide
25     Panel have a policy with respect to how that

1                    E. EICHENHOLTZ
2    pattern should affect the determination of a
3    voter on whether or not to grant a religious
4    accommodation?
5         A.    So the employee -- so that would be
6    one of the facts that the panel members
7    consider in connection with all the facts of
8    the entire record to determine whether or not
9    the employee has a sincerely-held religious
10   belief and whether there's a conflict with the
11   vaccine requirement that could play a role in
12   that fact, could play a role in the
13   consideration, yes.
14        Q.    And what about, there's a provision,
15   there's a guidance, there's a discussion in
16   the EEOC Guidance that says that, "an
17   employee's newly adopted or inconsistently
18   observed practices may nevertheless be
19   sincerely held."  And to what extent have you
20   ever seen that guidance applied by a panel
21   member in supporting the grant of a religious
22   accommodation?
23        A.    Well, as I think you -- you know, I
24   will just sort of echo back to you that that
25   would be applied.  As the EEOC says, you can't

1          E. EICHENHOLTZ
2    say without looking at the entire record, the
3    new adoption of religious belief automatically
4    makes it insincere.  What you would do, what
5    the panel would do in the way the panel
6    animates that, you know, I focus here on the
7    word may, they would review the entire record,
8    all the relevant facts, and make a
9    determination on the overall record, of which
10   that issue may or may not be a contributing
11   factor.
12        Q.    And so, does your Citywide Panel
13   have a policy following the EEOC Guidance that
14   no one factor or consideration should be
15   determinative and that the religious objective
16   should be evaluated on an individual basis?
17        A.    Finally, yes, we do have a policy.
18   And that is generally how we approach it.  You
19   know, we look at all the facts, and we weigh
20   those facts.  And like I said, to the extent
21   I've seen disagreements between the panel
22   members, it is usually over how the facts are
23   waived.
24        Q.    So I'd like to refer again to our
25   Exhibit 1, which is the email exhibit.

1                    E. EICHENHOLTZ

2         A.    Uh-huh.

3         Q.    So in that exhibit, one of the

4    panelists from the Law Department states, "I'm

5    mostly seeing folks expressing their view that

6    all COVID vaccines contain or were tested

7    using fetal stem cells and some personal

8    statements saying I've never taken vaccines

9    ever, or not since I become an adult

10   (vaccinated as an adult).  My understanding

11   from our conversation is that those would not

12   constitute sincerely-held religious beliefs."

13          Do you find that text in the email?

14   Have you seen that?

15        A.    Yes, I see that text.

16        Q.    And that's what it says, right?

17        A.    That is what it says.

18        Q.    Okay.  Now, it looks like this email

19   is saying that the Citywide Panel had a policy

20   that the objection that all COVID vaccines

21   contain fetal stem cells does not constitute a

22   sincerely-held religious belief.  Was that a

23   policy that the panel ever had in place?

24   That's the first question.

25        A.    No.

1          E. EICHENHOLTZ

2      Q.    Is that a policy?

3      A.    Yeah, no, no.

4      Q.    Aside from in this email, have you

5  heard that view expressed in the course of

6  your discussions with the other panel members?

7      A.    Only in this email, and it was a

8  part of what animated my response to this

9  email and my follow up with that panel member,

10 was seeing that particular comment in the

11 previous email.  It showed me there was

12 confusion that needed to be clarified.

13     Q.    So why didn't you clarify that in

14 your response in the email?

15     A.    That is the line General Gist and

16 the fact pattern is, employee articulates

17 sincerely-held belief, has articulated how

18 they act on that belief outside the COVID

19 context, and has properly applied the belief

20 to the COVID vaccination.  That was my first

21 step in doing it.  You know, we had follow-up

22 discussions to this email, not via email, but

23 that was my very quick response to let him

24 know that that is -- that yes, there are

25 occasions where that would be the basis of a

1                    E. EICHENHOLTZ
2    grant.
3        Q.    Well, you didn't specifically
4    mention the objection of using fetal stem
5    cells or any of the other details that the
6    panelists wrote in the email.  Why is that?
7        A.    Again, because -- and I've expressed
8    this throughout this discussion, my view was I
9    was very hesitant to put any particular
10   religious belief, religion issue in a
11   particular yes or no bucket because I don't
12   think that is the way -- that shortcuts things
13   too much.  And so, what I was doing more was I
14   was talking about the various factors that
15   would weigh in one direction or another.
16       Q.    Well, you said you were not wanting
17   to put specific religious beliefs into one
18   bucket or other, but it seems to me that
19   this -- well, and I see in the email, it says
20   that this person's understanding was that this
21   didn't even constitute a religious belief, a
22   sincerely-held religious belief.  Did you
23   unequivocally tell this person either -- it
24   would have had to have been orally because you
25   said it's not in an email --

1              E. EICHENHOLTZ
2      A.     Right, right.
3      Q.     -- that a belief with respect to
4  COVID vaccines could be a religious belief?
5      A.     With respect to COVID -- you mean
6  the fetal stem cell testing?
7      Q.     Yes.
8      A.     Yes, if -- I wouldn't have said it
9  unequivocally because it's not an unequivocal
10  concept.  There are people who oppose fetal
11  stem cells in testing and do not do so as a
12  matter of religious belief.  There are
13  individuals who possess a religious belief
14  that might cause them opposition to the use of
15  fetal stem cells in testing, but nonetheless
16  their religious beliefs in their personal view
17  would permit them to take the vaccine.  So I
18  would not say anyone who says fetal stem
19  cells, that's always religious, that's always
20  a yes.  You have to look at the record,
21  understand what the source of the religious
22  belief is.  Obviously, if the employee says,
23  I'm a Catholic and through my Catholic
24  upbringing and the teachings of the church, I
25  believe that life begins at conception, or

1          E. EICHENHOLTZ

2     life begins at fertilization, if that's what

3     they believe and the source of that is a

4     religious belief, and I have practiced that

5     religious belief by making sure I was never

6     even remotely connected to abortion, including

7     I will not take any vaccines that were tested

8     on cell lines derived from fetal cell lines,

9     then yes, that would be a scenario.  But there

10    are a lot of pieces of that scenario that come

11    together.  You can't generalize and say that

12    everyone who is opposed to the use of cells

13    derived from -- and by the way, fetal stem

14    cells, fetus that are a product of abortion I

15    think is really the key there.  You cannot

16    generalize or assume, you know, absent more

17    from the employee, what the source of that

18    belief is or how it's practiced.

19         Q.    Now, some of the applications may

20    have contained claims of belief that vaccines

21    actually contain aborted fetal cells as

22    opposed to being somehow, you know, derived

23    from them or being somehow perhaps tested

24    using them.  And were the panel members given

25    any instructions with respect to whether or

1              E. EICHENHOLTZ
2      not any one of or all of those factual
3      contentions were truthful or accurate?
4          A.    So we go off of the CDC Guidelines
5      and have DOHMH available to us for any medical
6      questions.  My understanding and the factual
7      understanding that we've been functioning on
8      is, because we're doing this in the context of
9      the City Health Commissioner's order and the
10     City Health Commissioner has the authority to
11     make those sorts of medical determinations, is
12     that there is for, I believe, the Pfizer and
13     the Moderna vaccines, there was fetal -- there
14     were cells that were derived from fetal stem
15     cells that were a product of abortion a
16     lengthy period of time ago used in the
17     testing, and that in Johnson & Johnson it was
18     used in sort of the manufacturing, and that
19     neither actually contained those cells,
20     particularly the Pfizer and the Moderna.
21              And when we're applying facts, we
22     are going off the facts that the health
23     commissioner relied on in issuing his order.
24     One could not change those facts by saying
25     that, I do not believe the factual findings of

1              E. EICHENHOLTZ

2      the health commissioner to be true.

3          Q.    So if a person cited something that

4      you found to be factually incorrect, was it

5      the policy of the panel that that should be a

6      count against the application for religious

7      accommodation on behalf of that person?

8          A.    No, no.  What would happen there is

9      we would look at all the facts and the basis

10     for the belief.  What might happen there, for

11     example, if someone says, the way I practice,

12     I have a religious belief that prevents me

13     from being associated with abortion, and that

14     belief compels me to never inject cells

15     derived from an aborted fetus into my body,

16     well, these vaccines do not require that, so

17     when you review that record, absent something

18     more, there may be something more that

19     suggests a broader conflict, there would be no

20     RA there because there would be no conflict

21     because the employee could take that vaccine

22     without offending the employee's religious

23     beliefs.

24              So that's not -- I wouldn't call

25     that counting it against the employee.  That's

1                    E. EICHENHOLTZ
2     assessing the employee's own religious beliefs
3     on the terms and in the manner the employee is
4     explaining it to the agency and that we're
5     reviewing it on appeal.
6          Q.    So essentially, then, under those
7     circumstances, the panelist would be
8     determining that the applicant was not
9     violating his own beliefs if he or she were to
10    be taking the COVID-19 vaccine?
11         A.    No, the applicant made that
12    statement in connection with a request.  The
13    panel's not making that determination.
14         Q.    No --
15         A.    The applicant is providing us the
16    circumstances under which there is a conflict.
17         Q.    Yes.
18         A.    We would be applying the applicant's
19    circumstances.  We're not making any
20    determination there about the applicant's
21    religious belief.
22         Q.    Well, you are making a -- if a
23    religious belief, you know, if it's expressed
24    as an opposition to taking the COVID-19
25    vaccine and it's expressed as being on the

1                    E. EICHENHOLTZ

2       basis of a belief that the COVID-19 vaccine,

3       you know, contained aborted fetal stem cells,

4       then aren't you saying essentially that the

5       religious belief is wrong of the applicant, or

6       are you saying something else?

7            A.    No, absolutely not.  I'm saying in

8       that circumstance, I'm saying that the

9       employee doesn't have those -- the employee

10      has a belief that's sincerely held, they

11      practice it in a certain way, and taking the

12      vaccine is not inconsistent with how they've

13      articulated they will practice their belief.

14      There is no judgment whatsoever in that

15      scenario about the employee and their belief.

16           Q.    Well, are you -- it seems to me that

17      there is, and correct me if I'm wrong, but

18      aren't you essentially the determining in the

19      course of that adjudication that a person's

20      belief that there are fetal stem cells

21      contained in the vaccine is not religious?

22           A.    No.

23                 MR. HAIDER:  Objection.

24           A.    Absolutely not.  I'm -- in that

25      scenario I described, I made the following

1                   E. EICHENHOLTZ

2     conclusions.  One, that the person's objection

3     to fetal stem cells is religious in nature,

4     let's say for our hypothetical that person

5     says as a result of their Catholic religion.

6     Second, that they have a sincerely-held belief

7     that is practiced in such a manner that it

8     could potentially apply to vaccinations.  And

9     third, that they've provided an explanation of

10    what practices would offend their religious

11    beliefs.  And all of those things are accepted

12    is true in that scenario.  There is no

13    judgment about the employee's belief there.

14                   What is done is factually, it's

15    actually the judgment is on the vaccine

16    mandate.  Looking factually at the vaccine

17    mandate, there is nothing that conflicts with

18    that religious belief as the employee has

19    expressed it.  So there are no judgments being

20    made in that scenario about the sincerity or

21    the extent of the employee's religious belief.

22         Q.    But you are making a judgement with

23    respect to the voracity of the belief --

24         A.    No.

25         Q.    -- to the extent that the belief

```
 1                    E. EICHENHOLTZ
 2      includes an assertion that stem cells are
 3      contained in the vaccine?
 4              MR. HAIDER:  Objection.
 5          A.    That's not a religious belief.
 6          Q.    I was asking.  That's my question.
 7      You're saying that's not a religious belief?
 8          A.    Yes, that's not a religious belief.
 9      That's not part of the employee's religious
10      belief.  The employee's believing that stem
11      cells are in a vaccine that doesn't contain
12      stem cells.  That's a fact, the employee may
13      be mistaken about how -- what's contained in
14      the vaccine, there may be a misunderstanding
15      by the employee about the vaccine's
16      ingredients, but that doesn't constitute a
17      religious practice or belief when an employee
18      makes a -- you know, is applying -- is
19      describing, this is how I apply my beliefs,
20      and the vaccine mandate doesn't require the
21      employee to do something that doesn't -- you
22      know, that doesn't conflict with those
23      beliefs.
24          Q.    What if the employee is basing the
25      employee's belief on -- with respect to the
```

1                    E. EICHENHOLTZ

2       presence of fetal stem cells in a vaccine on

3       information or direction that has been

4       provided to the applicant by a spiritual

5       director or a clergy person of their faith?

6            A.    It's not a religious belief.  They

7       cannot -- an employee cannot claim a vaccine

8       contains something they don't claim.  If the

9       clergy says it, if -- regardless.  If someone

10      says the sky is green, that is -- you know,

11      and we know the sky is blue, then the sky is

12      blue.  You know, that is not -- you can't

13      change the underlying facts of what the

14      mandate requires by having a member of clergy

15      say, well, actually the facts are different

16      than what the mandate requires.  You can't --

17      there's no legal or factual basis to do

18      something like that.

19               MR. HAIDER:  Mr. Nelson, if we could

20          just take a ten-minute bathroom break.

21               MR. NELSON:  Sure.  We'll break for

22          ten minutes.  I have 2:32, but whatever

23          ten minutes is, let's take it and come

24          back.

25               THE VIDEOGRAPHER:  We're now going

1              E. EICHENHOLTZ

2          off the record.  The time is 2:32.

3                (Recess was taken.)

4                THE VIDEOGRAPHER:  We're now back

5          on.  The time is 2:43.

6    BY MR. NELSON:

7          Q.    So, Mr. Eichenholtz, who gets to

8     make the decision as to whether or not a

9     belief is religious in nature?

10         A.    "Religious in nature."  It would be

11    assessed obviously in the first instance, in

12    the primary instance, at the agency level as a

13    result of the information they have, the

14    cooperative dialogue, upon consideration of

15    what the employee has advised, the information

16    the employee has provided.

17         Q.    Why would it not be a matter for the

18    individual involved and his or her pastor or

19    religious leader to make that determination as

20    to whether or not it was a religious, you

21    know, bit of information or a belief?

22         A.    It would be.  I don't think we're --

23    I'm referring more to the process.  We're here

24    talking about the process.  You're absolutely

25    right, the agency is obtaining information

1                    E. EICHENHOLTZ
2       from the employee and potentially, if they
3       provide some furnished information from the
4       employee's religious leader, and that is what
5       the agencies consider.
6            Q.    So if an individual, if an employee
7       is making a religious accommodation request
8       based upon instructions the employee has
9       received from his religious leader that the
10      panel finds to be factually untrue, what turns
11      that into not being a religious belief?
12           A.    It's not, not a religious -- it is a
13      religious belief.
14           Q.    So, for example, taking the scenario
15      that we were discussing before, if the
16      religious leader has told the congregation to
17      which the employee belongs, the applicant,
18      that there stem cells derived from abortion
19      that are contained in all of the vaccines, and
20      that therefore, in order to be religiously
21      observant, the applicant must not take any of
22      the COVID vaccines, how can the panel be
23      empowered to determine that it's not a
24      religious belief?
25           A.    That -- they wouldn't be.  In this

1              E. EICHENHOLTZ

2    circumstance, the panel will not be

3    questioning that that is the employee's

4    religious belief.

5         Q.    And so, as a consequence, what the

6    panel in that circumstance should do is not to

7    count the inaccuracy of any factual element of

8    that belief as disqualifying the person from

9    having a religious belief with respect to the

10   use of the vaccine, correct?

11             MR. HAIDER:  Objection.

12        A.    With respect to the determination

13   that the employee has a particular religious

14   belief, yes, that's correct.

15        Q.    Okay.  And so, if the panel, then,

16   decides to deny that application, the panel

17   would be requiring the appellant to violate a

18   sincerely-held religious belief; isn't that

19   correct?

20        A.    No, that's not correct.

21        Q.    Well, you've got a denial that

22   sanctions the person for not taking a vaccine,

23   right?  The person loses his job.

24        A.    A denial that -- well, the person

25   would then be subject to the vaccine mandate,

1                    E. EICHENHOLTZ

2    yes.

3        Q.    Okay.  And to be subject to the

4    vaccine mandate, a person has to take the

5    vaccine or --

6        A.    Correct.

7        Q.    -- suffer sanctions, correct?

8        A.    "Suffer sanctions"?  Well, to

9    continue in their employment, yes, they're

10   going to have to take the vaccine.

11       Q.    Okay.  So how is that -- if granted

12   what you just conceded is a sincerely-held

13   religious belief, how does that -- how does a

14   denial of the exemption application not force

15   this person either to violate their

16   sincerely-held religious belief or to suffer

17   sanctions for refusal to violate the belief?

18       A.    Because, and I think we're really

19   getting into legal arguments which are not,

20   quite frankly, for me to make in this context,

21   what the panel is doing there is not

22   denying -- or the agency and then the panel is

23   affirming in this instance is not affirming a

24   denial on the ground that the employee does

25   not have a sincerely-held religious belief.

1              E. EICHENHOLTZ

2        Q.    What would it be doing in the

3    contrary, if it is not doing that?

4              MR. HAIDER:  Objection.

5        A.    It's denying the -- it's not -- it's

6    making a determination that a reasonable

7    accommodation is not appropriate under the

8    facts and circumstances presented, and there

9    are a whole panoply of reasons that the panel

10   would do that, one of which is the sincerity

11   of a religious belief.

12       Q.    But haven't you just conceded that

13   we're dealing with a scenario in which we have

14   a sincerely-held religious belief?  They

15   couldn't under those certain circumstances,

16   given no other facts on the matter, conclude

17   otherwise, correct?

18       A.    If the belief was insincere?

19   Correct.

20       Q.    That it was insincere.

21       A.    The panel under those circumstances

22   could not conclude the belief is insincere,

23   that is correct.

24       Q.    Or that --

25       A.    I mean, absent some additional

1                    E. EICHENHOLTZ
2     circumstances, we're not talking about a
3     hypothetical.  But that's not the only reason
4     a reasonable accommodation would be denied.
5     So that's what I'm trying -- you know, I'm
6     trying to answer your question to the best of
7     my ability.
8          Q.    Sure.  And again, I'm trying to get
9     through an outline that I have, and I'm
10    skipping over all the ones where we've asked
11    the question before, so I'm actually saving
12    you time by doing it like this.
13              So were Citywide Panel members given
14    an instruction as to how to handle
15    applications that contained objections that
16    were based upon factual beliefs about
17    vaccination that were in conflict with the
18    actual findings of the health commissioner?
19         A.    They were to consider it, you know,
20    based on the facts and circumstances, applying
21    the various standards of Title VII, and make
22    the determination whether the agency had
23    properly denied the reasonable accommodation.
24         Q.    So the decision they were making was
25    whether the agency had properly denied the

1           E. EICHENHOLTZ

2    reasonable accommodation; it was not whether

3    or not the person was entitled to a religious

4    accommodation?

5        A.    Well, when we're reviewing it, we're

6    reviewing the denial.  So if the person was

7    entitled to a reasonable accommodation, the

8    agency's decision would be reversed.

9        Q.    Okay.  So what if the facts were

10   imbalanced?  What if the evaluator, the panel

11   member, found that the, on the one hand, there

12   were perhaps reasons for the denial, but on

13   the other hand, that they were equally

14   balanced by the reasons for affirmance?  Was

15   there a policy of the panel as to whether that

16   should lead to a denial or a grant?

17       A.    No specific policy about how one

18   would deal with something where they truly

19   believed the factors were equally balanced.

20       Q.    But if the matter deemed decided was

21   whether or not the agency was justified in

22   making its determination, isn't that a

23   different determination than whether or not

24   the applicant was entitled to an

25   accommodation?

1                     E. EICHENHOLTZ

2          A.    I'm a little confused.  Can you try

3     to rephrase it?

4          Q.    Sure.  There are -- these are two

5     different standards, are they not?  One is

6     whether or not the panel, the agency below,

7     was justified, you know, had justification for

8     its decision.  The other is, if you're on a de

9     novo standard, whether or not the applicant is

10    entitled to an exemption.  They're different

11    standards, they have different weights.  It

12    sounds to me like what you're saying is that

13    in making an adjudication of this kind, the

14    Citywide Appeal Panel members were expected to

15    deny if they felt that there was justification

16    for the agency's denial; is that correct?  Is

17    that what was being done?

18         A.    That -- no, I really that's not an

19    accurate description of how we go about doing

20    it and I -- yeah, that's all I...

21         Q.    Where was the expectation?

22         A.    There was no expectation.  The panel

23    was required to review the record, which

24    included the reasons the agency gave for their

25    denial, the information provided by the

1          E. EICHENHOLTZ
2     employee, any information provided by the
3     agency, balance all of that, review all of
4     that, and make a determination.  If they
5     determine that the reasonable accommodation
6     should have been denied, the agency's decision
7     would be affirmed.  If they believed the
8     record demonstrated an accommodation ought to
9     have been granted, then they would essentially
10    reverse the agency and grant a reasonable
11    accommodation.
12         Q.    Did the Citywide Panel have a policy
13    as to how to treat applications that stated
14    objections to the vaccine based upon aborted
15    fetal cells, but where the applications were
16    silent on the applicant's use of Tylenol or
17    Pepto Bismol?
18         A.    No specific policy on that.  An
19    employee providing us information on use of
20    medications, because at some point in the
21    cooperative dialogue either they volunteered
22    it or the agency solicited that information
23    obviously would be considered along with any
24    explanation the agency -- the employee
25    presented about whether they used or did not

1                    E. EICHENHOLTZ
2      use those medications.
3           Q.    And what would be the purpose for
4      eliciting that information about the use of
5      ibuprofen or Pepto Bismol or any other
6      medications?
7           A.    To understand how the employee
8      applies his or her sincerely-held religious
9      belief concerning in that case aborted -- a
10     religious belief that concerned opposition or
11     a feeling that there was a prohibition on
12     abortion, because again, you know, you have to
13     understand not only the general category of
14     what the belief is, but how the employee
15     practices.
16          Q.    So what is the relevance of the use
17     of Pepto Bismol to understanding a person's
18     religious practices?
19          A.    Well, it depends on what they're
20     claim -- there may be no relevance.  It
21     depends on what their particular claim of
22     their religious belief is.  I think we're --
23     we've been focused recently on the idea of
24     religious opposition to fetal cells derived
25     from abortion, and there are many, many

                    E. EICHENHOLTZ
1
2   people, probably millions, who have that
3   religious opposition, would use those sorts of
4   products and would use many and all products
5   in which there was scientific testing where
6   there may or may not have been those sorts of
7   cells.  That their religious practice is
8   baited upon, for example, not, you know,
9   carrying a baby to term, not engaging or
10  encouraging abortions, things like that, but
11  that is where their personal practice of that
12  religious belief ends, and that there are
13  others who will practice it differently and
14  practice it far more deeply when it comes to
15  the area relevant to the vaccine mandate.  And
16  not all people -- you know, we don't
17  stereotype.  Not all people who have a
18  religious belief concerning abortion believe
19  in the same things and practice their beliefs
20  in the same way.
21      Q.    Why would the Citywide Panel or the
22  agencies below ask a question about Pepto
23  Bismol?
24      A.    As I said, first thing, I don't know
25  why they would ask about Pepto Bismol or not.

1            E. EICHENHOLTZ
2    As I said, if they did and if the employee did
3    it, we would consider it amongst a variety of
4    other factors in the record to the extent
5    there's any relevance to determine it.  And
6    that at the end of the day is what we're
7    doing.
8        Q.    I'm sorry, but that doesn't get at
9    the nature of the question.  I was asking
10   about Pepto Bismol.  Why in the world would
11   anyone involved in the City's, you know,
12   determination of these questions or the
13   appeals, believe that use of Pepto Bismol was
14   somehow relevant to the sincerity of a
15   religious belief that the aborted fetal cells
16   should not be, you know, ingested?
17            MR. HAIDER:  Objection.
18       A.    I don't -- I don't know the answer
19   to that question.  To the extent it's helpful,
20   I can tell you that I'm not aware, and I don't
21   believe there's any member of the panel who
22   has denied an appeal on the ground that an
23   employee has taken Pepto Bismol.
24       Q.    And the same questions with respect
25   to ibuprofen.  Why would anybody -- well, I

1                    E. EICHENHOLTZ
2     mean, you can see -- well, first of all, let
3     me step back.  I'll take that pending question
4     off the record, please.
5               You are aware, were you not, that
6     questions have been raised repeatedly,
7     frequently by the agency's below and discussed
8     in the records that you've reviewed in the
9     Citywide Appeal Panel process concerning the
10    applicant's use of Pepto Bismol, correct?
11    You're aware of that?
12        A.    Yes.
13        Q.    Okay.  Is there some fact that
14    relates to Pepto Bismol that you think might
15    make use of Pepto Bismol relevant in any way
16    to an inquiry into the sincerity of someone's
17    religious belief?
18        A.    I don't know if this is the case or
19    not, but it could be that if Pepto Bismol was
20    a product that was derived indirectly or
21    tested indirectly from abortion, aborted fetal
22    cells, it might have an analogy.  So, you
23    know, an employee might say, well, I
24    understand Pepto Bismol to be this case and
25    that's why I abstain from it.  You know,

1                    E. EICHENHOLTZ

2     generally it would -- you know, as I sit here,

3     you know, I don't know.  I don't know for

4     sure.  I'm not looking at a specific case, and

5     I can't tell you, as I sit here now.

6          Q.    Are you aware that the City Health

7     Commissioner, the former commissioner,

8     Mr. Chokshi issued a statement or a paper

9     mentioning Pepto Bismol and ibuprofen and

10    containing certain factual assertions with

11    respect to the use of fetal stem cells in

12    connection one way or another with those two

13    products?

14              MR. HAIDER:  Objection.

15         A.    I'm not aware of a specific paper

16    issued by the City Health Commissioner, no.

17    I -- no.

18         Q.    And are you aware that the

19    commissioner had made some statements with

20    respect to that topic?

21         A.    No.

22         Q.    And are you aware that some of the

23    adjudicators of religious accommodation

24    requests at both the agency level and at the

25    City Appeals Panel level relied upon some

1          E. EICHENHOLTZ

2     assertions with respect to the use of fetal

3     stem cells in connection in one way or another

4     with Pepto Bismol and ibuprofen in

5     adjudicating religious accommodation requests?

6               MR. HAIDER:  Objection.  I'm going

7          to instruct the witness to limit his

8          answer to as the process of the Citywide

9          Panel --

10              THE WITNESS:  Right.

11              MR. HAIDER:  -- agency.

12              THE WITNESS:  Thank you, counsel.

13     A.    The records I've seen in the panel

14     generally -- like, what I'm trying to wrap my

15     head around is I cannot recall, as I sit here

16     today, did you use Pepto Bismol, yes or no, or

17     any discussion where it's like, someone used

18     Pepto Bismol.  I remember there have been

19     questions that tended to group together

20     products such as Tylenol, Tums, ibuprofen, and

21     as I understand it, these are products that at

22     one point in their, you know, in their

23     creation, in their development, were tested on

24     cell lines that may have been derived --

25     again, I don't know if Pepto Bismol was or was

1                    E. EICHENHOLTZ
2     not, and as I sit here today and I keep
3     thinking about it, I certainly can't think of
4     Pepto Bismol in isolation.  The one that I've
5     seen most frequently is Tylenol.
6          Q.    Okay.  What is the relevance of
7     Tylenol, asking questions about Tylenol use to
8     the existence of a sincerely-held religious
9     belief?
10          A.    Well, the first thing I want to say,
11     Mr. Nelson, is I see it in both directions,
12     correct?  I see employees volunteering in
13     support, when they're -- especially where it's
14     a religious belief that's connected with
15     abortion.  Seeing them affirmatively say, I
16     don't use Tylenol, acetaminophen, ibuprofen,
17     and Tums because those products have been
18     tested on cell lines that derive from
19     abortion.  I do not just see it in agencies --
20     some agencies have asked that question.  I do
21     not just see it from the agencies.  I also see
22     it from the employees.  So, you know,
23     certainly -- and I've never seen in the
24     records that I've reviewed a situation where
25     the agencies, you know, list a bunch of

1                    E. EICHENHOLTZ

2     products and the employee said, well, I've

3     used these because, for example, I don't

4     understand these to have any connection to

5     abortion.  So that's -- you know, so it's not

6     accurate to say that this is just something

7     agencies have asked and that's how I've

8     encountered it and that's how the panel's

9     encountered it in their work.

10          Q.    What would the -- withdrawn.

11               Does the City have a policy with

12     respect to the manner in which a religious

13     accommodation applicant explains what a use of

14     ibuprofen despite having an objection to the

15     use of stem cells in the development of the

16     vaccines and, you know, are there explanations

17     for which -- of such behavior which the City

18     panel finds to be acceptable or not?

19               MR. HAIDER:  Objection.

20          A.    There's no particular policy with

21     respect to that.  You know, I know employees

22     provided various explanations, and they're

23     reviewed in conjunction with the other facts

24     in the record to make the various

25     determinations that we need to make.  So it

1                    E. EICHENHOLTZ

2       would not be -- there's no specific policy as

3       to do this or do that or consider it in this

4       way or that way.

5            Q.    Are you aware of any decisions of

6       the Citywide Panel that granted a religious

7       accommodation to anyone who continues to use

8       Tylenol?

9            A.    Offhand, I mean, I can't recall

10      whether, you know, whether there was an

11      application that was granted where someone

12      said specifically, I use Tylenol.  I couldn't

13      tell you that for certain.  But like I said, I

14      can say, categorically, if someone said they

15      use Tylenol, that's not going to be a

16      guaranteed rejection of their reasonable

17      accommodation by any stretch of the

18      imagination.

19           Q.    What training or information, if

20      any, did Citywide panelists receive with

21      respect to any connection between Tylenol and

22      Pepto Bismol to aborted fetal cells?

23                MR. HAIDER:  Objection.

24           A.    I -- we did not have any specific

25      training as to Tylenol or Pepto Bismol with

                    E. EICHENHOLTZ
1
2    respect to aborted fetal cells.
3         Q.    And did the Citywide Panel rely on
4    any particular authority to support the
5    relevance of Tylenol or Pepto Bismol use in
6    determining an objection based upon abortion?
7         A.    Not that I'm aware of.  No one
8    particular specific authority, no.
9         Q.    And did the Citywide Panel consult
10   with any expert or any scientific studies
11   about whether Tylenol or Pepto Bismol was
12   developed using aborted fetal cell lines?
13        A.    My understanding is Tylenol wasn't
14   developed using aborted fetal cell lines in
15   the first instance.  It was developed many,
16   many years before, but that over the years,
17   some testing, manufacturing-type work had been
18   done.  That was always my understanding.  No,
19   I don't think there was any specific, you
20   know -- I'm trying to think of the way to put
21   this -- a study or -- you know, obviously some
22   of the medical questions were resolved through
23   the health commissioner and the Department of
24   Health and Mental Hygiene who have expertise
25   in the public health emergency we're going

1                    E. EICHENHOLTZ
2      through, as well as some of the medical issues
3      that were being encountered.
4          Q.    So was the Citywide Panel made aware
5      that the actual development of Tylenol and
6      Pepto Bismol did not involve aborted fetal
7      cell lines, but after these products were on
8      the markets, tests were performed on them
9      using fetal cell lines?
10         A.    Yes.  I mean, I don't think we did
11     it in a systemic way, but certainly through
12     the records that have been reviewed, I'm aware
13     of that because it's been pointed -- you know,
14     like I said, there is a lot of assertions in
15     the cooperative dialogue both from employees
16     and from the agencies on this issue that I've
17     encountered and the panel's encountered in
18     their work.
19  RQ            MR. NELSON:  So, you know, we think
20             that pursuant to the requests we've
21             already made in this litigation, that we
22             should be entitled to any written
23             materials that may have been disseminated
24             to Citywide Appeal Panel members who
25             relied upon them on these topics prepared

1                        E. EICHENHOLTZ

2            by Dr. Chokshi or wherever they came from.

3            A.    Okay.  That's --

4                 MR. HAIDER:  Objection.  You can ask

5            a question, but in terms of following up

6            on documents, we can do it in writing.  If

7            you have a more pointed question about the

8            existence of documents, go ahead.

9            Q.    So the information that was provided

10      to Citywide Appeal Panel members with regard

11      to Tylenol and Pepto Bismol, was any of that

12      in writing, or was it orally communicated?

13            A.    It was -- it was presented -- we,

14      and I'll say this again because we seem to

15      lose sight of this.  The Citywide Appeal Panel

16      is an appellate body.  We are not a body to

17      gather facts.  Our function is not to do that.

18      We are reviewing the information that is

19      provided by the agency and by the employee

20      about the employee's -- the basis for the

21      employee's requested reasonable accommodation,

22      about the vaccine mandate, about the agency's

23      position to the extent it's relevant, we're

24      reviewing those documents, and we're

25      determining, because we're only seeing

1                    E. EICHENHOLTZ
2    denials, whether the reasonable accommodation
3    should have been denied or should be granted.
4    That is what we are doing.  It is the -- you
5    know, so no, we did not have any proceedings
6    where we were gathering facts about Tylenol or
7    Pepto Bismol or anything like that.  The
8    writings we were reviewing were the records
9    that were presented to us by the employee and
10   by the employer and the assertions that were
11   presented to us by the employee and by the
12   employer.
13        Q.    Did the Citywide Appeals Panel not
14   send requests to applicants for information
15   about their use of certain products, including
16   Tylenol and others --
17             MR. HAIDER:  Objection.
18        Q.    -- and for information also about
19   what foods or medications they abstained from
20   for religious reasons?
21             MR. HAIDER:  Objection.
22        A.    That's correct.  We did that based
23   on the Department of Education cases, and we
24   did that based on the fact that we were trying
25   to approximate as best we could the process

1                 E. EICHENHOLTZ

2     agencies had been using to gather that

3     information so there were inquiries in the

4     Department of Education cases that

5     approximated inquiries that we had seen from

6     other agencies.  And in fact, one of the

7     reasons we asked that question in a more

8     open-ended way, the way you just described it,

9     tell us what you abstain from and why, is

10    because in our view, it was a better way to

11    allow the employee to explain their religious

12    practice or belief, because the primary

13    source, other than maybe practicing employee's

14    religious leader, if they wanted to provide

15    documentation from that, to educate us about

16    extent of the employee's religious belief and

17    the associated religious practices would be

18    the employee.  So we asked the sort of more

19    closed-ended question, but we also made sure

20    that there was also an open-ended question so

21    that the employee could educate us.

22         Q.    Did the Citywide Appeals Panel or

23    individual panels not also send out

24    questionnaires about using or abstaining

25    products to applicants who were not in the

1                    E. EICHENHOLTZ

2        Department of Education, but were employees of

3        other agencies of the City?

4                    MR. HAIDER:  Objection.

5            A.      It could be in isolated incidents in

6        other cases.  Generally the inquiry we have

7        sent out is a general question of how one

8        practices their -- the cited religious belief,

9        whatever it might be, outside the -- you know,

10       outside of I don't want the COVID vaccine, so

11       that we can better understand the connection

12       between that religious practice and the COVID

13       vaccine and we can understand how the

14       employees sincerely-held personal belief does

15       potentially or does not conflict with the

16       COVID vaccine when the record isn't clear.  So

17       yes, and many employees, again, you know, this

18       doesn't just come from the agencies, many

19       employees affirmatively offer that they

20       abstain from certain products and give us a

21       reason why to help, you know, the agency in

22       the first instance, but if the panel feels

23       that that was missing from the cooperative

24       dialogue and relevant, ultimately the panel,

25       after the case is remanded, to understand the

1                    E. EICHENHOLTZ
2     nature of their practice.  Because as I said,
3     you know, you need to understand whether there
4     is a conflict between the religious belief and
5     the vaccine requirement.
6          Q.    Okay.  But are you saying that just
7     because some of the applicants did not follow
8     the same religious beliefs of other
9     applicants, that there was to be an adverse
10    inference to be drawn from their continued use
11    of products that other people abstained from?
12               MR. HAIDER:  Objection.
13         A.    No.
14         Q.    Well, then what is the purpose of
15    obtaining the information?
16         A.    I explained that in the answer
17    previously.  I'm not going to re-explain that.
18         Q.    Is it not true that the Citywide
19    Appeals Panel drew adverse inferences from the
20    answers that they obtained from applicants in
21    the response to questions there concerning
22    their use of over-the-counter products, like
23    Tylenol and Pepto Bismol?
24               MR. HAIDER:  Objection.
25         A.    No.  The panel considered various

1                    E. EICHENHOLTZ

2       facts presented in the record, balanced those

3       facts and determined whether the employee had

4       a sincerely-held religious belief and whether

5       that religious belief was of such a nature

6       that the employee's practice with that

7       religious belief conflicted with the vaccine

8       requirement.  There might be facts that

9       weighed in one favor or in the other.  There

10      were no adverse inferences drawn.  As I said

11      previously, the panel does not, you know,

12      imply if an employee volunteers one thing and

13      not another, and that the other thing would be

14      unfavorable.  That's not, you know, how we go

15      about these reviews.  And you keep trying to

16      sort of re-characterize and change the way the

17      panel reviews, and I can't answer the

18      questions when it doesn't accurately describe

19      the work that the panel is doing.

20           Q.    Did anyone instruct the Citywide

21      Appeals Panel that as to whether -- I'm going

22      to withdraw that question.

23                 Did anyone instruct the members of

24      the Citywide Appeals Panel as to how to

25      determine when the connection between aborted

1                    E. EICHENHOLTZ
2      fetal cell lines in a drug or vaccine become
3      strong enough to form the basis of a sincerely
4      held religious objection?
5           A.    No, because that's not what -- we're
6      not looking at the strength of the religious
7      belief at all.
8           Q.    So what definition of "sincerely
9      held" do you use in reviewing religious
10     applications for accommodation, and where do
11     you get that definition?
12          A.    Does the employee sincerely believe
13     what they are describing what they believe.
14     And the get that definition from the EEOC
15     Guidance and the law.
16          Q.    How do you determine if an
17     applicant's beliefs are sincere?
18          A.    The EEOC Guidance provides
19     generally, you will start at the place that
20     what they're saying is accurate and sincere.
21     If you start seeing facts that suggest
22     otherwise and you may choose to engage in
23     limited inquiry to test the sincerity of that
24     belief if you're starting to see those
25     objective facts, and you look at those facts.

1            E. EICHENHOLTZ
2    And if there are facts, you know, through
3    inconsistencies, through other factors, you
4    know, undermine the sincerity of the belief,
5    then you would find the belief insincere.
6    And, you know, you could undergo that inquiry
7    if necessary.  It's certainly not always
8    necessary.
9        Q.    So you used the word "accurate."
10   What role does the accuracy of a person's
11   religious belief have with respect to whether
12   or not it is sincerely held?
13       A.    So, you know, I don't think I
14   described an accuracy of a religious belief.
15   A religious belief --
16       Q.    "Accurate and sincere," I'm quoting
17   you.
18       A.    I don't believe --
19       Q.    You said, "accurate and sincere."
20       A.    I don't believe I used the word
21   "accurate."  I said --
22           MR. NELSON:  Would the court
23       reporter please read back the --
24       A.    I need to hear the context.
25           MR. NELSON:  -- the question that is

1                    E. EICHENHOLTZ
2          the last substantive question that I asked
3          and then the first two sentences of the
4          witness' response.
5                    (Record read.)
6                    MR. NELSON:  Thank you.  That's
7          enough.
8          Q.    So what relevance does the accuracy
9     of a belief have to do with whether or not it
10    is sincerely held?
11         A.    I don't -- I understand the court
12    reporter read back that word.  There is no
13    accuracy of a religious belief.  What you have
14    to look at -- oh, that's what I said, I said
15    you start at the place where you assume that
16    the religious belief is sincere, and then if
17    you start seeing objective facts that might
18    cause you to question the sincerity, you then
19    might consider in the agency, on appeal the
20    agency may have already taken this step, so
21    the appeals panel may not take it, but you
22    start -- you might do some limited factual
23    inquiry to explore that further, and then you
24    review those facts.  That's how you're
25    supposed to go about it.

1                        E. EICHENHOLTZ

2          Q.     But the accuracy of the belief has

3     nothing to do with whether or not this is

4     sincere; is that correct?

5          A.     That is correct.  I mean, listen, I

6     don't even know conceptually how a religious

7     belief could be accurate or inaccurate because

8     it is what someone believes.

9          Q.     So -- sorry.

10         A.     No, go ahead.

11         Q.     Is it an objective fact or a

12    subjective standard that is used to determine

13    whether or not an applicant's beliefs are

14    sincere?

15         A.     You're relying on objective facts.

16    So if you don't have objective facts to

17    cause -- you know, if someone denies, you

18    know, essentially subjectively, without being

19    able to point to objective facts, that's not

20    appropriate.  You need to point to objective

21    facts.  And generally, in our review, I think

22    when the agency EEO officers are making their

23    determination, as well, we're looking for

24    those objective facts.  It can't be, like, a

25    gut feeling or something like that.

1          E. EICHENHOLTZ

2      Q.    Oh, okay.  Who determines that a

3   religious belief cannot be a gut feeling?

4      A.    No, no, no, no, no.  I said "it,"

5   meaning the determination of the person about

6   sincerity, the determination of the

7   adjudicator about sincerity cannot be a gut

8   feeling.  I'm not talking about the religious

9   beliefs.  I'm sorry I used a pronounce there

10  and you assumed it was the other part that I

11  was referring to.  I'm saying as someone -- if

12  you're analyzing whether or not a belief is --

13  the person who is analyzing whether or -- let

14  me do this to be perfectly clear:  The person

15  who is analyzing whether or not a religious

16  belief is sincere cannot say it's insincere

17  because I have a gut feeling that person's

18  belief is insincere.  That's what I'm saying.

19  Does that make -- does that clarify it?

20     Q.    Can a religious belief be considered

21  sincere if it contradicts what other members

22  of the religion believe?

23     A.    Yes.

24     Q.    Can a new found religious belief be

25  considered sincere?

1                    E. EICHENHOLTZ

2          A.    Yes.

3          Q.    How are panel members trained on

4     these distinctions?

5                MR. HAIDER:  Objection.

6          A.    Sure, okay.  They're asked -- they

7     review the EEOC's Guidance which covers these

8     things, and they're asked to apply each case

9     individually based on the facts and

10    circumstances of those cases, and we have, in

11    the course of this deposition, gone through

12    many hypotheticals and scenarios that would

13    approximate some discussions, you know, a

14    check-ins, not those exact scenarios, that the

15    panel members might discuss to refine their

16    understanding, as well, as we went through the

17    process.

18         Q.    So was the panel instructed to

19    characterize a belief as personal if involved

20    abstaining from substances?

21                MR. HAIDER:  Objection.

22         A.    I don't understand that question.

23         Q.    Suppose an employee stated that they

24    ate a plant-based diet because of their

25    religious beliefs.  Was it the policy of the

1                    E. EICHENHOLTZ
2    Citywide Panel to conclude that the employee
3    was making secular, fact-based choices about
4    food as opposed to religious decisions?
5        A.    No, the panel was instructed to
6    consider that fact in the context of what the
7    employee was describing as their beliefs, the
8    reasons for their beliefs, and any other
9    objective facts or circumstances in the
10   record, weigh those facts, and make a
11   determination about whether the employee had a
12   sincerely-held religious belief and whether
13   that belief conflicts with the vaccine
14   requirement.
15       Q.    So if an employee stated that he or
16   she avoided painkillers, for example, or
17   alcohol or synthetic sweeteners or other
18   substances because of his or her religious
19   beliefs, was it the policy of the Citywide
20   Panel to treat such decisions as personal
21   preferences?
22           MR. HAIDER:  Objection.
23       A.    The policy of the Citywide Panel was
24   to consider those facts, to review what the
25   employee was saying the nature of their

1              E. EICHENHOLTZ

2    religious belief was, and to look at all the

3    other facts and circumstances in the record to

4    determine whether the employee had a

5    sincerely-held religious belief, and to the

6    extent the employee did so, that that belief

7    was in conflict with the vaccine requirement.

8         Q.    Would it have been improper for a

9    panel to characterize abstaining from those

10   substances that I described in my last

11   question as being personal preferences rather

12   than elements of a religious belief?

13        A.    No.

14        Q.    From the standpoint of the Citywide

15   Panel's determinations, what difference did

16   they draw between personal preferences and

17   religious beliefs?

18        A.    It depends on the facts and

19   circumstances presented by the employee, all

20   the other circumstances presented in the

21   record, and the assessment of all those facts

22   and the weighing of them.

23        Q.    So, for example, what circumstances,

24   what additional circumstances would justify

25   characterizing, you know, abstaining from

1          E. EICHENHOLTZ

2     substance use of various kinds as personal

3     preferences as opposed to religious beliefs?

4          A.    I abstain from those substances

5     because my health is important to me, without,

6     you know -- you know, just in isolation, that.

7     But again, that's why the context, the facts

8     and the circumstances of what the employee's

9     saying and why is important.

10         Q.    What if the justification is, it is

11    both for religious reasons and health reasons

12    that the person's abstaining?

13         A.    Then you have to look at the

14    individual facts and circumstances, see what

15    the employee's saying, you might look at other

16    facts that are presented by the employee in

17    the record and determine whether it's either

18    or a combination of both, as best you can

19    determine given the record.

20         Q.    How are Citywide Panel members

21    instructed to consider appeals from employees

22    whose religious exemption requests contain

23    both religious and political beliefs?

24              MR. HAIDER:  Objection.

25         A.    Okay.  I'll repeat this.  What you

1                    E. EICHENHOLTZ

2    do is you look at -- the panel member's

3    instructed to look at all the various facts,

4    circumstances, assertions, what the employee's

5    saying, any cooperative dialogue that was

6    held, look at all those factors, weigh them,

7    look at the objective facts, and make a

8    determination as to whether it was a religious

9    belief or political belief or a combination of

10   the two, and proceed accordingly.

11       Q.    If an application cited scripture to

12   support the objection that the applicant had

13   to the use of the COVID-19 vaccine, was there

14   an instruction to members of the Citywide

15   Panel as to how to apply that fact, the

16   citation of scripture, to their analysis or to

17   an application's religious basis?

18            MR. HAIDER:  Objection.

19       A.    I may repeat this.  If someone cited

20   to scripture to help describe their religious

21   belief, it would be considered, you know, as

22   any employee description of what their

23   religious belief or the source of the belief

24   is, and it would be considered in conjunction

25   with the other facts and circumstances

1          E. EICHENHOLTZ

2    presented by the employee and the agency in

3    connection with the application.

4          Q.    If an employee's application

5    indicates that their religion prohibits them

6    from being vaccinated, is there any

7    circumstance under which it would be

8    appropriate for Citywide Appeals Panel to

9    conclude that the applicant's beliefs do not

10   prohibit vaccination?

11         A.    Yes, if the facts and circumstances

12   of the application suggest that based on the

13   employee's description, the other facts and

14   circumstances in the application suggest that

15   there is no conflict between the vaccine

16   mandate and the employee's religious beliefs,

17   then the panel could conclude there is no

18   conflict.

19         Q.    But if the person states that their

20   religious beliefs do prohibit them from being

21   vaccinated, what basis, what justification

22   could the panel have for concluding that that

23   is not the truth?

24         A.    Whatever justification --

25              MR. HAIDER:  Objection.

1          E. EICHENHOLTZ

2          THE WITNESS:  Oh, sorry.

3     A.    Whatever justification may exist in

4     that particular case and the facts and

5     circumstances presented by the employee and

6     reviewed by the panel.  It would be highly

7     fact dependent, highly fact dependent, and

8     there's no universal answer to that.

9     Q.    What possible evidence could provide

10    a sufficient basis for concluding that what

11    the applicant says is his or her religious

12    belief is not his or her religious belief?

13         MR. HAIDER:  Objection.

14    A.    Again, I've discussed this

15    numerous -- the first thing, that's a

16    different question than the one you asked

17    moments ago, but let's focus on that.  That

18    applicant may say, this is my religious belief

19    and then describe facts and circumstances that

20    are inconsistent with that religious belief.

21    So the panel might conclude either one of two

22    things; either the employee does not have that

23    religious belief or the employee does have

24    that religious belief and it's not practiced

25    in a way that conflicts with the vaccine

1                    E. EICHENHOLTZ

2    requirement.  You know, amongst a variety of

3    other factors and possibilities that can lead

4    to that conclusion.

5         Q.    Were panelists instructed as to what

6    to do if they disagreed with an applicant's

7    interpretation of religious scripture?

8         A.    I cannot think of a circumstance

9    where a panel member would be placed in a

10   position to disagree with the -- you know,

11   you're talking about saying, well, they're

12   saying scripture says this, but I believe

13   scripture says something else?  That would

14   never happen.

15              MR. HAIDER:  Mr. Nelson, I would

16        note that, you know, we've been doing

17        close to 90 minutes of hypotheticals of

18        testimony time, and obviously, we can do

19        endless amount of hypotheticals, given how

20        fact sensitive these religious combination

21        appeals -- requests and appeals are.  I

22        will just, you know, pursuant to rule 30,

23        it is approaching -- if we continue along

24        the line of hours of hypotheticals, we are

25        close to being in a manner that's

1                    E. EICHENHOLTZ
2          unreasonably annoying.  So I just want to
3          note that for the record, as we continued
4          here.  And if need be, if this continues,
5          we may have to call the Court, and as you
6          know, Judge Scanlon said she's leaving
7          prior to 4:30 -- or she's leaving at 4:30.
8          So if we feel the need to terminate or
9          stop the deposition to call the Court, we
10         may, if it continues in this manner.
11              MR. NELSON:  I certainly have not
12         intended to act in -- I forget exactly
13         what the word, I think "annoying" was the
14         word that you used, but that's not been my
15         intent.  Every question I've asked has
16         been a legitimate question that is
17         relevant to the case and within the scope
18         of the order pursuant to which we are
19         proceeding.  However, it happens that my
20         next set of questions is not hypothetical.
21     BY MR. NELSON:
22         Q.    What input, if any, did the Citywide
23     Panel receive concerning hardship from the
24     Department of Buildings?
25         A.    Did you say "hardship"?

1                    E. EICHENHOLTZ

2        Q.      Undue hardship.

3        A.      "Undue hardship."  So generally on

4    an undue hardship case, we would have some

5    sort of explanation or declination letter in

6    the file that set forth the agency's basis for

7    concluding that the reasonable accommodation

8    if granted would present an undue hardship.

9        Q.      And did the Citywide Appeals Panel

10   receive any materials regarding undue hardship

11   from the Department of Buildings that was not

12   contained within an individual file sent to

13   them with respect to an individual employee's

14   application for religious accommodation?

15       A.      Not that I'm aware of.

16       Q.      And was information about the

17   question of undue hardship received -- oh, I'm

18   sorry.

19              Was it considered outside of the

20   individual case with respect to which it was

21   submitted to the Citywide Appeals Panel?

22       A.      Generally, as an answer to that, no.

23   Theoretically if someone saw something, you

24   know, if a panel -- if there was a denial on

25   undue hardship or a panel member saw something

1                    E. EICHENHOLTZ
2     that suggested there might be an undue
3     hardship and felt that that was a grounds for
4     affirmance, they might note that.  But
5     generally, undue hardship cases involve the
6     agency providing us in the record some sort of
7     write-up.
8         Q.    So are you saying that a -- I'm not
9     sure that I understand your answer.  I was
10    asking about whether there was material that
11    had been contained within one appeal file with
12    respect to that subject that might have been
13    considered by a panel member in another appeal
14    with respect to which it was not contained.
15        A.    Oh, no, that would not happen; that
16    would not.  I mean, there -- there could be
17    information about agency operations that the
18    panel generally knows, but it would not be
19    material from one appeal file considered in
20    another appeal, no.
21        Q.    All right.  Then, let's go through
22    the agencies.  From the police department, did
23    the Citywide Appeals Panel receive any
24    information about undue hardship, other than
25    in connection with individual appeals that

1                    E. EICHENHOLTZ

2      were submitted?

3           A.    So there are more than 5,000 --

4      individual appeals?  No, no.

5           Q.    I'm sorry, what is your answer?

6           A.    So I apologize, I thought you were

7      saying did we categorically receive anything

8      from the NYPD about undue hardship, and I was

9      starting to explain that 5,000 appeals, then I

10     heard your qualifier that outside of

11     individual appeals.

12               No, we did not hear anything about

13     from NYPD outside of individual appeals about

14     undue hardship.

15          Q.    Okay.  Same question about the fire

16     department.

17          A.    The fire department -- to the panel?

18     No, no.  The fire department, again, the fire

19     department provides a denial letter that sets

20     forth its basis for undue hardship.

21          Q.    What about the Department of

22     Education?

23          A.    The Department of Education, yes, in

24     many but not all the cases, the Department of

25     Education puts in essentially an explanation

1                    E. EICHENHOLTZ
2      when they were determining that they were
3      denying on undue hardship grounds.
4          Q.    Was anything received by the
5      Citywide Appeals Panel other than in
6      connection with the individual cases, whether
7      it's in general?
8          A.    No.
9          Q.    Okay.
10         A.    No.  Outside, of course, the EEOC
11     Guidance that describes how one would analyze
12     undue hardship.
13         Q.    First of all, did the Citywide
14     Appeals Panel receive any information about
15     undue hardship from any of the agencies
16     that -- you know, from which appeals were
17     taken, other than in the individual appeal
18     files?
19             MR. HAIDER:  Objection.
20         A.    No.
21         Q.    All right.
22         A.    No.
23         Q.    Now --
24         A.    Yeah, because -- right, if there was
25     a follow-up inquiry, it would be in the

1              E. EICHENHOLTZ
2     individual appeal files.  So yes, no, only in
3     the individual appeals files.
4          Q.    And did individual panels of the
5     Citywide Appeals Panel make inquiries with
6     respect to information about undue hardship in
7     any of the individual cases that they have
8     adjudicated?
9          A.    Yes.
10         Q.    Okay.  In which departments did they
11    ask for this information?
12         A.    I couldn't tell you categorically it
13    was always this department or that department
14    or these are the exhaustive lists of the
15    departments.
16         Q.    So potentially from all departments?
17         A.    Sure.  It would appear in the file
18    of the appeal.
19         Q.    And was any of this information
20    about undue hardship shared with the
21    individual applicants for their feedback?
22         A.    No.
23         Q.    And why not?
24         A.    I mean, the denial letters certainly
25    were, and the applicants had the ability to

1                    E. EICHENHOLTZ
2      respond.  But the undue hardship issue, again,
3      is for the agency to describe.  You know, it
4      is the agency's description of their needs and
5      how their requested accommodation would
6      interfere with potentially their needs under
7      the standards set forth in the law.
8           Q.    And it's your position, it's the
9      City's position that the applicants had no
10     right to respond to the position that the City
11     was taking with respect to undue hardship or
12     to provide information to rebut what the
13     departments were saying?
14               MR. HAIDER:  Objection.
15          A.    No, that's not the City's position.
16          Q.    Then how could they rebut or how
17     could they respond if they were not provided
18     with the information that the departments were
19     providing on the issue of undue hardship?
20          A.    You're making this binary
21     distinction.  I've reviewed multiple appeals
22     where the employees in the first instance have
23     asserted that there's no undue hardship --
24          Q.    It is binary.  You win or you lose,
25     the department fires you or you keep your job.

                    E. EICHENHOLTZ

1

2    It's binary.

3        A.    Sir, we're not here to have a

4    debate.

5             MR. HAIDER:   Objection.

6        A.    If you have a question for me, you

7    can ask it.

8        Q.    Isn't it binary?

9        A.    No.

10       Q.    How many outcomes are there,

11   potentially, then?

12       A.    There are many outcomes on --

13       Q.    So how many different outcomes there

14   could be in one of these decisions?

15       A.    Well, there -- they -- there's -- an

16   accommodation can be granted, it can be

17   granted permanently, it can be granted

18   temporarily, the accommodation could be

19   denied, it can be denied for a whole host of

20   reasons and a whole host of justifications

21   depending on the facts and circumstances of

22   each case.  So I mean the point of the

23   cooperative dialogue is for the employer

24   and -- the employer to assess whether or not

25   an accommodation is appropriate by engaging

1                    E. EICHENHOLTZ
2     with the employee, by having a dialogue with
3     the employee.  As I said earlier, it's not a
4     litigation proceeding, it's not, you know,
5     employee verse employer.  It is the employee
6     engaging in cooperative dialogue, making a
7     determination.  And with respect to the City's
8     policy, we also build into that process and
9     appeal, and that appeal is being reviewed and
10    a determination being made on appeal either
11    affirming or reversing or sometimes remanding
12    and then affirming or reversing the agency's
13    determination.
14         Q.    Isn't there a possible alternative
15    conclusion also, which is that the
16    accommodation is not granted exactly as
17    requested, but in some other form?
18         A.    In connection with many reasonable
19    accommodation requests, yes, that is a
20    possibility, certainly.
21         Q.    How often did the Citywide Appeals
22    Panel decision result in that kind of
23    accommodation?
24         A.    So I'm going to say this again.
25    What the Citywide Appeals Panel is doing is

1                    E. EICHENHOLTZ

2      not gathering facts.  They are reviewing a

3      record on appeal.  In virtually all of our

4      appeals, the employees are requesting a

5      particular accommodation, they have engaged in

6      cooperative dialogue with the employer, and a

7      determination has been rendered, and we are

8      reviewing the factual record to determine

9      whether or not the decision of the agency

10     should be affirmed or reversed.

11          Q.    Now, do you have any statistics with

12     respect to the percentage of times in which

13     cooperative dialogue actually was engaged in,

14     in these appeals prior to the filing of the

15     appeal at the agency level?

16          A.    I mean, I can't think of a file --

17     there may be one or two where we made

18     follow-up inquiry, but I can't think of a file

19     where there wasn't cooperative dialogue of

20     some sort.

21          Q.    What to you would indicate that

22     cooperative dialogue took place?

23          A.    Agency solicited information from

24     employee, the employee provided information,

25     or vice versa.

1          E. EICHENHOLTZ

2     Q.    And is that a kind of a dialogue

3     that, in your mind, results in potentially an

4     alternative -- a grant of an alternative

5     accommodation; not perhaps one that was

6     specifically requested by the applicant?

7     A.    I don't think what's in my mind is

8     relevant here.  You know, the law requires

9     that back and forth, and there are sometimes

10    circumstances where an agency is part of that

11    cooperative dialogue, says we can't give you,

12    employee, what we want, but we could provide

13    this alternative.

14    Q.    In your observation, in what

15    percentage, approximate percentage of your

16    cases have you seen that exhibited in the

17    file?

18    A.    I mean, I can't put a percentage on

19    it.  Most of them, I'd say the vast majority

20    are the employee saying, I don't want to be

21    vaccinated, and I want to come to work, and

22    the employer saying, well, you -- you know,

23    basically either you're not entitled to a

24    reasonable accommodation at all, you know, or

25    this presents an undue hardship or a

1                    E. EICHENHOLTZ
2    combination of those.
3        Q.    So how many times have you seen --
4        A.    In the religion.
5        Q.    Now, how many times have you seen an
6    employer offer some accommodation which is not
7    exactly what was requested by the employee,
8    but that offers some less restrictive means of
9    trying to accommodate the employee's religious
10   beliefs?
11 DI          MR. HAIDER:  Objection.  I'm going
12        to instruct the witness not to answer.
13             The agency's determinations on the
14        reasonable accommodations are not subject
15        to this 30(b)(6) testimony.
16        Q.    Well, so it's your position that the
17   Citywide Appeals Panel was not in a position
18   to grant any kind of accommodation short of
19   the accommodation that was expressly requested
20   in an accommodation request?
21        A.    So, Mr. Nelson, you've been telling
22   me a lot today what the City's position is or
23   is not.  I think I'm here to explain that.
24        Q.    I'm sorry, that was a question.
25   There was a question mark at the end of that.

1                    E. EICHENHOLTZ

2        A.    Yes, it was a statement with a

3    question mark.  The answer is no, that is not

4    the City's position.

5        Q.    Okay.  So then the Citywide Appeals

6    Panel was empowered to consider and grant

7    accommodations that were not exactly what was

8    requested by the applicant; is that correct?

9        A.    What we would do in that sort of

10   scenario, if the cooperative dialogue and the

11   review of the record suggested that that might

12   be appropriate is we would remand to the

13   agency for that sort of additional cooperative

14   dialogue.  But, you know, that would require

15   to be a relevant consideration that would turn

16   on, you know -- that would be determinative on

17   whether or not a reasonable accommodation is

18   requested or denied, and I cannot think of a

19   circumstance where either the requests or the

20   cooperative dialogue were turning on that

21   issue.  But, you know, again, there were some

22   certainly in the medical context that were

23   considered.  But in the religious context, I

24   can't think of an example.

25       Q.    Right.  So you can't think of an

1                    E. EICHENHOLTZ
2      example in which a case was sent back to --
3      remanded to the agency in a religious
4      accommodation context for consideration of
5      some alternative accommodation?
6          A.    I mean, I can't think of an example
7      where it was appropriate to do so.
8          Q.    What would have determined whether
9      it was appropriate or not?
10         A.    If there was something -- again, if
11     the reasonable accommodation issue was turning
12     on the nature of the accommodation, there was
13     suggestion in the record that a lesser
14     accomodation would both be permissible under
15     the City's public health order and possibly --
16     you know, because we wouldn't know, possibly
17     acceptable to the employee, I'm certain there
18     could be, you know, if there was something in
19     the record that suggested that, we might
20     remand to the agency.  But that's generally
21     not what these requests were about.
22         Q.    Well, I'm trying to think of less
23     restrictive results that might have, you know,
24     come from application of a mandate.  Did the
25     Citywide Appeals Panel ever give

1                      E. EICHENHOLTZ
2     consideration, for example, to suggesting or
3     finding or somehow ruling that being on leave
4     without pay might permit as a condition that a
5     person could be employed outside the agency?
6          A.    So that --
7                MR. HAIDER:  Objection.
8          A.    Yeah, I mean, employees -- many
9     employees had the ability to do so, at least
10    in the short term.  And again, I'm not
11    thinking of requests where that's what the
12    employee was seeking or interested in.  These
13    requests were generally for an exception to a
14    vaccine requirement that requires the
15    employee -- where the employee's stating they
16    would like to continue coming to work and
17    testing, and the employee's purpose in
18    requesting the accommodation is they want to
19    come to work in their existing job, so, you
20    know --
21         Q.    But were you aware that there was
22    more at stake for employees, and at least in
23    most of these agencies, than simply whether
24    they were going to be coming to the office
25    every day and working?

1                    E. EICHENHOLTZ
2        A.     Obviously from the employee's
3    perspective, if they were unwilling to get
4    vaccinated and were seeking an accommodation,
5    a great deal would be at stake from the
6    employee's perspective.
7        Q.     Are you aware that the terms of
8    being on the leave without pay status also
9    included a rule for bidding them, the employee
10   who was on leave without pay, from working
11   outside the agency for gain, for income?
12              MR. HAIDER:  Objection.
13       A.     I mean, that -- not -- I don't -- I
14   have no -- no such prohibition, and there were
15   many different leave statuses at issue here
16   and I'm, quite frankly, not here to discuss
17   leave status.
18       Q.     Well, you're not aware that being on
19   leave without pay, which many of these people
20   were pursuant to your, you know -- the program
21   that you designed and that other people
22   designed for the City, that they were not
23   permitted to earn outside income while they
24   were on leave without pay?
25              MR. HAIDER:  Objection.

                        E. EICHENHOLTZ

1

2      A.     So -- I mean, we're -- we are sort

3   of in this hypothetical world where, you

4   know --

5      Q.     It's not hypothetical.  It's a fact.

6   That's what these people are subject to.  They

7   can't -- they have no income while they're on

8   leave without pay, and that's why things are

9   so desperate for them.  If they were given an

10  option to work at McDonald's even, they might

11  be able to pay their rent.

12             MR. HAIDER:  Objection.

13             Is that a question or --

14     A.     Yeah, that's a --

15     Q.     So why did the Citywide Appeals

16  Panel not consider other alternative means of

17  providing some accommodation to the

18  applicants, for example, to alter the

19  conditions of their leave without pay status

20  so that they could earn outside income while

21  the pandemic continued?

22             MR. HAIDER:  Objection.

23     A.     I understand.  I will say that, as I

24  said, those considerations, at least in the

25  cases that I've reviewed, never presented

1                    E. EICHENHOLTZ

2       themselves as, given the nature of the

3       cooperative dialogue, the nature of the

4       request, the facts underlying the request, and

5       the nature of the vaccine mandate, as the sort

6       of accommodation requests that were either

7       being sought or that were appropriate in the

8       circumstances.

9           Q.    If you were giving a de novo review

10      of the cases, why did you not consider such

11      alternative grants of accommodations?  Since

12      it was de novo, you should have been -- should

13      you not have been considering all the

14      different aspects of the case?

15               MR. HAIDER:  Objection.

16          A.    Not if there is a dispositive issue.

17      And again, this is an appellate review.  So

18      this is the appeal stage.  The employee has

19      had their cooperative dialogue with the

20      agency, and there is a record, and we're

21      reviewing the record for sufficiency.  That is

22      our function.  And in that record an

23      accommodation is sought as cooperative

24      dialogue, and we're reviewing that process and

25      the outcome.

E. EICHENHOLTZ

1

2      Q.    So how many cases were denied on the

3   basis of undue hardship?

4      A.    I couldn't give you a number.

5      Q.    A percentage?

6      A.    I would -- the vast majority of

7   denials are not undue hardship.

8      Q.    Were there any --

9      A.    That I've seen, that I've seen.

10  What?

11     Q.    Were there any appeals that were

12  denied on the basis of undue hardship?

13     A.    Of course.

14     Q.    Okay.  And the hardship generally

15  consisted of what?

16     A.    It's -- that's very fact specific.

17  There's no general.

18     Q.    So what hardship would it have

19  caused the agencies that were employers of

20  these applicants to permit them to earn income

21  outside the agency while they were on leave

22  without pay?

23     A.    In- --

24           MR. HAIDER:  Objection.

25     A.    Indefinitely?

1                    E. EICHENHOLTZ

2        Q.    What harm would they have suffered?

3        A.    I'm trying to understand the purpose

4    of that accommodation.  If someone is not and

5    never willing to comply and unable to comply

6    with a mandate that's going to prevent them

7    from ever returning to the job, what would the

8    purpose of an accommodation that allows them

9    essentially to be on leave without pay from

10   the City and continue their career elsewhere

11   give them?  I'm really -- this is sort of

12   getting into -- this is becoming -- you know,

13   it almost sounds like it's a

14   reverse-engineered hypothetical.  Like, I'm

15   not seeing the purpose in that.  You know, I

16   know that's -- I'm trying to do my best,

17   Mr. Nelson, to kind of engage with you to help

18   understand the various processes and things,

19   but I -- you -- I'm lost.

20       Q.    So forgive me, but I thought that

21   the mandates were emergency orders.  Is that

22   not the case?

23       A.    That is the case.  Well, the order

24   is borne out of a public health emergency,

25   yes.

                        E. EICHENHOLTZ

1

2       Q.    And isn't every emergency order

3   limited in time?

4       A.    This isn't an emergency executive

5   order.

6       Q.    I'm sorry, what isn't?

7       A.    This is not an emergency executive

8   order.  This is a public health order of the

9   City's Health Commissioner.

10      Q.    Well, aren't there both emergency

11  orders and public health orders?

12      A.    Yes, there are.

13      Q.    And doesn't each public health order

14  refer to, you know, a currently-existing

15  emergency?

16      A.    Yes.

17      Q.    And isn't every emergency, by its

18  definition, temporary in character?

19      A.    Not -- I mean, certainly the

20  steps -- there is no -- yeah, I mean, yes.

21  You know, we're talking theoretically here,

22  there is obviously, and hopefully there will

23  be a point where, you know, this order doesn't

24  need to be necessary.

25  RL   Q.    Well, and isn't it a fact that if

```
1              E. EICHENHOLTZ
2     and when the pandemic ends, that the public
3     health order will also end?
4  DI          MR. HAIDER:  Objection.  This is way
5          beyond the scope of this witness' purview
6          at this point.
7               We're now getting into what neither
8          the mayor or the Department of Health
9          orders when he's here to simply testify
10         about the Citywide Panel's process and the
11         standards used by the Citywide Panel.
12              So with that, I'm going to instruct
13         him not to answer that question.
14    Q.    Was the Citywide Panel instructed to
15    assume that the City's public health emergency
16    would never end?
17    A.    No.
18    Q.    I'm sorry, did you miss the
19    question?
20    A.    I said no.
21    Q.    All right.
22              MR. NELSON:  Okay.  We're going to
23         preserve the question that I asked to
24         which you made the objection for raising
25         with the magistrate judge.  We're not
```

1                    E. EICHENHOLTZ
2          going to do that right now.
3                I'll just note I understand the
4          magistrate judge is leaving at 4 p.m.
5          It's 4 p.m. now.  We can't raise it now
6          with her.
7                MR. HAIDER:  She said she's leaving
8          at 4:30 p.m., so we can raise it, if
9          you --
10               MR. NELSON:  Thank you.
11               MR. HAIDER:  Oh, just to be clear,
12         do you intend on raising it?  If so, we
13         ask that you raise it now before 4:30.  We
14         have no plans to pause this deposition.
15               MR. NELSON:  Yes, I understand.  I'm
16         not going to ask it right now.
17   BY MR. NELSON:
18         Q.    Did any agency provide information
19    to the Citywide Panel as to the number of
20    employees it could afford to employ without
21    causing undue hardship?
22         A.    No, that's not the context of which
23    generally the agencies were borne --
24         Q.    And --
25         A.    -- [inaudible].

1                    E. EICHENHOLTZ

2              (Discussion held off the written

3       record.)

4       A.    I was saying the agencies, that's

5  not really the basis under which some of the

6  agencies were making their argument.  They

7  were making -- you know, they were explaining

8  the necessity to have personnel present and at

9  work and the importance of the agency's

10 mission and things of that nature.

11      Q.    You know, I am certain -- are you

12 certain that the agencies never mentioned an

13 inability to afford to pay employees who were

14 not working in the course of their

15 explanations of undue hardship at the agency

16 level?

17              MR. HAIDER:  Objection.

18      A.    It could be that they did.  That

19 certainly would not be in -- a dispositive

20 inability to pay employees?  That certainly

21 has never been a dispositive factor in any

22 appellate determination I've made while on the

23 panel.

24      Q.    How do you know -- I'm sorry.

25              You're not referring to the votes of

1                    E. EICHENHOLTZ
2      other panel members, however?
3           A.    Right.  I'm referring to -- I mean,
4      I could also include, based on our, as I said,
5      we've had discussions about undue hardship,
6      defenses and various agencies that have made
7      the assertion and denials on those grounds,
8      and certainly the ability to pay employees has
9      not come up.
10          Q.    So as far as you know, that wasn't
11     an element of undue hardship for any of the
12     agencies with respect to which religious
13     accommodation or medical accommodation appeals
14     were made?
15          A.    I can't --
16                MR. HAIDER:  Objection.
17                THE WITNESS:   Sorry.
18          A.    I can't rule out that that was some
19     assertion, you know, fits that
20     characterization was made by an agency.
21          Q.    And was any information about their
22     ability or inability to make payroll with
23     unvaccinated persons ever submitted in any of
24     these cases, so far as you know?
25                MR. HAIDER:  Objection.

1                    E. EICHENHOLTZ
2          A.    Not that -- I've never seen any
3     document like that, no.
4          Q.    Did any agency provide any
5     information as to the additional costs it
6     could afford to spend without causing undue
7     hardship?
8          A.    Additional costs -- I don't -- what
9     does that mean, additional costs they can
10    afford to spend without causing undue
11    hardship?
12         Q.    Yeah.
13         A.    I'm sorry, I'm just -- I don't
14    understand that.
15         Q.    I can --
16         A.    Try to re- -- yeah, if you can
17    rephrase.
18         Q.    I'm not asking a question if I
19    respond to you.
20              In context of the question, the last
21    question that I'm still asking you to answer,
22    costs are money that an agency might need to
23    spend in the context of making an
24    accommodation to a request for religious
25    accommodation.

1              E. EICHENHOLTZ
2       A.    Right.
3       Q.    So did any agency provide you with
4    any information as to those kinds of
5    additional costs that it could afford without
6    causing undue hardship?
7       A.    Not that I recall.
8       Q.    Okay.  Did any agency provide any
9    information to the panel as to the number or
10   nature of unfilled positions it was seeking to
11   fill at any time?
12      A.    Unfilled positions?  It could have
13   been; I don't know.  I know -- I think there
14   was some discussion of staffing of certain
15   requests.  Whether those were vacancies that
16   needed to be filled or the importance of
17   maintaining proper staffing I can't
18   characterize accurately, as I sit here today.
19      Q.    Was any of that information
20   considered to be relevant as to whether or not
21   the agencies would suffer undue hardship by
22   granting a religious accommodation?
23      A.    I can't specifically recall whether
24   the information meeting that description was
25   made, so I certainly can't tell you whether it

1                    E. EICHENHOLTZ
2    was relevant or not.  As I said, we assess the
3    agency's explanation and generally with the
4    needs of the agency, the importance of
5    staffing, things like that.
6        Q.    Did any agency provide information
7    about its capacity to work with remote
8    workers?
9        A.    Generally speaking, and again, there
10   may be specific exceptions to this, but I will
11   state this as the rule, agencies that have
12   positions for which remote work is permissible
13   were not claiming undue hardship.  There may
14   have been agencies that asserted undue
15   hardship in those sorts of positions, and the
16   panel would take into consideration whether
17   the described nature of the work was such that
18   maybe an alternative accommodation like remote
19   work was permissible when determining whether
20   or not, you know, it would be appropriate to
21   deny a reasonable accommodation on the ground
22   of undue hardship.
23       Q.    You used the word "may" in your last
24   answer.  Did the Citywide Appeals Panel ever,
25   you know, consider that, the question of the

1                    E. EICHENHOLTZ
2       capacity of agencies to work with remote
3       workers in deciding a religious accommodation
4       appeal?
5            A.    So again, now we're sort of talking
6       about two slightly different things.  You're
7       talking about agency capacity, budgets, things
8       like that.  I'm focused more on the nature of
9       the position the employee has, right?  So an
10      agency may have a capacity for remote work,
11      but if the employee is engaged in a job for
12      which the presence at work is needed, even if
13      the agency has other positions that other
14      people believe they may be able -- they can do
15      potentially remote, it might not be a factor.
16      And that's why I say "might," because it's
17      highly dependent on the specific facts.
18      Again, as I've said so many times today, this
19      is an individualized fact-based interview --
20      process, and so it really depends on the
21      particular facts; what the employee's title
22      is, what the agency's claiming is undue
23      hardship.  And we would review all those
24      things in connection with an undue hardship
25      application.

1          E. EICHENHOLTZ

2          Q.    Did agencies provide information --
3     and this is not just to the panel directly,
4     but in any of the -- this applies also to the
5     files that they have for the individual cases.
6     Did they provide any information to the panel
7     about arrangements they have already made to
8     accommodate unvaccinated workers whose
9     accommodation requests were granted?
10         A.    There may have been.  I can't recall
11    any, offhand.
12         Q.    Did any agencies fail to provide
13    information about their ability to accommodate
14    unvaccinated workers with remote work or with
15    work in an isolated site for unvaccinated
16    employees?
17         A.    No.
18         Q.    So they all provided you with that
19    information?
20         A.    No, we were aware -- I can think of
21    one example in particular of an agency that
22    had provided accommodations for remote work
23    sites.
24         Q.    And what agency was that?
25         A.    That was the Department of

1                    E. EICHENHOLTZ

2     Education.

3         Q.    And did their provision of remote

4     work sites have any effect upon the -- did it

5     result in the grant of any accommodations for

6     a religious accommodation by the Citywide

7     Appeals Panel?

8         A.    It was a factor considered in

9     whether or not to grant -- you know, to affirm

10    the denial or grant the reasonable

11    accommodation.

12        Q.    What was the information that the

13    Department of Education provided to you

14    concerning remote sites for unvaccinated

15    employees?

16        A.    I believe that they had given

17    teachers sort of temporary accommodations

18    working in remote work sites, you know, in

19    connection with some of their reasonable

20    accommodation cases, and the panel inquired

21    and wanted an explanation as to why the

22    employees that we were reviewing would present

23    an undue hardship on the agency.  And they

24    provided the explanation, and the panel

25    members reviewed it and voted accordingly.

1                E. EICHENHOLTZ

2        Q.    So was that information provided

3    only in connection with individual cases, or

4    was it provided to the appeals panel as

5    general information available to all the

6    members of the panel?

7        A.    I don't -- we certainly made the

8    inquiry of DOE I think because whether the

9    entire panel was aware, whether it was just

10   some of us were aware that that had happened

11   and we wanted to understand the basis for an

12   undue hardship assertion and to evaluate that.

13       Q.    So it may very well have been

14   provided to the panel as a whole and not

15   something to individual panelists?

16       A.    I know that in our check-ins, we

17   discussed DOE and undue hardship and even the

18   fact the DOE had some people working sort of

19   temporarily offline was discussed in those

20   discussions.  So we were generally aware, and

21   I know that we made inquiry of the Department

22   of Education in regards to cases that we were

23   reviewing to understand their position on the

24   undue hardship issue.

25       Q.    And some of the information was

```
 1                    E. EICHENHOLTZ
 2      provided to you in writing from the Department
 3      of Education?
 4           A.    Yes.  The writings were submitted
 5      in -- the inquiry and the writings were made
 6      in individual cases, and I think eventually,
 7      you know, the inquiry almost became, like, a
 8      standard inquiry, and they would give us the
 9      writing in appropriate cases.  You know, there
10      were cases the DOE did not assert an undue
11      hardship position, and they didn't give us a
12      writing in those cases.
13  RQ             MR. NELSON:  Well, so we are going
14           to be requesting copies of any writings
15           that reflected or constituted any of that
16           information from the DOE regarding the
17           remote sites.
18           Q.    Did the DOE ever tell you whether
19      their remote sites were filled to capacity?
20           A.    I don't think we asked about that,
21      whether they were filled to capacity or not.
22           Q.    And you didn't --
23           A.    We didn't ask.
24           Q.    -- information about it?
25           A.    Not that I am aware of.
```

1                    E. EICHENHOLTZ
2        Q.    And why didn't you ask about the
3    extent of their capacity remaining?
4        A.    Because it was for DOE to explain to
5    the panel why DOE was asserting an undue
6    hardship in these individual circumstances.
7        Q.    At what time did the Department of
8    Education first provide you with this
9    information about its remote site capacity?
10       A.    Again, I don't think DOE provided us
11   the information.  I think we were aware that
12   there had been people, you know, who were
13   assigned to remote sites through the
14   reasonable accommodation process, and we
15   wanted to understand what their position was
16   with respect to the appeals that we were
17   reviewing, and they provided us in each
18   individual case that they were asserting undue
19   hardship, the DOE that is, the DOE provided us
20   with an explanation for that assertion.
21       Q.    When did you first obtain that
22   information?
23       A.    Again, the DOE filed that
24   information into SalesForce, either
25   contemporaneously with other documentation or

1                     E. EICHENHOLTZ

2      separately, when the panel was considering

3      various DOE appeals.

4           Q.    So did you -- did the panel consider

5      that in connection with all DOE appeals?

6           A.    No.  As I said moments ago, there

7      were cases where DOE did not make any

8      assertion that they were denying on undue

9      burden grounds, and in those cases or those

10     appeals, there was nothing in the record to

11     support -- undue hardship, sorry, undue

12     hardship grounds, and in those cases there was

13     nothing -- you know, if there was a case where

14     there was nothing in the record to support

15     undue hardship, then there was nothing in the

16     record to support undue hardship and you

17     focused on other inquiries.

18           Q.    Did any agencies in the -- either in

19     the individual files or outside of those

20     files, the appeal files, state that individual

21     plaintiffs or employees -- I'm sorry, not the

22     individual plaintiffs, I can't inquire about

23     that.

24                 Did any employees state that their

25     employees posed a direct threat to others if

1                    E. EICHENHOLTZ

2    they remained employed?

3        A.    Yes, there were employees who

4    asserted specifically a direct threat, and

5    then there was, you know, the health

6    commissioner's order that said that given the

7    nature of the public health emergency, that

8    only vaccinated individuals, with the

9    exception of those who demonstrated that they

10   were entitled to a reasonable accommodation to

11   be without vaccination, should be present at

12   City work sites.

13           MR. HAIDER:  Mr. Nelson, I'd just

14       ask to take another ten-minute break.

15           MR. NELSON:  Okay.  We'll come back

16       in ten minutes.

17           THE VIDEOGRAPHER:  Going off record.

18       The time is 4:17.

19           (Recess was taken.)

20           THE VIDEOGRAPHER:  We're now back

21       on.  The time is 4:30.

22           MR. NELSON:  Thank you.  Gentlemen

23       and ladies, toward the end of the

24       deposition I'm going to be surrendering

25       the mic to my co-counsel, Sujata Gibson,

1              E. EICHENHOLTZ
2         who has some very specific kinds of
3         questions, lines of questions, not very
4         long that she's going to be asking.  And I
5         just wanted to let you know in advance so
6         it's not some sort of a surprise.  But,
7         you know, we're definitely going to get
8         this done within the seven hours that
9         we're allowed for the deposition, so no
10        need to worry about that.
11   BY MR. NELSON:
12        Q.    So my first question, I want to just
13    follow up on, and who knows, maybe -- well, I
14    want to follow up on a line of questioning I
15    was asking before.
16              Are the panelists, like, provided
17    with one or more objective criteria which
18    would determine whether an exemption request
19    ought to be granted or denied by itself?
20        A.    No.
21        Q.    There's none, okay.
22              Now, how many agencies made a claim
23    that granting a religious accommodation would
24    cause a direct threat to anyone?
25        A.    Correction is the only one that

1                     E. EICHENHOLTZ
2     stands out as we sit here today.
3         Q.    Did they make that in 100 percent of
4     their cases or something less?
5         A.    I'm not sure.
6         Q.    I'm sorry?
7         A.    I'm not sure.
8         Q.    Oh, you're not sure.  Thanks.
9         A.    Yeah.
10        Q.    All right.  I didn't hear the --
11        A.    Sorry, yeah I'll get a little
12    closer, yeah.
13        Q.    And was it in most of the files that
14    they sent you or less than half?
15        A.    I can't remember.  It was in many of
16    the ones that I reviewed.
17        Q.    And what about the other agencies?
18    Did any of the others raise the claim of a
19    direct threat?
20        A.    Not -- again, I can't recall an
21    example with another agency.
22        Q.    Did the Citywide Appeals Panel deny
23    any appeals on the basis that the appellant
24    would have caused a direct threat?
25        A.    Can the caveat that I, you know,

1                    E. EICHENHOLTZ
2      that maybe that I'm either not aware of or
3      haven't seen, I cannot think of a single
4      example that was denied on -- of a reasonable
5      accommodation request that was denied on
6      direct threat and affirmed solely on the issue
7      of direct threat.
8          Q.    So there may have been some that
9      would have been affirmed partially on the
10     basis of direct threat?
11         A.    Again, at least that I've seen, I
12     haven't seen where someone's focused -- a
13     panel member has focused on the direct threat
14     issue in their notes about their affirmance.
15         Q.    So insofar as you know, the direct
16     threat issue was not a basis for any
17     affirmances from any department?
18         A.    As far as I'm aware, yes.  But there
19     may be, and they would be, you know, indicated
20     in the particular case.
21         Q.    And what, if you recall, was the
22     basis for the Department of Corrections claim
23     that direct threats existed from the granting
24     of religious accommodation to employees?
25         A.    I don't recall offhand, I don't

```
 1                    E. EICHENHOLTZ
 2      recall offhand.
 3           Q.    Okay.  Do you recall whether there
 4      was any objective or scientific, you know,
 5      analysis that was provided in support of the
 6      Corrections Department's assertion that a
 7      direct threat existed?
 8           A.    As I said, I don't remember
 9      precisely what the explanation was.
10           Q.    Okay.  Thank you.
11                 So one presumes -- and again, this
12      is not a question, but a preface to a
13      question.  One presumes that the City is
14      concerned that unvaccinated people may get
15      COVID-19 and spread it.  So that's the
16      predicate, that's the assumption that I'm
17      stating, and I have a question:  Can
18      vaccinated people get COVID-19?
19   DI            MR. HAIDER:  Well, objection.  I'm
20           going to instruct the witness not to
21           answer.
22                 He's here to be -- you know,
23           questions that should be directed at a
24           medical professional or someone similar.
25           Again, subject to Citywide Panel's process
```

1                    E. EICHENHOLTZ
2          in reviewing beyond the standards of the
3          Citywide Panel.  So I'm going instruct the
4          witness to not answer that question.
5          Q.    So in considering undue hardship
6      requests, has the Citywide Appeals Panel or
7      any of its individual panels considered
8      whether it makes any difference to the
9      spreading of COVID-19 whether an employee is
10     vaccinated or unvaccinated?
11               MR. HAIDER:  Objection.
12               You can answer.
13         A.    Yeah, as I said, I don't remember
14     the particular rationale.  You know, obviously
15     I'm aware of the various rationales of the
16     vaccine and their effectiveness and it might
17     play a role in depending on the agency's
18     explanation.  But to say here it played a role
19     in this way or this way, I can't say.
20         Q.    So is there a finding on the part of
21     the panel or any individual panels that it
22     makes a difference whether unvaccinated people
23     spread COVID-19 in any greater extent than
24     vaccinated people do?
25         A.    The purpose of --

1                    E. EICHENHOLTZ

2              MR. HAIDER:  Objection.

3              THE WITNESS:  Sorry.

4         A.    The purpose of the panel is not to

5    gather facts and make a determination in the

6    first instance.  It's to review the record

7    presented to it on appeal that has follow-up

8    inquiry in any particular case, to engage in

9    follow-up inquiry to make sure that it has all

10   the facts it needs to decide an appeal.

11        Q.    But isn't it true that on occasion,

12   in cases where applicants present discussions

13   of their own religious beliefs and other bases

14   for their religious accommodation, that the

15   Citywide Appeals Panel considers whether the

16   basis is valid or true or accurate?

17        A.    Yes, and also whether -- I mean, I

18   wouldn't say that -- you see, that's --

19   you're -- sort of there are two things that

20   are getting mixed up, and we kind of got mixed

21   up on this before.  There's a difference

22   between validity of a religious belief,

23   whether a religious belief has a conflict with

24   the COVID-19 vaccine mandate, the factual

25   issue as to whether, we talked about this

1                    E. EICHENHOLTZ
2    before, whether the refusal to vaccinate or
3    the desire not to vaccinate comes from a
4    religious source or a secular source or a
5    political source.  Those are all three
6    separate issues that may come into play in any
7    given case.
8        Q.    Okay.  Well, when considering those
9    issues, those questions of, for example,
10   accuracy and that sort of thing, why do you
11   not also consider the question of the accuracy
12   of whether there is a difference -- whether it
13   makes a difference to exclude unvaccinated
14   people from employment?
15             MR. HAIDER:  Objection.
16             You can answer.
17       A.    So there are factual findings
18   that -- you know, there's a factual basis for
19   the mandate that is basically that there is a
20   necessary public health benefit to employees
21   engaging in the actions contained in the
22   health commissioner's order that has been
23   challenged and upheld, and so we are reviewing
24   these requests in that context.  Reasonable
25   accommodations are not a vehicle to challenge

1                    E. EICHENHOLTZ
2    the underlying health order.  It is a vehicle
3    to -- for legal -- on specific legal bases to
4    request expectations in that order.  One of
5    those bases is not personal, factual
6    disagreement with the findings of the health
7    commissioner.
8        Q.    So do any Citywide Panel conduct an
9    independent undue hardship analysis in
10   considering whether or not a sincere religious
11   accommodation might be accommodated offsite or
12   remotely?
13            MR. HAIDER:  Objection.
14       A.    The Citywide Appeal Panel is doing
15   appellate-type work.  They do not in the first
16   instance gather fact.  We may have factual
17   inquiries that we direct off into the agency
18   or the employee, as appropriate, and ask them
19   to provide the facts to us that we need to
20   make our determination.  We are making our
21   determination based on the record developed on
22   appeal.
23       Q.    Isn't there a contradiction between
24   saying you are making your determination on
25   the -- based on the record that was developed

                    E. EICHENHOLTZ

1
2       on appeal, that is to say, the record that
3       comes to you from the agency on the one hand,
4       and then to say that, you know, if there are
5       questions that you think require additional
6       information, you go out and ask the agency for
7       them, or you ask the applicant for it?  Aren't
8       those two statements in contradiction?
9            A.    No.
10           Q.    How can that be?
11           A.    Because they're not.
12           Q.    Well, all right.  Either you're
13      deciding it on the basis of -- well,
14      withdrawn.
15                So the materials that you solicit
16      from the agencies, those are not materials
17      that are contained in the record on appeal; is
18      that correct?  The record that --
19           A.    They are -- they are part of the
20      record when we make our determination on the
21      appeal, yes.
22           Q.    But they are not part of the record
23      that was sent to you by the agency at the
24      start of the appeal?
25           A.    Right, because we've made a

```
1                    E. EICHENHOLTZ
2      determination that we want to remand for
3      further development of the record and we have
4      done so.
5           Q.    Okay.  So the additional information
6      is always done on remand?
7           A.    Well, again, functionally, yes,
8      that's how this works.  We make an inquiry of
9      the agency, either on rare occasion directly
10     to the employee, but generally, the agency to
11     either provide us an explanation or get
12     information from the employee, to review it,
13     and to submit it to augment the record.
14          Q.    You just used the word "remand."
15     Are you saying that you are giving the case
16     back for a fresh consideration for its own
17     decision to the City agency, or are you saying
18     something else?
19          A.    We are sending it back, and when
20     information is provided, there are occasions
21     where the agency will advise the panel that
22     when it obtained the information, it
23     determined that the reasonable accommodation,
24     in fact, should be granted, and at that point,
25     we close our appeal administratively because
```

1                    E. EICHENHOLTZ
2    we do not review appeals of grants of
3    reasonable accommodations.
4         Q.    How often has that been done, how
5    many times?
6         A.    I couldn't give you a number.  I
7    would certainly -- yeah, I couldn't give you a
8    number.
9         Q.    And do -- withdrawn.
10              Is there any written communication
11   or document that sets forth, like, the terms
12   of the remand, including that the agency may
13   reconsider its decision before sending it back
14   to you?
15        A.    No, no.  Usually what happens is
16   there is a communication agency, the panel is
17   interested in this information in any
18   particular case, and the agency will provide
19   our response -- its response to the panel, and
20   we'll proceed from there.
21   RQ          MR. NELSON:  So we're going to want
22         to see procedure, in connection with our
23         procedural request for information on
24         copies of such communications made to each
25         agency that received at least one of those

1                    E. EICHENHOLTZ
2          things that you call a "remand."
3               MR. HAIDER:  We'd just ask that you
4          follow up in writing.
5               MR. NELSON:  Okay.
6          Q.    Now, when you informed the agency
7     that you are doing this thing that you call a
8     "remand," do you provide any similar notice to
9     the applicant?
10         A.    So again, we are an appeals panel.
11         Q.    Yes.
12         A.    The entity that is doing the
13    interaction with the applicant is the agency;
14    not the appeals panel.  There have been
15    circumstances, they're rare, that we will
16    directly communicate with the applicant for a
17    variety of reasons, you know, exceptional
18    reasons is what I'll call it.  But generally,
19    the interaction is because that is their
20    function, through the agency and its EEO
21    office.  Our function is to review these
22    matters on appeal.
23         Q.    So does the applicant even have any
24    knowledge, typically, that the matter has been
25    remanded to the agency for further development

1                    E. EICHENHOLTZ
2       of the record?
3            A.    It would have to because the agency
4       EEO officer or someone in the agency is
5       reaching out to the employees and requesting
6       information, and sometimes they may say, the
7       City Appeal Panel wanted us to ask or wants to
8       know, sometimes they say, we need to know
9       this.  But the employee is notified that the
10      information is needed in considering with
11      their RA request.
12           Q.    So you never remand a case unless
13      the information you want is coming from the
14      applicant?
15           A.    No.  As I said, we've had ones where
16      we've made inquiries to both the applicant and
17      the agency, but it is very -- you know, it's
18      rare that we would have specific follow up for
19      the agency because it's generally outside of
20      the context of something like undue hardship,
21      you know.  We really need to understand the
22      nature of the request from the applicant; not
23      the agency.
24           Q.    Are there times when you are
25      requesting information from the agency; not

1                    E. EICHENHOLTZ
2    from the applicant?  Have there been such
3    instances?
4        A.    Exclusively the agency?  I can't
5    recall any, offhand.
6        Q.    Were individual panels that were
7    confronted with undue hardship claims from the
8    agency involved in an appeal, were those
9    panels expected to attempt to verify that the
10   hardship claimed by the agency existed?
11       A.    No, they were expected to review the
12   explanation of the agency and look at the
13   facts in the record and assess whether the
14   agency had established an undue hardship.
15       Q.    So what level of evidence was the
16   agency required to provide to the appeals
17   panel to meet that standard?
18       A.    The agency was required to
19   articulate what about its needs and operations
20   was causing an undue hardship.
21       Q.    Were they able to provide any
22   evidence that that was true?
23       A.    I don't -- certainly if there was
24   inconsistencies in the agency's statement that
25   required further inquiry or suggested that it

1            E. EICHENHOLTZ
2    was untrue, we would have followed up.  You
3    know, and certainly in circumstances where the
4    description doesn't seem to match the nature
5    of the job the employee's doing, there may
6    have been some follow up in those cases, as
7    well.  But no, they're not required -- no one
8    in this process is required to -- you know,
9    it's put to a burden of evidentiary proof.
10   You know, it's all about assertions and, you
11   know, information that is generated as part of
12   the cooperative dialogue.
13       Q.    But it seems to me it isn't true
14   that no one is required to provide evidentiary
15   proof because there very clearly is a burden
16   on the applicant to provide evidence to
17   support their claim that they have a religious
18   objection.  Why is -- I mean, you would agree
19   with that statement, wouldn't you?
20       A.    No, I would not agree with that
21   statement.
22       Q.    Okay.  The religious applicant is
23   not required to provide any evidence?
24       A.    That's -- I mean, not in a -- in
25   a -- you know, in an evidentiary backup,

1                    E. EICHENHOLTZ
2      burden of proof way.  The requirement is that
3      the employee articulate their religious belief
4      and explain what the belief is, the source of
5      the belief, and the conflict between the
6      belief and the vaccine requirement.  It could
7      simply be the employee saying so.
8          Q.    But isn't it a fact that normally,
9      in such a case, the employee is also required
10     to respond to specific questions that are
11     addressed to the employee, and if the response
12     is not sufficient, then there's a denial of
13     the application?
14   DI              MR. HAIDER:  Objection.  Again, this
15          is outside the scope.
16              We're now talking about what an
17          agency is supposed to do rather than what
18          the Citywide Panel does in reviewing the
19          appeal through the agency and where the
20          standards apply.
21              So I would instruct the witness not
22          to answer.
23              MR. NELSON:  That's actually not
24          true though because what I'm dealing with
25          here is the inconsistent standards that

```
 1                    E. EICHENHOLTZ
 2        the appeals panel has with respect to
 3        evidentiary requirements.  They require
 4        evidence of the applicant for an
 5        exemption, but they require no evidence of
 6        undue burden, if it's asserted by the
 7        agency.
 8             MR. HAIDER:  Well, I think it was
 9        phrased in a different way.  You can go
10        ahead and ask it, if it's phrased with
11        respect to the Citywide --
12             THE WITNESS:  Well, I -- yeah,
13        sorry.  Okay.
14             MR. HAIDER:  Can you phrase the
15        question?
16   BY MR. NELSON:
17        Q.    Isn't it a fact that you do not
18   require evidence from the agencies with
19   respect to any claims that they make of undue
20   hardship?
21        A.    No.  Like I said, there's no
22   evidentiary requirement of any participants in
23   cooperative dialogue here.  There are many
24   cases where it will simply be the employee
25   explaining their needs and the basis for their
```

1                    E. EICHENHOLTZ
2      accomodation and the agency explaining their
3      needs.
4          Q.    Again, I'm trying to eliminate
5      questions that we've written, so I'm saving us
6      time by being quiet for a moment.
7          A.    I understand.  Thank you.
8          Q.    Were panelists instructed to assume
9      that any or all of the agencies that had
10     denied religious accommodation requests had a
11     compelling interest of any kind?
12         A.    I don't understand -- I'm not
13     familiar with the term "compelling interest"
14     in this context.
15         Q.    Are you aware that the term
16     "compelling interest" is used in the context
17     of the application of the United States
18     Constitution's First Amendment to situations
19     of religious discrimination?
20              MR. HAIDER:  Objection.
21              THE WITNESS:  Yeah.
22  DI          MR. HAIDER:  I'm going to -- you're
23         calling for a legal response to a question
24         about, you know, First Amendment, which
25         has not been testified as a standard

1                    E. EICHENHOLTZ
2         that's applicable here.
3              So I'm going instruct the witness
4         not to answer.
5         Q.    So did the individual panelists have
6    any instructions with respect to whether or
7    not to consider alternative accommodation
8    possibilities?
9         A.    If the record -- well, I can't
10   recall if there are -- other than the guidance
11   that they were provided, that they reviewed, I
12   can't recall any specific discussions on
13   alternative accommodation possibilities at the
14   panel level.
15              Again, you know, I want to be extra
16   clear as often as I can that we are really
17   talking about half, and I don't even want to
18   say "half," but the final phase of the
19   reasonable accommodation process, the
20   post-determination phase of the reasonable
21   accommodation process.  So what may have been
22   appropriate at other phases, you know, we're
23   not really, you know, here to discuss.  But,
24   you know, in terms of the panel, we did not
25   get records where the cooperative dialogue

1                    E. EICHENHOLTZ
2      really went too deeply into that issue.
3           Q.    So the, as you stated, the Citywide
4      Panel was governed not only by Title VII, but
5      also by the New York State and New York City
6      Human Rights Laws.  To what extent did the
7      panel actually implement the requirements of
8      the New York State and New York City Human
9      Rights Laws?
10          A.    It wasn't charged with implementing
11     those laws, it was charged with applying the
12     standards necessary to review an appeal of the
13     denial of a reasonable accommodation under the
14     framework of federal, state, and city law.
15          Q.    And that would have included the New
16     York State and City Human Rights Laws,
17     correct?
18          A.    As I just said, federal, state, and
19     city law.
20          Q.    Right, okay.  So what is the
21     standard for -- what do you understand the --
22     sorry, I'm sorry.
23                You stated previously that in
24     consideration whether or not an undue hardship
25     existed for the agency to grant a religious

1                   E. EICHENHOLTZ
2      accommodation, that the City or the agency was
3      required to show more than a de minimus cost
4      or burden on their operations from the
5      granting of such an accomodation.  Do you
6      recall that testimony?
7           A.    That's correct.
8           Q.    How much more?
9                 MR. HAIDER:  Objection.
10          A.    Again, this is actual inquiry that
11     we review in every case.  We have to see
12     sufficient level of disruption to agency
13     operations and justification for why the
14     reasonable accommodation would present an
15     undue burden to the particular agency, when
16     we're considering undue burden.
17          Q.    So the standards that the -- I'm
18     sorry.
19                Were express instructions ever given
20     to the members of the individual panels with
21     respect to the exact standards that they were
22     to apply with respect to determining if
23     there's an undue burden?
24                MR. HAIDER:  Objection.
25          A.    With respect to the COVID-19 vaccine

1                    E. EICHENHOLTZ
2       requirement and health emergency, the panel
3       was directed to the EEOC Guidance, and as I
4       said earlier, my understanding was, given the
5       nature, the emergent nature of the pandemic,
6       the City Commission of Human Rights, which is
7       the agency charged with enforcing the human
8       rights law, adopted that guidance, so we felt
9       that that was the guidance that those agencies
10      that are, unlike the Citywide Panel, charged
11      with implementing those laws were directing us
12      to.
13          Q.    Did the Citywide Panel routinely
14      request from agencies that were having an
15      undue hardship from granting an accommodation,
16      did they routinely request from those agencies
17      information about the identifiable cost of the
18      accommodation request, and including the costs
19      of loss of productivity and of retaining or
20      hiring employees or transferring employees
21      from one facility to another in relation to
22      the size and operating cost of the employer?
23              MR. HAIDER:  Objection.
24          A.    So again, as I've said, the agencies
25      provided the justification for asserting undue

1                    E. EICHENHOLTZ
2       hardship, which was factually reviewed in
3       every case in which it was asserted by the
4       panel members, and a determination rendered as
5       to whether or not they had established an
6       undue hardship under the standards set forth
7       in the guidance.
8           Q.    Did the Citywide Appeal Panel
9       specifically examine whether or not the
10      information that I identified in my last
11      question had been provided by the agency
12      employers?
13              MR. HAIDER:  Objection.
14          A.    So again, you know, I'll try and
15      explain this as best I can, that that is the
16      agency's, you know -- the agency is doing that
17      when they are assessing the employee's request
18      for reasonable accommodation.  On appeal, we
19      review the material that was provided to us by
20      the employee and the agency and make a
21      determination on appeal whether the
22      accommodation was denied, properly denied, or
23      should have been granted based on the facts
24      and circumstances presented to us by the
25      agency and by the employee.

1          E. EICHENHOLTZ

2     Q.    Does the civil -- oh, I'm sorry.

3          Does the Citywide Appeals Panel

4     routinely examine whether or not the materials

5     provided by the agency employer in connection

6     with the file from their denial of the

7     religious accommodation includes information

8     concerning the identifiable cost of the

9     accommodation, including the costs of loss of

10    productivity and of retaining and hiring

11    employees or transferring employees from one

12    facility to another in relation to the size

13    and operating cost of the employer?

14          MR. HAIDER:  Objection.

15    A.    Again, the various factors, costs,

16    etcetera, pertinent to a reasonable

17    accommodation is made during the cooperative

18    dialogue and the review of the employee's

19    request by the agency, the Citywide Panel

20    receives the information provided by the

21    employee and by the agency, reviews that

22    information and makes a determination as to

23    whether the reasonable accommodation was

24    properly denied, or if it was not, whether the

25    reasonable accommodation should be granted.

1                    E. EICHENHOLTZ
2          Q.    And so, in effect, your answer to my
3    last question is no?
4          A.    No, that is not accurate.
5          Q.    So, again, I will ask a question
6    that is designed to produce the same
7    information that I did not receive in response
8    to the last several questions.
9                Does the Citywide Appeals Panel
10   routinely examine whether or not the record on
11   appeal provided by the agency that claims
12   undue hardship has included information about
13   "the identifiable cost of the accommodation,"
14   and this is statutory language I'm reading,
15   "including the costs of loss of productivity
16   and of retaining or hiring employees or
17   transferring employees from one facility to
18   another, in relation to the size and operating
19   costs of the employer"?
20         A.    So again, the way the reasonable
21   accommodation process works is those facts are
22   reviewed by the agency, they engage in a
23   cooperative dialogue with the employee, and
24   they make a determination.  The information
25   the employee provided and the explanation of

1                    E. EICHENHOLTZ
2      the agency is submitted to the Citywide Appeal
3      Panel, and the Citywide Appeal Panel will
4      decide on appeal whether the agency's
5      determination to deny the reasonable
6      accommodation was appropriate, and if it
7      wasn't appropriate, whether it's appropriate
8      to grant the reasonable accommodation.
9          Q.    So in reviewing a decision to deny a
10     reasonable accommodation on the basis of undue
11     hardship, is it the case that the Citywide
12     Appeals Panel does not consider it
13     dispositive, whether or not the record on
14     appeal contains information provided by the
15     agency employer about "the identifiable cost
16     of the accomodation, including the costs of
17     loss of productivity, and retaining or hiring
18     employees or transferring employees from one
19     facility to another, in relation to the size
20     and operating cost of the employer"?
21         A.    There does not need to be -- the
22     employer is providing us the explanation for
23     why they believe they have an undue hardship.
24     In making those determinations, they consider
25     the factors they necessarily need to consider

1                      E. EICHENHOLTZ

2      for their operations, and that either is or is

3      not reflected factually in their summary and

4      their explanation that they provide us, and we

5      can take that into consideration as needed

6      when making our determination on appeal.

7           Q.    So are you aware that the language

8      that I've repeatedly cited here is contained

9      in the New York State and New York City Human

10     Rights Laws in context of whether or not an

11     undue burden has been sufficiently

12     demonstrated?

13          A.    I'm well aware of that, yes.

14          Q.    Okay.  Then why does the Citywide

15     Appeals Panel not bother to consider whether

16     or not that criteria has been met in a claim

17     of undue burden by the agencies?

18          A.    Your --

19               MR. HAIDER:  Objection.

20               THE WITNESS:  Sorry.

21          A.    Your characterization is incorrect,

22     and I'm not going to engage in argument.  This

23     is legal argument, and I'm not going to

24     entertain it.  If you have a factual question,

25     I'd be happy to answer a factual question.

1              E. EICHENHOLTZ

2        Q.    Does the Citywide Appeals Panel

3     consider to be dispositive in adjudicating

4     appeals from agency employers based on undue

5     hardship, whether that file contains

6     information about the number of individuals

7     who will need the particular accommodation to

8     a sincerely-held religious observance or

9     practice that is involved in that appeal?

10        A.    Do we consider that dispositive?  We

11     consider the explanation the agency provides

12     as to why there's an undue burden.  That is

13     what we consider, and we look at the facts

14     that are generated by that and our

15     understanding of those facts in connection

16     with what the employee is claiming the facts

17     provided by the employee, and the panel will

18     make an appellate determination from that

19     point forward.

20        Q.    So same question about whether or

21     not the appeal file contains information from

22     the agency employer for an employer with

23     multiple facilities about the degree to which

24     the geographic separateness or administrative

25     or fiscal relationship of the facilities will

1                    E. EICHENHOLTZ
2       make the accommodation more difficult or
3       expensive.
4           A.    I know of no legal requirement that
5       requires at the appellate phase of a review
6       that that sort of assessment be provided at
7       that level of detail.  What we are getting on
8       appellate review from both the employee and
9       the employer is an explanation as to why an RA
10      is appropriate, an explanation as to why the
11      RA may have been denied on reasons, including,
12      but not limited to, undue hardship, and we
13      assess that.  There is no requirement,
14      statutory or otherwise, that the employer,
15      that the agency, that the City -- the City's
16      internal appeal process specifically provide
17      that sort of data.  What they need to do is
18      explain their justification for undue burden.
19          Q.    So I'm going to ask about some
20      factors that are listed in the New York City
21      Human Rights Law concerning how an undue
22      hardship is to be explained by an employer,
23      and ask you whether or not this list of
24      factors is expressly considered by the
25      Citywide Appeals Panel in making its

1          E. EICHENHOLTZ

2    determinations on undue hardship cases where

3    the accommodation has been denied on the basis

4    of undue hardship.

5             So that list is as follows:  Nature

6    and cost of the accomodation; the overall

7    financial resources of the facility or the

8    facilities involved in the provision of the

9    reasonable accommodation; the number of

10   persons employed in such facility; the effect

11   on expenses and resources, or the impact

12   otherwise of such accommodation upon the

13   operation of a facility; the overall financial

14   resources of the covered entity; the overall

15   size of the business of a covered entity with

16   respect to the number of its employees; the

17   number type and location of its facilities;

18   and the type of operation or operations of the

19   covered entity, including the composition,

20   structure, and functions of the workforce of

21   such entity; the geographic separateness;

22   administrative or fiscal relationship of the

23   facility or facilities in connection to the

24   covered entity.

25        A.    So we would of course review any

1                    E. EICHENHOLTZ
2        requests for an undue hardship asserted by the
3        agency with an understanding that those are
4        some of the factors that the agency is --
5        should be looking at when making its
6        determination that a particular accomodation
7        requires an undue hardship.
8            Q.    Does the Citywide Panel require
9        evidence that the agency employer has, in
10       fact, provided information or obtained
11       information or relied upon information of this
12       kind?
13           A.    Again, we are -- the panel does
14       not -- the panel reviews the assertions of the
15       parties from the cooperative -- not "parties."
16       The employer and the employee in a cooperative
17       dialogue determine whether the reasonable
18       accommodation is granted or should be denied,
19       outside of -- there's some requirement
20       obviously for documentation in the medical
21       context.  There was no specific evidentiary
22       rule or showing that is required on an appeal
23       of the employer or of the employee.  That is
24       not how the appeal process works.  The appeal
25       process is reviewing the record and the

1              E. EICHENHOLTZ

2      assertions of the employer and the employee of

3      why the accomodation is necessary and why it

4      was denied in determining whether or not the

5      accomodation was properly denied and whether

6      the accomodation should be granted based on

7      the facts presented to the panel in that

8      record.  And if we need more information, if

9      there is a particular aspect of the

10     explanation that we might need information

11     about one of those particular elements that

12     one might need to consider, we can certainly

13     make inquiry of the agency and have done so.

14          Q.   But the Citywide Appeals Panel is

15     basically not required to determine whether or

16     not the agency employer has complied with the

17     New York State Human Rights Law or the New

18     York City Human Rights Law.  Is that a fair --

19          A.   Yeah, and to do this, to engage in

20     this kind of back and forth, you know, I think

21     we need -- you know, and it's not my role here

22     to have a legal discussion with you about what

23     the law requires, what the law requires

24     someone to show at certain stages of the

25     process, and so I'm not going to dig into

1                    E. EICHENHOLTZ
2     that.  I've explained what the panel looks
3     for, I've explained how we go about looking
4     for it.  I don't think there's more factual
5     information I can provide, other than what
6     I've already provided.
7          Q.    So when assessing whether or not it
8     would be an undue hardship to accommodate the
9     Department of Education employees, does the
10    Citywide Panel consider the fact that there
11    are only 30 accommodated Department of
12    Education employees working remotely at the
13    department's workspace in Brooklyn at 1087
14    Ocean Avenue and that it can accommodate 312
15    employees?
16              MR. HAIDER:  Objection.
17         A.    To the extent that that fact would
18    be relevant to a determination in any
19    individual case, we would consider that.
20         Q.    Has the panel ever considered that
21    evidence?
22              MR. HAIDER:  Objection.
23         A.    Again, I think right -- you know, I
24    can't answer that without really discussing
25    the facts and circumstances of an individual

1                    E. EICHENHOLTZ
2    case.  I certainly would not say that it is a
3    dispositive factor on the issue of undue
4    hardship, that there may be seats available in
5    any given facility or desks available or what
6    have you.  It would not necessarily be a
7    dispositive factor.
8         Q.    When assessing whether or not it
9    would be an undue hardship to accommodate City
10   employees, did the Citywide Panel ever
11   consider whether it would constitute an undue
12   hardship on the employing agencies to modify
13   their termination descriptions so that they
14   might be eligible to collect unemployment
15   insurance?
16             MR. HAIDER:  Objection.
17        A.    I don't know if that came up in any
18   cooperative dialogue.  I can't say here for
19   certain.
20             MR. NELSON:  All right.  We have
21        some other questions that are going to be
22        posed by Sujata Gibson, but we need to
23        take a short break before that begins.
24        This is -- you know, we have -- I guess we
25        have -- I'm not sure exactly how much more

1                    E. EICHENHOLTZ

2           time we have.

3                    But where are we on the time spent

4           so far?  I'm asking the videographer.

5                    THE VIDEOGRAPHER:  You have

6           29 minutes left.

7                    MR. NELSON:  Thank you.

8                    So let's take a short break, another

9           ten minutes, please, and we'll -- sorry,

10          go ahead.

11                   THE VIDEOGRAPHER:  We're now going

12          off record.  The time is 5:16.

13                   (Recess was taken.)

14                   THE VIDEOGRAPHER:  We're now back

15          on.  The time is 5:27.

16     EXAMINATION BY

17     MS. GIBSON:

18          Q.   Mr. Eichenholtz, I wanted to follow

19     up on some of your direct threat comments.

20     The first was, you stated that you don't want

21     to second guess the commissioner's mandate.

22     Where did the mandates say that unvaccinated

23     employees with religious and medical

24     exemptions cannot be accommodated without

25     posing a direct threat to others?

1                    E. EICHENHOLTZ

2          A.     It doesn't.  To the contrary, it

3    specifically contemplates that those who have

4    religious and medical exemptions to the -- to

5    the vaccination requirement can be at the

6    workplace, I believe with certain conditions,

7    obviously.

8          Q.     Thank you.

9                 And you also said that Corrections

10   was the only department, that you're aware of,

11   agency, that did provide any kind of analysis

12   on direct threat.  Isn't it true that they

13   provided no scientific support with that?

14         A.     Again, as I said earlier, I don't

15   remember the precise explanation that the

16   Department of Correction provided regarding

17   direct threat.

18         Q.     But is it fair to say that other

19   than their conclusory statements, they didn't

20   provide any citations to science or anything

21   evidentiary to support their assertion that

22   there could be a direct threat based on

23   vaccination status?

24         A.     Ms. Gibson, I can't give you a

25   characterization when I don't remember

1              E. EICHENHOLTZ
2      precisely what it says.
3          Q.    Okay.  I was looking through the
4      discovery materials, and the FDNY didn't
5      provide any direct threat analysis, but said
6      there could be a potential for a direct
7      threat.  Would you consider that as persuasive
8      evidence to uphold an undue hardship
9      determination?
10         A.    As I --
11 DI           MR. HAIDER:  Objection.
12              You know, Ms. Gibson, I know you're
13         referencing discovery materials particular
14         to one of the plaintiffs, which is, you
15         know, not permitted in this deposition.
16              Even though it's posed as a
17         hypothetical question, I'm going direct
18         the witness to not answer that question.
19              MS. GIBSON:  Well, I'm not going to
20         accept that.  The FDNY put a policy
21         statement out for all FDNY employees about
22         the potential for undue hardship, and I'm
23         not going to accept in a deposition not
24         answering a question, so we reserve the
25         right to bring this back up with the

1                    E. EICHENHOLTZ

2       Court.

3       Q.    I would ask again:  If the FDNY put

4    out a potential, as they did, potential undue

5    hardship without any individualized review of

6    an individual person and why they would pose a

7    direct threat, would you uphold that as an

8    undue hardship determination?

9              MR. HAIDER:  Objection.

10             You can answer.

11      A.    Yeah, I know of no circumstances

12   where the Citywide Panel was provided an

13   explanation of direct threat without other

14   information that allowed for some

15   individualized understanding of the particular

16   employee, such as job title, job location, and

17   the like, elsewhere in the record.

18      Q.    Did the Citywide Panel ever uphold

19   undue hardship determinations for anyone else

20   than DOE employees?

21      A.    Yes.

22      Q.    And you say that none of these

23   agencies, other than Department of

24   Corrections, ever provided any information

25   about direct threats?

1                    E. EICHENHOLTZ

2          A.     Not that I recall, no.

3          Q.     So how could you have an undue

4     hardship determination based on fear of COVID

5     spread without a direct threat analysis?

6          A.     I'm not aware of an undue hardship

7     determination based on fear of COVID spread,

8     as you've characterized that.  Yeah, I --

9          Q.     Well, the basic premise --

10         A.     I can't answer that question, yeah.

11         Q.     You said that the mandates do not

12    say that these employees cannot be reasonably

13    accommodated, correct?

14         A.     Yes, if they're entitled to

15    accommodation under the parameters set forth

16    in the law, yeah.

17         Q.     Okay.  Thank you.

18                But so how, then, would it be an

19    undue hardship to accommodate any of these

20    employees if they were not a direct threat to

21    others?

22         A.     Because the nature of the -- the

23    mandate and the nature of their job is such

24    that they cannot be taken offline -- I mean,

25    I'm not quite sure with this -- how you're

1          E. EICHENHOLTZ
2    saying it's -- you know, the -- there are
3    individuals and agencies that require physical
4    presence in the workplace, and there is -- and
5    there are people who work with vulnerable
6    populations and things like that, and that
7    would obviously be relevant to a direct threat
8    analysis.  It's also relevant to an undue
9    hardship analysis in appropriate
10   circumstances.  That doesn't mean that one
11   needs to prove the other.  You know, I
12   understand that may be your legal position.
13   I'm not sure we see eye to eye on the law
14   there.
15        Q.    I'm trying to understand your
16   position.  So my -- I guess let me dial this
17   back.
18              Does anything in these mandates,
19   specific mandates covering these plaintiffs,
20   does anything in these mandates state, if
21   accommodated for religious or medical
22   concerns, these employees cannot be physically
23   present at the workplace, as a blanket rule?
24        A.    If accommodated?  If an
25   accommodation is granted, they can be

```
1                    E. EICHENHOLTZ
2      physically present subject to certain
3      conditions that I don't want to misstate
4      because I don't have the order in front of
5      me --
6          Q.    Okay.  But just to clarify, the
7      mandate does not say they cannot be
8      accommodated by allowing them to remain at
9      work with sincere religious objections,
10     correct?
11         A.    Correct.  It says --
12         Q.    Okay.
13         A.    -- that --
14         Q.    So unless they were a direct threat
15     to others, there's no reason why, if they were
16     found to have sincere religions objections,
17     they couldn't continue at their job, correct?
18         A.    No, because their requested
19     accommodation may pose an undue hardship.
20         Q.    Only if they're a direct threat,
21     though, right?
22         A.    No, that's not correct.  I
23     understand that is your legal position, I
24     think --
25         Q.    Well, why else?
```

1                    E. EICHENHOLTZ

2        A.    -- that is a legal argument, and I'm

3    not here, respectfully, to argue the law.  I'm

4    here to provide you facts about the Citywide

5    Appeal Panel and its processes.

6        Q.    And the Citywide Appeal Panel

7    granted multiple undue hardship claims,

8    correct?

9        A.    That's correct.

10       Q.    So I'm asking you:  If it's not

11   based on a direct threat analysis, what

12   possible reason could there be if somebody is

13   not a direct threat, what possible reason

14   could there be for undue hardship?

15       A.    Because granting the reasonable

16   accommodation in the context of that employer,

17   employer, they're based on the functions and

18   the operations, will cause a significant

19   enough disruption that it constitutes an undue

20   hardship under the law.

21       Q.    How, if they're not a direct threat,

22   would that be true?

23       A.    Because the granting enough

24   accommodations can impair the function of an

25   agency, granting particular accommodations in

1                    E. EICHENHOLTZ
2    particular functions can impair the agencies,
3    and there may be some, as I said to you,
4    Ms. Gibson, I'll say it again, there may be
5    some facts that go into the undue hardship
6    analysis that are similar to those that we
7    might think of in the direct threat analysis.
8    But that doesn't mean that the direct threat
9    is a prerequisite to undue hardship.  Again,
10   that is a legal argument you are making, and
11   I'm not here to debate the law.
12        Q.    Mr. Eichenholtz, I'm asking for your
13   explanation of how anybody -- how it would be
14   an undue hardship.  If they are not a direct
15   threat and they can be accommodated in their
16   current job physically present, how is that an
17   undue hardship absent a direct threat
18   analysis?
19        A.    Because the agency articulates that
20   granting that accomodation, either alone or in
21   a certain amount, will impair the agency's
22   operations, and there could be a way that
23   having unvaccinated personnel poses a certain
24   amount of risk.  This is a slightly different
25   issue, we're looking at a different area of

1           E. EICHENHOLTZ
2      the law here when we're talking about undue
3      hardship, that might also factor in to the
4      potential disruption to the agency's
5      operations, if that accomodation is granted,
6      so --
7           Q.    What kind of threat would not be
8      part of a direct threat analysis?
9                 MR. HAIDER:  Objection.
10          A.    Again, the fact -- I keep saying
11     this, and I understand it's your legal
12     argument, and once again I --
13          Q.    Please stick to the question I'm
14     asking you.  I'm just asking you:  What type
15     of threat would not be part of a direct threat
16     analysis?
17          A.    What type of --
18          Q.    What type of risk?
19          A.    Okay.  Obviously risk is a very
20     important part of direct threat analysis --
21          Q.    Yes.  What type is not -- if you're
22     saying direct threat is irrelevant, I'm -- you
23     cannot be a direct threat, but you can still
24     pose an undue hardship because of the risk you
25     pose.  Why -- what possible type of risk would

1                     E. EICHENHOLTZ
2     not be part of that direct threat analysis?
3          A.     That's not what I said, Ms. Gibson.
4          Q.     Okay.  I'm going move on.
5                 So have you relied on any documents
6     at all, any science, anything, any evidence at
7     all to establish that the risk that these
8     employees posed because of their vaccination
9     status is substantial?
10                MR. HAIDER:  Objection.
11                You can answer.
12         A.     Risk because of their vaccination
13    status is substantial?
14         Q.     Yes.
15         A.     Again, this is sort of completely
16    divorced from any context, and you're talking
17    about me personally --
18         Q.     Could you -- I would direct you to
19    just answer the question:  Is there any
20    evidence at all that you relied on, let's
21    start with -- actually I'm going to
22    rephrase -- no, I'm going to stick with the
23    original question.
24         A.     Okay.
25         Q.     Any evidence at all that you relied

1                    E. EICHENHOLTZ
2       on to determine that unvaccinated employees
3       with sincere religious beliefs pose a
4       substantial risk to others based on their
5       vaccination status?
6               MR. HAIDER:  Objection just to the
7          form as to what he relied on or as to the
8          panel relied on.
9               MS. GIBSON:  Well, that's a good
10         distinction, and I do want to clarify.
11         And I would ask, Mr. Haider, to continue
12         to clarify the reasons for your objections
13         if you can so that I have a chance to
14         respond.
15         Q.    So both.  Did you rely on any
16      evidence, and to your knowledge, did the panel
17      rely on any actual evidence to establish that
18      unvaccinated employees could pose a higher
19      risk to others based on their vaccination
20      status?
21         A.    So as I said earlier, in the appeals
22      that I've reviewed, I've never affirmed an
23      appeal on the basis of direct threat.  I have
24      affirmed on the basis of undue hardship.
25         Q.    I think as yes or a no would be

1                    E. EICHENHOLTZ
2     great.  Have you ever relied on any evidence
3     for that determination?
4          A.    What's "that determination"?  That's
5     where I'm confused, Ms. Gibson.  I'm not
6     trying to be difficult.  I'm just trying to
7     understand what you want to know from me.
8          Q.    Okay.  Have you ever assessed the
9     duration of the risk that an individual might
10    pose to others using evidence?
11         A.    In my lifetime?
12         Q.    In these panel proceedings, have you
13    or the panel ever looked at the duration of
14    the risk an individual might pose based on
15    their vaccination status?
16         A.    So, and I think I explained this
17    earlier, this is done in a context that
18    includes a public health emergency order that
19    has a factual predicate, and so we work off of
20    that factual predicate and --
21         Q.    Did you rely on any evidence to make
22    the determination on the duration of the risk
23    that an individual might pose for an undue
24    hardship analysis?
25         A.    Again, I will repeat again, I have

1              E. EICHENHOLTZ
2    not affirmed denials of reasonable
3    accommodations on the grounds -- specifically
4    the grounds that they present -- oh, I'm
5    sorry, undue hardship.  On the grounds -- you
6    know, on the direct -- on the undue hardship
7    grounds, I have looked at the potential
8    disruption to agency operations if the
9    reasonable accommodations were granted, and
10   there could be a multitude of reasons for
11   those.
12        Q.    Were any -- again, you haven't
13   answered my question.  Did you rely on any
14   evidence for those determinations?
15        A.    We've had this conversation with --
16        Q.    For your undue hardship
17   determinations, did you rely on any evidence?
18        A.    My function in the panel is not to
19   gather --
20        Q.    I would ask that you say yes or no.
21        A.    -- evidence.
22              I'm trying to explain to you why I
23   can't answer it yes or no.  So it is -- it is
24   challenging because you're using terms like
25   "you," which I can't even tell whether you're

```
 1                    E. EICHENHOLTZ
 2      asking me personally, you're asking the panel,
 3      you're asking the whole reasonable
 4      accommodation process.  You know, we're here
 5      to discuss what the Citywide Panel does, and
 6      you're asking me what I would do without
 7      really an explanation as to -- I'm trying to
 8      explain to you why this is so confusing to me.
 9           Q.    You trained the panel, correct?
10                 MR. HAIDER:  Objection.
11           A.    No.
12           Q.    Who trained the panel?
13           A.    I mean, I -- as I said, the panel
14      was given, you know, the guidance and things
15      like that, and we've had group discussions and
16      there's, you know, the City Commissioner's on
17      the panel.  So we do it collaboratively.
18           Q.    Okay.  But you wrote the FAQ?
19                 MR. HAIDER:  Objection.
20           A.    No.
21           Q.    You participated in writing the FAQ?
22           A.    Yeah, I reviewed it.  I reviewed the
23      draft.
24           Q.    With how many other people?
25           A.    As I said earlier, I cannot tell you
```

1                    E. EICHENHOLTZ
2    the specific people, but the agencies would
3    have been the Department of Citywide
4    Administrative Services, as well as the City
5    Commission on -- I mean, I'm sorry, not "City
6    Commission"; the Office of Labor Relations.
7    Sorry, it's getting late.
8        Q.    And people came to you for advice on
9    how to handle -- what the standards were and
10   the criteria that they were supposed to
11   employ, correct?
12            MR. HAIDER:  Objection.
13       A.    No, that's not correct.
14       Q.    So those emails to you were random?
15       A.    No.  That -- they were -- so that
16   was -- Ms. Gibson, I'm really lost.  So
17   generally, I was not -- the guidance we were
18   given comes from the EEOC policy.  That was a
19   request from a City panel to explain what was
20   going on.  I was not the source of the
21   guidance, you know, as --
22       Q.    Why --
23       A.    I would talk with panel members and
24   the panel would talk directly about the issues
25   we were dealing with.

                    E. EICHENHOLTZ

1

2      Q.    So just to clarify, neither you nor

3   the City Panel, to your knowledge, was given

4   any evidence, beyond conclusory statements, to

5   support undue hardship or direct threat

6   analysis?

7            MR. HAIDER:  Objection.

8      A.    I -- no, I wouldn't agree with that

9   characterization.

10     Q.    Okay.  So what evidence were you

11  given to support a direct threat or an undue

12  hardship determination?

13     A.    I can't answer that question in that

14  generalization.  I've tried to explain the

15  framework and the context in which we've

16  decided these cases.

17     Q.    Mr. Eichenholtz, there are either

18  documents or there are not.  What I'm trying

19  to determine is whether we need to make a

20  request for these documents or not.

21            Did you or the Citywide Panel, to

22  your knowledge, rely on any documents,

23  evidence or documents, to support your undue

24  hardship determination?

25     A.    Yes.

1              E. EICHENHOLTZ

2        Q.    What were they?

3        A.    The documents provided in the appeal

4    files for the agencies, the EEOC Guidance with

5    respect to undue hardship, and direct threat

6    to the extent panel members were considering

7    direct threat.

8        Q.    So any scientific studies?

9        A.    The reason I hesitate to answer that

10   question is because we are working from a

11   public health order that was based on a

12   scientific determination that was made by the

13   Commissioner of Health who was lawfully able

14   to find those determinations.  It is not the

15   function of the reasonable accommodation

16   process or the Citywide Panel to question or

17   to demand evidence to support why the City

18   Health Commissioner was making a particular,

19   you know, requirement or why the public health

20   order was necessary.

21       Q.    But these public health orders all

22   said that reasonable accommodation -- nothing

23   in the order should suggest that you shouldn't

24   reasonably accommodate employees.  So what

25   from that did you take as saying you had to

1                    E. EICHENHOLTZ
2     not reasonably accommodate those with sincere
3     religious beliefs?
4             MR. HAIDER:  Objection.
5        A.    I've never taken the position that
6     the City is not to accommodate sincere
7     religious belief.
8        Q.    And yet you're saying to me right
9     now that you based your undue hardship
10    determinations for those with sincere
11    religious belief on the commissioner's order?
12       A.    No, that's not what I'm saying.  I'm
13    saying, you -- that was -- no, that's not what
14    I'm saying, no.
15       Q.    So what are you saying about the
16    relevance of the commissioner's order to an
17    undue hardship determination?
18       A.    I said the commissioner's order
19    contextualizes the basis and the process for
20    which we are proceeding, that there is a
21    public health emergency, that vaccination of
22    City employees is an important measure to
23    address that public health emergency, is all
24    within the context in which we're deciding
25    this.  So, for example, there was no need to

1                        E. EICHENHOLTZ
2      review scientific studies to determine whether
3      there was a public health emergency or to
4      review scientific studies to determine whether
5      by and large vaccination would be beneficial
6      to address that emergency.
7                  And at least that's how I'm
8      understanding your questions now, which is,
9      did you do those things.  And that is my
10     response, that we have a public health order
11     that I think, you know, establishes that
12     framework.  But the specific undue hardship
13     analysis was about impact of granting
14     accommodations on agency operations.  So the
15     reason that fits within the legal framework of
16     the health commissioner's order is because the
17     health commissioner's order requires
18     reasonable accommodations to the extent
19     permitted by law, and law requires -- allows
20     an agency to deny an accomodation on certain
21     grounds with respect to undue hardship.
22         Q.    Going back to the personal rather
23     than religious distinction, a frequent reason,
24     and I'm not speaking about any particular, you
25     know, panels, but a frequent reason that came

1                    E. EICHENHOLTZ
2      up in the notations on the spreadsheet was,
3      "Appellant explains his or her understanding
4      of her sincerely-held religious beliefs" --
5      oh, "Under appellant's," you know,
6      "explanation of his understanding of
7      sincerely-held religious belief, it is
8      ultimately appellant's choice whether to take
9      or abstain from food or medication."
10              So my understanding is you're saying
11     they have a sincerely-held religious belief,
12     but because they have a choice under their
13     religious belief system, we're going to deny
14     them; is that correct?
15              MR. HAIDER:  Objection.
16        A.    I -- yeah, I could not tell you for
17     sure without understanding the facts and
18     circumstances of --
19        Q.    Well, this was regularly put in the
20     notations on the spreadsheet, and I'm trying
21     to understand what that means.
22        A.    Well --
23        Q.    So what would it mean for somebody
24     to have a sincerely-held religious belief that
25     allows for choice?  Why would that be a basis

1                    E. EICHENHOLTZ
2    for denial?
3         A.    The record --
4              MR. HAIDER:  Objection.
5              THE WITNESS:  Sorry.
6         A.    The record is important to
7    understand what that might mean in any
8    particular context.  As I've explained many
9    times now, those determinations are based on
10   the balancing of a variety of factors, and I
11   could not give you an answer without
12   understanding the particular factors that may
13   have been at play in any particular case
14   because these determinations truly are
15   individualized.
16        Q.    So but help me understand this,
17   because you said in your email response that
18   these notations on the spreadsheet are largely
19   shorthand for you, that they're not supposed
20   to explain anything to anyone else, correct?
21        A.    They're not shorthand for me, no.
22   They're shorthand -- they're basically for the
23   panel members to take notes.
24        Q.    Right.  But they're not meant as
25   an -- they're not necessarily transparent for

1                    E. EICHENHOLTZ
2     other people to understand what that means,
3     right?
4              MR. HAIDER:  Objection.
5         A.    Yeah, I'm not sure I understand that
6     question.
7         Q.    They're for personal notes to
8     remember the basis for an exemption, correct?
9         A.    Yes, yes, that's correct.
10        Q.    Okay.  So what would that type of
11    personal note indicate?  And I'm going to back
12    up for a moment and say that I've noticed that
13    whenever someone has an objection based-
14    personal prayer, direction from personal
15    prayer, they get that notation.  So what, in
16    your mind, are the Citywide Panel's approach
17    to these cases would say that that's not
18    religious in nature somehow?
19              MR. HAIDER:  Objection.
20        A.    I could not tell you without seeing
21    the factual circumstances in each case.  I can
22    tell you that there have been cases involving
23    personal prayers that I voted to grant, and
24    there are ones that I voted to deny.  It
25    depends on the factual circumstances of the

1                    E. EICHENHOLTZ

2     records.  It really -- it depends on what the

3     employee is describing and the nature of

4     their -- what the nature of their religious

5     belief is, the factual application, the other

6     facts that are present.

7          Q.    Well, let's go back, then, a little

8     bit higher level.  You made a distinction

9     between two kind of levels.  One is a

10    sincerity analysis, does this person have

11    sincere religious beliefs.  And the other, are

12    there religious beliefs actually in conflict

13    with the vaccine.  You're nodding your head

14    yes, so I think we're on the same page.

15         A.    Yes, yes.  I'm sorry, I didn't know

16    if you were done with your question.

17         Q.    It's fine, just for the record.  I

18    know it's been a long day.

19              But so in the latter category of

20    these determinations that you say yes, they

21    have a sincere religious belief, that's

22    actually quite related to this kind of

23    notation, but we don't think that that's

24    actually holding them back from vaccination.

25    How in cases where the applicant is saying,

1                    E. EICHENHOLTZ

2      yes, that my sincere religious belief is what

3      is holding me back from vaccination, how is it

4      permissible for you to step into their shoes

5      and say it's not?

6              MR. HAIDER:  Objection.

7        A.      Again, you would evaluate that on

8      the basis of objective facts, right?  It's not

9      for me or any member of the panel to step into

10     someone's shoes and say this is who they are,

11     this is what they believe.  It's looking at

12     all of the relevant facts of the particular

13     belief and making a determination as to

14     whether the employee has established that they

15     possess a belief that is in conflict with the

16     vaccine mandate.

17        Q.      So in these cases where employees

18     say, I get my direction from prayer and god

19     just tells me not to take these vaccines, how

20     would that not be -- how would you say to

21     that, how would you respond to that, yes, they

22     have sincere religious beliefs, but these

23     beliefs aren't holding them back from

24     vaccination?

25              MR. HAIDER:  Objection.

1          E. EICHENHOLTZ
2      A.    So prayerful contemplation, while it
3   has a religious element to it, is not
4   necessarily establishing a religious belief
5   that conflicts with the vaccine mandate.  So,
6   for example, if an employee were to say, I
7   think this vaccine is dangerous, so after
8   prayerful contemplation, I've chosen not to
9   take it --
10     Q.    What if they don't say that?  What
11  if they say, god told me not to take this
12  vaccine?
13     A.    If they say, god -- then again, we'd
14  need to understand the facts and the
15  circumstances.  You know, we spent a great
16  deal of time earlier in the deposition talking
17  about how we might review those sorts of
18  things factually.  I won't recap it now, but
19  there are a lot of different factual analyses
20  and balancing that can go into play, you know,
21  if someone were to make that sort of assertion
22  that might compel a conclusion one way or the
23  other.
24     Q.    Okay.  Just a few more short
25  questions.  So one question is about the DOE

1                     E. EICHENHOLTZ
2    reviews.
3                You noted that the DOE reviews, the
4    Citywide Panel did about 500 of them; is that
5    about right?
6         A.    I think it was closer to 550-plus,
7    but yes, it was lower than 600, I know that.
8         Q.    Okay.  Lower than 600.
9                And is your understanding -- I'm
10   going to tell you what I think the facts are
11   from before that process just so we know where
12   we are.
13        A.    Yeah.
14        Q.    The initial applications, the DOE
15   denied every one under undue hardship.  The
16   arbitrators awards, some 165 were granted, and
17   then 550 or so denials from the arbitration
18   awards were sent to the Citywide Panel; is
19   that correct?
20        A.    Based on my -- all I can tell you is
21   that roughly 550 to 600 were sent to the
22   panel.  I cannot tell you with certainty what
23   category they were in and how they got there.
24   And I was focused on, you know, the DOE was to
25   file qualified candidates who needed to be

1                    E. EICHENHOLTZ
2      reviewed by the panel, with the panel.  And
3      when they came in, we took a look at those --
4          Q.    Okay.  So you don't know whether or
5      not everybody was denied initially at the DOE?
6          A.    The ones that came to us certainly
7      were, as I said, because we don't hear appeals
8      of affirmances -- of grants, sorry.
9          Q.    But you don't have any independent
10     knowledge of whether every one was denied
11     initially under undue hardship?
12         A.    Yeah, I have no independent
13     knowledge of that.
14         Q.    Okay.  So how many did you grant
15     through the Citywide Appeals Panel for the
16     DOE?
17         A.    I don't have that number, offhand.
18         Q.    Can you get that number?
19         A.    DOE cases?  Certainly, as I said
20     before, we can obtain that information from
21     our databases --
22         Q.    Are you aware if any teachers were
23     granted at the Citywide --
24         A.    Yes, there were.
25         Q.    Teachers; not administrators.

1                    E. EICHENHOLTZ
2         A.    My understand -- I mean, I could be
3    wrong, but my understanding was at least one
4    teacher, but I --
5         Q.    So what would the difference be
6    between a classroom teacher that is accepted
7    and the rest that are told that they have
8    sincere religious beliefs, but it would be an
9    undue hardship to grant them accommodation?
10              MR. HAIDER:  Ms. Gibson, our time is
11         up I'll obviously allow Mr. Eichenholtz to
12         answer this question.
13        A.    Well, there could be teachers who
14   have non-classroom functions, for example.
15   But, you know, it depended on the particular
16   circumstances, and there were cases, as I
17   mentioned earlier, where the Department of
18   Education did not present an explanation of
19   undue hardship, and so we did not consider
20   undue hardship in cases where it was not, you
21   know, it was not presented as part of the
22   record, or at least I didn't, but I don't
23   think -- you know, so there were ones that
24   were -- where undue hardship wasn't a factor.
25              MS. GIBSON:  Mr. Haider, I just have

1                    E. EICHENHOLTZ
2          one more very short line of questioning.
3          Can I ask it?
4                MR. HAIDER:  I'll allow two
5          questions.
6                MS. GIBSON:  Okay.  I just want to
7          do the background of --
8          Q.    You can just correct me if I'm wrong,
9      because this is just background for the question.
10         A.    Sure, sure.
11         Q.    There was, and I'm sure you're aware
12     of it, an arbitration proceeding between the
13     DOE and Scheinman Arbitration that resulted in
14     an arbitration award that the Second Circuit
15     found unconstitutional or likely
16     unconstitutional, setting forth various
17     criteria, and there were also related
18     arbitrations that resulted in similar awards
19     for many other departments and union members.
20                My question is:  Did you, before you
21     took your current position in October 2021,
22     did you participate in any of those
23     arbitration proceedings resulting in those
24     awards?  I'm not talking about individual
25     people's, you know, arbitrations.  I'm talking

1                     E. EICHENHOLTZ
2       about, you know, the agency wide or department
3       wide ones, the award from Scheinman saying
4       this is the arbitration.
5           A.    No, with the sole exception of I may
6       have been -- as the process was going on and
7       the people who were engaged in such processes
8       were doing it may have had my legal opinion
9       solicited on various issues --
10          Q.    And was that legal opinion ever
11      solicited for suggested criteria for
12      determining religious accommodations?
13          A.    I cannot say due to attorney/client
14      privilege.
15              MR. NELSON:  Well, that was two
16          questions, and Mr. Eichenholtz, you get
17          the last word.  So we thank you both, all
18          of you, really, for participating in this,
19          and we look forward to seeing you again.
20              MR. HAIDER:  I hope not.  Thank you,
21          Mr. Nelson.
22              THE VIDEOGRAPHER:  This concludes
23          today's deposition.  The time is 5:59.
24          We're now off the record.
25              (Time noted:  5:59 p.m.)

A C K N O W L E D G M E N T

STATE OF NEW YORK    )

                     :SS

COUNTY OF            )

I, ERIC EICHENHOLTZ, hereby certify that I have read the transcript of my testimony taken under oath in my deposition of May 24, 2022; that the transcript is a true, complete and correct record of my testimony, and that the answers on the record as given by me are true and correct.


                    _____
                         ERIC EICHENHOLTZ


Signed and subscribed to before
me, this              day
of                    , 20__.

_____
Notary Public, State of New York

1

2      -------------------I  N  D  E  X--------------------

3      WITNESS                  EXAMINATION BY          PAGE

4      ERIC EICHENHOLTZ     MR.  NELSON                    5

5                           MS.  GIBSON                  305

6

7      DIRECTION:  46, 67, 92, 98, 102, 105, 111,

8      113, 114, 116, 117, 125, 132, 164, 246, 256,

9      275, 286, 288, 307

10     RULING:   255

11

12     ---------------DOCUMENT  PRODUCTION--------------

13     PAGE    22    Recordings of agency personnel

14                   officer and EEO officer calls

15           23    DCAS PowerPoint

16          150    Redacted copy of model acceptance

17          215    Any written materials that may have

18                   been disseminated to Citywide Appeal

19                   Panel members

20          267    Any writings that reflected or

21                   constituted any of that information

22                   from the DOE regarding the remote

23                   sites

24

25

1

2    ---------DOCUMENT PRODUCTION (cont'd)-----------

3    PAGE  281    Procedure for information on copies

4                of such communications made to each

5                agency that received at least remand

6

7    --------------------EXHIBITS--------------------

8    EICHENHOLTZ                              FOR I.D.

9    EX 1     Email chain of November 2021        138

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

STATE OF NEW YORK        )

                         ) SS.:

COUNTY OF SUFFOLK        )

       I, KRISTI CRUZ, a Notary Public
within and for the State of New York, do
hereby certify:

       That the witness whose deposition
is hereinbefore set forth, was duly
sworn by me and that such deposition is
a true record of the testimony given by
such witness.

       I further certify that I am not
related to any of the parties to this
action by blood or marriage; and that I
am in no way interested in the outcome
of this matter.

       IN WITNESS WHEREOF, I have
hereunto set my hand this 28th day of
May 2022.


                        KRISTI CRUZ

1

2            **\*\*\*ERRATA SHEET\*\*\***

3          **VERITEXT LEGAL SOLUTIONS**

4 **NAME OF CASE:  NYFRL V. CITY OF NEW YORK**

  **DATE OF DEPOSITION:  MAY 24, 2022**

5 **NAME OF WITNESS:  ERIC EICHENHOLTZ**

6 **PAGE   LINE       FROM          TO         REASON**

7 \_\_\_\_|\_\_\_\_\_|_____|_____|_____

8 \_\_\_\_|\_\_\_\_\_|_____|_____|_____

9 \_\_\_\_|\_\_\_\_\_|_____|_____|_____

10 \_\_\_\_|\_\_\_\_\_|_____|_____|_____

11 \_\_\_\_|\_\_\_\_\_|_____|_____|_____

12 \_\_\_\_|\_\_\_\_\_|_____|_____|_____

13 \_\_\_\_|\_\_\_\_\_|_____|_____|_____

14 \_\_\_\_|\_\_\_\_\_|_____|_____|_____

15 \_\_\_\_|\_\_\_\_\_|_____|_____|_____

16 \_\_\_\_|\_\_\_\_\_|_____|_____|_____

17 \_\_\_\_|\_\_\_\_\_|_____|_____|_____

18

19                   _____

20

21 **Subscribed and Sworn before me**

  **this _____ day of _____, 20\_\_.**

22

23

24 _____    _____

25 **Notary Public              My Commission Expires:**

| & |
| --- |
| **&** 92:2 104:4 189:17 |

| 0 |
| --- |
| **0** 151:14 |
| **00752** 1:15 |

| 1 |
| --- |
| **1** 82:23 137:15 138:4 151:14 163:7,15 183:25 338:9 |
| **1,015** 29:25 |
| **10,000** 29:11,17 |
| **100** 2:20 32:19 33:16,22 34:6 54:3,9 83:13 165:19 272:3 |
| **10007** 2:21 |
| **10016** 2:7 |
| **101** 61:18 |
| **102** 337:7 |
| **105** 337:7 |
| **1087** 303:13 |
| **10:14** 52:11 |
| **10:25** 52:14 |
| **111** 337:7 |
| **113** 337:8 |
| **114** 337:8 |
| **116** 337:8 |
| **117** 337:8 |
| **11:41** 109:12 |
| **11:53** 109:15 |
| **125** 337:8 |
| **12:29** 135:21 136:4,5 |
| **12:30** 135:20,21 |
| **132** 337:8 |
| **138** 338:9 |
| **14** 44:2,11 46:19 48:13 52:20 55:9 |

55:13 106:11
**1452** 150:3
**14850** 2:14
**150** 337:16
**164** 337:8
**165** 331:16
**19** 10:3,22 25:13 25:15 61:22 62:4 63:11 66:9,18 68:4 76:10 98:6 100:3,6,15,17,25 173:10,21 175:22 176:14 178:5 191:10,24 192:2 231:13 274:15,18 275:9,23 276:24 291:25
**19939** 339:24
**1:18** 137:3,5
**1:2022** 1:15
**1:2022cv00752** 4:19

| 2 |
| --- |
| **2** 137:16 151:14 163:16 |
| **20** 31:18 56:16 336:20 340:21 |
| **201** 2:13 |
| **2013** 8:10 |
| **2017** 166:25 |
| **2021** 8:3 9:12 31:18 56:16 82:23 137:18 138:5 139:11 149:23 154:21 334:21 338:9 |
| **2022** 1:17 4:3 336:10 339:22 340:4 |
| **20th** 9:11 15:2 |

**215** 337:17
**22** 337:13
**23** 337:15
**24** 1:17 4:3 139:11 336:10 340:4
**246** 337:8
**255** 337:10
**256** 337:8
**267** 337:20
**275** 337:9
**2800** 2:6
**281** 338:3
**286** 337:9
**288** 337:9
**28th** 339:21
**29** 305:6
**2:32** 195:22 196:2
**2:43** 196:5

| 3 |
| --- |
| **3** 137:16 151:15 163:20 |
| **3,000** 54:4 |
| **3,200** 29:23 32:17 33:16 |
| **30** 6:8 8:12 70:6 92:23 99:20 102:22 103:4 112:2 113:18 115:8 137:17 149:23 234:22 246:15 303:11 |
| **305** 337:5 |
| **307** 337:9 |
| **30th** 142:15 144:6 |
| **312** 303:14 |

| 4 |
| --- |
| **4** 151:15 257:4,5 |
| **407** 2:13 |
| **45** 7:16 108:23 135:24 |

**46** 337:7
**475** 2:6
**4:12** 142:16
**4:17** 270:18
**4:30** 235:7,7 257:8 257:13 270:21

| 5 |
| --- |
| **5** 127:24 151:15 337:4 |
| **5,000** 238:3,9 |
| **50** 127:8 |
| **500** 48:2 49:17 55:10 57:16,19 58:8 331:4 |
| **550** 331:6,17,21 |
| **5:16** 305:12 |
| **5:27** 305:15 |
| **5:59** 335:23,25 |

| 6 |
| --- |
| **6** 6:8 8:12 92:23 99:20 102:22 103:4 112:2 113:18 115:8 151:15 246:15 |
| **6,500** 29:7 |
| **600** 331:7,8,21 |
| **67** 337:7 |

| 7 |
| --- |
| **7** 151:15 |
| **7,000** 29:7 30:9 |

| 8 |
| --- |
| **8** 151:15 |
| **80** 33:3 127:9 |
| **85** 33:3,13 |

| 9 |
| --- |
| **9** 127:24 |
| **90** 234:17 |
| **92** 337:7 |

**98** 337:7
**9:11** 1:18 4:4

**a**

**a.m.** 1:18
**ability** 95:4 132:16
   154:2 169:7 201:7
   240:25 249:9
   259:8,22 264:13
**able** 14:5 16:15
   35:18 138:7,19
   145:10 149:16
   156:20 225:19
   251:11 263:14
   284:21 322:13
**aborted** 188:21
   190:15 192:3
   204:14 205:9
   207:15 208:21
   213:22 214:2,12
   214:14 215:6
   221:25
**abortion** 188:6,14
   189:15 190:13
   197:18 205:12,25
   206:18 208:21
   211:15,19 212:5
   214:6
**abortions** 206:10
**abreast** 112:24
**absent** 167:22
   169:10 188:16
   190:17 200:25
   313:17
**absolutely** 43:4
   52:22 192:7,24
   196:24
**abstain** 208:25
   218:9 219:20
   230:4 325:9
**abstained** 181:5
   217:19 220:11

**abstaining** 218:24
   227:20 229:9,25
   230:12
**abuse** 53:6
**accept** 21:11
   167:23 307:20,23
**acceptable** 7:16,19
   118:25 170:20,22
   212:18 248:17
**acceptance** 150:5
   337:16
**accepted** 193:11
   333:6
**accepting** 167:24
**access** 27:24 31:25
   35:4 48:15 101:20
   101:21 154:3
**accidentally** 26:15
**accommodate**
   95:22 246:9 264:8
   264:13 303:8,14
   304:9 309:19
   322:24 323:2,6
**accommodated**
   278:11 303:11
   305:24 309:13
   310:21,24 311:8
   313:15
**accommodation**
   9:9 11:23 12:2
   14:11,15,21 15:17
   17:9 18:4 19:22
   20:17,20 24:7
   25:16 28:14 29:15
   31:23 32:8,23
   33:8,21,24 34:3,23
   35:20 36:23 47:20
   48:20 50:7,10
   53:3,22 54:16
   59:19,21 60:23
   61:14,18 62:25

66:11,23 67:4,12
   68:8 76:9,25
   83:23 84:11,21
   85:2 86:13,19
   88:25 90:7 91:23
   92:18 95:8,20,23
   97:4,14,19 98:9
   101:9 111:22
   112:11,15,17
   113:6 120:14
   122:21 124:8
   133:18 140:22
   142:25 145:17
   146:6 159:9
   160:12,17 166:5
   167:12,14,17
   168:19 169:21,23
   173:17 177:3
   178:4 179:18
   180:19 182:4,22
   190:7 197:7 200:7
   201:4,23 202:2,4,7
   202:25 204:5,8,11
   209:23 210:5
   212:13 213:7,17
   216:21 217:2
   222:10 236:7,14
   241:5 242:16,18
   242:25 243:16,19
   243:23 244:5
   245:5,24 246:6,18
   246:19,20 247:17
   248:4,5,11,12
   249:18 250:4
   251:17 252:6,23
   254:4,8 259:13,13
   260:24,25 261:22
   262:18,21 263:3
   264:9 265:6,11,20
   268:14 270:10
   271:23 273:5,24

276:14 278:11
   280:23 288:10
   289:7,13,19,21
   290:13 291:2,14
   292:15,18 293:18
   293:22 294:7,9,17
   294:23,25 295:13
   295:21 296:6,8,10
   298:7 299:2 300:3
   300:9,12 301:18
   309:15 310:25
   311:19 312:16
   319:4 322:15,22
   333:9
**accommodations**
   16:8 17:10 18:23
   24:13 29:10 33:5
   33:13 35:11 54:24
   68:3 89:7,7 97:17
   98:14 103:19
   104:7 117:25
   118:2 145:14
   148:15 246:14
   247:7 252:11
   264:22 265:5,17
   277:25 281:3
   312:24,25 318:3,9
   324:14,18 335:12
**accomodation**
   32:24 89:11 92:13
   248:14 288:2
   291:5 296:16
   300:6 301:6 302:3
   302:5,6 313:20
   314:5 324:20
**accomplish** 147:16
**account** 43:19
   58:20,25
**accuracy** 45:8
   223:10,14 224:8
   224:13 225:2

277:10,11
**accurate** 13:12
34:20 41:13,25
42:6 48:11 143:7
143:8,16 147:11
189:3 203:19
212:6 222:20
223:9,16,19,21
225:7 276:16
295:4
**accurately** 221:18
261:18
**acetaminophen**
211:16
**acquiring** 164:17
**acronym** 21:8
**act** 185:18 235:12
**acted** 101:15,18
**acting** 89:24
115:17
**action** 25:7 339:17
**actions** 277:21
**actively** 13:7 81:7
**actual** 20:12 84:20
201:18 215:5
291:10 316:17
**adams** 1:10 118:6
**adapt** 15:18
**adaptations** 15:23
**add** 48:22 154:25
155:17
**added** 31:14 81:9
81:25 87:10 139:4
139:4 154:24
155:13
**adding** 155:11
**addition** 26:12,17
26:18 140:13
**additional** 17:15
26:19 39:19 47:4
49:10 51:10 55:10

126:13 153:14
174:13,16 176:7
200:25 229:24
247:13 260:5,8,9
261:5 279:5 280:5
**address** 15:19
323:23 324:6
**addressed** 112:12
141:23 286:11
**adjudicate** 72:19
**adjudicated** 29:20
29:23,24 30:3,16
57:20 100:8
118:10 240:8
**adjudicating**
14:10 59:16
161:10 210:5
298:3
**adjudication**
192:19 203:13
**adjudications**
30:10 106:22
110:14
**adjudicative** 61:14
**adjudicator** 95:5
226:7
**adjudicators**
97:18 209:23
**administrative**
9:21 10:14 20:23
20:25 36:15 37:22
38:13,19 39:6,21
41:14 79:2 103:21
104:2 151:12
298:24 300:22
320:4
**administratively**
280:25
**administrators**
154:8 332:25

**admission** 156:9
**admitted** 137:24
**admittedly** 115:2
**adopted** 182:17
292:8
**adopting** 63:5,14
**adoption** 183:3
**adult** 184:9,10
**advance** 271:5
**adversarial** 47:18
50:8
**adverse** 220:9,19
221:10
**advice** 18:18 90:22
118:19 151:7
320:8
**advise** 60:16
280:21
**advised** 65:12
196:15
**advising** 31:11
**advocate** 95:3
**affect** 175:20
176:10 182:2
**affidavits** 27:7
75:25
**affirm** 165:18,23
265:9
**affirmance** 41:12
158:23 202:14
237:4 273:14
**affirmances**
273:17 332:8
**affirmations** 28:10
**affirmatively**
211:15 219:19
**affirmed** 108:9
159:2,3 165:25
204:7 244:10
273:6,9 316:22,24
318:2

**affirming** 199:23
199:23 243:11,12
**afford** 257:20
258:13 260:6,10
261:5
**afternoon** 109:5
137:10,11
**afterward** 25:24
70:23
**agencies** 9:16
12:12,16 16:22
18:2,5,25 20:10,16
20:22 21:5 22:10
22:25 25:22 28:16
30:5,6,7,9,10,12
34:2 36:5,9,12,17
36:20 37:16 38:25
41:9 44:6 55:23
58:10 59:22 60:21
62:15 63:4,18
69:17,19,21 76:20
78:5,7,9,10 82:9
82:15 84:3,12
85:21 103:7
111:16,20 112:4
124:18 125:2,3,7
125:15,21,23
128:14,19 129:24
130:19 149:21
152:22 157:8,18
169:14 172:5,6,14
197:5 206:22
211:19,20,21,25
212:7 215:16
218:2,6 219:3,18
237:22 239:15
249:23 253:19
257:23 258:4,6,12
259:6,12 261:21
262:11,14 263:2
264:2,12 269:18

271:22 272:17
279:16 287:18
288:9 292:9,14,16
292:24 297:17
304:12 308:23
310:3 313:2 320:2
322:4
**agency** 16:10,11
16:14 17:5,14
18:7,12 21:2,2,8
21:13 22:21 23:10
26:9 29:17,19
30:8 36:20 38:5,9
41:9 42:14 50:20
51:7,12,14,24
54:22,22 56:17,20
56:21 59:7,8,11
60:2,7,9 61:6 62:2
62:20 64:2 65:14
67:7 68:10 69:10
72:8 73:15,18
78:3 80:19 84:16
84:19,25 85:8
89:16 90:20,22
95:14,15 98:16
106:22 107:20
124:22 126:10,16
128:21 129:3,14
129:15 130:18,21
131:10,13,16,17
131:21 134:25
137:19 140:24
141:4 150:13,14
152:15,25 153:5,6
153:13 154:18
158:15,21 159:16
160:7 169:25
170:2 172:15
180:25 191:4
196:12,25 199:22
201:22,25 202:21

203:6,24 204:3,10
204:22,24 209:24
210:11 216:19
219:21 224:19,20
225:22 232:2
237:6,17 241:3
244:9,15,23
245:10 247:13
248:3,20 249:5
250:11 252:20
253:21 257:18
258:15 259:20
260:4,22 261:3,8
262:4,6 263:7,10
263:13 264:21,24
265:23 272:21
278:17 279:3,6,23
280:9,10,17,21
281:12,16,18,25
282:6,13,20,25
283:3,4,17,19,23
283:25 284:4,8,10
284:12,14,16,18
286:17,19 287:7
288:2 290:25
291:2,12,15 292:7
293:11,16,20,25
294:5,19,21
295:11,22 296:2
296:15 298:4,11
298:22 299:15
301:3,4,9 302:13
302:16 306:11
312:25 313:19
318:8 324:14,20
335:2 337:13
338:5
**agency's** 16:23
23:19 53:20 66:25
112:5 125:12
127:2 128:16

131:8 141:10
158:19 160:7,8
202:8 203:16
204:6 208:7
216:22 236:6
241:4 243:12
246:13 258:9
262:3 263:22
275:17 284:24
293:16 296:4
313:21 314:4
**ago** 71:23 166:23
167:20 169:4
189:16 233:17
269:6
**agovino** 1:4 3:11
**agree** 4:13 53:15
64:6 104:20
159:22 285:18,20
321:8
**agreed** 48:15
**agreement** 56:23
**agreements** 79:4
**ahead** 180:9 216:8
225:10 287:10
305:10
**akin** 53:17
**al** 4:16,17
**alcohol** 228:17
**allegation** 159:12
**alleges** 159:7
**allocated** 150:25
**allow** 45:3 93:24
97:23 115:4 155:2
218:11 333:11
334:4
**allowed** 20:5
92:24 93:6 113:15
115:2 116:8,16
155:12 271:9
308:14

**allowing** 311:8
**allows** 153:14
173:5 254:8
324:19 325:25
**alter** 100:6 251:18
**altered** 63:24
77:13,17
**alternative** 243:14
245:4,4,13 248:5
251:16 252:11
262:18 289:7,13
**amendment**
288:18,24
**amount** 7:14
54:12 69:10 127:5
127:20 128:6
161:8 165:23,23
234:19 313:21,24
**analogy** 53:17
208:22
**analyses** 330:19
**analysis** 131:10
166:15 172:21
174:5 175:20
176:11 231:16
274:5 278:9
306:11 307:5
309:5 310:8,9
312:11 313:6,7,18
314:8,16,20 315:2
317:24 321:6
324:13 328:10
**analyze** 239:11
**analyzing** 226:12
226:13,15
**andrea** 2:24 5:15
**angle** 43:7
**animated** 185:8
**animates** 183:6
**announcements**
72:13

annoying 235:2,13
answer 6:24 36:25
42:25 46:12,12
54:9 67:19 89:14
92:21 93:9 96:12
97:23 98:23 99:7
103:5 105:7,18,20
110:4,7 111:24
112:7 113:9
115:11 117:2,12
118:16 122:12
125:5,20 129:10
131:2 132:13,19
132:21 152:7
159:23 165:4
177:5,13 178:7
179:4 180:10
201:6 207:18
210:8 220:16
221:17 233:8
236:22 237:9
238:5 246:12
247:3 256:13
260:21 262:24
274:21 275:4,12
277:16 286:22
289:4 295:2
297:25 303:24
307:18 308:10
309:10 315:11,19
318:23 321:13
322:9 326:11
333:12
answer's 110:5
answered 18:10
133:6,7 318:13
answering 42:24
307:24
answers 116:9
220:20 336:12

anticipated 16:13
anybody 7:11 43:3
169:6 207:25
313:13
anyone's 120:13
apologize 88:10
109:20 110:6
133:4 134:10
152:8 238:6
apos 23:14
apparently 122:6
appeal 11:23,25
12:2 15:13 20:19
25:10 28:19 34:3
35:16 36:22 40:3
42:14 48:18 51:21
53:4,22 56:4,15,24
57:8,10,12 58:24
60:8 62:15 71:2,9
73:21 79:5,6,7,11
79:14 80:24 84:22
85:16 89:17 96:10
104:11 107:11
118:9 123:19
125:12 133:11,12
135:14,16 140:23
141:10 145:18
150:22 160:8,9
162:9,11,13,14,16
162:17,21 163:9
163:10,13,18,22
163:25 164:7,23
170:12 176:5
191:5 203:14
207:22 208:9
215:24 216:10,15
224:19 237:11,13
237:19,20 239:17
240:2,18 243:9,9
243:10 244:3,15
252:18 263:4

269:20 276:7,10
278:14,22 279:2
279:17,21,24
280:25 282:22
283:7 284:8
286:19 290:12
293:8,18,21
295:11 296:2,3,4
296:14 297:6
298:9,21 299:16
301:22,24,24
312:5,6 316:23
322:3 337:18
appealed 20:20
33:23
appeals 9:2 14:23
16:10,13 17:6,19
24:9,10,15 27:20
27:24 29:8,15
31:15,16 32:9,17
32:22,25 33:4,17
34:16 35:9,12,13
36:3 37:6,18,25
38:4 43:21 44:9
45:6 46:7 48:14
48:16,25 49:5
51:3 53:12 55:4,4
56:4,6,7 57:4,9,13
58:6,10 59:13,16
62:4,10,12 65:24
67:23 70:2 74:22
82:3,6 83:16 85:4
85:5 86:24,25
87:12,18,25 88:17
88:19 89:4 90:7
91:24 97:10,16
101:23 103:10,14
111:19 112:8
119:22 120:11
128:11,23 130:16
130:21 131:7

132:5,11 133:25
149:4,25 153:20
158:3,12 159:18
161:3,10 162:7
163:15 164:19
165:8,19 166:4,17
170:21 173:9
207:13 209:25
217:13 218:22
220:19 221:21,24
224:21 230:21
232:8 234:21,21
236:9,21 237:23
237:25 238:4,9,11
238:13 239:5,14
239:16 240:3,5
241:21 243:21,25
244:4,14 246:17
247:5 248:25
251:15 253:11
259:13 262:24
265:7 266:4
268:16 269:3,5,10
272:22,23 275:6
276:15 281:2
282:10,14 284:16
287:2 294:3 295:9
296:12 297:15
298:2,4 299:25
302:14 316:21
332:7,15
appear 13:17
77:20 240:17
appearance
181:18
appears 46:4
68:16 137:16
appellant 154:12
176:13 198:17
272:23 325:3

**appellant's** 325:5
  325:8
**appellants** 32:21
  44:23 47:15,23
  49:17 50:3,25
**appellate** 17:18
  34:15 39:5 43:18
  44:20 49:6 51:9
  52:24 53:11 59:8
  59:10 62:12
  131:23 148:17
  158:24 159:2
  216:16 252:17
  258:22 278:15
  298:18 299:5,8
**appellate's** 176:11
**applicability** 24:6
  66:9
**applicable** 66:12
  164:21 289:2
**applicant** 175:17
  177:7 191:8,11,15
  192:5 195:4
  197:17,21 202:24
  203:9 212:13
  231:12 233:11,18
  245:6 247:8 279:7
  282:9,13,16,23
  283:14,16,22
  284:2 285:16,22
  287:4 328:25
**applicant's** 176:10
  181:16 191:18,20
  204:16 208:10
  222:17 225:13
  232:9 234:6
**applicants** 166:5
  173:9 179:17
  217:14 218:25
  220:7,9,20 240:21
  240:25 241:9

251:18 253:20
  276:12
**application** 63:11
  73:8 113:5 123:10
  146:18 158:11
  159:16 160:2
  168:2,5 190:6
  198:16 199:14
  213:11 231:11
  232:3,4,12,14
  236:14 248:24
  263:25 286:13
  288:17 328:5
**application's**
  231:17
**applications** 72:21
  100:16 111:21
  188:19 201:15
  204:13,15 222:10
  331:14
**applied** 59:2,12,13
  59:20 64:5,11
  65:4 76:3 100:14
  100:15,19 105:15
  106:3 107:5,19
  111:9 119:7
  138:21 148:20
  164:18 182:20,25
  185:19
**applies** 46:10
  105:10 205:8
  264:4
**apply** 15:6 61:21
  64:8 67:23 68:5
  107:14 110:9,11
  110:23 111:2,9,15
  112:10 114:22
  122:20 148:18
  164:22 193:8
  194:19 227:8
  231:15 286:20

291:22
**applying** 76:9,25
  83:24 87:4 100:11
  106:9,10 107:15
  108:6,18 110:24
  172:22 174:18,21
  189:21 191:18
  194:18 201:20
  290:11
**approach** 43:24
  53:3 183:18
  327:16
**approached** 29:11
**approaches** 135:3
**approaching**
  234:23
**appropriate** 39:9
  82:12 83:17 96:7
  151:25 152:3
  156:18 168:20
  170:9,9 177:4,5
  200:7 225:20
  232:8 242:25
  247:12 248:7,9
  252:7 262:20
  267:9 278:18
  289:22 296:6,7,7
  299:10 310:9
**appropriately**
  149:20
**approvals** 32:3
**approve** 141:19
**approved** 150:2
**approving** 41:23
**approximate**
  29:14 217:25
  227:13 245:15
**approximated**
  218:5
**approximately** 4:4

**arbitral** 55:24
  56:2,8,11 60:11
  163:12 164:4
**arbitration** 14:13
  14:16 15:7 48:4
  54:25 55:2 56:20
  56:23 57:11 58:17
  58:23 60:2 107:5
  107:13 111:5
  163:10,18,19,22
  331:17 334:12,13
  334:14,23 335:4
**arbitrations**
  334:18,25
**arbitrator** 14:13
  44:15 56:8,24
  57:3,10,10,12,15
  60:18 163:12
**arbitrators** 55:6
  56:13,14 58:18
  110:22 111:10
  331:16
**area** 95:25 101:3
  148:16 206:15
  313:25
**areas** 78:6 95:16
**argue** 114:14
  312:3
**argument** 69:18
  69:19 258:6
  297:22,23 312:2
  313:10 314:12
**arguments** 199:19
**arising** 133:24
**arose** 97:5
**arrangements**
  264:7
**array** 141:14
**art** 68:21
**articulate** 67:2
  284:19 286:3

**articulated** 185:17
192:13
**articulates** 185:16
313:19
**articulating** 68:25
102:24 121:23
**aside** 42:21 78:17
123:13 156:21
185:4
**asked** 44:12,17
60:15 82:9,11
104:6 109:19
114:22 140:20
145:5,11 146:2
201:10 211:20
212:7 218:7,18
224:2 227:6,8
233:16 235:15
256:23 267:20
**asking** 25:22
43:10 50:5,21
54:24 64:21
116:13 132:3
142:5 146:7 194:6
207:9 211:7
237:10 260:18,21
271:4,15 305:4
312:10 313:12
314:14,14 319:2,2
319:3,6
**asks** 16:18
**aspect** 6:21 302:9
**aspects** 24:11
36:13 252:14
**assert** 267:10
**asserted** 241:23
262:14 270:4
287:6 293:3 301:2
**asserting** 268:5,18
292:25

**assertion** 119:22
194:2 259:7,19
266:12 268:20
269:8 274:6
306:21 330:21
**assertions** 209:10
210:2 215:14
217:10 231:4
285:10 301:14
302:2
**assess** 242:24
262:2 284:13
299:13
**assessable** 75:18
**assessed** 196:11
317:8
**assessing** 191:2
293:17 303:7
304:8
**assessment** 73:9
73:20 229:21
299:6
**assessments**
124:16 172:25
**assign** 84:3
**assigned** 44:3
73:23 268:13
**assigning** 40:17
**assistance** 86:25
**assistant** 7:23
**associated** 165:6
190:13 218:17
**assume** 161:25
188:16 224:15
256:15 288:8
**assumed** 170:24
226:10
**assuming** 147:2,4
165:14
**assumption** 147:6
274:16

**assumptions**
144:19
**ate** 227:24
**attempt** 284:9
**attempted** 163:9
**attempting** 158:25
**attendance** 22:10
**attended** 83:10
**attention** 18:19
**attorney** 6:10 88:2
96:14 99:13
118:18 335:13
**attorneys** 2:5,19
85:9 86:23 89:18
153:24
**audio** 4:11 26:13
86:4
**augment** 280:13
**authority** 38:15,18
38:20 39:7 85:10
85:12 88:9,12
122:9 151:5 169:7
189:10 214:4,8
**automatically**
157:10,22 183:3
**available** 26:21
189:5 266:5 304:4
304:5
**avenue** 2:6 303:14
**average** 40:8
123:2 128:2,11
161:8
**avoided** 228:16
**award** 14:16,18
15:7 44:5 107:5
111:5 334:14
335:3
**awards** 331:16,18
334:18,24
**aware** 14:16,17
22:6 31:14 42:16

64:3 100:21
106:14 118:22
122:13,19 130:20
134:2 150:14
159:6,11,15 160:7
160:14,17,20,21
161:14 171:2
175:13 207:20
208:5,11 209:6,15
209:18,22 213:5
214:7 215:4,12
236:15 249:21
250:7,18 264:20
266:9,10,20
267:25 268:1
273:2,18 275:15
288:15 297:7,13
306:10 309:6
332:22 334:11

## b

**b** 6:8 8:12 92:23
99:20 102:22
103:4 112:2
113:18 115:8
246:15
**babwah** 3:12
**baby** 206:9
**back** 25:21 41:24
46:25 50:16 51:18
51:24 52:13,16
57:12 64:9 70:22
80:17 81:15 82:13
82:14 109:14,23
122:4 137:4
140:23 182:24
195:24 196:4
208:3 223:23
224:12 245:9
248:2 270:15,20
280:16,19 281:13
302:20 305:14

307:25 310:17
324:22 327:11
328:7,24 329:3,23
**background** 92:25
106:8 334:7,9
**backup** 285:25
**baited** 206:8
**balance** 149:15
172:11 174:24
204:3
**balanced** 202:14
202:19 221:2
**balancing** 124:15
172:24 326:10
330:20
**banks** 11:9 20:15
**bar** 26:16 94:5
**barbara** 10:16
**bargaining** 56:24
**barry** 3:6
**base** 112:25
**based** 16:3,23
42:18 47:7 69:20
106:25 117:3
120:20 121:16,17
130:2 146:11
149:20 151:17
164:2 165:16
173:10 197:8
201:16,20 204:14
214:6 217:22,24
227:9,24 228:3
232:12 259:4
263:19 278:21,25
293:23 298:4
302:6 306:22
309:4,7 312:11,17
316:4,19 317:14
322:11 323:9
326:9 327:13
331:20

**bases** 131:17
276:13 278:3,5
**basic** 22:24 309:9
**basically** 13:23
36:17 39:22
158:23 245:23
277:19 302:15
326:22
**basing** 194:24
**basis** 8:21 54:19
56:11 60:11,12,13
60:16 117:5
130:13 131:16,19
152:12 153:2
160:11 171:23
173:16 175:11
178:2,2 180:19
183:16 185:25
190:9 192:2
195:17 216:20
222:3 231:17
232:21 233:10
236:6 238:20
253:3,12 258:5
266:11 272:23
273:10,16,22
276:16 277:18
279:13 287:25
296:10 300:3
316:23,24 323:19
325:25 327:8
329:8
**bathroom** 7:11
195:20
**bear** 14:4 16:25
17:17
**becoming** 254:12
**began** 139:25
**beginning** 146:7
**begins** 187:25
188:2 304:23

**behalf** 1:7 5:11 6:8
8:12,14 10:12
47:6 81:18 190:7
**behavior** 212:17
**belief** 120:7,8,22
120:24 121:21
146:20,21,22
147:3,7 148:4,10
166:11 167:8
170:24 171:8
175:10 176:12
177:25 179:9
180:4,6 181:20
182:10 183:3
184:22 185:17,18
185:19 186:10,21
186:22 187:3,4,12
187:13,22 188:4,5
188:18,20 190:10
190:12,14 191:21
191:23 192:2,5,10
192:13,15,20
193:6,13,18,21,23
193:25 194:5,7,8
194:10,17,25
195:6 196:9,21
197:11,13,24
198:4,8,9,14,18
199:13,16,17,25
200:11,14,18,22
205:9,10,14,22
206:12,18 207:15
208:17 211:9,14
218:12,16 219:8
219:14 220:4
221:4,5,7 222:7,24
223:4,5,11,14,15
224:9,13,16 225:2
225:7 226:3,12,16
226:18,20,24
227:19 228:12,13

229:2,5,6,12 231:9
231:9,21,23,23
233:12,12,18,20
233:23,24 276:22
276:23 286:3,4,5,6
323:7,11 325:7,11
325:13,24 328:5
328:21 329:2,13
329:15 330:4
**beliefs** 121:22
168:12 181:17
184:12 186:17
187:16 190:23
191:2,9 193:11
194:19,23 201:16
206:19 220:8
222:17 225:13
226:9 227:25
228:7,8,19 229:17
230:3,23 232:9,16
232:20 246:10
276:13 316:3
323:3 325:4
328:11,12 329:22
329:23 333:8
**believe** 9:11 12:12
23:13 25:14 29:7
29:22 35:23 51:9
63:19 77:11 81:9
83:12 98:8 99:2
145:9 187:25
188:3 189:12,25
206:18 207:13,21
222:12,13 223:18
223:20 226:22
234:12 263:14
265:16 296:23
306:6 329:11
**believed** 202:19
204:7

**believes** 225:8
**believing** 194:10
**belonged** 19:9
**belongs** 197:17
**beneficial** 324:5
**benefit** 19:6
  277:20
**best** 124:12 128:15
  128:15 201:6
  217:25 230:18
  254:16 293:15
**better** 126:2
  218:10 219:11
**beyond** 120:19
  181:14 256:5
  275:2 321:4
**bhaider** 2:25
**bidding** 250:9
**big** 112:20 134:14
  142:3
**bilal** 2:22 5:10
  7:18
**bill** 117:20 118:3
**binary** 241:20,24
  242:2,8
**binding** 57:11
**bismol** 204:17
  205:5,17 206:23
  206:25 207:10,13
  207:23 208:10,14
  208:15,19,24
  209:9 210:4,16,18
  210:25 211:4
  213:22,25 214:5
  214:11 215:6
  216:11 217:7
  220:23
**bit** 155:2 196:21
  328:8
**black** 2:4 3:6 5:2,5

**blank** 80:4,9
**blanket** 121:9
  166:7 173:14
  310:23
**blasio's** 19:3,14,16
  118:23
**blood** 339:17
**blue** 195:11,12
**board** 139:21
  152:11
**body** 190:15
  216:16,16
**bolts** 20:17 23:25
**book** 28:6
**books** 27:9,14,15
**born** 167:3
**borne** 254:24
  257:23
**bother** 297:15
**bottom** 138:17
**bounds** 172:20
**brandon** 3:12
  137:21,22,25
**break** 7:7,11 31:24
  33:11 52:6 101:19
  101:21 108:20,23
  135:20,22,24
  195:20,21 270:14
  304:23 305:8
**breaking** 7:12
**breaks** 6:21,22,22
**brendan** 1:4
**brief** 126:5
**bring** 14:4 16:24
  17:16 72:6,8
  95:14,15 122:4
  307:25
**bringing** 116:2,6
**broad** 16:3 134:14
  154:16 155:5,12
  155:18 157:20

158:8
**broader** 62:13
  141:14 190:19
**broadly** 91:25
  92:3
**brooklyn** 303:13
**brought** 129:22
  139:21
**bucket** 181:8
  186:11,18
**budgets** 263:7
**build** 75:8 243:8
**building** 75:4
**buildings** 235:24
  236:11
**bullets** 22:24
**bunch** 131:20
  159:21 166:14
  211:25
**burden** 31:22
  65:25 66:25 67:8
  68:2,10,12,17,20
  68:24 69:10,16
  70:9 269:9 285:9
  285:15 286:2
  287:6 291:4,15,16
  291:23 297:11,17
  298:12 299:18
**burdens** 69:15
**bureau** 103:14,15
**business** 30:20
  300:15

|   c   |
|-------|

**c** 2:2 3:2 5:19,19
  88:8 137:6,6
  336:2 339:2,2
**call** 16:4 18:7 22:2
  76:8 117:8,9
  152:20 169:11
  174:8 190:24
  235:5,9 282:2,7,18

**called** 5:20 75:22
**calling** 288:23
**calls** 20:21 21:14
  21:16,23,23,24
  22:13 337:14
**camera** 4:8 43:5,7
  43:7
**campion** 11:7
  20:14
**candidates** 331:25
**capable** 83:23,25
**capacity** 1:10,11
  1:12 88:5,6 95:18
  95:18 119:15
  262:7 263:2,7,10
  267:19,21 268:3,9
**capital** 10:18
**captured** 48:7
**career** 104:17
  254:10
**carefully** 34:8
  159:6
**carrying** 206:9
**case** 1:15 4:19
  13:17 28:3,6
  30:11 39:20 40:2
  40:9,11,18 41:5,8
  41:12 42:10 45:4
  53:4 54:19 60:19
  72:23 73:17,24
  74:12,13 80:24
  90:12,12,18 92:4,7
  98:18,19,19
  104:23 105:4
  106:3 108:6
  119:19 123:2
  129:17 133:14
  134:19,21 141:12
  141:14 146:4,4
  147:14,22 148:25
  149:25 150:22,23

151:6,13,18 152:5
152:9,14 153:5,6
153:23 154:5,11
155:12,18 160:14
167:12 170:6
172:9 176:17
178:17,20 205:9
208:18,24 209:4
219:25 227:8
233:4 235:17
236:4,20 242:22
248:2 252:14
254:22,23 268:18
269:13 273:20
276:8 277:7
280:15 281:18
283:12 286:9
291:11 293:3
296:11 303:19
304:2 326:13
327:21 340:4
**cases** 29:20,24
30:5 31:22 33:8
34:17 37:20,20
39:8 42:16 43:20
43:22,23,24,25
51:22 53:7,9,13,14
54:3,9,21 55:5,6,8
55:13,17,22 56:15
58:12 59:3,12,17
71:10 72:3,7,7,10
72:19 73:13 82:12
89:2,21 96:22
100:7 101:13,17
102:6,19 104:9,11
106:7,10,15
107:17,21 108:9
110:24 118:9
119:14 121:7
127:2 128:6,9
129:16 130:20

145:21,22,24,24
150:11,24 151:5
152:13,18,20
153:16 161:10
169:15 171:15
174:14 175:8
179:19 217:23
218:4 219:6
227:10 237:5
238:24 239:6
240:7 245:16
251:25 252:10
253:2 259:24
264:5 265:20
266:3,22 267:6,9
267:10,12 269:7,9
269:12 272:4
276:12 285:6
287:24 300:2
321:16 327:17,22
328:25 329:17
332:19 333:16,20
**cast** 40:22
**categorically**
213:14 238:7
240:12
**categories** 154:16
154:17 155:13
157:20
**category** 69:23,24
155:5,18 158:9
205:13 328:19
331:23
**catholic** 119:16
121:9 124:8
187:23,23 193:5
**catholicism**
121:14,15,17
**catholics** 121:18
121:20

**caught** 142:4
**cause** 168:4
179:20 187:14
224:18 225:17
271:24 312:18
**caused** 253:19
272:24
**causing** 257:21
260:6,10 261:6
284:20
**caveat** 272:25
**cayuga** 2:13
**cchp** 161:19
**cchr** 38:20 81:22
103:22 123:20
**ccr** 103:7
**cdc** 189:4
**cell** 187:6 188:8,8
210:24 211:18
214:12,14 215:7,9
222:2
**cells** 184:7,21
186:5 187:11,15
187:19 188:12,14
188:21 189:14,15
189:19 190:14
192:3,20 193:3
194:2,11,12 195:2
197:18 204:15
205:24 206:7
207:15 208:22
209:11 210:3
212:15 213:22
214:2
**certain** 10:24 26:5
33:15 34:4 52:22
65:10 77:15 78:13
96:18,19 107:18
133:17 162:3
192:11 200:15
209:10 213:13

217:15 219:20
248:17 258:11,12
261:14 302:24
304:19 306:6
311:2 313:21,23
324:20
**certainly** 7:13
33:25 34:24 69:18
93:7 106:11 111:4
113:10 120:16
134:17 143:8
147:7 156:16
160:22 173:16
181:12 211:3,23
215:11 223:7
235:11 240:24
243:20 247:22
255:19 258:19,20
259:8 261:25
266:7 281:7
284:23 285:3
302:12 304:2
332:6,19
**certainty** 83:13
168:25 331:22
**certify** 336:7
339:9,15
**chain** 138:4,20,22
138:23 140:3
143:25 338:9
**challenge** 277:25
**challenged** 277:23
**challenging** 62:8
169:3 318:24
**chance** 169:20
316:13
**change** 32:12
79:10 80:5,10,11
80:12 122:16
154:19 155:9,15
189:24 195:13

221:16
**changed** 77:7 80:3
80:10 81:20
181:17
**changes** 79:16
81:16
**changing** 80:22
155:10
**character** 255:18
**characteristics**
31:5
**characterization**
259:20 297:21
306:25 321:9
**characterize** 58:22
60:8 221:16
227:19 229:9
261:18
**characterized**
309:8
**characterizing**
229:25
**charge** 37:5,24
38:3
**charged** 103:16
290:10,11 292:7
292:10
**charges** 103:17
**check** 12:17 69:13
70:2,13,14,24,25
71:7,11,23 72:18
80:18 112:20
130:2,17 134:15
142:4 149:14
169:13 227:14
266:16
**chief** 7:23 8:7 13:4
39:5
**child** 2:9 5:4,5
170:14

**children** 176:10
176:13 177:8,17
177:18
**choice** 325:8,12,25
**choices** 157:21
228:3
**chokshi** 1:11
209:8 216:2
**choose** 97:7
222:22
**choosing** 82:7
**chosen** 97:11
160:8 330:8
**christian** 119:23
167:3
**church** 2:20
119:16 120:17
187:24
**circuit** 43:17 44:4
57:21 106:2
107:25 108:5
334:14
**circuit's** 48:13
107:17
**circum** 162:18
**circumstance**
15:20 108:16
122:14,19 159:13
192:8 198:2,6
232:7 234:8
247:19
**circumstances**
23:16 41:5 100:12
100:16 101:5
159:25 162:19,25
165:21 170:10
176:4 179:25
180:4 191:7,16,19
200:8,15,21 201:2
201:20 227:10
228:9 229:3,19,20

229:23,24 230:8
230:14 231:4,25
232:11,14 233:5
233:19 242:21
245:10 252:8
268:6 282:15
285:3 293:24
303:25 308:11
310:10 325:18
327:21,25 330:15
333:16
**citation** 231:16
**citations** 306:20
**cited** 190:3 219:8
231:11,19 297:8
**city** 1:10,10,12
2:18 4:17 6:8 7:17
8:8,12,15 9:3,19
9:20,22,23,25 10:6
12:5,19 13:3,9
14:4 16:20 19:22
23:19 27:10 28:16
31:18 36:6,20
38:11 54:13 56:17
58:10,15 62:23
63:7,13,23 64:7,15
64:16,19,20 65:3,7
65:9,19 66:10
76:5 78:20 81:8
82:4 85:10,11
86:3 88:9,11,17
89:11,12 98:16
103:12,15,19
106:10 112:5
127:16,17 131:8
132:3 151:4,19
157:6,7,16 189:9
189:10 209:6,16
209:25 212:11,17
219:3 241:10
250:22 254:10

270:12 274:13
280:17 283:7
290:5,8,14,16,19
291:2 292:6 297:9
299:15,20 302:18
304:9 319:16
320:4,5,19 321:3
322:17 323:6,22
340:4
**city's** 13:4 15:15
17:22 24:6 36:14
36:21 63:7 66:3
102:15 207:11
241:9,15 243:7
246:22 247:4
248:15 255:9
256:15 299:15
**citywide** 9:2,21
10:13 11:3 14:25
15:13 16:25 17:6
17:24 19:24 20:23
20:25 24:9,10,14
25:10 28:20 29:4
29:21 30:23 32:10
36:3,10,11,15 37:6
37:25 38:3,13
43:21 46:9 48:14
48:16,25 49:5
51:2 53:12 56:4
56:25 57:4,9,13
58:6,24 59:16
62:3,10,11 65:24
67:16,22 70:11
71:2,8 74:22 77:8
77:9 78:25 81:3
82:19 83:15 84:24
85:4 86:11 87:18
89:4 92:2 93:3,4,5
93:18 94:22 96:8
97:10,15 99:21,23
100:15 101:14

103:3,10,14,21,25
104:3,3,22 105:2,9
105:10 106:4
107:11 111:19
112:3,8 113:12,14
113:17 114:16,22
116:10,18 118:9
119:21 120:11
125:9,10,12
126:17,19,22
128:23 129:2
132:5,11,23,24,25
133:25 151:11
153:20 161:9
162:7 163:15
164:15 165:7
166:4,17 170:12
170:21 173:8
176:9 179:5,14
181:24 183:12
184:19 201:13
203:14 204:12
206:21 208:9
210:8 213:6,20
214:3,9 215:4,24
216:10,15 217:13
218:22 220:18
221:20,24 228:2
228:19,23 229:14
230:20 231:14
232:8 235:22
236:9,21 237:23
239:5,13 240:5
243:21,25 246:17
247:5 248:25
251:15 256:10,11
256:14 257:19
262:24 265:6
272:22 274:25
275:3,6 276:15
278:8,14 286:18

287:11 290:3
292:10,13 293:8
294:3,19 295:9
296:2,3,11 297:14
298:2 299:25
301:8 302:14
303:10 304:10
308:12,18 312:4,6
319:5 320:3
321:21 322:16
327:16 331:4,18
332:15,23 337:18
**civil** 294:2
**claim** 90:6 92:13
195:7,8 205:20,21
271:22 272:18
273:22 285:17
297:16
**claimed** 284:10
**claiming** 262:13
263:22 298:16
**claims** 69:25 89:10
89:12 92:18 97:19
113:6 188:20
284:7 287:19
295:11 312:7
**clarification**
128:25 142:13
**clarified** 185:12
**clarify** 37:4 50:5
104:12 107:16
185:13 226:19
311:6 316:10,12
321:2
**clarifying** 37:3
**clarity** 142:14
155:2
**classroom** 333:6
333:14
**clear** 41:17 44:4
139:14 142:12

171:5 219:16
226:14 257:11
289:16
**clearly** 115:24
170:19 285:15
**clergy** 195:5,9,14
**client** 95:3 96:14
99:12 105:17
118:18 335:13
**clients** 79:21
**close** 18:19 131:23
140:25 234:17,25
280:25
**closed** 218:19
**closer** 272:12
331:6
**closest** 131:24
**code** 40:18
**cohen** 10:16 37:12
37:19 38:12,17
39:18 40:5 78:18
**collaboration** 36:8
**collaborative** 37:7
37:16
**collaboratively**
9:17 38:24 319:17
**collect** 304:14
**collected** 47:7
**collective** 56:23
**collectively** 72:12
**column** 79:22,23
80:4 153:14
**combination**
172:2 230:18
231:9 234:20
246:2
**combinations**
169:2
**come** 38:18 87:22
145:22 151:24
152:3 173:2

188:10 195:23
219:18 245:21
248:24 249:19
259:9 270:15
277:6
**comes** 36:10
149:21 151:2
181:8 206:14
277:3 279:3
320:18
**coming** 16:14
43:21 142:2 171:3
174:11 175:9
249:16,24 283:13
**comment** 42:8
80:9,10,12,13,22
80:23 123:15
124:9 185:10
**comments** 40:17
42:4 47:16 79:11
79:16,24 80:3
170:19 305:19
**commission** 63:16
64:7 65:7,13 81:8
103:12,16 292:6
320:5,6 340:25
**commissioner**
1:11,12 9:10
10:17 11:2,8,10
19:21 20:14,15
21:19 38:12 56:16
151:19 189:10,23
190:2 201:18
209:7,7,16,19
214:23 255:9
278:7 322:13,18
**commissioner's**
11:17 189:9 270:6
277:22 305:21
319:16 323:11,16
323:18 324:16,17

committee 152:13 156:23

communicate 75:16 282:16

communicated 85:19 156:10 216:12

communication 74:6,8 134:18 135:18 156:5,12 281:10,16

communications 6:25 74:17 75:18 104:25 117:20 155:19,22 281:24 338:4

comparing 125:7

compel 167:13 176:20 179:20 330:22

compelling 31:8 288:11,13,16

compels 190:14

compensation 20:13

competing 174:22 177:2

competition 126:2

complaint 25:6 159:5,7

complete 336:11

completely 145:21 315:15

completeness 45:8

completion 152:18

compliance 13:6 79:3,4 86:20 87:9

compliant 31:9

complied 302:16

comply 254:5,5

component 38:20

composed 30:4 148:12

composition 12:14 93:5 300:19

computer 43:8 179:2

conceded 199:12 200:12

concept 88:2 94:4 187:10

conception 187:25

concepts 52:21

conceptually 225:6

concern 17:8

concerned 56:17 71:25 100:24 141:13 173:3 205:10 274:14

concerning 25:24 65:2 205:9 206:18 208:9 220:21 235:23 265:14 294:8 299:21

concerns 310:22

conclude 200:16 200:22 228:2 232:9,17 233:21

concludes 335:22

concluding 232:22 233:10 236:7

conclusion 54:18 174:12 180:12 234:4 243:15 330:22

conclusions 172:10 193:2

conclusory 306:19 321:4

condition 249:4

conditions 251:19 306:6 311:3

conduct 130:16 156:19,19 181:16 278:8

conducted 4:6

confer 71:25

conferences 71:16

confirm 37:20 39:22 41:25 42:6

confirming 40:18

conflict 94:9 102:11,23 120:7 123:14 146:23 167:10 168:14 180:8 182:10 190:19,20 191:16 194:22 201:17 219:15 220:4 229:7 232:15,18 276:23 286:5 328:12 329:15

conflicted 166:11 221:7

conflicting 121:23 172:13

conflicts 148:4 171:8 193:17 228:13 233:25 330:5

confrontational 50:15

confronted 47:10 47:12 284:7

confused 28:23 55:9 203:2 317:5

confusing 93:23 319:8

confusion 39:17 185:12

congregation 197:16

conjunction 212:23 231:24

connected 188:6 211:14

connection 4:8 62:3 133:16 178:11 182:7 191:12 209:12 210:3 212:4 213:21 219:11 221:25 232:3 237:25 239:6 243:18 263:24 265:19 266:3 269:5 281:22 294:5 298:15 300:23

connotations 104:19

conscientious 54:10 135:11

consecutive 151:16

consequence 198:5

consider 51:20 56:6 97:20 133:10 135:6 166:8 176:15,16 178:10 181:6 182:7 197:5 201:19 207:3 213:3 224:19 228:6,24 230:21 247:6 251:16 252:10 262:25 269:4 277:11 289:7 296:12,24 296:25 297:15 298:3,10,11,13

302:12 303:10,19
304:11 307:7
333:19
**consideration** 15:7
15:21 16:17 23:19
53:23 182:13
183:14 196:14
247:15 248:4
249:2 262:16
280:16 290:24
297:5
**considerations**
16:5 251:24
**considered** 14:21
34:8 176:25
178:11 204:23
220:25 226:20,25
231:21,24 236:19
237:13,19 247:23
261:20 265:8
275:7 299:24
303:20
**considering** 173:6
252:13 269:2
275:5 277:8
278:10 283:10
291:16 322:6
**considers** 276:15
**consist** 76:3
**consisted** 253:15
**consistency**
180:15
**consistent** 65:4
**consistently** 108:9
**constitute** 184:12
184:21 186:21
194:16 304:11
**constituted** 267:15
337:21
**constitutes** 312:19

**constitution's**
288:18
**constraints** 39:10
**consult** 28:2 214:9
**consulted** 9:7
10:25 11:21 65:13
**cont'd** 3:2 338:2
**contact** 23:12
**contain** 157:3
158:7 159:8 184:6
184:21 188:21
194:11 230:22
**contained** 27:4
188:20 189:19
192:3,21 194:3,13
197:19 201:15
236:12 237:11,14
277:21 279:17
297:8
**containing** 209:10
**contains** 195:8
296:14 298:5,21
**contemplates**
306:3
**contemplation**
330:2,8
**contemporaneou...**
268:25
**contentions** 189:3
**context** 31:3,6
32:11 33:19 61:22
63:4 64:9 66:17
66:22 69:16 74:25
90:17 100:25
104:15,21 106:6
115:6 143:17
144:17,24,25
145:9 146:11
176:16 185:19
189:8 199:20
223:24 228:6

230:7 247:22,23
248:4 257:22
260:20,23 277:24
283:20 288:14,16
297:10 301:21
312:16 315:16
317:17 321:15
323:24 326:8
**contexts** 100:19
**contextualizes**
323:19
**continue** 4:12 7:13
199:9 234:23
249:16 254:10
311:17 316:11
**continued** 137:8
138:20 220:10
235:3 251:21
**continues** 213:7
235:4,10
**contradiction**
278:23 279:8
**contradictory**
172:12
**contradicts** 226:21
**contrary** 92:11
121:18 122:9
148:23 200:3
306:2
**contrasting** 52:19
**contributing**
183:10
**control** 29:2 37:14
39:13,21 78:17
114:6 122:2,25
123:8,25 124:2
179:13
**conversation**
65:12 66:2 184:11
318:15

**conversations**
22:4 60:20 63:18
64:22 65:6 66:5
73:5,11,12 86:5
117:24 118:12
119:21 139:17,19
**conversion** 166:19
166:20,21 167:5
168:6,13,16,18
170:15,16 171:6,7
**converted** 167:2,3
**convey** 158:25
**conveyed** 111:14
116:12
**conveying** 118:19
**cooperative** 47:19
50:7,11 51:10,12
73:16 124:19
125:2,16,22 126:5
126:11,13 158:4
158:16 160:5
174:13,16 176:7
196:14 204:21
215:15 219:23
231:5 242:23
243:6 244:6,13,19
244:22 245:11
247:10,13,20
252:3,19,23
285:12 287:23
289:25 294:17
295:23 301:15,16
304:18
**coordinate** 9:25
**coordinates** 12:11
**coordination** 12:6
**coordinator**
158:20 170:4
**coordinators**
54:15

copies 267:14
281:24 338:3
copy 150:5 157:7
157:9 337:16
corner 43:12
corporate 8:14
corporation 5:11
7:23 13:3,13,14
38:11
correct 6:10,11
8:13,14 45:9
57:23,25 88:10
91:13 99:4 111:10
123:25 138:25
144:8 145:2,6
153:8 161:6
192:17 198:10,14
198:19,20 199:6,7
200:17,19,23
203:16 208:10
211:12 217:22
225:4,5 247:8
279:18 290:17
291:7 309:13
311:10,11,17,22
312:8,9 319:9
320:11,13 325:14
326:20 327:8,9
331:19 334:8
336:11,13
correction 271:25
306:16
corrections 273:22
274:6 306:9
308:24
correctly 30:22
48:8
correspondence
69:8
cost 291:3 292:17
292:22 294:8,13

295:13 296:15,20
300:6
costs 260:5,8,9,22
261:5 292:18
294:9,15 295:15
295:19 296:16
counsel 4:22 5:9
5:12 6:14 7:2,3,17
7:24 10:16 11:19
13:3,13,14,15
18:13 37:13 38:11
78:5 104:4 154:9
156:18 210:12
270:25
counsel's 87:22
count 190:6 198:7
counter 220:22
counting 190:25
county 336:5
339:5
couple 142:12
162:24
couple's 88:3
course 15:8 16:16
18:22 24:25 25:8
25:23 27:11 79:11
102:4,8 123:24
155:23 178:21
185:5 192:19
227:11 239:10
253:13 258:14
300:25
court 1:2 4:18,20
5:18 17:19 39:5
106:13,25 109:22
117:9,10 138:2
164:25 223:22
224:11 235:5,9
308:2
courts 34:16 94:25
104:18

covered 8:18
21:21 56:22 96:13
96:17 300:14,15
300:19,24
covering 310:19
covers 78:7 227:7
covid 10:3,22
21:17 25:13,15
61:22 62:4 63:11
66:9,18 68:4
76:10 98:6 100:3
100:15,17 173:10
173:21,24,25
175:22 176:14
178:5 184:6,20
185:18,20 187:4,5
191:10,24 192:2
197:22 219:10,12
219:16 231:13
274:15,18 275:9
275:23 276:24
291:25 309:4,7
create 16:25 68:17
created 30:23 31:5
creates 94:4
creating 31:10
creation 77:7
210:23
credibility 73:9
124:16 172:25
173:3
criteria 118:24
157:24 158:3,8
159:17 271:17
297:16 320:10
334:17 335:11
criticized 107:18
107:24 108:6
crowd 61:11
cruz 1:22 4:21
339:7,25

curious 142:21
current 29:9 34:20
149:15 181:19
313:16 334:21
currently 81:5
255:14
curtis 1:4
cut 35:3,4 141:8
cutler 1:4
cutting 35:2
134:11
cv 1:15

## d

d 336:2 337:2
dangerous 330:7
dannenberg 10:17
dart 174:8
dartboard 174:8
data 34:24 35:4
154:3 299:17
database 35:17,23
75:15,17,20,21
79:17,20 154:3
156:21,25 157:2,3
157:10
databases 332:21
date 29:21,22
31:22 32:10
101:14 138:6
144:6 340:4
dated 137:17
dave 1:11
day 32:12 66:14
127:25 207:6
249:25 328:18
336:20 339:21
340:21
days 20:19 163:24
dcas 10:13 21:7,12
22:23 23:10 26:8
37:13 38:19 61:8

65:14 76:21 81:7
81:22,24 103:7
128:10 140:2
161:19 337:15
**dcas's** 153:14
**de** 19:3,14,16 53:8
53:18 54:2 66:25
68:11 118:22
131:24 203:8
252:9,12 291:3
**deal** 92:3 133:23
134:22 202:18
250:5 330:16
**dealing** 21:16
91:22 97:25
200:13 286:24
320:25
**dealt** 25:15 95:17
**dean** 1:5 3:5 12:20
**debate** 242:4
313:11
**deblasio** 117:20
118:3
**december** 154:21
**decide** 15:24 24:4
36:22 54:4 57:6
65:25 107:10,12
128:12 169:8
170:22 178:3
276:10 296:4
**decided** 27:25
54:22 55:5 57:3
80:25 97:6 101:14
202:20 321:16
**decides** 198:16
**deciding** 40:11
53:4 72:3 79:11
89:6 133:17 263:3
279:13 323:24
**decision** 14:20
30:13 39:2 40:18

41:3 43:17 44:3
51:21 53:5 85:14
85:15 92:17
105:25 106:8
107:17,24 108:5
111:20 115:17
125:12 155:4,6,8
159:3 160:7,8,9
163:12 164:3
169:8 172:19
178:19 196:8
201:24 202:8
203:8 204:6
243:22 244:9
280:17 281:13
296:9
**decisions** 14:12
17:5 27:21 30:15
38:23 39:13 56:7
58:7 60:10,22
78:19 97:3 107:20
107:20 111:17,18
114:4 125:15
131:8 152:21
165:21 179:12,14
213:5 228:4,20
242:14
**declarations** 25:7
28:9
**declination** 236:5
**deemed** 202:20
**deep** 109:5
**deeply** 206:14
290:2
**def** 137:15
**defend** 89:20,21
97:2
**defendant** 2:19
**defendants** 1:14
5:9,11,14,16 6:9
8:13 137:14

**defended** 95:7
**defense** 102:15
**defenses** 259:6
**deficient** 158:11
**define** 88:13 93:22
**defining** 88:11
**definitely** 141:11
271:7
**definition** 57:11
94:11,15 222:8,11
222:14 255:18
**definitions** 100:22
**definitively**
129:11 130:9,11
**degree** 180:2
181:18 298:23
**delay** 70:6
**deleted** 80:7
**delgado** 1:4 3:10
**demand** 322:17
**demartini** 1:4
**demonstrated**
204:8 270:9
297:12
**demonstrates**
168:9
**denial** 34:6 40:3
41:12 48:4 54:18
60:17 95:7 131:8
131:17,18 154:11
154:12,13 157:4
157:22 158:6,9,18
158:23 159:18
164:2 171:21
179:20 198:21,24
199:14,24 202:6
202:12,16 203:16
203:25 236:24
238:19 240:24
265:10 286:12
290:13 294:6

326:2
**denials** 16:10 32:2
34:21 43:16 57:20
103:18 140:24
141:6,10 145:25
155:9,11,14,16
159:7 217:2 253:7
259:7 318:2
331:17
**denied** 17:14
31:23 32:9,17
33:24 43:20 48:19
54:10 56:21 57:7
60:18 131:15
145:18 159:3,4,20
160:2,18,19
163:19 165:24
169:22 173:22
176:22 201:4,23
201:25 204:6
207:22 217:3
242:19,19 247:18
253:2,12 271:19
273:4,5 288:10
293:22,22 294:24
299:11 300:3
301:18 302:4,5
331:15 332:5,10
**denies** 172:4
225:17
**dennis** 1:5
**deny** 59:11 145:13
165:23 168:4
173:24 176:6
179:17 198:16
203:15 262:21
272:22 296:5,9
324:20 325:13
327:24
**denying** 44:18
53:21 59:9 180:19

199:22 200:5
239:3 269:8
**department** 2:18
8:8 9:20,20,23
10:6,13 11:13
12:24 14:14 18:16
20:22,24 28:23
29:2,5 31:15,17
35:21 36:13,15
37:9 38:13,17
39:15 44:8,16
45:10 48:15 56:5
60:15 64:15,24
78:25 81:6,10,19
82:4 85:12 87:17
88:18 89:5 91:20
93:17 94:19,21
96:6,24 101:24,25
103:20,25 105:15
128:10 129:6
130:15 133:16
137:19 150:19
151:11 161:19
163:8,17,23 184:4
214:23 217:23
218:4 219:2
235:24 236:11
237:22 238:16,17
238:18,19,21,23
238:24 240:13,13
241:25 256:8
264:25 265:13
266:21 267:2
268:7 273:17,22
303:9,11 306:10
306:16 308:23
320:3 333:17
335:2
**department's**
89:16 274:6
303:13

**departments** 13:9
36:5 65:19 66:3
81:21 130:14
240:10,15,16
241:13,18 334:19
**depended** 333:15
**dependent** 16:10
126:24 180:3
233:7,7 263:17
**depending** 172:11
178:18 242:21
275:17
**depends** 4:7 114:7
205:19,21 229:18
263:20 327:25
328:2
**deposing** 98:20
**deposition** 1:21
4:5,14 6:7,8 8:18
25:18 76:7 227:11
235:9 257:14
270:24 271:9
307:15,23 330:16
335:23 336:9
339:10,12 340:4
**depositions** 6:13
6:15 115:5
**deputy** 10:17 11:2
11:10 12:18,20
20:15
**derive** 211:18
**derived** 188:8,13
188:22 189:14
190:15 197:18
205:24 208:20
210:24
**deriving** 144:24
**describe** 16:3
25:10 221:18
231:20 233:19
241:3

**described** 43:19
131:25 141:20
144:4 147:25
171:3 192:25
218:8 223:14
229:10 262:17
**describes** 163:3
239:11
**describing** 50:17
62:8 194:19
222:13 228:7
328:3
**description** 168:10
203:19 231:22
232:13 241:4
261:24 285:4
**descriptions**
304:13
**designated** 170:3
**designation**
159:18
**designed** 250:21
250:22 295:6
**designing** 15:21
**desire** 17:4 277:3
**desired** 16:5,6
**desires** 19:3,15,17
**desks** 304:5
**desperate** 251:9
**despite** 122:8
168:5 170:23
212:14
**detail** 111:4,7
121:10 299:7
**detailed** 101:11
**details** 186:5
**determination**
16:19 42:18 50:14
56:18 59:8,10
62:24 84:2,15
85:4 90:5 120:13

173:15 176:5
182:2 183:9
191:13,20 196:19
198:12 200:6
201:22 202:22,23
204:4 207:12
225:23 226:5,6
228:11 231:8
243:7,10,13 244:7
258:22 276:5
278:20,21,24
279:20 280:2
289:20 293:4,21
294:22 295:24
296:5 297:6
298:18 301:6
303:18 307:9
308:8 309:4,7
317:3,4,22 321:12
321:24 322:12
323:17 329:13
**determinations**
16:15 59:20 85:8
89:17 189:11
212:25 229:15
246:13 296:24
300:2 308:19
318:14,17 322:14
323:10 326:9,14
328:20
**determinative**
183:15 247:16
**determine** 164:8
177:3 182:8
197:23 204:5
207:5 221:25
222:16 225:12
229:4 230:17,19
244:8 271:18
301:17 302:15
316:2 321:19

324:2,4
**determined** 64:2
  170:8 221:3 248:8
  280:23
**determines** 66:24
  226:2
**determining** 162:8
  162:15 191:8
  192:18 214:6
  216:25 239:2
  262:19 291:22
  302:4 335:12
**developed** 74:25
  75:14 168:13
  214:12,14,15
  278:21,25
**developing** 167:7
**development**
  210:23 212:15
  215:5 280:3
  282:25
**developments**
  18:20 72:14 105:3
  112:21,22
**devoted** 126:22
**di** 46:3 67:13
  92:20 98:22
  102:20 105:5,19
  111:23 113:7
  114:20 116:25
  117:6 125:4
  132:12,20 164:10
  246:11 256:4
  274:19 286:14
  288:22 307:11
**dial** 310:16
**dialogue** 47:19,21
  49:2,16 50:2,2,8
  50:11 51:10,12,17
  73:16 124:20
  125:3,16,22 126:6

126:11,13 158:5
158:16 160:6
174:13,16 176:7
196:14 204:21
215:15 219:24
231:5 242:23
243:2,6 244:6,13
244:19,22 245:2
245:11 247:10,14
247:20 252:3,19
252:24 285:12
287:23 289:25
294:18 295:23
301:17 304:18
**diet** 227:24
**differ** 46:18,18
  141:24
**difference** 47:3
  229:15 275:8,22
  276:21 277:12,13
  333:5
**different** 9:17,18
  15:3,3,4 28:13
  30:5 43:23 59:18
  63:9 78:15 80:15
  95:13,14 100:18
  124:18 125:23,25
  128:7 129:14
  139:24 164:5
  168:25 169:5,18
  172:4 175:15
  177:2 181:21
  195:15 202:23
  203:5,10,11
  233:16 242:13
  250:15 252:14
  263:6 287:9
  313:24,25 330:19
**differently** 58:9
  150:14 206:13

**difficult** 299:2
  317:6
**dig** 302:25
**digit** 151:13,17
**direct** 7:5 67:18
  74:24 87:2 101:21
  105:20 117:19
  269:25 270:4
  271:24 272:19,24
  273:6,7,10,13,15
  273:23 274:7
  278:17 305:19,25
  306:12,17,22
  307:5,6,17 308:7
  308:13,25 309:5
  309:20 310:7
  311:14,20 312:11
  312:13,21 313:7,8
  313:14,17 314:8
  314:15,20,22,23
  315:2,18 316:23
  318:6 321:5,11
  322:5,7
**directed** 156:18
  274:23 292:3
**directing** 67:14
  99:3,14 292:11
**direction** 172:15
  186:15 195:3
  327:14 329:18
  337:7
**directions** 211:11
**directive** 38:6
**directives** 78:8
**directly** 12:13
  65:10,11 77:14
  89:8 264:3 280:9
  282:16 320:24
**director** 195:5
**disability** 54:15
  158:20 170:3

**disagree** 41:4
  171:18 234:10
**disagreed** 234:6
**disagreement**
  278:6
**disagreements**
  183:21
**discovery** 102:21
  307:4,13
**discretion** 39:7,9
  53:6 172:18 173:5
  174:4
**discretionary**
  174:8
**discrimination**
  95:21 97:4 103:18
  112:16 288:19
**discuss** 6:20 15:8
  17:24 18:13 19:3
  27:19 38:24 62:19
  70:8 71:25 72:18
  75:11 77:11,18
  106:17 119:8,20
  121:2 129:7,25
  144:12 149:14
  227:15 250:16
  289:23 319:5
**discussed** 15:12
  20:10 24:17 62:18
  69:10,14 85:20,21
  98:17 106:4,11,24
  107:8 112:19
  116:10,20 120:4
  128:8 129:20
  131:24 133:23
  134:4 142:11
  208:7 233:14
  266:17,19
**discussing** 12:13
  15:2,5,22 19:19
  62:21 64:8 70:13

91:10 108:14
119:13 130:5,25
197:15 303:24
**discussion** 10:24
13:24 14:7,8 15:4
15:14 17:4 19:13
68:2 70:21 73:19
85:23,24 91:9
96:17 104:23
105:3 106:12
107:4 120:10
138:21 142:3,8
146:2 148:24
182:15 186:8
210:17 258:2
261:14 302:22
**discussions** 11:11
11:25 12:15 18:25
27:4 64:14 65:2
69:7,18,25 70:22
96:5 106:19 118:7
119:4,5,13 120:3
120:25 129:12,14
129:15 130:19
134:15 135:12
149:12 156:8
185:6,22 227:13
259:5 266:20
276:12 289:12
319:15
**disparagement**
104:14
**dispense** 6:18
**dispositive** 119:18
120:15 175:5,8,12
178:17 252:16
258:19,21 296:13
298:3,10 304:3,7
**disqualifying** 95:3
95:10 198:8

**disregard** 107:14
110:23
**disregarded**
171:12
**disruption** 291:12
312:19 314:4
318:8
**disseminated**
77:24 78:11
215:23 337:18
**disseminating**
78:3
**distinction** 101:10
241:21 316:10
324:23 328:8
**distinctions** 227:4
**distinguish** 134:8
**distribute** 152:12
**distributed** 150:11
**district** 1:2,2 4:18
**divide** 128:14
**divided** 151:12,17
**dividing** 129:16
140:16,17
**division** 8:6,7
86:24 87:2,12,25
88:17 89:19 96:25
**divorced** 315:16
**doctors** 11:20
**document** 23:4,23
26:12 27:17 73:17
76:7 77:2 98:8,9
140:2 153:17
260:3 281:11
337:12 338:2
**documentation**
51:19 120:5
157:25 218:15
268:25 301:20
**documents** 22:20
24:5 25:2 26:2,6

26:18,25 27:22
76:4 98:7 133:13
135:2 153:25
154:6 216:6,8,24
315:5 321:18,20
321:22,23 322:3
**doe** 43:16 44:5,22
45:20 46:2,7,15,24
47:4,6,14,15,24
48:2,19 49:4,7,7,9
49:18,20,21 50:2
50:21,22 51:2
52:19 56:11 57:16
58:9 59:3,17,19
106:7 266:8,17,18
267:10,16,18
268:4,5,10,19,19
268:23 269:3,5,7
308:20 330:25
331:3,14,24 332:5
332:16,19 334:13
337:22
**dohmh** 84:17,17
85:24 103:7 128:7
189:5
**doing** 8:2,5 34:13
34:13 37:8,9
40:15 42:12 48:2
53:19 108:11,12
108:12 113:2
123:7,8 139:7
165:25 166:2
174:9 185:21
186:13 189:8
199:21 200:2,3
201:12 203:19
207:7 217:4
221:19 234:16
243:25 278:14
282:7,12 285:5
293:16 335:8

**double** 110:6
**doubled** 82:5
**download** 154:6
**downloading**
154:4
**dozen** 123:17
**dr** 216:2
**draft** 319:23
**drafted** 155:9,11
**drafting** 23:18,23
76:13,17
**drafts** 76:23
**draw** 229:16
**drawn** 220:10
221:10
**drew** 97:7 220:19
**drug** 222:2
**due** 45:24 118:17
335:13
**duly** 5:20 339:11
**duplicated** 44:14
**duration** 317:9,13
317:22
**duty** 92:6 95:21

|   e   |
| :---: |

**e** 2:2,2,9 3:2,2 5:1
5:19,19,19 6:1 7:1
8:1 9:1 10:1 11:1
12:1 13:1 14:1
15:1 16:1 17:1
18:1 19:1 20:1
21:1 22:1 23:1
24:1 25:1 26:1
27:1 28:1 29:1
30:1 31:1 32:1
33:1 34:1 35:1
36:1 37:1 38:1
39:1 40:1 41:1
42:1 43:1 44:1
45:1 46:1 47:1
48:1 49:1 50:1

| | | | |
|---|---|---|---|
| 51:1 52:1 53:1 | 171:1 172:1 173:1 | 294:1 295:1 296:1 | 268:8 303:9,12 |
| 54:1 55:1 56:1 | 174:1 175:1 176:1 | 297:1 298:1 299:1 | 333:18 |
| 57:1 58:1 59:1 | 177:1 178:1 179:1 | 300:1 301:1 302:1 | **eeo** 15:16 16:14 |
| 60:1 61:1 62:1 | 180:1 181:1 182:1 | 303:1 304:1 305:1 | 18:9 21:14 23:11 |
| 63:1 64:1 65:1 | 183:1 184:1 185:1 | 306:1 307:1 308:1 | 23:15 24:7 26:9 |
| 66:1 67:1 68:1 | 186:1 187:1 188:1 | 309:1 310:1 311:1 | 33:25 34:13 36:16 |
| 69:1 70:1 71:1 | 189:1 190:1 191:1 | 312:1 313:1 314:1 | 36:21 54:11,14 |
| 72:1 73:1 74:1 | 192:1 193:1 194:1 | 315:1 316:1 317:1 | 61:12 62:14 63:7 |
| 75:1 76:1 77:1 | 195:1 196:1 197:1 | 318:1 319:1 320:1 | 66:10 78:4 84:5,7 |
| 78:1 79:1 80:1 | 198:1 199:1 200:1 | 321:1 322:1 323:1 | 84:19 86:19 87:3 |
| 81:1 82:1 83:1 | 201:1 202:1 203:1 | 324:1 325:1 326:1 | 89:14 95:18,20 |
| 84:1 85:1 86:1 | 204:1 205:1 206:1 | 327:1 328:1 329:1 | 96:20 101:8 |
| 87:1 88:1 89:1 | 207:1 208:1 209:1 | 330:1 331:1 332:1 | 103:23 104:5 |
| 90:1 91:1 92:1 | 210:1 211:1 212:1 | 333:1 334:1 335:1 | 112:14 135:3,4 |
| 93:1 94:1 95:1 | 213:1 214:1 215:1 | 336:2,2 337:2 | 148:15 158:19 |
| 96:1 97:1 98:1 | 216:1 217:1 218:1 | 339:2,2 | 160:7 169:25,25 |
| 99:1 100:1 101:1 | 219:1 220:1 221:1 | **earlier** 28:22 48:4 | 225:22 282:20 |
| 102:1 103:1 104:1 | 222:1 223:1 224:1 | 54:8 78:2 128:9 | 283:4 337:14 |
| 105:1 106:1 107:1 | 225:1 226:1 227:1 | 144:11 151:4 | **eeoc** 61:6 63:6 |
| 108:1 109:1 110:1 | 228:1 229:1 230:1 | 181:21 243:3 | 64:10 66:7,17 |
| 111:1 112:1 113:1 | 231:1 232:1 233:1 | 292:4 306:14 | 68:4,18 98:6 |
| 114:1 115:1 116:1 | 234:1 235:1 236:1 | 316:21 317:17 | 100:6,18,23 |
| 117:1 118:1 119:1 | 237:1 238:1 239:1 | 319:25 330:16 | 101:11 112:18 |
| 120:1 121:1 122:1 | 240:1 241:1 242:1 | 333:17 | 139:25 146:25 |
| 123:1 124:1 125:1 | 243:1 244:1 245:1 | **early** 71:5 75:14 | 179:6 182:16,25 |
| 126:1 127:1 128:1 | 246:1 247:1 248:1 | 109:2 154:21 | 183:13 222:14,18 |
| 129:1 130:1 131:1 | 249:1 250:1 251:1 | **earn** 250:23 | 239:10 292:3 |
| 132:1 133:1 134:1 | 252:1 253:1 254:1 | 251:20 253:20 | 320:18 322:4 |
| 135:1 136:1 137:1 | 255:1 256:1 257:1 | **easily** 74:17 | **eeoc's** 25:11,13 |
| 137:2,2,6,6,6 | 258:1 259:1 260:1 | **eastern** 1:2 4:18 | 100:2 227:7 |
| 138:1 139:1 140:1 | 261:1 262:1 263:1 | **echo** 182:24 | **effect** 110:19,21 |
| 141:1 142:1 143:1 | 264:1 265:1 266:1 | **educate** 218:15,21 | 265:4 295:2 |
| 144:1 145:1 146:1 | 267:1 268:1 269:1 | **education** 14:14 | 300:10 |
| 147:1 148:1 149:1 | 270:1 271:1 272:1 | 28:24 29:2,5 | **effective** 154:19 |
| 150:1 151:1 152:1 | 273:1 274:1 275:1 | 31:15 44:8,17 | **effectively** 15:19 |
| 153:1 154:1 155:1 | 276:1 277:1 278:1 | 45:10 56:6 60:16 | **effectiveness** |
| 156:1 157:1 158:1 | 279:1 280:1 281:1 | 105:16 163:8,23 | 16:17 275:16 |
| 159:1 160:1 161:1 | 282:1 283:1 284:1 | 217:23 218:4 | **efficiently** 30:21 |
| 162:1 163:1 164:1 | 285:1 286:1 287:1 | 219:2 238:22,23 | **effort** 37:16 |
| 165:1 166:1 167:1 | 288:1 289:1 290:1 | 238:25 265:2,13 | **eichenholtz** 1:21 |
| 168:1 169:1 170:1 | 291:1 292:1 293:1 | 266:22 267:3 | 4:15 5:1,25 6:1 |

| | | | |
|---|---|---|---|
| 7:1,21 8:1 9:1 | 122:1 123:1 124:1 | 241:1 242:1 243:1 | 122:15 146:21 |
| 10:1 11:1 12:1 | 125:1,11 126:1 | 244:1 245:1 246:1 | 147:17 154:9 |
| 13:1 14:1 15:1 | 127:1 128:1 129:1 | 247:1 248:1 249:1 | 158:7 159:17 |
| 16:1 17:1 18:1 | 130:1 131:1 132:1 | 250:1 251:1 252:1 | 168:8 180:24 |
| 19:1 20:1 21:1 | 133:1 134:1 135:1 | 253:1 254:1 255:1 | 186:23 199:15 |
| 22:1 23:1 24:1 | 136:1 137:1,12,17 | 256:1 257:1 258:1 | 204:21 230:17 |
| 25:1 26:1 27:1 | 138:1,13 139:1 | 259:1 260:1 261:1 | 233:21,22 243:10 |
| 28:1 29:1 30:1 | 140:1 141:1 142:1 | 262:1 263:1 264:1 | 245:23 247:19 |
| 31:1 32:1 33:1 | 143:1 144:1 145:1 | 265:1 266:1 267:1 | 252:6 268:24 |
| 34:1 35:1 36:1 | 146:1 147:1 148:1 | 268:1 269:1 270:1 | 269:18 273:2 |
| 37:1 38:1 39:1 | 149:1 150:1 151:1 | 271:1 272:1 273:1 | 279:12 280:9,11 |
| 40:1 41:1 42:1,21 | 152:1 153:1 154:1 | 274:1 275:1 276:1 | 297:2 313:20 |
| 43:1 44:1 45:1 | 155:1 156:1 157:1 | 277:1 278:1 279:1 | 321:17 |
| 46:1 47:1 48:1 | 158:1 159:1 160:1 | 280:1 281:1 282:1 | **element** 198:7 |
| 49:1 50:1 51:1 | 161:1 162:1 163:1 | 283:1 284:1 285:1 | 259:11 330:3 |
| 52:1,16 53:1 54:1 | 164:1 165:1 166:1 | 286:1 287:1 288:1 | **elements** 77:12,16 |
| 55:1 56:1 57:1 | 167:1 168:1 169:1 | 289:1 290:1 291:1 | 77:19 229:12 |
| 58:1 59:1 60:1 | 170:1 171:1 172:1 | 292:1 293:1 294:1 | 302:11 |
| 61:1 62:1 63:1 | 173:1 174:1 175:1 | 295:1 296:1 297:1 | **eliciting** 205:4 |
| 64:1 65:1 66:1 | 176:1 177:1 178:1 | 298:1 299:1 300:1 | **eligible** 162:9,17 |
| 67:1 68:1 69:1 | 179:1 180:1 181:1 | 301:1 302:1 303:1 | 164:9 304:14 |
| 70:1 71:1 72:1 | 182:1 183:1 184:1 | 304:1 305:1,18 | **eliminate** 288:4 |
| 73:1 74:1 75:1 | 185:1 186:1 187:1 | 306:1 307:1 308:1 | **else's** 61:5 |
| 76:1,2 77:1 78:1 | 188:1 189:1 190:1 | 309:1 310:1 311:1 | **email** 23:8 26:11 |
| 79:1 80:1 81:1 | 191:1 192:1 193:1 | 312:1 313:1,12 | 74:6,7 78:11,13,13 |
| 82:1 83:1 84:1 | 194:1 195:1 196:1 | 314:1 315:1 316:1 | 78:14 82:14 |
| 85:1 86:1 87:1 | 196:7 197:1 198:1 | 317:1 318:1 319:1 | 133:14,19,22 |
| 88:1 89:1 90:1 | 199:1 200:1 201:1 | 320:1 321:1,17 | 134:3,6,6,8 135:8 |
| 91:1 92:1 93:1 | 202:1 203:1 204:1 | 322:1 323:1 324:1 | 137:17 138:4,15 |
| 94:1 95:1 96:1 | 205:1 206:1 207:1 | 325:1 326:1 327:1 | 140:19 141:23 |
| 97:1 98:1 99:1 | 208:1 209:1 210:1 | 328:1 329:1 330:1 | 142:16 143:5 |
| 100:1 101:1,22 | 211:1 212:1 213:1 | 331:1 332:1 333:1 | 144:7,13,16,17,18 |
| 102:1 103:1 104:1 | 214:1 215:1 216:1 | 333:11 334:1 | 144:21 149:24 |
| 105:1,25 106:1 | 217:1 218:1 219:1 | 335:1,16 336:7,17 | 154:15 155:3,25 |
| 107:1 108:1 109:1 | 220:1 221:1 222:1 | 337:4 338:8 340:5 | 156:16 157:10,13 |
| 109:19 110:1,3 | 223:1 224:1 225:1 | **eichenholtz's** | 158:25 183:25 |
| 111:1 112:1 113:1 | 226:1 227:1 228:1 | 99:25 102:23 | 184:13,18 185:4,7 |
| 114:1,20 115:1 | 229:1 230:1 231:1 | **either** 23:14 25:3 | 185:9,11,14,22,22 |
| 116:1,19,23 117:1 | 232:1 233:1 234:1 | 28:20 33:8 55:24 | 186:6,19,25 |
| 117:18 118:1 | 235:1 236:1 237:1 | 65:10,11 86:16,18 | 326:17 338:9 |
| 119:1 120:1 121:1 | 238:1 239:1 240:1 | 90:13 95:19 96:7 | |

**emails** 26:3,25
70:9 78:14,16
134:19,22 135:12
154:17 157:15,17
157:19 320:14
**emergency** 10:4
10:23 15:20 21:17
31:7 63:5 75:2
214:25 254:21,24
255:2,4,7,10,15,17
256:15 270:7
292:2 317:18
323:21,23 324:3,6
**emergent** 292:5
**emphasized**
142:20
**employ** 257:20
320:11
**employed** 59:18
249:5 270:2
300:10
**employee** 9:3
10:21 18:21 49:8
50:13 51:15,17
120:21 121:8,22
135:2 146:22
147:2,6,19 154:18
160:4,10 166:24
167:21 169:19,20
169:23 176:3,23
177:16 178:12
179:25 180:24
182:5,9 185:16
187:22 188:17
190:21,25 191:3
192:9,9,15 193:18
194:12,15,17,21
194:24 195:7
196:15,16 197:2,6
197:8,17 198:13
199:24 204:2,19

204:24 205:7,14
207:2,23 208:23
212:2 216:19
217:9,11 218:11
218:18,21 221:3
221:12 222:12
227:23 228:2,7,11
228:15,25 229:4,6
229:19 230:16
231:22 232:2
233:5,22,23 243:2
243:3,5,5 244:24
244:24 245:12,20
246:7 248:17
249:12,15 250:9
252:18 263:9,11
275:9 278:18
280:10,12 283:9
286:3,7,9,11
287:24 293:20,25
294:21 295:23,25
298:16,17 299:8
301:16,23 302:2
308:16 328:3
329:14 330:6
**employee's** 121:21
147:10,11 166:13
167:23,25 168:10
168:17 180:5
181:14 182:17
190:22 191:2
193:13,21 194:9
194:10,25 197:4
198:3 216:20,21
218:13,16 221:6
230:8,15 231:4
232:4,13,16
236:13 246:9
249:15,17 250:2,6
263:21 285:5
293:17 294:18

**employees** 17:14
23:20 31:18 44:7
44:11,12 46:16
50:21,22 54:23
55:23 56:17 58:9
76:6 92:19 103:9
103:20 120:6
125:25 166:18
179:7 211:12,22
212:21 215:15
219:2,14,17,19
230:21 241:22
244:4 249:8,9,22
257:20 258:13,20
259:8 264:16
265:15,22 269:21
269:24,25 270:3
273:24 277:20
283:5 292:20,20
294:11,11 295:16
295:17 296:18,18
300:16 303:9,12
303:15 304:10
305:23 307:21
308:20 309:12,20
310:22 315:8
316:2,18 322:24
323:22 329:17
**employer** 50:14
66:22 217:10,12
242:23,24 243:5
244:6 245:22
246:6 292:22
294:5,13 295:19
296:15,20,22
298:22,22 299:9
299:14,22 301:9
301:16,23 302:2
302:16 312:16,17
**employers** 253:19
293:12 298:4

**employing** 304:12
**employment** 7:24
8:7 15:16 18:16
63:15 88:4,23
89:19 95:21 96:25
97:4 112:15 199:9
277:14
**empower** 122:4
**empowered**
197:23 247:6
**empty** 151:8
**encountered** 72:24
72:25 73:4 75:10
141:17,18 151:6
181:3 212:8,9
215:3,17,17
**encouraging**
206:10
**ended** 57:14 218:8
218:19,20
**endless** 234:19
**ends** 57:14 206:12
256:2
**enforcement**
103:13,15 115:20
**enforcing** 292:7
**engage** 48:25
49:15 51:15,23
74:7 96:18,19
158:4 222:22
254:17 276:8
295:22 297:22
302:19
**engaged** 49:25
84:25 125:2,16
126:11 148:24
158:16 244:5,13
263:11 335:7
**engaging** 50:2
74:5 125:24 206:9
242:25 243:6

277:21
engineered 254:14
entertain 297:24
entire 98:5 104:17
  114:6 147:23
  182:8 183:2,7
  266:9
entirely 131:6
  171:13 179:21
entities 36:6
entitled 73:6 93:11
  102:14 167:11
  202:3,7,24 203:10
  215:22 245:23
  270:10 309:14
entity 8:15 29:3
  282:12 300:14,15
  300:19,21,24
envision 39:4
equal 15:16 63:15
  65:5
equally 202:13,19
equity 11:3 92:2
  104:3
eric 1:10,21 4:15
  101:22 137:17
  336:7,17 337:4
  340:5
errata 340:2
especially 87:6
  148:19 211:13
esq 2:8,9,15,22,23
  2:24
essence 51:11
essentially 17:10
  36:19 48:3 51:11
  56:14 99:10 107:2
  115:16 191:6
  192:4,18 204:9
  225:18 238:25
  254:9

establish 315:7
  316:17
established 74:21
  119:23 284:14
  293:5 329:14
establishes 324:11
establishing 330:4
estimate 30:14
  33:9 57:17
et 4:16,17
etcetera 26:10
  129:17 294:16
evaluate 68:25
  69:20 70:9 166:9
  266:12 329:7
evaluated 183:16
evaluating 69:16
evaluator 202:10
evening 127:23
eventually 154:15
  267:6
everybody 332:5
evidence 42:10,17
  42:19 233:9
  284:15,22 285:16
  285:23 287:4,5,18
  301:9 303:21
  307:8 315:6,20,25
  316:16,17 317:2
  317:10,21 318:14
  318:17,21 321:4
  321:10,23 322:17
evidentiary 285:9
  285:14,25 287:3
  287:22 301:21
  306:21
evolved 17:3
ex 338:9
exact 227:14
  291:21

exactly 44:6 53:16
  94:17 235:12
  243:16 246:7
  247:7 304:25
examination 5:23
  137:8 305:16
  337:3
examine 45:23
  181:13 293:9
  294:4 295:10
examined 5:21
example 27:18
  34:2 41:3,19 53:6
  90:11,25 91:20
  95:7 121:12
  123:19 127:7,19
  128:10 130:2
  141:12,22 149:25
  154:5 163:9
  166:22,23 167:2
  170:4 171:17
  176:12 178:13
  181:18 190:11
  197:14 206:8
  212:3 228:16
  229:23 247:24
  248:2,6 249:2
  251:18 264:21
  272:21 273:4
  277:9 323:25
  330:6 333:14
examples 140:20
  141:5,14 142:18
  143:3 145:16,16
  164:20
exception 17:11
  17:12 20:8 151:3
  152:10 249:13
  270:9 335:5
exceptional 130:4
  282:17

exceptions 262:10
exchange 51:19
  138:15,18
exchanged 26:2
  27:2
exchanges 69:8
exclude 277:13
excluding 29:4
exclusively 126:18
  284:4
excuse 23:12
  53:21
executive 10:19
  13:19 18:15 255:4
  255:7
exempt 121:10
exemption 68:7
  199:14 203:10
  230:22 271:18
  287:5 327:8
exemptions 17:23
  19:7 118:25
  305:24 306:4
exercise 39:8
  173:4
exercising 135:15
exhaustive 240:14
exhibit 137:13
  138:4,8,14 139:16
  183:25,25 184:3
exhibited 245:16
exhibits 338:7
exist 69:5,6 164:17
  233:3
existed 24:5 61:7
  273:23 274:7
  284:10 290:25
existence 77:23
  122:7 211:8 216:8
existing 15:15
  31:18 249:19

255:14
**exists** 34:24 172:3
**expect** 34:8,9,15
66:20
**expectation**
128:13 203:21,22
**expectations**
278:4
**expected** 67:23
128:12,21 149:8
203:14 284:9,11
**expenses** 300:11
**expensive** 299:3
**experience** 17:16
87:3,14,19,21
88:19 97:12
112:16 113:23
114:2 115:7,8
123:15 148:14,16
148:17 149:9
171:15
**experienced** 52:23
84:6 166:18
**experiences**
149:18
**expert** 214:10
**expertise** 86:10
87:4 95:25 98:2
214:24
**expires** 340:25
**explain** 33:18 37:2
54:2 218:11
220:17 238:9
246:23 268:4
286:4 293:15
299:18 318:22
319:8 320:19
321:14 326:20
**explained** 140:15
167:9 170:19
220:16 299:22

303:2,3 317:16
326:8
**explaining** 191:4
258:7 287:25
288:2
**explains** 155:8
212:13 325:3
**explanation** 43:13
121:11 143:13,14
143:16 164:25
166:13 167:23,25
193:9 204:24
236:5 238:25
262:3 265:21,24
268:20 274:9
275:18 280:11
284:12 295:25
296:22 297:4
298:11 299:9,10
302:10 306:15
308:13 313:13
319:7 325:6
333:18
**explanations**
147:18 212:16,22
258:15
**explore** 224:23
**exploring** 160:14
**exposure** 148:16
148:17
**express** 50:18
291:19
**expressed** 165:7
168:2 185:5 186:7
191:23,25 193:19
**expressing** 184:5
**expressly** 246:19
299:24
**extend** 6:25 180:7
**extensive** 87:3
98:2 152:24

**extent** 24:17
111:12 164:16
172:25 182:19
183:20 193:21,25
207:4,19 216:23
218:16 229:6
268:3 275:23
290:6 303:17
322:6 324:18
**extra** 289:15
**eye** 310:13,13
**eyes** 43:8

**f**

**f** 137:2 339:2
**face** 43:6
**facilitate** 35:16
**facilities** 298:23
298:25 300:8,17
300:23
**facility** 292:21
294:12 295:17
296:19 300:7,10
300:13,23 304:5
**fact** 43:20 59:2
73:5,8 82:2 90:20
99:19 101:6 106:8
106:12 119:17
120:16,19 121:2,5
121:6,7,17 131:12
140:21 141:16
142:19,24 143:4
145:16 146:8
147:9 148:21
159:14 167:13,14
167:15 168:5,17
169:13 170:23
171:25 181:9,10
182:12 185:16
194:12 208:13
217:24 218:6
225:11 228:3,6

231:15 233:7,7
234:20 251:5
253:16 255:25
263:19 266:18
278:16 280:24
286:8 287:17
301:10 303:10,17
314:10
**fact's** 177:14
**factor** 175:25
177:20 178:9,17
178:19 180:16
183:11,14 258:21
263:15 265:8
304:3,7 314:3
333:24
**factors** 146:17
147:20 168:3,8
171:10 172:24
177:14,22 178:12
179:20,24 186:14
202:19 207:4
223:3 231:6 234:3
294:15 296:25
299:20,24 301:4
326:10,12
**facts** 41:5 45:4
50:12 101:5 120:5
120:23 122:5,7
124:15 147:13,15
165:20 166:9,12
166:13 167:25
169:2 171:11
173:18 174:10,19
174:21,23 175:15
176:2,17 177:2,13
180:3 182:6,7
183:8,19,20,22
189:21,22,24
190:9 195:13,15
200:8,16 201:20

202:9 212:23
216:17 217:6
221:2,3,8 222:21
222:25,25 223:2
224:17,24 225:15
225:16,19,21,24
227:9 228:9,10,24
229:3,18,21 230:7
230:14,16 231:3,7
231:25 232:11,13
233:4,19 242:21
244:2 252:4
263:17,21 276:5
276:10 278:19
284:13 293:23
295:21 298:13,15
298:16 302:7
303:25 312:4
313:5 325:17
328:6 329:8,12
330:14 331:10
**factual** 87:5
124:14 168:22
172:9 173:15
174:20 176:18,21
189:2,6,25 195:17
198:7 201:16
209:10 224:22
244:8 276:24
277:17,18 278:5
278:16 297:24,25
303:4 317:19,20
327:21,25 328:5
330:19
**factually** 159:22
190:4 193:14,16
197:10 293:2
297:3 330:18
**fail** 264:12
**failed** 121:25
122:5,6

**fails** 177:8
**failure** 158:4
**fair** 122:23 172:17
174:7 302:18
306:18
**fairly** 8:4 81:25
99:11
**faith** 122:10 195:5
**familiar** 14:9
28:11 52:22 64:17
64:18,20 86:20
98:5 112:17
113:23 133:18
173:13 179:6
288:13
**familiarity** 114:3
**familiarize** 98:10
**family** 177:20
**faq** 23:23 24:8
26:7 27:17 62:7
76:5,8,14 98:7
319:18,21
**faqs** 61:7
**far** 100:24 101:23
113:20 128:9
130:23 140:8,14
141:5,17 146:13
161:14 206:14
259:10,24 273:18
305:4
**fault** 123:19
**faulty** 57:22
**favor** 221:9
**fdny** 307:4,20,21
308:3
**fear** 309:4,7
**feature** 154:24,25
155:11
**february** 8:10
82:2

**federal** 19:24 65:5
290:14,18
**feedback** 108:11
240:21
**feel** 92:6 169:17
178:14 235:8
**feeling** 205:11
225:25 226:3,8,17
**feels** 219:22
**felt** 126:12 176:8
203:15 237:3
292:8
**fertilization** 188:2
**fetal** 184:7,21
186:4 187:6,10,15
187:18 188:8,13
188:21 189:13,14
192:3,20 193:3
195:2 204:15
205:24 207:15
208:21 209:11
210:2 213:22
214:2,12,14 215:6
215:9 222:2
**fetus** 188:14
190:15
**field** 80:13,23
**fifth** 81:24
**figure** 55:19
153:16 156:20
**file** 162:9,13,14,20
163:9,17 164:7
236:6,12 237:11
237:19 240:17
244:16,18 245:17
294:6 298:5,21
331:25
**filed** 4:17 27:24
28:20 29:8 48:18
82:3 163:21
268:23

**files** 162:17 239:18
240:2,3 264:5
269:19,20,20
272:13 322:4
**filing** 163:14
244:14
**fill** 261:11
**filled** 261:16
267:19,21
**final** 30:13 39:2
51:21 289:18
**finally** 30:15
183:17
**financial** 300:7,13
**find** 70:4 149:13
155:22 156:13
184:13 223:5
322:14
**finding** 249:3
275:20
**findings** 189:25
201:18 277:17
278:6
**finds** 197:10
212:18
**fine** 52:7 108:21
109:8 328:17
**finish** 180:9
**fire** 238:15,17,18
238:18
**fires** 241:25
**firewall** 89:3 90:3
91:3 92:15 93:16
93:22 94:3,11,20
103:8
**firm** 2:12 75:9
135:19
**firm's** 13:16
**first** 11:9 12:18,19
20:15 32:11 37:5
44:2 56:18 62:21

91:4 96:23 104:6
113:22 150:23
170:21 184:24
185:20 196:11
206:24 208:2
211:10 214:15
219:22 224:3
233:15 239:13
241:22 268:8,21
271:12 276:6
278:15 288:18,24
305:20
**fiscal** 298:25
300:22
**fits** 128:15 259:19
324:15
**five** 81:5 150:19
**flag** 41:18 42:10
80:14 117:8,9
123:6 124:10
**flagged** 80:17
122:15
**flags** 80:24
**fluctuates** 32:25
**focus** 15:14 17:13
31:16 62:14 88:21
123:4 183:6
233:17
**focused** 129:18
205:23 263:8
269:17 273:12,13
331:24
**fogarty** 1:5
**folder** 157:12
**folks** 184:5
**follow** 26:3,6,24
49:21 66:7 68:6
73:18 80:14,20
107:16 110:2
115:21 128:21
131:21 140:10

142:9 146:16
150:9 185:9,21
220:7 239:25
244:18 271:13,14
276:7,9 282:4
283:18 285:6
305:18
**followed** 46:15
285:2
**following** 44:3
63:3 183:13
192:25 216:5
**follows** 5:22
115:15 137:7
300:5
**food** 228:4 325:9
**foods** 217:19
**force** 199:14
**forget** 235:12
**forgive** 254:20
**form** 39:24 59:24
134:18 222:3
243:17 316:7
**formation** 8:25
9:6 12:25 14:23
15:9 19:2 62:3
104:21 113:16,16
117:14
**formed** 14:23
92:16
**former** 118:22
209:7
**forth** 14:12,20
50:16 58:14,17
81:15 236:6
238:20 241:7
245:9 281:11
293:6 302:20
309:15 334:16
339:11

**forward** 37:11,18
37:22 75:19
298:19 335:19
**found** 57:21 190:4
202:11 226:24
311:16 334:15
**foundation** 75:8
164:17
**foundational**
92:25 115:3
**founding** 82:19
**four** 25:7 81:6
**frame** 106:17,18
**framed** 165:22
**framework** 114:7
172:21 290:14
321:15 324:12,15
**francis** 119:9,15
120:12 121:3
**frank** 1:6 3:8
127:15
**frankly** 14:7 19:16
199:20 250:16
**frequency** 180:15
**frequent** 74:3
141:4 324:23,25
**frequently** 80:12
125:16 208:7
211:5
**fresh** 58:19 280:16
**front** 67:25 311:4
**full** 50:23 126:18
141:9
**fully** 29:23
**fulsome** 44:11
**function** 31:13,19
35:8 39:3,4 41:6
42:13,15 51:9
58:12 74:10 82:10
89:20 97:2 118:19
132:17 216:17

252:22 282:20,21
312:24 318:18
322:15
**functionally** 280:7
**functioning** 189:7
**functions** 14:5
300:20 312:17
313:2 333:14
**furnished** 197:3
**further** 57:3 109:6
159:19 224:23
280:3 282:25
284:25 339:15

## g

**g** 336:2
**gain** 250:11
**gallery** 43:11
**gather** 50:22
216:17 218:2
276:5 278:16
318:19
**gathered** 34:7
46:23 49:20
**gathering** 50:12
50:19 125:24
217:6 244:2
**gauge** 50:13
**general** 10:16
11:19 18:13 24:6
37:12 49:12 69:24
78:4,24 87:22
88:3 104:4 141:16
149:18 151:10
164:16 185:15
205:13 219:7
239:7 253:17
266:5
**generalization**
321:14
**generalize** 169:3
188:11,16

**generalizing** 169:4
**generally** 14:17
  22:22 26:20,23
  27:16,16 35:13
  42:12 50:12,20
  51:18 54:18,20
  62:9 66:12,20
  72:22 73:12 75:14
  78:2,23 86:15
  96:2 98:15 112:19
  118:8 123:21
  125:21 129:18,21
  130:4 134:19
  135:7 146:14,19
  150:21 158:17
  169:10 172:7
  180:21 183:18
  209:2 210:14
  219:6 222:19
  225:21 236:3,22
  237:5,18 248:20
  249:13 253:14
  257:23 262:3,9
  266:20 280:10
  282:18 283:19
  320:17
**generate** 35:15
**generated** 157:13
  157:22 285:11
  298:14
**generates** 157:10
**generic** 61:4
**generous** 7:10
**gennaro** 1:4 3:11
**gentlemen** 137:10
  270:22
**geographic** 298:24
  300:21
**georgia** 10:11
  12:22 13:2

**getting** 31:20
  33:20,22 46:6
  59:6 107:10
  138:18 142:4,23
  199:19 254:12
  256:7 276:20
  299:7 320:7
**gibson** 2:12,15
  270:25 304:22
  305:17 306:24
  307:12,19 313:4
  315:3 316:9 317:5
  320:16 333:10,25
  339:7 337:5
**gibsonfirm.law**
  2:16
**gist** 141:16 185:15
**give** 32:16 39:12
  44:13,17 58:19
  61:18 78:18 110:3
  131:9 140:12,17
  141:15 149:25
  152:6 159:19
  219:20 245:11
  248:25 253:4
  254:11 267:8,11
  281:6,7 306:24
  326:11
**given** 6:24 39:10
  41:4 42:14 47:10
  55:23 56:3 59:17
  62:2 106:16
  110:12 115:13
  119:19 128:4
  140:8,23 141:9
  143:4 145:13,15
  145:19 151:6
  163:11 164:24
  169:5 188:24
  200:16 201:13
  230:19 234:19

**251**:9 252:2
  265:16 270:6
  277:7 291:19
  292:4 304:5
  319:14 320:18
  321:3,11 336:12
  339:13
**giving** 24:18 69:22
  125:13 146:15
  252:9 280:15
**go** 4:13 14:2 15:13
  18:3 24:22 35:2
  37:21 39:23 41:24
  54:25 55:3,24
  70:22 72:3 80:8
  80:16,17 105:11
  106:15 109:4,5,6
  111:4,7 115:5
  135:25 140:17
  149:6 150:15,17
  150:21 151:10
  152:19 169:23
  173:19 180:9
  189:4 203:19
  216:8 221:14
  224:25 225:10
  237:21 279:6
  287:9 303:3
  305:10 313:5
  328:7 330:20
**goal** 165:7
**god** 329:18 330:11
  330:13
**goes** 91:8 114:18
  117:4 150:20
**going** 4:2 10:2
  15:12 16:9 17:11
  21:6 22:25 23:4
  24:18 25:21 32:16
  46:11 51:6 52:10
  56:20 60:4 61:3

**62**:17 70:7 85:14
  85:22 92:20 96:11
  98:22 105:6
  106:24 107:2,6,14
  108:13 109:5,11
  112:6 113:8
  114:14 117:11
  120:4 125:4,22
  128:16 129:7
  135:9,21 136:3
  137:20,21 138:17
  140:16 146:11
  149:2,3 159:19
  167:20,22 173:13
  177:16 180:11
  189:22 195:25
  199:10 210:6
  213:15 214:25
  220:17 221:21
  243:24 246:11
  249:24 254:6
  256:12,22 257:2
  257:16 267:13
  270:17,24 271:4,7
  274:20 275:3
  281:21 288:22
  289:3 297:22,23
  299:19 302:25
  304:21 305:11
  307:17,19,23
  315:4,21,22
  320:20 324:22
  325:13 327:11
  331:10 335:6
**good** 5:25 6:2,18
  7:20 87:10 109:16
  137:10,11 138:10
  178:13 316:9
**gotten** 30:19
**governed** 290:4

**government** 65:6
**grant** 34:3,4 40:2
  140:22 142:21,25
  146:5,18 157:4
  167:13 170:17,17
  171:12,20 173:25
  176:6,20 182:3,21
  186:2 202:16
  204:10 245:4
  246:18 247:6
  265:5,9,10 290:25
  296:8 327:23
  332:14 333:9
**granted** 32:18
  33:18 54:3 165:9
  173:19 199:11
  204:9 213:6,11
  217:3 236:8
  242:16,17,17
  243:16 264:9
  271:19 280:24
  293:23 294:25
  301:18 302:6
  310:25 312:7
  314:5 318:9
  331:16 332:23
**granting** 67:3,11
  173:16 178:3
  261:22 271:23
  273:23 291:5
  292:15 312:15,23
  312:25 313:20
  324:13
**grants** 33:6,12
  34:21 141:7 172:3
  252:11 281:2
  332:8
**great** 63:8 250:5
  317:2 330:15
**greater** 66:24
  68:11,17 275:23

**green** 195:10
**ground** 141:19
  199:24 207:22
  262:21
**grounds** 53:21
  117:3 237:3 239:3
  259:7 269:9,12
  318:3,4,5,7 324:21
**group** 11:4 15:23
  18:11 61:19 72:6
  74:9 82:17 129:20
  129:22 134:17
  145:20 149:14
  210:19 319:15
**groups** 78:15
  96:18,19
**guaranteed**
  213:16
**guess** 12:6 124:12
  124:14 137:24
  304:24 305:21
  310:16
**guidance** 24:2
  25:13 26:7,19,20
  61:7,21 63:3,6,10
  63:14,19 66:8,11
  66:17 68:4,6,18
  78:7,8 98:6 100:2
  100:5,7,10,14,23
  101:12 108:7
  112:18 140:2
  146:25 179:7
  182:15,16,20
  183:13 222:15,18
  227:7 239:11
  289:10 292:3,8,9
  293:7 319:14
  320:17,21 322:4
**guidelines** 76:3
  77:6,19,23 115:21
  189:4

**gut** 225:25 226:3,7
  226:17

**h**

**h** 2:22 5:19,19
  88:8 137:6,6
**haider** 2:22 5:10
  5:10 7:18,18
  22:18 45:13 46:3
  50:4 52:5 54:5
  56:9 57:24 58:3
  59:4,23 62:6 63:2
  66:6 67:10,13
  68:13 69:12 70:18
  71:21 76:18 77:25
  78:21 79:25 83:19
  84:13 86:7,14
  89:13 90:10 92:20
  93:19 94:13,23
  96:11 97:21 98:22
  99:7,18 100:9,20
  102:20 103:11
  105:5,19 108:2,19
  108:25 111:11,23
  113:7 114:12,20
  116:8,25 117:6
  118:14,16 119:2
  122:11 123:3
  125:4,19 127:12
  128:24 129:9
  131:5 132:8,12,20
  150:9 158:13
  164:10 165:15
  178:6 192:23
  194:4 195:19
  198:11 200:4
  207:17 209:14
  210:6,11 212:19
  213:23 216:4
  217:17,21 219:4
  220:12,24 227:5
  227:21 228:22

  230:24 231:18
  232:25 233:13
  234:15 239:19
  241:14 242:5
  246:11 249:7
  250:12,25 251:12
  251:22 252:15
  253:24 256:4
  257:7,11 258:17
  259:16,25 270:13
  274:19 275:11
  276:2 277:15
  278:13 282:3
  286:14 287:8,14
  288:20,22 291:9
  291:24 292:23
  293:13 294:14
  297:19 303:16,22
  304:16 307:11
  308:9 314:9
  315:10 316:6,11
  319:10,19 320:12
  321:7 323:4
  325:15 326:4
  327:4,19 329:6,25
  333:10,25 334:4
  335:20
**half** 40:5,5 83:2
  272:14 289:17,18
**hall** 9:25 12:6,19
**hand** 43:12 56:3
  202:11,13 279:3
  339:21
**handle** 16:12,16
  85:22 89:16 96:22
  119:14 129:7
  130:15 201:14
  320:9
**handles** 88:3
  150:13

**handling** 130:20 130:21 158:21
**happen** 20:2 90:18 177:19 190:8,10 234:14 237:15
**happened** 41:20 74:2 107:12 124:11 160:15 266:10
**happening** 130:3 142:7 161:17
**happens** 235:19 281:15
**happy** 24:24 37:4 297:25
**hardship** 64:2 66:16,21 67:8 69:25 235:23,25 236:2,3,4,8,10,17 236:25 237:3,5,24 238:8,14,20 239:3 239:12,15 240:6 240:20 241:2,11 241:19,23 245:25 253:3,7,12,14,18 257:21 258:15 259:5,11 260:7,11 261:6,21 262:13 262:15,22 263:23 263:24 265:23 266:12,17,24 267:11 268:6,19 269:11,12,15,16 275:5 278:9 283:20 284:7,10 284:14,20 287:20 290:24 292:15 293:2,6 295:12 296:11,23 298:5 299:12,22 300:2,4 301:2,7 303:8

304:4,9,12 307:8 307:22 308:5,8,19 309:4,6,19 310:9 311:19 312:7,14 312:20 313:5,9,14 313:17 314:3,24 316:24 317:24 318:5,6,16 321:5 321:12,24 322:5 323:9,17 324:12 324:21 331:15 332:11 333:9,19 333:20,24
**harm** 254:2
**hate** 55:17
**head** 36:20 87:25 210:15 328:13
**headline** 13:17
**heads** 38:5,19
**health** 1:11 9:23 10:3 11:13 15:20 19:20,21 21:17,19 31:7,8,17 56:16 63:5 75:2 81:10 81:19 85:12 91:20 161:19 189:9,10 189:22 190:2 201:18 209:6,16 214:23,24,25 230:5,11 248:15 254:24 255:8,9,11 255:13 256:3,8,15 270:5,7 277:20,22 278:2,6 292:2 317:18 322:11,13 322:18,19,21 323:21,23 324:3 324:10,16,17
**health's** 9:10
**hear** 31:16 48:9 62:10 154:4

223:24 238:12 272:10 332:7
**heard** 4:9 178:25 179:2 185:5 238:10
**hearing** 91:24
**heavily** 126:24
**heightened** 62:22
**held** 146:20 147:3 148:3,9 166:10 167:8 175:23 182:9,19 184:12 184:22 185:17 186:22 192:10 193:6 198:18 199:12,16,25 200:14 205:8 211:8 219:14 221:4 222:4,9 223:12 224:10 228:12 229:5 231:6 258:2 298:8 325:4,7,11,24
**help** 139:21 219:21 231:20 254:17 326:16
**helpful** 142:18 207:19
**hereinbefore** 339:11
**hereunto** 339:21
**hesitant** 186:9
**hesitate** 322:9
**hey** 41:7 73:2
**high** 18:9 20:9 21:4 22:23 24:2
**higher** 34:4,11 43:5 72:15 73:10 316:18 328:8
**highly** 96:21 148:20,21 178:19

181:8 233:6,7 263:17
**hiring** 292:20 294:10 295:16 296:17
**history** 114:24 119:24
**hold** 135:5
**holding** 328:24 329:3,23
**honestly** 156:6
**hope** 335:20
**hopefully** 255:22
**hoping** 152:17
**host** 35:23 122:17 147:19 155:17 168:7,15 242:19 242:20
**houlihan** 12:20
**hour** 83:2,2 135:23
**hours** 127:25 234:24 271:8
**house** 88:5 103:23
**housing** 85:10,12 88:9,12 151:4
**hr** 18:8
**huh** 48:21 74:19 76:11 77:21 134:7 159:11 184:2
**human** 10:18 18:21 58:15,15 62:23 63:8,23 64:8,15,16,19,21 65:3,7,8,18 66:3 81:8 103:12,16 151:19 290:6,8,16 292:6,7 297:9 299:21 302:17,18
**hundred** 31:15 162:2

**hundreds** 51:25 52:3,4
**hygiene** 9:24 11:13 81:10,19 85:13 161:20 214:24
**hypothetical** 133:24 134:5,10 160:4,13,16,24 193:4 201:3 235:20 251:3,5 254:14 307:17
**hypotheticals** 134:13 165:2 227:12 234:17,19 234:24

**i**

**i.d.** 338:8
**ibuprofen** 205:5 207:25 209:9 210:4,20 211:16 212:14
**idea** 150:6 205:23
**ideal** 75:3
**identifiable** 292:17 294:8 295:13 296:15
**identification** 138:5
**identified** 70:21 142:16 293:10
**identify** 65:17 74:13,16
**imagination** 213:18
**imagine** 8:20 54:12
**imbalanced** 202:10
**impact** 300:11 324:13

**impair** 312:24 313:2,21
**implement** 290:7
**implementation** 10:22 18:6 19:4 21:22 24:12 31:9
**implemented** 16:8 20:18 36:18
**implementing** 20:8 290:10 292:11
**implication** 177:11
**implications** 18:14
**imply** 177:16 221:12
**importance** 258:9 261:16 262:4
**important** 6:21 17:11 28:21 31:4 33:20 61:10 72:14 107:9 111:14 115:22 132:18 230:5,9 314:20 323:22 326:6
**importantly** 92:22
**impossible** 90:16
**improper** 229:8
**improve** 95:23
**inability** 258:13 258:20 259:22
**inaccuracy** 198:7
**inaccurate** 225:7
**inaudible** 59:3 73:8 257:25
**incidents** 219:5
**include** 74:12 259:4
**included** 203:24 250:9 290:15 295:12

**includes** 194:2 294:7 317:18
**including** 18:22 24:13 139:25 154:2 188:6 217:15 281:12 292:18 294:9 295:15 296:16 299:11 300:19
**inclusion** 11:3 92:2 104:4
**income** 250:11,23 251:7,20 253:20
**inconsistencies** 147:17,18 148:6 223:3 284:24
**inconsistency** 168:9 179:22
**inconsistent** 42:9 140:7 148:9 192:12 233:20 286:25
**inconsistently** 182:17
**incorrect** 143:11 190:4 297:21
**increases** 181:19
**indefinitely** 253:25
**independent** 53:19 73:7 115:17,18 119:3 135:15 149:19 278:9 332:9,12
**indicate** 244:21 327:11
**indicated** 49:9 76:12 81:17 124:19 130:22 273:19

**indicates** 139:16 232:5
**indifferent** 135:22
**indirectly** 65:11 65:12 208:20,21
**individual** 11:16 23:18 38:2,3 59:15 69:9 70:10 72:21,23 73:20 78:9,10 79:9,21 81:2 86:11 89:21 91:6 92:4 96:9,22 96:23 113:3 124:16 129:13 149:22 150:12 151:20,21 164:19 166:10 173:4 183:16 196:18 197:6 218:23 230:14 236:12,13 236:20 237:25 238:4,11,13 239:6 239:17 240:2,3,4,7 240:21 264:5 266:3,15 267:6 268:6,18 269:19 269:20,22 275:7 275:21 284:6 289:5 291:20 303:19,25 308:6 317:9,14,23 334:24
**individual's** 67:12
**individualized** 101:4 147:22 148:20 263:19 308:5,15 326:15
**individually** 1:6 72:11 92:6 169:14 227:9

**individuals** 9:15
10:20 40:25 45:17
45:19 48:2 61:17
65:17 76:20 86:16
86:17 91:24 139:2
139:5,15,20
148:13 151:23
164:22 173:6
187:13 270:8
298:6 310:3
**inference** 220:10
**inferences** 220:19
221:10
**infirm** 171:4
**influencing** 91:7
**informal** 71:24
**information** 25:19
34:7 35:19,22
44:9,14,17,21,23
45:3,25 47:5,7,10
47:13,24 49:3,7,10
50:19,23 51:4
59:17 69:21 73:14
77:22 79:20
111:14 115:13
116:17 120:21
122:16 125:24
135:4,6 150:8
153:2,10 154:7
156:2 159:19
172:13 176:3
195:3 196:13,15
196:21,25 197:3
203:25 204:2,19
204:22 205:4
213:19 216:9,18
217:14,18 218:3
220:15 236:16
237:17,24 239:14
240:6,11,19
241:12,18 244:23

244:24 257:18
259:21 260:5
261:4,9,19,24
262:6 264:2,6,13
264:19 265:12
266:2,5,25 267:16
267:24 268:9,11
268:22,24 279:6
280:5,12,20,22
281:17,23 283:6
283:10,13,25
285:11 292:17
293:10 294:7,20
294:22 295:7,12
295:24 296:14
298:6,21 301:10
301:11,11 302:8
302:10 303:5
308:14,24 332:20
337:21 338:3
**informed** 282:6
**ingested** 207:16
**ingredients** 194:16
**initial** 29:18 48:18
60:10,22 84:11,14
85:2 331:14
**initially** 154:14
332:5,11
**inject** 190:14
**input** 45:24
235:22
**inquire** 24:23
164:15 269:22
**inquired** 265:20
**inquiries** 46:22
218:3,5 240:5
269:17 278:17
283:16
**inquiring** 93:12
**inquiry** 22:11
45:16,18,21 74:14

126:15 208:16
219:6 222:23
223:6 224:23
239:25 244:18
266:8,21 267:5,7,8
276:8,9 280:8
284:25 291:10
302:13
**ins** 69:13 70:2,13
70:14,24 71:7,11
71:23 72:18
130:17 142:4
149:14 227:14
266:16
**insincere** 183:4
200:18,20,22
223:5 226:16,18
**insofar** 273:15
**instance** 56:18
96:23 104:6
196:11,12 199:23
214:15 219:22
241:22 276:6
278:16
**instances** 284:3
**instant** 46:17
98:19
**institutional**
119:16
**institutionally**
120:17
**instruct** 46:11
60:24 92:21 93:8
96:12 98:23 105:6
111:24 112:6
113:8 117:11
125:5 132:13,21
148:11 165:4
210:7 221:20,23
246:12 256:12
274:20 275:3

286:21 289:3
**instructed** 68:5
107:22 110:9,10
131:9 148:8 149:6
227:18 228:5
230:21 231:3
234:5 256:14
288:8
**instructing** 103:5
115:10 117:2
140:5
**instruction** 61:16
110:13 133:9
142:23 149:9
201:14 231:14
**instructions** 18:10
54:23 61:24
140:13,18 145:12
146:14 188:25
197:8 289:6
291:19
**insufficient** 127:20
157:25
**insurance** 304:15
**intend** 257:12
**intended** 17:18
145:4 235:12
**intent** 235:15
**intention** 145:8
**interacted** 158:19
**interaction** 121:11
282:13,19
**interactive** 160:5
160:6
**interagency** 10:2
12:7
**interest** 102:12
288:11,13,16
**interested** 163:14
249:12 281:17
339:18

interfere 241:6
interim 20:20
intermediate
53:10
internal 16:21
299:16
internet 4:8 77:20
interpretation
45:9 234:7
interruption 26:13
interview 263:19
introduce 4:22 5:7
137:13
invitation 23:13
23:14
invite 82:16,18
involve 94:10
103:13,18,22
215:6 237:5
involved 8:25 9:5
10:7,12,23 11:10
11:12,16,24 12:5
12:13,23 13:7,10
13:18 14:8,22
17:25 18:11,14
20:6,25 21:6
23:17,22 26:3
28:12 31:21 33:8
46:17 76:13,23,24
77:4 81:18,23
84:19 85:3,7
86:19 89:8 90:13
92:8 102:7,15,18
104:9 105:13
117:19 143:25
196:18 207:11
227:19 284:8
298:9 300:8
involvement 11:21
14:6 91:4,5 94:7
102:10 128:5

involving 88:19
327:22
irregularity
123:18
irrelevant 19:17
19:18 314:22
isolated 219:5
264:15
isolation 211:4
230:6
issue 13:6 20:3
30:13 41:18 51:16
66:15 70:8 73:4
73:14 89:2 91:6
92:9 93:7 95:2
104:8 107:8
122:15 123:9,13
124:6 129:24
134:16 144:15
183:10 186:10
215:16 241:2,19
247:21 248:11
250:15 252:16
266:24 273:6,14
273:16 276:25
290:2 304:3
313:25
issued 14:13 19:20
21:19 31:6 101:11
153:19 154:11
155:4 209:8,16
issues 10:2 18:13
18:21 21:18 65:25
69:14 72:16,25
88:4 89:9 90:4
91:23 92:17 93:12
97:5,13 102:12
105:13 112:20
123:7 129:16
149:10,13 180:14
215:2 277:6,9

320:24 335:9
issuing 155:6
189:23
italicization
143:22
italicized 143:15
144:10,14
italicizing 143:17
143:18
italics 142:20
ithaca 2:14

**j**

james 1:6
janine 1:4
jehovah's 119:24
jnelson 2:10
job 41:8 42:17
126:3 148:18
166:2,2 198:23
241:25 249:19
254:7 263:11
285:5 308:16,16
309:23 311:17
313:16
johnson 189:17,17
jonathan 2:8 5:2
judge 8:19 39:6
115:18 164:14
235:6 256:25
257:4
judge's 8:24
judgement 193:22
judges 39:7
judgment 73:7
124:14 135:15
145:2,3 169:11,12
174:18 192:14
193:13,15
judgments 193:19
judicial 108:11

justification 203:7
203:15 230:10
232:21,24 233:3
291:13 292:25
299:18
justifications
171:4 242:20
justified 165:21
202:21 203:7
justify 229:24

**k**

k 25:14 336:2
kane 46:20 48:13
52:20 53:13 55:3
55:6,7,12,25 57:19
98:18,25 99:16
102:10,19 103:2
104:23 105:3,13
106:3,21 107:20
110:14,17
keep 128:16
161:21 211:2
221:15 241:25
314:10
keeps 161:13
kept 112:24
135:12
key 188:15
kind 49:16 52:25
80:15 83:5 89:3
90:2 91:12 92:14
94:7,9,20 140:21
142:19 147:15
149:7 161:14,21
203:13 243:22
245:2 246:18
254:17 276:20
288:11 301:12
302:20 306:11
314:7 328:9,22

**kinds** 12:7 53:7,9
53:10 72:19 89:12
130:25 133:17
142:24 148:6
149:10 230:2
261:4 271:2
**know** 6:16 7:9,10
8:4 9:25 10:19
11:19 13:16 16:12
17:9,19 18:15
21:3 24:3,5 25:3
27:13,20 28:15,17
29:6,8,11,12 30:18
32:2,3,3,20 33:7
33:14 34:14,16
36:12 37:18 38:20
39:3,23 40:14
41:11,20,22 42:15
44:4 45:9 47:18
50:11,15 53:2
56:19 57:14 60:3
61:4 62:2 64:9,22
68:24 69:13,21,22
72:13,13,19,23
73:15,18,24 74:8
74:21,24 75:5,9,11
78:22,24 79:7
80:18 82:14,15
83:9,13 84:2,3
86:3 87:5,23,23
88:4,22,24 89:9
90:4,15,23 91:2,3
92:8 93:11 94:25
97:19 100:25
101:7 102:7,12,13
102:14 104:14
106:14 107:3,7
109:3,4 110:20
112:5 113:3,10,24
113:25 114:12,23
114:24 115:4,6,12

115:12,18,19,23
115:23,25 116:3,4
116:19,24 118:21
119:9 121:2,12
122:3,14 123:5,20
123:21 124:7,7
125:7 126:5,25
127:10 128:17
129:20,23 130:6
130:23,23 131:4
131:11,22 133:23
135:9,10 141:8
142:7,25 143:3
149:16 151:4,6,16
152:22 155:14,19
156:17 157:8,21
158:8,14,15
159:24 160:22
161:18,20,24
162:18 163:2,3,13
163:25 165:12
167:13,21 168:3
168:23 169:11,18
169:18,19,20
170:9,18,19 171:6
171:10,13,25
172:21,23,24
173:23 174:7,12
174:23 176:19
177:6,11,12,16
178:15,16,16
181:2,6 182:23
183:6,19 185:21
185:24 188:16,22
191:23 192:3
194:18,22 195:10
195:11,12 196:21
201:5,19 203:7
205:12 206:8,16
206:24 207:11,16
207:18 208:18,23

208:25 209:2,3,3,3
210:22,25 211:22
211:25 212:5,16
212:21,21 213:10
214:20,21 215:13
215:19 217:5
219:9,17,21 220:3
221:11,14 223:2,4
223:6,13 225:6,17
225:18 227:13
229:25 230:6,6
231:21 234:2,10
234:16,22 235:6
236:24 239:16
241:3 243:4 245:8
245:22,24 247:14
247:16,21 248:16
248:16,18,23
249:20 250:20
251:4 254:12,15
254:16 255:14,21
255:23 258:7,11
258:24 259:10,19
259:24 261:13,13
262:20,25 265:9
265:18 266:16,21
267:7,9 268:12
269:13 270:5
271:5,7 272:25
273:15,19 274:4
274:22 275:14
277:18 279:4
282:17 283:8,8,17
283:21 285:3,8,10
285:11,25 288:24
289:15,22,23,24
293:14,16 299:4
302:20,21 303:23
304:17,24 307:12
307:12,15 308:11
310:2,11 317:7

318:6 319:4,14,16
320:21 322:19
324:11,25 325:5
328:15,18 330:15
330:20 331:7,11
331:24 332:4
333:15,21,23
334:25 335:2
**knowing** 119:4
**knowledge** 8:17
8:22 24:20,23
94:5 95:16,22
98:2 106:5 112:25
117:5,7 130:13
133:8 143:20
145:8 165:13,16
282:24 316:16
321:3,22 332:10
332:13
**knowledgeable**
148:13 169:24
**knows** 237:18
271:13
**kolenovic** 1:5 3:9
**krista** 1:5 3:7
**kristi** 1:21 4:21
339:7,25
**kyle** 46:20 48:13
52:20 53:13 55:3
55:6,7,12,25 57:19
98:18,25 99:17
102:10,19 103:2
104:23 105:3,13
106:3,21 107:21
110:14,17

**l**

**l** 5:19 25:14 137:6
336:2
**labelled** 137:15
**labor** 1:13 8:7
9:22 11:6,8 76:22

79:3 89:19 96:25
320:6
**lack** 180:17
**ladies** 270:23
**landau** 11:18
**language** 295:14
297:7
**large** 16:13 82:2,5
84:4 86:15 324:5
**largely** 326:18
**late** 14:24 154:20
320:7
**laughing** 175:9
**laura** 1:6
**law** 2:12,18 8:7,8
9:19 10:6 12:23
18:16,19 20:3
36:13 37:8 38:17
39:11,15 48:15
58:15,16 63:8,8
64:4,10,12,15,19
64:21,22 65:4,5
79:2 81:5,22
83:24 85:6 86:22
87:6,10,11,17
88:17 89:4,16,19
93:17 94:19,21
96:5,24,25 98:13
101:3,24,25
103:13,15 111:21
128:10 130:14
133:15 137:18,19
138:16 148:23
150:18,19 173:5
184:4 222:15
241:7 245:8
290:14,19 292:8
299:21 302:17,18
302:23,23 309:16
310:13 312:3,20
313:11 314:2

324:19,19
**law.nyc.gov** 2:25
**lawfully** 31:9
322:13
**laws** 19:23 62:24
63:24 84:16 290:6
290:9,11,16
292:11 297:10
**lawsuit** 6:9 13:10
46:17,20 79:22
**lawyer** 52:23
**lawyers** 84:4
**lead** 18:6 21:22
135:7 202:16
234:3
**leader** 119:16
196:19 197:4,9,16
218:14
**leads** 18:8
**learn** 63:17
**leave** 151:7,8
249:3 250:8,10,15
250:17,19,24
251:8,19 253:21
254:9
**leaving** 235:6,7
257:4,7
**left** 169:12 174:3
305:6
**legal** 13:4,5,25
15:14 17:12 18:13
18:17,20 36:14
46:6 68:21 79:3
86:18 87:5,8
90:22 92:16 95:2
98:16 104:17
106:9 108:7,11
112:21,22 118:19
151:7 161:3
172:20 195:17
199:19 278:3,3

288:23 297:23
299:4 302:22
310:12 311:23
312:2 313:10
314:11 324:15
335:8,10 340:3
**legitimate** 235:16
**lengthy** 189:16
**lesser** 68:17
248:13
**letter** 67:24 158:9
158:18 159:18
236:5 238:19
**letters** 157:4,23
158:7 240:24
**level** 17:5,7,14
18:9 19:24 20:9
21:4 22:23 24:2
29:17,18,18,19
39:9 42:12 50:20
54:22 56:20 60:7
60:9,9 63:13 68:9
72:15 73:10 84:25
85:8 91:4 98:16
98:16 114:6
124:22 170:12
196:12 209:24,25
244:15 258:16
284:15 289:14
291:12 299:7
328:8
**levels** 160:19
166:14 328:9
**liberty** 1:3 4:16
**life** 118:4 166:25
187:25 188:2
**lifetime** 317:11
**limit** 96:12 165:9
210:7
**limitation** 19:5,7

**limited** 31:12,19
38:16 102:21
222:23 224:22
255:3 299:12
**line** 174:15 185:15
234:24 271:14
334:2 340:6
**lines** 188:8,8
210:24 211:18
214:12,14 215:7,9
222:2 271:3
**links** 26:7
**lisa** 11:18,20
**list** 145:15 147:20
154:12 211:25
299:23 300:5
**listed** 13:15 140:3
154:15,17 299:20
**listen** 225:5
**listing** 80:3
**listings** 158:9
**lists** 23:12 240:14
**literally** 32:12
153:12
**litigated** 90:4,21
**litigating** 89:8
**litigation** 7:24
25:9 47:17,18
48:24 74:15 87:14
87:19,21 88:5
89:22 90:14 91:5
92:11 95:18 96:2
97:5 98:25 99:4,6
99:8,9,14 102:10
102:16,25 103:2
104:17 108:10
117:16 153:22
154:9,10 215:21
243:4
**litigation's** 164:23

**little** 31:20 61:3
93:23 108:25
109:6 116:5
139:22 203:2
272:11 328:7
**living** 61:13
**liz** 1:4 3:10
**llp** 2:4 5:3,5
**local** 19:24
**location** 300:17
308:16
**lodged** 28:15
**logged** 79:16
**long** 7:13,25 8:9
40:20 82:24
165:25 271:4
328:18
**longer** 13:14 126:8
166:20
**look** 58:13,19
121:20 122:4
126:9 135:10
147:23,23,24
156:13 175:15
176:2 177:13
183:19 187:20
190:9 222:25
224:14 229:2
230:13,15 231:2,3
231:6,7 284:12
298:13 332:3
335:19
**looked** 175:25
317:13 318:7
**looking** 43:6,8,9
121:19 123:24
131:13 146:24
174:9 175:14
183:2 193:16
209:4 222:6
225:23 301:5

303:3 307:3
313:25 329:11
**looks** 42:22 184:18
303:2
**lora** 2:23 5:13
**lose** 216:15 241:24
**loses** 171:20
198:23
**loss** 292:19 294:9
295:15 296:17
**lost** 26:14 55:19
254:19 320:16
**lot** 37:10 46:21
72:6 92:24 123:5
188:10 215:14
246:22 330:19
**lower** 331:7,8
**lowest** 150:22,23
**lunch** 7:12,15
108:23 135:20,22
136:5

**m**

**m** 2:24 336:2
**madden** 2:4 5:2,5
**magistrate** 8:19
256:25 257:4
**maintain** 23:12
**maintaining**
149:19 261:17
**major** 105:13
**majority** 33:2
34:17 245:19
253:6
**maker** 39:2
115:17 169:8
**makers** 104:5
111:20
**making** 14:20
17:13 40:16 51:23
59:7,10 60:21
69:17,19 84:15

89:10,11 92:17
107:24 108:5
111:17 114:3
116:7 144:19
188:5 191:13,19
191:22 193:22
197:7 200:6
201:24 202:22
203:13 225:22
228:3 241:20
243:6 258:6,7
260:23 278:20,24
296:24 297:6
299:25 301:5
313:10 322:18
329:13
**management**
129:17
**manager** 79:7
**managers** 78:5
127:16,17
**mandate** 9:4 14:25
15:3,3 16:7 17:12
17:24 18:7 20:5
21:20 24:12 31:17
38:6 39:10 66:9
76:6,10 89:21
97:3 118:8 193:16
193:17 194:20
195:14,16 198:25
199:4 206:15
216:22 232:16
248:24 252:5
254:6 276:24
277:19 305:21
309:23 311:7
329:16 330:5
**mandated** 19:23
**mandates** 18:21
19:4 254:21
305:22 309:11

310:18,19,20
**manner** 16:9 67:2
70:15 105:22
149:5 174:22
191:3 193:7
212:12 234:25
235:10
**manuals** 75:5
**manufacturing**
189:18 214:17
**march** 71:5
**mark** 138:2
246:25 247:3
**marked** 138:5,7
**markets** 215:8
**marriage** 339:17
**match** 41:21 285:4
**material** 44:14
45:10 80:6,19
171:23 237:10,19
293:19
**materials** 27:4
45:19 97:14
126:10 215:23
236:10 279:15,16
294:4 307:4,13
337:17
**matter** 4:15 7:8
31:10 51:24 57:19
86:10 92:9,10,15
94:6,7,10 107:12
116:15 148:15
159:6 187:12
196:17 200:16
202:20 282:24
339:19
**matters** 8:17
12:14 34:23 36:11
85:11 88:19,24
94:8 95:20 102:13
103:24 126:19,23

127:10 135:7
282:22
**matthew** 1:5
**mayor** 1:10 12:20
19:3,14,16,21
118:5,8,20,22,24
256:8
**mayor's** 9:22 11:5
12:19 19:25
**mayoral** 28:25
**mcdonald's**
251:10
**mean** 24:4 30:2
53:25 64:10,23
80:5,7 82:5 83:14
84:7 90:9 91:3,9
93:22 123:5
140:25 152:4
156:24 157:8
162:10 174:6
177:10 187:5
200:25 208:2
213:9 215:10
225:5 237:16
240:24 242:22
244:16 245:18
248:6 249:8
250:13 251:2
255:19,20 259:3
260:9 276:17
285:18,24 309:24
310:10 313:8
319:13 320:5
325:23 326:7
333:2
**meaning** 144:24
226:5
**means** 51:13 78:12
80:9 144:20 246:8
251:16 325:21
327:2

**meant** 42:3,4
71:23 326:24
**measure** 323:22
**mechanically**
62:17
**medical** 11:20
14:11 31:25 32:5
32:24 33:7 34:22
86:12 89:7,11
98:14 123:19
158:2 189:5,11
214:22 215:2
247:22 259:13
274:24 301:20
305:23 306:4
310:21
**medication** 325:9
**medications**
204:20 205:2,6
217:19
**medium** 22:2
155:19
**meet** 157:24 158:7
159:17 284:17
**meeting** 20:11
26:19 82:16,18,19
82:20 83:7 116:11
128:18 129:5
261:24
**meetings** 18:5,12
18:15 19:15 20:9
21:14 22:5,21,22
23:8 25:22,24,25
26:4,22 37:10
61:24 129:2,3
130:7,25
**meets** 158:3
**member** 41:19,24
51:13 72:8 91:7
91:18,21 98:11
122:20 127:7,8,16

127:19 130:10
131:18,20 133:9
143:18,24,24
151:2,9 168:4
182:21 185:9
195:14 202:11
207:21 234:9
236:25 237:13
273:13 329:9
**member's** 73:20
231:2
**members** 37:17
38:17 39:14 49:15
58:25 59:15 69:9
70:19 71:8,24
81:2 82:8 84:16
84:19 85:9,24
86:11,23 87:13,17
87:21 91:19,25
94:22 96:5 97:7
97:10,15 104:3,5
106:4 107:22
111:16 112:9,13
112:23,23 113:4
113:21 114:9,13
114:24 115:7
116:6,19 117:13
119:21 125:13
126:17,22,25
128:6,15 129:6,13
129:15,23 130:16
131:9 132:2 135:9
138:17 148:7
153:4 161:15
170:5 171:18,23
173:4 174:9
176:25 179:5,14
182:6 183:22
185:6 188:24
201:13 203:14
215:24 216:10

221:23 226:21
227:3,15 230:20
231:14 259:2
265:25 266:6
291:20 293:4
320:23 322:6
326:23 334:19
337:19
**membership**
70:11
**memo** 155:25
**mental** 9:24 11:13
81:10,19 85:13
161:20 214:24
**mention** 28:21
158:2 177:8 186:4
**mentioned** 8:23
12:4,22 15:10
27:9 28:22,23
43:15 71:22 151:3
258:12 333:17
**mentioning** 209:9
**mercurio** 3:13
4:20
**merits** 73:21 90:25
**message** 74:9
116:12
**met** 129:6 297:16
**method** 23:9
**methods** 107:23
108:4
**metrics** 72:4
**mic** 270:25
**microsoft** 71:15
74:8
**mid** 71:5 141:8
**mill** 101:8
**millions** 206:2
**mimic** 44:6
**mind** 245:3,7
327:16

minded 53:19

mindful 53:20
94:24

minds 79:10
158:12

mine 102:2

minicucci 2:23
5:13,13

minimus 66:25
68:11 291:3

ministerial 41:14

minute 40:15 52:6
108:20 135:24
195:20 270:14

minutes 7:16 52:9
108:23 109:9
122:25 195:22,23
234:17 270:16
305:6,9

missing 73:17
219:23

mission 16:24
258:10

missions 149:21

misstate 311:3

mistaken 194:13

misunderstanding
194:14

mitigate 167:16
179:25

mixed 276:20,20

model 150:5
337:16

moderna 189:13
189:20

modified 63:24

modify 304:12

molly 12:10

moment 24:21
70:3 71:14 141:6
166:23 169:4

180:23 288:6
327:12

moments 71:22
167:20 233:17
269:6

money 260:22

montalban 11:2

months 25:9 75:3

morning 5:25 6:2
141:3

mouth 61:5,5

move 37:17,21
152:17 315:4

moving 37:11
75:19

muddy 107:8

multiple 78:14
95:16 131:17
158:22 241:21
298:23 312:7

multitude 318:10

muslim 124:9

**n**

n 2:2 3:2 5:19 88:8
137:2,2,2,6 336:2
336:2 337:2

name 4:19 11:15
82:14 162:24
340:4,5

named 17:17 44:2
48:24 52:20 57:18

native's 76:21

nature 27:3,14
44:9 90:6 92:12
97:17 99:15
106:20 117:24
120:22 121:20
193:3 196:9,10
207:9 220:2 221:5
228:25 248:12
252:2,3,5 258:10

261:10 262:17
263:8 270:7
283:22 285:4
292:5,5 300:5
309:22,23 327:18
328:3,4

necessarily 35:14
80:11,21 155:3
175:5 180:12,13
296:25 304:6
326:25 330:4

necessary 7:14
15:24 51:10 61:17
126:15 176:6
223:7,8 255:24
277:20 290:12
302:3 322:20

necessity 258:8

need 21:9 22:8,9
38:25 70:21 75:19
98:3 110:7 122:17
128:6 135:19
146:19 149:15
155:15 174:13,15
179:7 181:4
212:25 220:3
223:24 225:20
235:4,8 255:24
260:22 271:10
278:19 283:8,21
296:21,25 298:7
299:17 302:8,10
302:12,21 304:22
321:19 323:25
330:14

needed 11:21
22:25 25:19 36:2
68:10,23,23 75:16
107:11 127:18
131:15 146:17
176:8 185:12

261:16 263:12
283:10 297:5
331:25

needing 46:25

needs 7:7,11 13:25
15:25 50:13
128:16 152:9,15
153:6 172:13
241:4,6 262:4
276:10 284:19
287:25 288:3
310:11

negative 104:19
110:7,12

negotiate 7:14

neither 189:19
256:7 321:2

nelson 2:4,8 4:25
5:2,2,5,6,24 7:20
22:16 23:3 43:9
52:5,7,15 53:16
55:18 58:2 60:3,6
93:10 94:3,16,18
99:5,6,15,24
104:10 105:11
108:19,21 109:8
109:16,17,20,22
113:19 114:18
115:12 116:22
117:4,17 129:4
132:15 135:17
137:9 150:4
168:24 195:19,21
196:6 211:11
215:19 223:22,25
224:6 234:15
235:11,21 246:21
254:17 256:22
257:10,15,17
267:13 270:13,15
270:22 271:11

281:21 282:5
286:23 287:16
304:20 305:7
335:15,21 337:4
**nelsonmaddenbl...**
2:10
**neutral** 95:4
**never** 6:14 15:10
26:11 38:25
107:22 108:3
114:10 118:3
119:5 123:9
124:11 147:9
163:10 181:2
184:8 188:5
190:14 211:23
234:14 251:25
254:5 256:16
258:12,21 260:2
283:12 316:22
323:5
**nevertheless**
182:18
**new** 1:2,3,10,11,12
1:12,23 2:7,7,14
2:18,21,21 4:15,17
4:18 8:8,15 9:3,19
9:20,21,23 10:6
13:3 19:22 27:10
38:11 54:13 62:23
62:23 63:23,23
64:14,16,18,20
65:3 76:5 82:4
85:9,11 88:9,11
137:19 151:4
183:3 226:24
290:5,5,8,8,15
297:9,9 299:20
302:17,17 336:3
336:22 339:3,8
340:4

**newly** 182:17
**nodding** 328:13
**non** 56:11 333:14
**noncovid** 100:6,25
**nonemergent**
101:8
**nonlawyer** 84:5
**nonlegal** 86:18
**noon** 108:22
**normally** 286:8
**north** 2:13
**notary** 1:22 5:21
336:22 339:7
340:25
**notation** 327:15
328:23
**notations** 325:2,20
326:18
**note** 4:5 59:24
63:8 67:14 234:16
235:3 237:4 257:3
327:11
**noted** 137:3 331:3
335:25
**notes** 7:4 28:5
41:21,23 43:3
71:18 83:6,10
130:24 273:14
326:23 327:7
**notice** 282:8
**noticed** 327:12
**notification**
158:18
**notified** 283:9
**notwithstanding**
167:14 168:16,17
**november** 82:23
137:17 138:5
139:11 142:15
144:6 149:23
154:20 338:9

**novo** 53:8,18 54:2
131:24 203:9
252:9,12
**number** 4:19
16:13 19:5 27:19
27:20,23,24 28:17
28:18 32:16 33:12
34:9,21 57:17
67:25 74:13 82:2
101:23 133:5
137:15 150:2,23
151:14,18 152:15
153:5,15 163:7
165:8,9 178:3
253:4 257:19
261:9 281:6,8
298:6 300:9,16,17
332:17,18
**numbers** 28:12
29:9,14 32:2,12
33:7 34:10,12
54:7 70:10 82:5
101:16,20,21
128:8 153:13
**numerous** 114:23
233:15
**nuts** 20:16 23:25
**nutshell** 67:4
**nycha** 85:23 87:22
88:7 91:20
**nycha's** 87:25
**nyfrl** 98:19 102:7
340:4
**nypd** 238:8,13

**o**

**o** 5:19 137:2,2,2,6
336:2
**o'connor** 2:24
5:15,15
**o'dea** 1:5 3:7

**oath** 336:9
**object** 173:12
**objected** 173:10
**objecting** 173:21
176:14
**objection** 45:13
46:3,3 50:4 54:5
56:9 57:24 58:4
59:4,23 62:6 63:2
66:6 67:10,13
68:13 69:12 70:18
71:21 76:18 77:25
78:21 79:25 83:19
84:13 86:7,14
89:13 90:10 92:20
93:19 94:23 96:11
97:21 98:22 99:16
100:9,20 102:20
103:11 105:5,17
108:2 111:11,23
113:7 116:25
118:14 119:2
122:8,11 123:3
125:4,19 127:12
128:24 129:9
131:5 132:8,12,20
158:13 164:10
165:15 175:21
178:6 180:18
184:20 186:4
192:23 193:2
194:4 198:11
200:4 207:17
209:14 210:6
212:14,19 213:23
214:6 216:4
217:17,21 219:4
220:12,24 222:4
227:5,21 228:22
230:24 231:12,18
232:25 233:13

239:19 241:14
242:5 246:11
249:7 250:12,25
251:12,22 252:15
253:24 256:4,24
258:17 259:16,25
274:19 275:11
276:2 277:15
278:13 285:18
286:14 288:20
291:9,24 292:23
293:13 294:14
297:19 303:16,22
304:16 307:11
308:9 314:9
315:10 316:6
319:10,19 320:12
321:7 323:4
325:15 326:4
327:4,13,19 329:6
329:25
**objections** 173:11
179:17 201:15
204:14 311:9,16
316:12
**objective** 147:12
147:15 166:9
173:2 174:10
183:15 222:25
224:17 225:11,15
225:16,19,20,24
228:9 231:7
271:17 274:4
329:8
**objectively** 132:17
**objects** 122:24
**obligation** 127:17
161:4
**obligations** 128:5
**observance** 177:24
179:8,16 180:18

298:8
**observant** 197:21
**observation**
179:11 181:19
245:14
**observe** 124:25
**observed** 182:18
**obtain** 25:19 51:4
268:21 332:20
**obtained** 220:20
280:22 301:10
**obtaining** 45:2
196:25 220:15
**obviously** 12:17
13:5,15 17:13
21:18 24:14,22
28:7 32:13 36:14
37:8 38:4,6 54:19
63:7 68:19 72:7
84:6 89:17 91:25
96:20 102:7
112:20 124:10
128:7 129:11
153:4,21 156:17
167:21 169:20
176:23 178:13
187:22 196:11
204:23 214:21
234:18 250:2
255:22 275:14
301:20 306:7
310:7 314:19
333:11
**occasion** 41:20
74:7 90:19 160:20
276:11 280:9
**occasions** 123:12
158:22 170:6
185:25 280:20
**occur** 6:23 124:21
124:21 172:7

**occurred** 124:22
**occurrence** 141:5
**ocean** 303:14
**october** 8:3 9:11
9:11 14:24 15:2
31:18 56:16
334:21
**offend** 193:10
**offending** 190:22
**offer** 219:19 246:6
**offers** 176:24
246:8
**offhand** 28:17
213:9 264:11
273:25 274:2
284:5 332:17
**office** 6:5 9:22
11:5 76:22 79:3
87:23 88:3 104:4
104:5 249:24
282:21 320:6
**officer** 13:5 21:13
21:14 23:11,11
33:25 89:15 96:20
103:23 135:3
158:19 169:25
283:4 337:14,14
**officer's** 16:14
**officers** 18:8,9
23:15 26:9,10
34:13 54:14 61:6
62:14 78:4,4
225:22
**official** 1:10,11
**officials** 65:8
**offline** 266:19
309:24
**offsite** 278:11
**oh** 26:12 39:16
42:8 80:21 103:21
109:21 110:5

138:12 139:12
155:15 165:22
167:18 173:23
177:15 180:13
224:14 226:2
233:2 236:17
237:15 257:11
272:8 294:2 318:4
325:5
**okay** 5:17 6:16
7:25 8:21 12:4
23:3 37:2 39:16
48:9 50:6,25 52:4
60:5 67:21 74:5
77:6 81:14 84:14
92:5 109:10,21
110:2 117:6
127:13 131:7
133:21 138:10,13
139:13 150:18
152:6 153:7,10
159:13 162:5
178:8 179:11
184:18 198:15
199:3,11 202:9
208:13 211:6
216:3 220:6 226:2
227:6 230:25
238:15 239:9
240:10 247:5
253:14 256:22
261:8 270:15
271:21 274:3,10
277:8 280:5 282:5
285:22 287:13
290:20 297:14
307:3 309:17
311:6,12 314:19
315:4,24 317:8
319:18 321:10
327:10 330:24

331:8 332:4,14
334:6
**old** 79:22
**olr** 76:21
**omitting** 68:19
**onboarding**
143:25 146:3
**once** 314:12
**one's** 165:22
181:19
**ones** 121:3 140:13
201:10 272:16
283:15 327:24
332:6 333:23
335:3
**ongoing** 21:18
**open** 53:19 105:21
218:8,20
**operated** 78:10
**operating** 292:22
294:13 295:18
296:20
**operation** 300:13
300:18
**operations** 66:25
237:17 284:19
291:4,13 297:2
300:18 312:18
313:22 314:5
318:8 324:14
**opinion** 73:7 122:9
335:8,10
**opinions** 19:25
92:16
**opportunities**
71:24 72:12
**opportunity** 15:16
17:15 47:11 49:13
63:15 65:5 72:15
163:11

**oppose** 187:10
**opposed** 33:16
125:17 169:9
188:12,22 228:4
230:3
**opposition** 119:25
187:14 191:24
205:10,24 206:3
**opted** 163:17
**option** 54:25 55:3
55:24 56:3,14
251:10
**options** 54:23
164:6
**oral** 49:16 94:20
155:24
**orally** 47:22
186:24 216:12
**order** 8:18,24 9:11
11:17,22 15:24
19:20 25:4,17
31:6 39:24 40:17
46:5 48:13 56:16
66:19 92:23
102:21 106:15
132:14 145:22
146:18 152:19
164:13,24 169:22
189:9,23 197:20
235:18 248:15
254:23 255:2,5,8,8
255:13,23 256:3
270:6 277:22
278:2,4 311:4
317:18 322:11,20
322:23 323:11,16
323:18 324:10,16
324:17
**ordered** 48:5
106:13

**orders** 254:21
255:11,11 256:9
322:21
**ordinance** 30:24
**ordinarily** 36:21
50:9
**organization** 35:6
**organizational**
36:4
**organized** 21:13
36:5 85:21
**organizing** 17:22
37:10
**orientation** 82:20
82:22 142:3
**oriented** 43:5
**original** 18:3
315:23
**ought** 65:4,24
124:20 204:8
271:19
**outcome** 252:25
339:18
**outcomes** 242:10
242:12,13
**outline** 70:4 201:9
**outlook** 23:13
157:12
**outside** 13:19 46:4
55:6,16 56:5
67:17 75:16 77:17
90:16 91:19 92:22
97:22 99:18
111:25 116:15
125:6 132:14,22
163:24 164:10
165:3 185:18
219:9,10 236:19
238:10,13 239:10
249:5 250:11,23
251:20 253:21

269:19 283:19
286:15 301:19
**overall** 35:11
62:16,16 78:25
183:9 300:6,13,14
**overly** 148:24
152:24
**oversee** 36:12
39:12
**overseeing** 18:16
18:17 99:13
**oversight** 36:14,16
37:14 39:19 40:4
40:10,12,13,16
41:6 78:19,24
**owing** 96:2

**p**

**p** 2:2,2 3:2,2
**p.m.** 136:5 137:3
142:16 257:4,5,8
335:25
**page** 328:14 337:3
337:13 338:3
340:6
**painkillers** 228:16
**pandemic** 21:16
21:17 251:21
256:2 292:5
**panel** 9:2,6,8,14
10:8 11:5,25
12:14,25 13:22
14:23 15:5,9,13,22
17:3,6,22,24 19:2
20:7,13 24:9,10,15
25:10 27:25 28:5
28:20 29:21 30:4
30:23 32:10 36:3
36:18 37:6,11,17
37:25 38:4,10
41:19,24 43:15,21
45:3,6 46:15,19,24

46:25 48:5,14,16
48:25 49:3,5,15,23
49:25 51:3,7,8,13
51:18,22 53:12
54:9 55:4,4,11
56:4,6,25 57:4,9
57:13 58:6,24
59:16 62:11,12,15
65:24 67:23 69:9
70:10,11,19 71:3,9
71:24 72:8 73:20
74:22 75:11 77:8
77:10 78:20 79:6
79:7,7,81:3 82:3,8
82:10,17,19 83:16
84:9,16,19,24 85:5
85:8,23 86:11,11
86:22,23 87:7,10
87:12,13,18 89:4
89:15,20,25 90:2
91:7,15,18,19,21
92:2 93:4,6,18
94:22 95:10 96:3
96:8,9 97:8,10,16
98:5,12,12 99:23
100:6,15,24
101:15 103:3,10
103:14 104:2,22
105:2,10,12 106:4
106:13,19 107:11
107:18,22,25
111:15,19 112:8
112:14,23,23
113:4,14,17,22
114:4,10,11,13,17
114:22,24,25
115:7,14,15 116:2
116:5,10,18,20
117:13,15,19,21
119:9,22 120:11
122:17,19 125:10

125:13 126:18,19
126:22,23,25
127:7,8,10,16,19
127:22 128:6,14
128:23 129:2,5,8
129:13,15,23
130:10,16 131:9
131:18,20,25
132:5,11,24,25
133:8,25 135:8,8
137:20 138:16,25
139:3,5,22 140:21
141:18,25 142:6
143:18,23,24
148:7,12 149:6
150:2,25 151:9
152:13 153:2,4,20
153:25 156:23
157:5 158:12
161:3,10,11,15
162:7 163:15,18
163:19,22 164:4,7
165:7,25 166:2,4
166:17 168:4
170:5,12,21
171:18,22,24
173:4,9 174:9
175:19,24 176:9
176:16,25 178:3
178:10 179:6,15
181:25 182:6,20
183:5,5,12,21
184:19,23 185:6,9
188:24 190:5
197:10,22 198:2,6
198:15,16 199:21
199:22 200:9,15
201:13 202:10,15
203:6,14,22
204:12 206:21
207:21 208:9

209:25 210:9,13
212:18 213:6
214:3,9 215:4,24
216:10,15 217:13
218:22 219:22,24
220:19,25 221:11
221:17,19,21,24
224:21 227:3,15
227:18 228:2,5,20
228:23 229:9
230:20 231:2,15
232:8,17,22 233:6
233:21 234:9
235:23 236:9,21
236:24,25 237:13
237:18,23 238:17
239:5,14 240:5
243:22,25 246:17
247:6 248:25
251:16 256:11,14
257:19 258:23
259:2 261:9
262:16,24 264:3,6
265:7,20,24 266:4
266:6,9,14 268:5
269:2,4 272:22
273:13 275:3,6,21
276:4,15 278:8,14
280:21 281:16,19
282:10,14 283:7
284:17 286:18
287:2 289:14,24
290:4,7 292:2,10
292:13 293:4,8
294:3,19 295:9
296:3,3,12 297:15
298:2,17 299:25
301:8,13,14 302:7
302:14 303:2,10
303:20 304:10
308:12,18 312:5,6

316:8,16 317:12
317:13 318:18
319:2,5,9,12,13,17
320:19,23,24
321:3,21 322:6,16
326:23 329:9
331:4,18,22 332:2
332:2,15 337:19
**panel's** 28:4 31:21
46:9 67:16 93:3
99:21 105:9 112:3
113:12 125:9
132:23 164:16
191:13 212:8
215:17 229:15
256:10 274:25
327:16
**panelist** 124:17
128:12 133:22
134:4 142:12,17
143:4 145:15
149:8 161:9 191:7
**panelist's** 149:9
**panelists** 79:9
85:25 118:22
124:17 132:4,16
134:22 139:18
140:19 142:10
146:15,16 150:12
184:4 186:6
213:20 234:5
266:15 271:16
288:8 289:5
**panels** 79:10
218:23 240:4
275:7,21 284:6,9
291:20 324:25
**panoply** 200:9
**paolillo** 1:5 3:5
**paper** 209:8,15

paragraph  141:16
  141:20
paralegal  3:12
  137:23
parameters
  309:15
parenthetically
  158:2
park  2:6
part  6:12,15 9:7
  13:23 17:4 36:6
  46:22 49:11 50:10
  97:12 99:2 134:14
  137:14,23 185:8
  194:9 226:10
  245:10 275:20
  279:19,22 285:11
  314:8,15,20 315:2
  333:21
partial  30:10
partially  29:24
  30:3 273:9
participants  4:9
  287:22
participate  92:7
  96:7 128:19
  334:22
participated  71:6
  76:16 84:10 98:18
  99:10 102:18
  319:21
participating
  70:20 92:17 94:8
  335:18
participation
  93:18 94:21 103:9
particular  35:5
  73:24 91:5 120:19
  121:5 129:6
  142:11 149:12
  175:4 180:6

185:10 186:9,11
198:13 205:21
212:20 214:4,8
233:4 244:5
263:21 264:21
273:20 275:14
276:8 281:18
291:15 298:7
301:6 302:9,11
307:13 308:15
312:25 313:2
322:18 324:24
326:8,12,13
329:12 333:15
particularly  37:17
  98:3 141:4 189:20
particulars  98:11
parties  4:13 45:22
  301:15,15 339:16
pass  153:24
passing  7:4
pastor  196:18
path  57:7,14
pattern  90:20
  121:7,7 134:15
  140:21 141:17
  142:19 146:8
  181:9,11 182:2
  185:16
patterns  120:19
  121:2,5 142:24
  143:4 145:17
pause  257:14
pausing  180:22
pay  249:4 250:8
  250:10,19,24
  251:8,11,19
  253:22 254:9
  258:13,20 259:8
paying  18:19

payroll  259:22
pending  208:3
people  9:18 11:20
  12:5 18:18 19:5
  20:7 26:20 33:23
  40:24 52:19,21
  56:5 57:5,16,18
  61:12 65:7 71:9
  72:25 76:13 81:5
  81:6,7,21 83:10
  84:9,25 85:7 89:6
  89:24,25 92:15
  94:5 95:17 96:19
  96:20 97:25 98:4
  114:2,9 119:11
  127:5 132:4
  135:19 141:22
  148:11 149:13
  151:5 158:6
  162:12,14 163:16
  169:24 174:23
  187:10 206:2,16
  206:17 220:11
  250:19,21 251:6
  263:14 266:18
  268:12 274:14,18
  275:22,24 277:14
  310:5 319:24
  320:2,8 327:2
  335:7
people's  334:25
pepto  204:17
  205:5,17 206:22
  206:25 207:10,13
  207:23 208:10,14
  208:15,19,24
  209:9 210:4,16,18
  210:25 211:4
  213:22,25 214:5
  214:11 215:6
  216:11 217:7

220:23
percent  33:3,13,22
  34:6 54:9 83:13
  127:8,9 162:3
  165:19 272:3
percentage  32:21
  32:23 33:17 84:10
  101:13 126:21,25
  127:6 165:8
  244:12 245:15,15
  245:18 253:5
percentages  34:22
perfectly  226:14
perform  14:5
  42:15 123:2
performed  38:16
  133:2 139:10
  215:8
performing  35:7
  51:8 128:22
period  152:24
  181:6 189:16
permanently
  242:17
permissible
  248:14 262:12,19
  329:4
permit  105:17
  187:17 249:4
  253:20
permitted  162:12
  162:14,20 163:25
  173:7 250:23
  307:15 324:19
permitting  120:17
permutation
  172:2
permutations
  169:2,6
person  13:8 35:7
  35:15 50:12 53:4

65:22,22 81:9,24
92:10 104:15
144:13 148:25
162:16 163:7,21
168:5 170:13
172:19 174:25
175:2 177:23
186:23 190:3,7
193:4 195:5 198:8
198:22,23,24
199:4,15 202:3,6
226:5,13,14
232:19 249:5
308:6 328:10
**person's** 175:21
177:20 186:20
192:19 193:2
205:17 223:10
226:17 230:12
**personal** 8:16,22
24:19 38:15 91:12
143:20 145:8
150:7 165:12,16
184:7 187:16
206:11 219:14
227:19 228:20
229:11,16 230:2
278:5 324:22
327:7,11,14,14,23
**personally** 13:18
17:25 23:17 39:25
41:4 91:17 92:8
98:17 102:2 109:7
315:17 319:2
**personnel** 18:7
21:13 23:11 26:9
36:10,16 54:16
62:2,20 78:3
81:16,18 82:12
89:18 158:21
170:2 258:8

313:23 337:13
**persons** 10:5
14:22 38:18 40:22
47:5,8,9 48:17,23
48:23 66:2 73:23
85:19 87:16 89:9
113:21 115:16,23
132:10 164:6
259:23 300:10
**perspective** 16:6
16:23 17:16 72:9
87:8,8,9 95:16
250:3,6
**perspectives** 95:13
95:15 135:14
149:20
**persuasive** 307:7
**pertinent** 294:16
**pestana** 10:11
12:23 13:2,18
20:14
**pfizer** 189:12,20
**phase** 24:15 65:14
289:18,20 299:5
**phases** 289:22
**phrase** 110:8
287:14
**phrased** 105:24
287:9,10
**physical** 25:3
310:3
**physically** 310:22
311:2 313:16
**pick** 151:2 152:9
**picked** 152:5
**picture** 112:20
134:14 142:3
**piece** 31:12
**pieces** 188:10
**pillet** 1:5

**place** 4:12 71:11
82:24 84:21 89:5
92:15 113:22
184:23 222:19
224:15 244:22
**placed** 234:9
**plaintiff** 164:15
**plaintiffs** 1:8 2:5
4:25 5:4 44:2 45:7
45:25 48:14,23,24
52:20 55:10 57:18
106:11 164:19
269:21,22 307:14
310:19
**plans** 257:14
**plant** 227:24
**play** 182:11,12
275:17 277:6
326:13 330:20
**played** 275:18
**please** 4:4,22 5:6
5:18 7:5,8 22:12
27:13 41:24 47:2
109:24 118:11
138:14 180:9
181:6 208:4
223:23 305:9
314:13
**pllc** 2:12
**plus** 331:6
**point** 26:20 29:24
45:7 52:6 58:11
62:13 82:15 92:24
93:20,25 95:12
105:19,22 114:15
114:15 135:8
137:12 158:17
160:10 171:11
204:20 210:22
225:19,20 242:22
255:23 256:6

280:24 298:19
**pointed** 61:6
215:13 216:7
**points** 10:25
**police** 82:4 237:22
**policies** 12:7 15:18
15:19 24:7 39:11
103:8
**policy** 7:24 10:2
10:21 11:20 15:16
16:3,6,18 18:17
19:25 20:4,9,21
23:23 36:11,16,21
63:7,14 66:10
83:25 93:17 95:24
104:3,4 132:3
166:3,7,16 168:22
173:8,14 174:2
175:19,24 176:9
181:25 183:13,17
184:19,23 185:2
190:5 202:15,17
204:12,18 212:11
212:20 213:2
227:25 228:19,23
243:8 307:20
320:18
**political** 230:23
231:9 277:5
**pope** 119:9,15
120:12 121:3,19
**pope's** 121:16
**populations** 310:6
**portion** 179:6
**pose** 308:6 311:19
314:24,25 316:3
316:18 317:10,14
317:23
**posed** 6:24 165:3
269:25 304:22
307:16 315:8

poses 313:23
posing 305:25
position 7:22 80:6
80:11,22,23 99:11
144:9 216:23
234:10 241:8,9,10
241:15 246:16,17
246:22 247:4
263:9 266:23
267:11 268:15
310:12,16 311:23
323:5 334:21
positions 171:22
261:10,12 262:12
262:15 263:13
possess 187:13
329:15
possibilities 234:3
289:8,13
possibility 243:20
possible 50:24
131:6 152:18
166:8 171:16,21
179:22 233:9
243:14 312:12,13
314:25
possibly 147:20
248:15,16
post 289:20
posted 26:7 63:19
potential 7:4
102:23 122:15
178:2 307:6,22
308:4,4 314:4
318:7
potentially 103:17
120:18 178:9
193:8 197:2
219:15 240:16
241:6 242:11
245:3 263:15

powerpoint 22:23
337:15
practice 125:13
180:6,7,15 190:11
192:11,13 194:17
206:7,11,13,14,19
218:12 219:12
220:2 221:6 298:9
practiced 104:16
146:22 147:19
188:4,18 193:7
233:24
practices 164:16
164:18 182:18
193:10 205:15,18
218:17 219:8
practicing 218:13
prayer 327:14,15
329:18
prayerful 330:2,8
prayers 327:23
pre 84:22 89:17
preceded 144:5
precise 10:20
67:24 68:15
306:15
precisely 53:17
58:18 141:2 274:9
307:2
predates 138:23
139:2
predicate 58:2
274:16 317:19,20
predict 30:18
prediction 30:19
preface 274:12
preferences
228:21 229:11,16
230:3
premise 95:6
309:9

preparation 28:9
prepare 25:4,17
25:23
prepared 22:24
25:8 61:8 215:25
preparing 26:8
27:11 75:4
prerequisite 313:9
prerogative
165:20
presence 195:2
263:12 310:4
present 3:4 58:22
236:8 258:8
265:22 270:11
276:12 291:14
310:23 311:2
313:16 318:4
328:6 333:18
presented 42:19
72:20 175:16
176:4,17 180:24
200:8 204:25
216:13 217:9,11
221:2 229:19,20
230:16 232:2
233:5 251:25
276:7 293:24
302:7 333:21
presents 245:25
preserve 256:23
pressed 26:15
presumably
113:25 167:6
presume 87:14
147:10 180:22,23
presumed 170:24
presumes 274:11
274:13
presuming 88:8

pretty 94:3 132:18
prevent 67:3
92:15 254:6
prevents 190:12
previous 116:13
117:3 166:6
185:11
previously 60:18
130:22 142:7
149:11 220:17
221:11 290:23
primarily 9:19
10:15 11:16,18
12:15 20:13 84:3
86:17 99:11
129:16
primary 13:15
20:12 31:16 123:4
151:21 196:12
218:12
prior 27:7 43:21
60:21 94:5 97:12
114:24 116:14
117:14 139:11
149:9 158:17
166:19 167:7
235:7 244:14
privilege 96:14
118:18 335:14
privy 29:8
probably 7:16
78:14 154:20
206:2
problem 43:14
162:6
procedural 73:13
91:8 124:3 135:7
135:12 281:23
procedurally
134:24

**procedure** 82:7
84:23 115:15,19
162:8 281:22
338:3
**procedures** 93:14
93:16 128:20
133:16 140:9
**proceed** 138:10
231:10 281:20
**proceeding** 49:11
55:25 69:20
235:19 243:4
323:20 334:12
**proceedings** 4:1
158:15 217:5
317:12 334:23
**process** 9:9 10:7
11:23 12:3,24
13:22 14:17,20
15:4,13 16:11
17:2,2,18,21 18:3
19:23 20:7,18,18
21:2 24:14,16,17
25:11 35:17 37:11
37:15,18,22 38:23
39:3 44:22 45:24
46:9,14,23 47:20
48:20 50:8 56:8
56:12 58:17,23
62:4,4,13,15,16,21
67:16 73:3 74:25
77:13 78:25 83:23
84:7,21 85:13
93:3 95:24 96:8
98:9 99:21 103:10
103:14 105:9
112:3,5,18 113:12
116:6 117:25
118:9 124:20,23
125:3,9,14,17,22
132:23 139:7

144:2 146:3,10
152:11 154:22
160:6,11 165:18
169:25 196:23,24
208:9 210:8
217:25 227:17
243:8 252:24
256:10 263:20
268:14 274:25
285:8 289:19,21
295:21 299:16
301:24,25 302:25
319:4 322:16
323:19 331:11
335:6
**processes** 18:2
21:5 61:14 98:15
254:18 312:5
335:7
**produce** 22:17
295:6
**produced** 22:20
**product** 188:14
189:15 208:20
**production** 133:13
137:14 337:12
338:2
**productivity**
292:19 294:10
295:15 296:17
**products** 206:4,4
209:13 210:20,21
211:17 212:2
215:7 217:15
218:25 219:20
220:11,22
**professed** 177:24
**professional** 54:11
274:24
**professionals**
61:12 84:6

**program** 75:21
250:20
**progress** 72:3
**prohibit** 232:10,20
**prohibition**
205:11 250:14
**prohibits** 232:5
**project** 139:21
**promptly** 30:20
152:18
**pronounce** 226:9
**pronouncement**
121:16
**pronouncements**
119:17
**proof** 285:9,15
286:2
**proper** 16:17
261:17
**properly** 36:18
41:10,11 122:20
185:19 201:23,25
293:22 294:24
302:5
**prosecuting**
103:17
**protocol** 74:11,18
84:24 85:17
**protocols** 74:20
75:5
**prove** 310:11
**provide** 13:24
34:19 35:18 44:23
115:5 141:13,21
152:25 153:3
161:4 197:3
218:14 233:9
241:12 245:12
257:18 260:4
261:3,8 262:6
264:2,6,12 268:8

278:19 280:11
281:18 282:8
284:16,21 285:14
285:16,23 297:4
299:16 303:5
306:11,20 307:5
312:4
**provided** 16:22
44:15 46:2 47:4
48:16 49:6,10
62:22 63:6,14
79:19 90:22 97:15
102:22 108:7
112:18 141:12
164:21 171:24
174:10 176:4
179:24 193:9
195:4 196:16
203:25 204:2
212:22 216:9,19
241:17 244:24
264:18,22 265:13
265:24 266:2,4,14
267:2 268:10,17
268:19 271:16
274:5 280:20
289:11 292:25
293:11,19 294:5
294:20 295:11,25
296:14 298:1
299:6 301:10
303:6 306:13,16
308:12,24 322:3
**provides** 79:19
120:21 176:24
222:18 238:19
298:11
**providing** 45:11
49:22 79:24 81:21
158:22 191:15
204:19 237:6

241:19 251:17
296:22
**provision** 182:14
265:3 300:8
**public** 1:23 5:21
10:3 15:20 19:20
21:17 31:7,8 63:5
75:2 214:25
248:15 254:24
255:8,11,13 256:2
256:15 270:7
277:20 317:18
322:11,19,21
323:21,23 324:3
324:10 336:22
339:7 340:25
**publicly** 63:20
**pulled** 137:25
145:21 153:25
**pulling** 137:22
**purely** 42:9 171:5
**purpose** 45:2 72:5
79:23 115:25
165:2 205:3
220:14 249:17
254:3,8,15 275:25
276:4
**purposes** 29:3
39:22 115:4
**pursuant** 181:16
215:20 234:22
235:18 250:20
**pursue** 56:3
**purview** 256:5
**put** 9:8,14 11:4
15:5 22:19 23:5
24:2 35:25 69:4
82:16 114:25
124:13 157:22
173:17 181:7
186:9,17 214:20

245:18 285:9
307:20 308:3
325:19
**puts** 89:5 238:25
**putting** 10:8 13:22
14:2 17:21 20:7
28:15 80:21

## q

**qualification**
58:21
**qualified** 82:11
83:15,17 84:8
96:21 331:25
**qualifier** 238:10
**qualitative** 104:13
**quality** 4:6,7
37:14 39:13,21
78:17 114:6
122:24 123:8,25
124:2 179:13
**quantify** 127:14
128:2
**queries** 49:20
**query** 50:22
**question** 6:23
25:21 34:12,25
37:3 42:24 46:4
46:13 51:16 53:24
55:14,19 58:3
60:4 67:14,19,21
90:8 93:9 94:14
95:6 99:3,17
102:9,11,17 103:6
104:13 105:8,12
105:21 106:2
109:18,23 110:2,4
111:25 116:13
125:6 130:12
144:11 146:2
165:5 177:6,7
179:21 184:24

194:6 201:6,11
206:22 207:9,19
208:3 211:20
216:5,7 218:7,19
218:20 219:7
221:22 223:25
224:2,18 227:22
229:11 233:16
235:15,16 236:17
238:15 242:6
246:24,25 247:3
251:13 256:13,19
256:23 260:18,20
260:21 262:25
271:12 274:12,13
274:17 275:4
277:11 287:15
288:23 293:11
295:3,5 297:24,25
298:20 307:17,18
307:24 309:10
314:13 315:19,23
318:13 321:13
322:10,16 327:6
328:16 330:25
333:12 334:9,20
**questionable**
131:20
**questioning** 198:3
271:14 334:2
**questionnaires**
218:24
**questions** 18:10
38:23 43:2,10
44:12 46:6 64:14
71:25 92:25 93:2
93:7 97:20 98:24
113:15 115:3
116:9,17 117:7,12
124:4 126:13
129:21 133:5,18

142:5 189:6
207:12,24 208:6
210:19 211:7
214:22 220:21
221:18 235:20
271:3,3 274:23
277:9 279:5
286:10 288:5
295:8 304:21
324:8 330:25
334:5 335:16
**quick** 31:9 185:23
**quickly** 152:22
**quiet** 133:4 288:6
**quite** 14:7 19:16
48:7 54:6 56:10
127:15 199:20
250:16 309:25
328:22
**quote** 140:23,25
141:8,9
**quoting** 223:16

## r

**r** 2:2,8 3:2 5:19
137:2,6 339:2
**ra** 20:8 23:19 24:4
24:14,15,17 62:4
142:21 170:8
171:12 173:19,22
181:5 190:20
283:11 299:9,11
**ra's** 159:2
**raise** 7:8,9 66:22
123:12 129:24
257:5,8,13 272:18
**raised** 32:22,24
92:13 102:13
123:7,9 208:6
**raises** 130:12
**raising** 256:24
257:12

**random** 145:21
320:14
**range** 53:9 127:4
**rare** 74:4 123:16
123:22 130:4
280:9 282:15
283:18
**ras** 27:23
**rate** 34:4,15
**rationale** 275:14
**rationales** 275:15
**reach** 46:25 47:21
50:14 51:3
**reached** 29:12
44:7 56:22
**reaching** 54:17
84:2 283:5
**read** 109:23,25
143:9 159:5
223:23 224:5,12
336:8
**reading** 42:23,25
142:15 164:12
295:14
**reads** 150:6
169:16
**ready** 30:12 37:21
39:22 40:19 139:6
151:9 173:19
**really** 14:6,7 16:18
23:24 30:17 31:3
34:25 50:18 61:17
72:5 77:10 78:9
102:14 114:14
131:2,19 147:21
158:24 159:23
169:16 171:14
175:14 188:15
199:18 203:18
254:11 258:5
263:20 283:21

289:16,23 290:2
303:24 319:7
320:16 328:2
335:18
**reardon** 1:12
**reason** 31:8 91:16
113:21 143:21
152:16 154:12,14
158:3 159:15
167:22 201:3
219:21 311:15
312:12,13 322:9
324:15,23,25
340:6
**reasonable** 9:9
11:23 12:2 15:17
16:7 17:9,10 18:4
18:22 19:22 20:17
24:7,13 25:16
29:10,15 33:4,9,12
33:21 34:3 35:10
36:22 47:19 48:19
50:7,10 53:21
54:16 61:13,18
66:11,23 67:4
68:3,7 76:9,25
83:22 84:20 85:2
86:19 88:25 91:22
95:8,19,23 97:3
98:8,13 101:8
103:19 104:7
112:15,17 122:21
124:8 145:13
146:6 148:14
160:12 167:11
168:19 173:17
174:11,22 177:3
200:6 201:4,23
202:2,7 204:5,10
213:16 216:21
217:2 236:7

243:18 245:24
246:14 247:17
248:11 262:21
265:10,19 268:14
270:10 273:4
277:24 280:23
281:3 289:19,20
290:13 291:14
293:18 294:16,23
294:25 295:20
296:5,8,10 300:9
301:17 312:15
318:2,9 319:3
322:15,22 324:18
**reasonably** 95:22
168:3 171:22
309:12 322:24
323:2
**reasoning** 131:10
174:18
**reasons** 60:15
101:11 122:17
144:10 155:17
159:8 161:4
168:15 170:18
173:2 200:9
202:12,14 203:24
217:20 218:7
228:8 230:11,11
242:20 282:17,18
299:11 316:12
318:10
**rebut** 47:11
241:12,16
**recall** 11:14,15
15:11 26:11 27:6
62:14 63:21 71:14
82:25 109:18
111:3,12 124:2
210:15 213:9
261:7,23 264:10

272:20 273:21,25
274:2,3 284:5
289:10,12 291:6
309:2
**recap** 330:18
**receive** 45:6 157:9
158:18 213:20
235:23 236:10
237:23 238:7
239:14 295:7
**received** 16:2
45:19 47:14,24
49:3,19 74:15
96:24 106:6,16
116:18,24 117:14
133:9,14 135:17
158:6 162:10
166:6 197:9
236:17 239:4
281:25 338:5
**receives** 294:20
**receiving** 106:7
159:16 160:9
**recess** 52:12
109:13 136:5
196:3 270:19
305:13
**recipient** 145:4
**recipients** 157:14
157:14,19
**recollection** 23:24
26:6
**reconciled** 172:14
172:14,15
**reconsider** 135:4
281:13
**reconvene** 52:8
**record** 4:3,24 7:9
13:16 22:9 28:7
42:19 44:19 49:6
50:23 51:4 52:11

53:20 58:7,13
59:7 79:14 83:24
86:2,3,4,4 109:12
109:25 120:22
136:3 147:13,23
155:7 156:13,14
171:5,11 172:9
174:17,23 175:14
176:3 178:18
180:25 182:8
183:2,7,9 187:20
190:17 196:2
203:23 204:8
207:4 208:4
212:24 219:16
221:2 224:5
228:10 229:3,21
230:17,19 235:3
237:6 244:3,8
247:11 248:13,19
252:20,21,22
258:3 269:10,14
269:16 270:17
276:6 278:21,25
279:2,17,18,20,22
280:3,13 283:2
284:13 289:9
295:10 296:13
301:25 302:8
305:12 308:17
326:3,6 328:17
333:22 335:24
336:11,12 339:13
**recorded** 1:20
4:11 22:5 41:10
70:15 71:16 83:3
83:10
**recording** 4:7,12
**recordings** 22:13
337:13

**records** 27:10,15
27:15 44:10 49:23
61:23 87:4 148:18
156:22 208:8
210:13 211:24
215:12 217:8
289:25 328:2
**recourse** 57:4
**redact** 150:7
**redacted** 150:5
337:16
**refer** 27:2 29:16
54:8 98:5 183:24
255:14
**reference** 129:3
**referenced** 26:22
27:8 55:2 76:5
111:13
**referencing**
307:13
**referred** 27:3 76:7
100:2
**referring** 59:25
64:9 99:24 129:2
129:4 196:23
226:11 258:25
259:3
**refine** 227:15
**reflect** 80:11 122:6
**reflected** 79:13
267:15 297:3
337:20
**reflects** 155:8
**refusal** 199:17
277:2
**regard** 13:7 31:19
35:9,10 68:22
86:21 171:19
216:10
**regarding** 85:11
112:25 118:24

137:19 236:10
267:16 306:16
337:22
**regardless** 195:9
**regards** 266:22
**registered** 152:14
**regs** 75:6
**regular** 21:16
39:23 69:13
**regularly** 325:19
**regulation** 30:24
**rejection** 41:22
159:9,15 213:16
**relate** 83:6 97:13
100:17 132:15
156:22
**related** 14:14
21:18 38:23 61:15
74:15 88:20 89:9
89:10 97:16 98:24
126:19 180:14
328:22 334:17
339:16
**relates** 86:5 93:18
94:21 102:11
116:20 208:14
**relating** 96:9
103:8
**relation** 292:21
294:12 295:18
296:19
**relations** 9:22 11:6
11:8 76:22 79:3
320:6
**relationship**
298:25 300:22
**relevance** 205:16
205:20 207:5
211:6 214:5 224:8
323:16

**relevant** 20:2 45:4
74:14 77:14 90:5
114:14 115:2
117:8,15 120:13
120:18 121:4
126:6 131:14
153:25 166:14
176:20,22 178:19
183:8 206:15
207:14 208:15
216:23 219:24
235:17 245:8
247:15 261:20
262:2 303:18
310:7,8 329:12
**relied** 27:9 189:23
209:25 215:25
301:11 315:5,20
315:25 316:7,8
317:2
**religion** 88:20,22
95:9 124:10 167:4
186:10 193:5
226:22 232:5
246:4
**religions** 19:8
119:23 120:4
311:16
**religious** 1:3 4:16
14:10,15,21 28:14
29:10,14 31:23,25
32:4,7,7,22 33:2,4
33:7,12 34:22
53:2 59:19 60:23
62:24 67:3,12
68:3 84:11 86:12
88:25 89:6 90:6,7
91:22 92:12,12,16
92:18 95:7,8,19
97:13,17,18 98:14
111:22 112:10

113:5 117:25
118:2,25 119:25
120:14,22 123:20
133:17 140:22
141:19 142:21,25
145:17 146:5,20
147:3,7 148:4,9
159:9,25 160:17
166:5,10,18 167:6
167:8 168:12
170:14,16,23
171:6,7,8 173:11
175:10,21 176:12
177:25 178:4
179:9,17 180:19
181:17,20 182:3,9
182:21 183:3,15
184:12,22 186:10
186:17,21,22
187:4,12,13,16,19
187:21 188:4,5
190:6,12,22 191:2
191:21,23 192:5
192:21 193:3,10
193:18,21 194:5,7
194:8,9,17 195:6
196:9,10,19,20
197:4,7,9,11,12,13
197:16,24 198:4,9
198:13,18 199:13
199:16,25 200:11
200:14 202:3
205:8,10,18,22,24
206:3,7,12,18
207:15 208:17
209:23 210:5
211:8,14 212:12
213:6 217:20
218:11,14,16,17
219:8,12 220:4,8
221:4,5,7 222:4,6

222:9 223:11,14
223:15 224:13,16
225:6 226:3,8,15
226:20,24 227:25
228:4,12,18 229:2
229:5,12,17 230:3
230:11,22,23
231:8,17,20,23
232:16,20 233:11
233:12,18,20,23
233:24 234:7,20
236:14 246:9
247:23 248:3
259:12 260:24
261:22 263:3
265:6 271:23
273:24 276:13,14
276:22,23 277:4
278:10 285:17,22
286:3 288:10,19
290:25 294:7
298:8 305:23
306:4 310:21
311:9 316:3 323:3
323:7,11 324:23
325:4,7,11,13,24
327:18 328:4,11
328:12,21 329:2
329:22 330:3,4
333:8 335:12
**religiously** 89:10
197:20
**rely** 149:8,17
179:15 214:3
316:15,17 317:21
318:13,17 321:22
**relying** 114:2
225:15
**remain** 100:23
149:15 311:8

**remainder** 138:22
**remained** 270:2
**remaining** 91:14
268:3
**remains** 12:10
66:13
**remand** 51:11
247:12 248:20
280:2,6,14 281:12
282:2,8 283:12
338:5
**remanded** 219:25
248:3 282:25
**remanding** 243:11
**rematch** 51:24
**remember** 12:9
21:25 24:11 61:11
68:15,15 69:3
97:25 120:2 156:6
156:8,8,9 210:18
272:15 274:8
275:13 306:15,25
327:8
**remote** 4:14 262:7
262:12,18 263:2
263:10,15 264:14
264:22 265:3,14
265:18 267:17,19
268:9,13 337:22
**remotely** 133:2
188:6 278:12
303:12
**remove** 69:5 96:3
**rendered** 56:7
244:7 293:4
**rendering** 51:21
**renee** 11:7
**rent** 251:11
**repeat** 94:13,16
230:25 231:19
317:25

**repeatedly** 99:25
208:6 297:8
**rephrase** 60:4
203:3 260:17
315:22
**rephrased** 105:22
**report** 35:15 38:4
38:7,10,12 51:18
82:13,14 152:12
153:3
**reported** 82:16
**reporter** 1:22 4:20
5:18 109:23 138:2
223:23 224:12
**reports** 36:2 153:7
153:11,18
**repository** 156:22
**represent** 4:23
**representations**
13:19
**representative**
37:9
**representatives**
84:17
**representing** 13:9
**reps** 41:9
**request** 17:23
22:19 23:4 24:4
33:21 35:25 36:23
44:18 51:14,14,23
59:9 66:23 67:12
68:6,8 80:14,20
92:14 101:9 104:7
108:20 122:22
150:4 154:10
158:21 170:8
174:10 175:11
179:18 180:20
181:7,14 191:12
197:7 246:20
252:4,4 260:24

271:18 273:5
278:4 281:23
283:11,22 292:14
292:16,18 293:17
294:19 320:19
321:20
**requested** 27:23
29:11 216:21
241:5 243:17
245:6 246:7,19
247:8,18 311:18
**requesting** 124:8
244:4 249:18
267:14 283:5,25
**requests** 14:11,15
14:21 16:4 18:4
23:19 25:16 28:15
28:18,19 29:17
31:23 32:9,23,24
35:20 44:13 54:17
59:21 60:23 62:25
85:3 86:13 95:20
96:23 111:22
112:11 120:20
143:2 149:4,24
153:22,22 159:10
173:6 209:24
210:5 215:20
217:14 230:22
234:21 243:19
247:19 248:21
249:11,13 252:6
261:15 264:9
275:6 277:24
288:10 301:2
**require** 190:16
194:20 247:14
279:5 287:3,5,18
301:8 310:3
**required** 20:3,4
45:24 69:11

203:23 284:16,18
284:25 285:7,8,14
285:23 286:9
291:3 301:22
302:15
**requirement**
120:9 121:24
146:23 148:5
166:12 167:10
168:14 171:9
180:8 182:11
220:5 221:8
228:14 229:7
234:2 249:14
286:2,6 287:22
292:2 299:4,13
301:19 306:5
322:19
**requirements**
13:25 287:3 290:7
**requires** 148:23
195:14,16 245:8
249:14 299:5
301:7 302:23,23
324:17,19
**requiring** 198:17
**research** 108:12
**reserve** 307:24
**resolve** 58:13
**resolved** 214:22
**resource** 99:13
**resources** 14:3
16:21,25 18:21
26:21 61:9 300:7
300:11,14
**respect** 6:22 7:10
8:22 9:10 10:3,22
18:20 19:3,5,7,8
23:5 26:4 29:13
29:14 32:21 34:20
35:12,13,19 37:23

38:8,9 39:13
44:21 45:8,25
46:7,15 47:5,23
48:22 49:2 50:21
50:25 52:23 56:15
58:8 60:22,24
61:25 63:11,25
65:23 66:8,15
67:22 68:2,9 71:2
77:9 79:2,4,20
86:12,22 89:24,25
91:11,23 92:4,18
93:11,13,13,15
94:6 98:24 99:8,9
99:16 100:3,7
111:21 112:9
113:4 120:3
123:10 131:2
134:20 140:9
142:23 143:9,21
145:7 149:10
157:8 159:20
161:8 166:4,17
172:18 173:2,9
174:4 177:25
181:25 187:3,5
188:25 193:23
194:25 198:9,12
207:24 209:11,20
210:2 212:12,21
213:21 214:2
223:11 236:13,20
237:12,14 240:6
241:11 243:7
244:12 259:12
268:16 287:2,11
287:19 289:6
291:21,22,25
300:16 322:5
324:21

**respectful** 73:5
**respectfully** 312:3
**respective** 38:5,8
**respond** 24:24
241:2,10,17
260:19 286:10
316:14 329:21
**responded** 144:16
**response** 17:23
25:9 31:6 80:19
81:25 149:24
185:8,14,23
220:21 224:4
281:19,19 286:11
288:23 295:7
324:10 326:17
**responses** 49:19
**responsibilities**
91:13
**responsibility**
36:17 78:6 153:17
179:13
**responsible** 40:24
**rest** 333:7
**restrict** 169:7
**restrictive** 246:8
248:23
**result** 43:16
147:16 167:4
193:5 196:13
243:22 265:5
**resulted** 14:18
334:13,18
**resulting** 334:23
**results** 245:3
248:23
**resumed** 137:7
**retain** 157:7
**retaining** 292:19
294:10 295:16
296:17

**returning** 254:7
**reversal** 34:15
  141:3
**reversals** 54:13
**reverse** 34:16
  204:10 254:14
**reversed** 202:8
  244:10
**reversing** 243:11
  243:12
**review** 17:15,17
  17:18 25:2 26:9
  28:3,5 30:22
  37:19 39:8,20
  40:5,21,25 41:2,25
  42:6,13,17,18
  43:19 44:20 48:3
  50:24 51:20 52:24
  53:11,20 54:11,16
  55:5 58:13 68:5
  70:22 72:2 78:18
  82:12 84:20 85:15
  90:12 104:6
  113:14 120:5,20
  122:18,25 125:11
  125:14 126:12
  128:7,9 131:23,25
  139:24 147:10,21
  148:18 149:3
  151:9 158:24
  159:2 165:20
  167:20 170:3
  183:7 190:17
  203:23 204:3
  224:24 225:21
  227:7 228:24
  247:11 252:9,17
  263:23 276:6
  280:12 281:2
  282:21 284:11
  290:12 291:11

293:19 294:18
  299:5,8 300:25
  308:5 324:2,4
  330:17
**reviewed** 25:6,7
  25:11,12,12 30:11
  34:7 39:25 44:19
  49:5 55:11 59:6
  59:14 111:18
  114:5 170:7
  179:12 208:8
  211:24 212:23
  215:12 233:16
  241:21 243:9
  251:25 265:25
  272:16 289:11
  293:2 295:22
  316:22 319:22,22
  332:2
**reviewer** 80:15,17
  150:20
**reviewers** 150:19
**reviewing** 28:8
  40:11 43:16,18
  46:9 53:18 71:10
  72:10,10 83:24
  87:4 90:17 99:22
  103:17 113:13
  122:21 125:9
  127:2 131:7 154:5
  154:22 169:15
  191:5 202:5,6
  216:18,24 217:8
  222:9 244:2,8
  252:21,24 265:22
  266:23 268:17
  275:2 277:23
  286:18 296:9
  301:25
**reviews** 40:5 79:6
  84:12 85:2 130:15

221:15,17 294:21
  301:14 331:2,3
**right** 7:3 29:5
  33:22 34:2,10
  43:9,12,25 49:12
  54:8 59:11 96:15
  100:22 101:5
  104:20 108:13
  118:5 121:15
  130:8 131:4,14
  143:9 149:11
  152:5,8,8 160:20
  166:23 169:15
  174:12 177:12,18
  180:13 184:16
  187:2,2 196:25
  198:23 210:10
  237:21 239:21,24
  241:10 247:25
  256:21 257:2,16
  259:3 261:2 263:9
  272:10 279:12,25
  290:20 303:23
  304:20 307:25
  311:21 323:8
  326:24 327:3
  329:8 331:5
**rights** 54:15 58:15
  58:16 62:24 63:8
  63:24 64:8,15,17
  64:19,21 65:3,8,8
  65:18 66:3 81:8
  103:13,16 151:20
  158:20 170:3
  290:6,9,16 292:6,8
  297:10 299:21
  302:17,18
**risk** 313:24 314:18
  314:19,24,25
  315:7,12 316:4,19
  317:9,14,22

**rivera** 1:6
**rl** 255:25
**roberta** 1:12
**rocco** 3:13 4:20
**role** 10:19 12:24
  13:20,21 25:23
  39:6,19 40:4,10,12
  40:13,16 41:6,14
  182:11,12 223:10
  275:17,18 302:21
**room** 130:9
**rough** 32:16
**roughly** 29:6,22
  32:17,19 71:4
  174:14 331:21
**routed** 123:20
**routinely** 62:19
  292:13,16 294:4
  295:10
**rq** 22:16 23:3
  150:4 215:19
  267:13 281:21
**rule** 8:11 92:23
  129:12 130:8,11
  173:23 174:2
  234:22 250:9
  259:18 262:11
  301:22 310:23
**rules** 6:16 28:25
  75:6 114:3
**ruling** 249:3
  337:10
**run** 36:2 101:8
  148:22

**s**

**s** 2:2 3:2 137:2,2,2
**sabina** 1:5 3:9
**salesforce** 75:22
  75:23 138:19,24
  139:10 150:20
  154:7,23 268:24

salient 126:7
sanctions 198:22
　199:7,8,17
sanford 10:15
　37:12 78:18
　133:21
sarah 2:9 5:5
satira 1:6
satisfy 14:3
saving 201:11
　288:5
saw 236:23,25
saying 57:2 68:18
　104:14 107:21
　108:14 145:12
　147:11,12 152:2
　160:4 174:19
　175:3,10 177:15
　178:12 184:8,19
　189:24 192:4,6,7,8
　194:7 203:12
　220:6 222:20
　226:11,18 228:25
　230:9,15 231:5
　234:11,12 237:8
　238:7 241:13
　245:20,22 258:4
　278:24 280:15,17
　286:7 310:2
　314:10,22 322:25
　323:8,12,13,14,15
　325:10 328:25
　335:3
says 68:18 79:22
　131:18 135:3
　141:15 179:7
　181:4 182:16,25
　184:16,17 186:19
　187:18,22 190:11
　193:5 195:9,10
　233:11 234:12,13

245:11 307:2
　311:11
scanlon 235:6
scenario 168:22
　171:2,14 174:20
　175:4 177:19
　188:9,10 192:15
　192:25 193:12,20
　197:14 200:13
　247:10
scenarios 164:20
　173:20 176:19,21
　227:12,14
schaeffer 12:10
scheinman 334:13
　335:3
schimenti 1:6 3:8
schmitt 1:6
science 119:23
　306:20 315:6
scientific 206:5
　214:10 274:4
　306:13 322:8,12
　324:2,4
scope 31:13 46:5,8
　67:17 77:17 92:22
　93:21,25 97:22
　99:19 111:25
　116:16 125:6,8
　132:14,22 164:11
　165:3 235:17
　256:5 286:15
screen 4:10 43:6,8
　43:12 96:3
scripture 119:10
　231:11,16,20
　234:7,12,13
scrolling 133:6
scrupulous 177:23
　178:22 179:3,4,8
　179:16 180:13,17

search 156:19
seats 304:4
second 42:22
　43:17 44:3 48:12
　57:21 70:6 99:2
　106:2 107:17,25
　108:5 124:14,24
　193:6 305:21
　334:14
sections 25:14
secular 228:3
　277:4
see 39:9 41:2,22
　54:6 68:24 73:2
　73:19 75:2 80:18
　88:13 94:2 122:6
　138:7 140:2,23
　141:9,19 146:17
　146:20 156:13
　161:22 181:2
　184:15 186:19
　208:2 211:11,12
　211:19,21,21
　222:24 230:14
　276:18 281:22
　291:11 310:13
seeing 43:5 53:22
　134:16 146:9
　184:5 185:10
　211:15 216:25
　222:21 224:17
　254:15 327:20
　335:19
seek 176:7
seeking 128:25
　249:12 250:4
　261:10
seen 4:10 123:9
　146:4 168:23
　172:2,3 179:13
　180:5 181:10,15

181:22 182:20
　183:21 184:14
　210:13 211:5,23
　218:5 245:16
　246:3,5 253:9,9
　260:2 273:3,11,12
sees 54:10
segmented 153:13
seller 145:6
seller's 145:8
send 42:2 47:13
　51:13 74:9 134:21
　154:9 217:14
　218:23
sending 41:11
　48:13 51:23
　107:17 280:19
　281:13
sense 61:2 142:5
　149:18
sensitive 234:20
sent 23:14 40:19
　46:24 133:15,22
　134:4 144:7,13,16
　144:18 146:12
　154:17 157:4,12
　157:13 219:7
　236:12 248:2
　272:14 279:23
　331:18,21
sentence 124:24
　141:8 164:13
sentences 224:3
separate 28:24
　29:3 135:14 277:6
separately 269:2
separateness
　298:24 300:21
series 44:12 52:21
　153:13 154:6,6
　173:18

**serve** 15:25 20:16
132:4,16
**served** 9:2
**service** 132:25
**services** 9:21
10:14 20:23,25
36:15 38:14 79:2
103:21 104:2
151:12 320:4
**serving** 13:4 91:18
95:10 132:11
**session** 137:24
**set** 12:17 14:11,19
23:8,8 28:24
57:20 58:14,17
90:3 100:12
115:21 138:19
139:6 145:16
167:5 235:20
236:6 241:7 293:6
309:15 339:11,21
**sets** 238:19 281:11
**setting** 18:11
334:16
**seven** 271:8
**severely** 107:18
**severing** 62:10
**share** 72:13
**shared** 26:2,25
112:22 149:17
240:20
**sheet** 340:2
**shoes** 36:19 329:4
329:10
**shoot** 174:7
**short** 106:16
175:13 246:18
249:10 304:23
305:8 330:24
334:2

**shortcuts** 186:12
**shorthand** 88:8
326:19,21,22
**show** 67:7 68:10
69:11 291:3
302:24
**showed** 185:11
**showing** 301:22
**side** 23:11 85:6
95:19 109:2
171:19,20
**sides** 146:9
**sidhu** 2:15
**sight** 216:15
**signature** 339:24
**signed** 336:19
**significant** 16:21
47:3 54:12 67:7
112:14 312:18
**significantly** 34:11
**silence** 70:3
177:11,17
**silent** 175:17
204:16
**silvia** 10:25
**similar** 27:22
102:12 105:23
274:24 282:8
313:6 334:18
**similarly** 1:7
103:22
**simply** 15:9 68:11
249:23 256:9
286:7 287:24
**sincere** 147:12
176:11 180:5
222:17,20 223:16
223:19 224:16
225:4,14 226:16
226:21,25 278:10
311:9,16 316:3

323:2,6,10 328:11
328:21 329:2,22
333:8
**sincerely** 146:20
147:3 148:3,9
166:10 167:8
175:22 182:9,19
184:12,22 185:17
186:22 192:10
193:6 198:18
199:12,16,25
200:14 205:8
211:8 219:14
221:4 222:3,8,12
223:12 224:10
228:12 229:5
298:8 325:4,7,11
325:24
**sincerity** 179:21
193:20 200:10
207:14 208:16
222:23 223:4
224:18 226:6,7
328:10
**single** 33:23 273:3
**sir** 242:3
**sit** 65:15,21 68:14
68:22 77:15 156:3
162:3 176:18
209:2,5 210:15
211:2 261:18
272:2
**site** 264:15 268:9
**sites** 264:23 265:4
265:14,18 267:17
267:19 268:13
270:12 337:23
**sitting** 7:3
**situated** 1:7
**situation** 75:12,13
133:24 134:5,9

149:7 163:7,15,16
163:20 170:13,20
177:7 181:4
211:24
**situations** 72:20
73:22 134:21
171:17 181:15,22
288:18
**six** 25:8
**size** 292:22 294:12
295:18 296:19
300:15
**skip** 56:19
**skipping** 201:10
**sky** 195:10,11,11
**slightly** 43:23
263:6 313:24
**small** 33:17
**smoothly** 115:5
**sole** 180:19 335:5
**solely** 173:21
273:6
**solicit** 279:15
**solicited** 204:22
244:23 335:9,11
**solutions** 340:3
**somebody** 7:7
83:15 133:15
312:12 325:23
**someone's** 90:13
95:2 208:16
273:12 329:10
**somewhat** 71:23
**soon** 135:21
**sorry** 10:19 26:15
32:7 36:24 45:14
52:2 53:24 55:18
64:25 83:20 86:8
127:13 132:7
143:11 144:3
152:2 159:4

160:24 162:11
167:18,19 178:25
207:8 225:9 226:9
233:2 236:18
238:5 246:24
255:6 256:18
258:24 259:17
260:13 269:11,21
272:6,11 276:3
287:13 290:22,22
291:18 294:2
297:20 305:9
318:5 320:5,7
326:5 328:15
332:8
**sort** 12:7 18:17
20:9 21:2,20
23:21,23 26:18
34:9 36:8 37:14
38:25 43:11 53:10
53:19 61:18,19,20
68:24 79:5 82:18
84:20 85:13 87:25
100:6 106:15
121:8 123:17
130:12 139:3,23
142:2,4,8 153:15
154:21,22 155:6
167:12 175:8
180:7 182:24
189:18 218:18
221:16 236:5
237:6 244:20
247:9,13 251:2
252:5 254:11
263:5 265:17
266:18 271:6
276:19 277:10
299:6,17 315:15
330:21

**sorts** 20:21 24:4
28:7 34:11 73:10
106:18 135:6
189:11 206:3,6
262:15 330:17
**sought** 86:24
252:7,23
**sound** 173:13
**sounds** 115:20
142:22 203:12
254:13
**source** 24:23
120:6 121:21
187:21 188:3,17
218:13 231:23
277:4,4,5 286:4
320:20
**sources** 139:24
140:4
**south** 2:6
**sovereign** 116:7
**space** 26:16 101:6
**speak** 25:18 41:18
50:13 163:11
**speaking** 17:25
91:25 92:3 150:21
262:9 324:24
**specific** 28:3 51:15
51:16,16 65:22,22
66:8 68:6 73:13
74:12 96:9 98:6
100:11 101:4,11
111:8 129:15
130:18 133:10,12
133:24 134:19,21
141:6,12,21
144:15 148:21
150:7 159:8
186:17 202:17
204:18 209:4,15
213:2,24 214:8,19

253:16 262:10
263:17 271:2
278:3 283:18
286:10 289:12
301:21 310:19
320:2 324:12
**specifically** 25:14
26:24 33:9 46:7
63:21 69:23 76:4
88:18,23 93:15
120:2 123:24
143:13 144:12
186:3 213:12
245:6 261:23
270:4 293:9
299:16 306:3
318:3
**specifics** 147:22
**spectrum** 131:23
**spend** 127:5,6
260:6,10,23
**spending** 75:3
127:25
**spends** 161:10
**spent** 40:8 305:3
330:15
**spiritual** 195:4
**split** 154:15
**spoke** 11:17 65:18
65:21 70:24 73:24
88:16
**spoken** 118:3
143:23
**spread** 274:15
275:23 309:5,7
**spreading** 275:9
**spreadsheet** 79:18
325:2,20 326:18
**ss** 336:4 339:4
**staff** 61:15 89:15
96:21 103:23

**staffing** 261:14,17
262:5
**stage** 41:15 48:18
50:19 58:23 62:12
62:21 84:11,14
102:21 117:16
252:18
**stages** 9:18 63:20
302:24
**stake** 249:22 250:5
**standard** 46:22
50:10 53:7,8,11,18
54:2 58:16,20
59:12 61:20,21
67:22 105:9
106:23 107:6,7,11
108:15 110:10,11
110:22 111:5
112:6,24 122:20
123:11 203:9
225:12 267:8
284:17 288:25
290:21
**standards** 14:10
14:19 15:6,15
21:6 23:18,22
46:10 52:24,25
53:10 55:2,25
56:2 57:21 58:14
59:2,18 60:11,14
60:25 61:25 62:22
63:9 67:16 75:9
87:5 93:4,13
99:22,25 100:11
100:19 105:14
106:3,9,21,24
107:15,19,23
108:4,7,14,17
110:13,17,18,24
111:2,8,13,15,22
112:4,9 113:5,13

114:19,21 116:11
116:21 118:2
119:6 125:10,14
128:20 129:19,22
130:5 132:23
138:21 139:23
140:10 148:19,19
201:21 203:5,11
241:7 256:11
275:2 286:20,25
290:12 291:17,21
293:6 320:9
**standing** 167:15
**standpoint** 87:11
229:14
**stands** 272:2
**start** 81:23 108:13
138:23 147:2
150:18 222:19,21
224:15,17,22
279:24 315:21
**starting** 222:24
238:9
**starts** 142:17
**state** 1:12,23 19:24
58:15 62:23 63:13
63:23 146:25
262:11 269:20,24
290:5,8,14,16,18
297:9 302:17
310:20 336:3,22
339:3,8
**stated** 117:3
144:10 172:8
204:13 227:23
228:15 290:3,23
305:20
**statement** 121:9
181:14 191:12
209:8 247:2
284:24 285:19,21

307:21
**statements** 118:23
184:8 209:19
279:8 306:19
321:4
**states** 1:2 63:15
164:14 184:4
232:19 288:17
**stating** 249:15
274:17
**statistics** 27:22
31:21 32:20 34:20
72:4 161:7,12,13
161:21 244:11
**stats** 37:19
**status** 250:8,17
251:19 306:23
315:9,13 316:5,20
317:15
**statuses** 250:15
**statutory** 295:14
299:14
**stay** 107:23
**stella** 10:18
**stem** 184:7,21
186:4 187:6,11,15
187:18 188:13
189:14 192:3,20
193:3 194:2,10,12
195:2 197:18
209:11 210:3
212:15
**stenographic** 1:22
**step** 185:21 208:3
224:20 329:4,9
**stepping** 42:21
**steps** 36:19 255:20
**stereotype** 206:17
**stereotyping**
121:14,15,17

**steven** 11:9
**stick** 314:13
315:22
**stood** 124:6
**stop** 235:9
**street** 2:13,20
**strength** 222:6
**stretch** 213:17
**strictly** 114:18
**strike** 53:24
**stringent** 181:20
**strong** 98:3 131:19
222:3
**structurally** 36:8
**structure** 12:17
14:3 31:11,11
36:4 75:8 115:14
300:20
**studies** 214:10
322:8 324:2,4
**study** 214:21
**style** 43:18 44:20
**subject** 19:12
86:10 92:9,10,14
94:6,7,10 99:20
103:3 113:17
115:8 116:14
148:15 198:25
199:3 237:12
246:14 251:6
274:25 311:2
**subjective** 225:12
**subjectively**
225:18
**submit** 280:13
**submitted** 27:8
33:21 236:21
238:2 259:23
267:4 296:2
**subscribed** 336:19
340:21

**subsequent** 104:25
108:9 164:13
**substance** 40:21
40:25 68:20 69:2
91:10 96:17 97:6
114:5 118:12
134:25 139:19
230:2
**substances** 227:20
228:18 229:10
230:4
**substantial** 33:11
34:9 68:12,16,21
69:3,14,15 315:9
315:13 316:4
**substantive** 41:18
123:6,9,13 124:4,6
224:2
**substitute** 179:3
**succinctly** 172:8
**suffer** 199:7,8,16
261:21
**suffered** 254:2
**sufficiency** 252:21
**sufficient** 233:10
286:12 291:12
**sufficiently** 297:11
**suffolk** 339:5
**suggest** 41:23
168:11 222:21
232:12,14 322:23
**suggested** 237:2
247:11 248:19
284:25 335:11
**suggesting** 249:2
**suggestion** 248:13
**suggests** 119:11
190:19
**suite** 2:6,13
**sujata** 2:15,16 5:6
270:25 304:22

**sum** 118:11
**summary** 297:3
**super** 79:5
**superceded** 79:24
**supervision** 61:16
**supervisors** 38:9
**supervisory** 13:20
**supply** 82:11
**support** 86:25
  122:7 172:10
  211:13 214:4
  231:12 269:11,14
  269:16 274:5
  285:17 306:13,21
  321:5,11,23
  322:17
**supported** 42:9
**supporting** 182:21
**suppose** 6:5
  227:23
**supposed** 146:16
  158:10 159:24
  170:12 172:22
  224:25 286:17
  320:10 326:19
**sure** 14:4 17:13
  21:3 30:22 31:20
  36:18 40:16 41:8
  44:10 48:10 52:7
  70:5 75:9,17,22
  84:25 89:5 90:3
  134:12 138:12
  139:16 141:7
  146:8 149:16
  163:2,4,6 173:17
  188:5 195:21
  201:8 203:4 209:4
  218:19 227:6
  237:9 240:17
  272:5,7,8 276:9
  304:25 309:25

  310:13 325:17
  327:5 334:10,10
  334:11
**surely** 175:12
**surprise** 271:6
**surrendering**
  270:24
**suspension** 64:11
**swear** 5:18
**sweeteners** 228:17
**sworn** 5:21 339:12
  340:21
**synthetic** 228:17
**system** 35:16,17
  138:19,24 139:10
  150:21 325:13
**systemic** 215:11

**t**

**t** 5:19 137:2,6
  336:2 339:2,2
**take** 4:12 40:14,20
  52:6 53:5 57:8
  58:20,25 70:3
  82:24 109:9
  122:25 135:10,20
  135:22,23 187:17
  188:7 190:21
  195:20,23 197:21
  199:4,10 208:3
  224:21 262:16
  270:14 297:5
  304:23 305:8
  322:25 325:8
  326:23 329:19
  330:9,11
**taken** 6:12,15
  52:12 71:18
  109:13 130:24
  136:5 171:22
  175:18 184:8
  196:3 207:23

  224:20 239:17
  270:19 305:13
  309:24 323:5
  336:9
**takes** 30:18
**talk** 19:14 29:4
  72:15 90:24,24
  95:13 134:17
  320:23,24
**talked** 119:6 142:6
  145:23 276:25
**talking** 39:11
  43:25 47:25 48:6
  50:18 52:18,25
  55:9,11,13,20
  61:11 84:15 101:3
  108:17 154:23
  160:3 170:11
  186:14 196:24
  201:2 226:8
  234:11 255:21
  263:5,7 286:16
  289:17 314:2
  315:16 330:16
  334:24,25
**tandem** 48:12
**tap** 87:6
**targeted** 126:14
**teacher** 333:4,6
**teachers** 265:17
  332:22,25 333:13
**teachings** 187:24
**team** 9:8,13 12:19
  137:23 154:23
**teams** 71:15 74:9
  74:10
**technology** 35:22
**telecommunicati...**
  35:22
**telephone** 21:23

**tell** 24:21 27:13
  28:18 29:13 33:11
  49:22 65:15,21
  69:22 76:19 77:11
  90:16 101:24
  102:2 104:18
  118:11 128:8
  129:12 162:2
  168:24 186:23
  207:20 209:5
  213:13 218:9
  240:12 261:25
  267:18 318:25
  319:25 325:16
  327:20,22 331:10
  331:20,22
**telling** 139:22
  246:21
**tells** 329:19
**temporarily**
  242:18 266:19
**temporary** 255:18
  265:17
**ten** 52:6,8 108:20
  109:9 195:20,22
  195:23 270:14,16
  305:9
**tended** 210:19
**term** 21:9 68:21
  206:9 249:10
  288:13,15
**terminate** 235:8
**termination**
  304:13
**terms** 20:15 24:5
  33:6 38:22 53:2
  60:7 63:10 104:17
  131:11 154:3
  191:3 216:5 250:7
  281:11 289:24
  318:24

test 222:23
tested 184:6 188:7
  188:23 208:21
  210:23 211:18
testified 5:22 27:5
  137:7 288:25
testify 114:21
  145:7 256:9
testifying 8:11
testimony 24:19
  25:5 38:21 97:11
  103:4 113:20
  117:16 124:2
  140:8 234:18
  246:15 291:6
  336:9,11 339:13
testing 187:6,11
  187:15 189:17
  206:5 214:17
  249:17
tests 215:8
text 143:9,12
  184:13,15
thank 6:3 12:21
  22:15,19 43:13
  45:14 52:8,17
  88:15 152:6 162:5
  210:12 224:6
  257:10 270:22
  274:10 288:7
  305:7 306:8
  309:17 335:17,20
thanks 272:8
theoretically
  236:23 255:21
thing 6:20 12:8
  107:9 108:13
  114:15 144:4
  151:24 167:19
  180:24 206:24
  211:10 221:12,13

233:15 277:10
  282:7
things 27:17 28:8
  37:21 39:24 63:9
  72:17 73:9 75:11
  75:13 86:17 96:13
  98:4 106:18
  123:21 124:3
  127:3 142:13
  147:24 153:22
  159:22 172:12,23
  172:23,24 173:3
  175:3 180:2
  181:13 186:12
  193:11 206:10,19
  227:8 233:22
  251:8 254:18
  258:10 262:5
  263:6,7,24 276:19
  282:2 310:6
  319:14 324:9
  330:18
think 6:19 16:2
  17:8 24:2 30:8
  31:3 33:19 34:14
  34:25 36:7 42:3,4
  43:4 46:23 48:7
  51:7 58:4 61:10
  64:7 74:23 82:3,5
  83:21 84:18 87:7
  90:19 91:2,14,17
  91:21 93:10,23
  94:24 95:5,12
  96:16 107:4
  112:12 115:22,25
  127:15 132:17
  133:15 135:24
  142:6,11,17 144:5
  163:23 170:6
  172:8 173:22
  174:6 175:7

176:18 178:13
  182:23 186:12
  188:15 196:22
  199:18 205:22
  208:14 211:3
  214:19,20 215:10
  215:19 223:13
  225:21 234:8
  235:13 244:16,18
  245:7 246:23
  247:18,24,25
  248:6,22 261:13
  264:20 266:8
  267:6,20 268:10
  268:11 273:3
  279:5 287:8
  302:20 303:4,23
  311:24 313:7
  316:25 317:16
  324:11 328:14,23
  330:7 331:6,10
  333:23
thinking 142:10
  162:19 211:3
  249:11
thinks 131:18
third 34:17 152:16
  152:24 193:9
thought 49:24
  73:3,3 94:9 238:6
  254:20
thoughts 13:24
  149:17,22
thousand 168:24
threat 269:25
  270:4 271:24
  272:19,24 273:6,7
  273:10,13,16
  274:7 305:19,25
  306:12,17,22
  307:5,7 308:7,13

309:5,20 310:7
  311:14,20 312:11
  312:13,21 313:7,8
  313:15,17 314:7,8
  314:15,15,20,22
  314:23 315:2
  316:23 321:5,11
  322:5,7
threats 273:23
  308:25
three 30:4,9 39:20
  42:14 73:23 81:11
  81:12 87:17
  124:17,18 127:25
  135:13 140:20
  142:18 145:20
  152:14 163:4,5
  164:5 169:14,24
  170:4 277:5
throw 163:5
time 4:4 7:7,14
  11:9,14 12:20
  13:2 18:24 21:10
  28:11 30:18 40:8
  40:14 52:11,13
  81:3 106:16,17
  109:12,15 126:18
  126:22 127:5,6,8,9
  127:18,20 130:10
  136:4 137:3,5
  140:6 150:25
  151:7 152:24
  153:19,19 161:9
  166:6 181:17
  189:16 196:2,5
  201:12 234:18
  255:3 261:11
  268:7 270:18,21
  288:6 305:2,3,12
  305:15 330:16
  333:10 335:23,25

timeline 139:3
timely 20:20
times 25:13 42:22
  75:16 112:13
  114:23 123:17
  126:4,7 172:5,6
  244:12 246:3,5
  263:18 281:5
  283:24 326:9
timing 161:15
tip 174:24,25
title 10:20 58:14
  60:14,24 61:25
  110:11 201:21
  263:21 290:4
  308:16
today 4:3 24:19
  65:15,21 68:14,23
  77:16,18 103:4
  156:3 162:3
  176:18 210:16
  211:2 246:22
  261:18 263:18
  272:2
today's 8:18 25:4
  25:17 335:23
told 82:9 106:25
  110:16,21,25
  140:9,14 197:16
  330:11 333:7
top 43:12
topic 25:25 65:20
  101:12 113:11
  114:17 118:4
  209:20
topics 8:23 21:21
  26:8 93:2 99:19
  112:2 113:11
  164:12 215:25
total 29:9 32:6,8

totally 174:20
touch 105:8
tough 127:14
  128:2
train 54:14 98:4
trained 54:11
  61:13 111:20
  112:9 113:4
  115:24 227:3
  319:9,12
training 113:10,16
  114:8,13,16 115:6
  116:3,4,14,24
  117:13 213:19,25
trains 97:16
transcript 83:6
  336:8,10
transferring
  292:20 294:11
  295:17 296:18
transparent
  326:25
treat 58:7 204:13
  228:20
treated 58:9
treatment 46:19
trends 72:2,24
  149:12
trial 104:18
tried 321:14
troubling 149:13
true 13:11 180:3
  190:2 193:12
  220:18 276:11,16
  284:22 285:13
  286:24 306:12
  312:22 336:10,13
  339:13
truly 202:18
  326:14

truth 159:14
  232:23
truthful 189:3
try 37:2 44:10
  203:2 260:16
  293:14
trying 12:9 50:17
  55:19 78:22 101:6
  160:24 201:5,6,8
  210:14 214:20
  217:24 221:15
  246:9 248:22
  254:3,16 288:4
  310:15 317:6,6
  318:22 319:7
  321:18 325:20
tuesday 144:6
tums 210:20
  211:17
turn 85:15 247:15
turned 145:25
turning 247:20
  248:11
turns 101:4
  197:10
two 16:2 20:21
  30:6,7,12 31:4
  40:15 46:16 54:23
  76:4 81:7 84:5,16
  85:8,23 86:17,23
  87:12,21 88:16
  93:2 98:7 99:19
  99:19 113:11
  119:22 122:25
  138:16 139:5,14
  140:20 141:25
  142:9,10,18
  145:20,22 152:14
  152:20,22 163:4,5
  167:25 169:17
  170:4,17,22 171:4

171:12 172:4,6,14
  180:2,5 203:4
  209:12 224:3
  231:10 233:21
  244:17 263:6
  276:19 279:8
  328:9 334:4
  335:15
tylenol 204:16
  210:20 211:5,7,7
  211:16 213:8,12
  213:15,21,25
  214:5,11,13 215:5
  216:11 217:6,16
  220:23
type 148:10,25,25
  214:17 278:15
  300:17,18 314:14
  314:17,18,21,25
  327:10
types 146:16
typically 282:24
typing 43:3

| u |
| --- |

u.s. 4:18
uh 48:21 74:19
  76:11 77:21 134:7
  159:11 184:2
ultimately 16:19
  17:2 219:24 325:8
unable 254:5
unanimous 172:3
  172:3
unconstitutional
  334:15,16
unconstitutional...
  105:14
undergo 223:6
underlying 195:13
  252:4 278:2

**undermine** 223:4
**underpinning**
  120:23
**understand** 28:4
  36:25 39:16 45:4
  45:6 58:4 60:13
  66:16 79:15 80:2
  89:23 92:5 95:5
  97:11 100:4,10
  120:6 131:15
  144:17,23 145:4
  145:10 158:10
  160:23 161:17
  162:13 187:21
  205:7,13 208:24
  210:21 212:4
  219:11,13,25
  220:3 224:11
  227:22 237:9
  251:23 254:3,18
  257:3,15 260:14
  266:11,23 268:15
  283:21 288:7,12
  290:21 310:12,15
  311:23 314:11
  317:7 325:21
  326:7,16 327:2,5
  330:14 333:2
**understanding**
  21:4 49:24 63:12
  63:22 65:23 66:4
  66:13,13 67:5,6,15
  67:20 83:25 91:12
  91:15 94:14 98:13
  101:2 108:8 114:8
  130:3 145:10
  146:10 161:2,5
  165:17 184:10
  186:20 189:6,7
  205:17 214:13,18
  227:16 292:4

298:15 301:3
  308:15 324:8
  325:3,6,10,17
  326:12 331:9
  333:3
**understands** 83:22
**understood** 7:6
  55:21 58:19 66:19
  90:19 91:16 94:4
  160:11
**undue** 63:25 65:25
  66:16,20,21 68:2
  69:15,15,25 70:9
  236:2,3,4,8,10,17
  236:25 237:2,5,24
  238:8,14,20 239:3
  239:12,15 240:6
  240:20 241:2,11
  241:19,23 245:25
  253:3,7,12 257:21
  258:15 259:5,11
  260:6,10 261:6,21
  262:13,14,22
  263:22,24 265:23
  266:12,17,24
  267:10 268:5,18
  269:8,11,11,15,16
  275:5 278:9
  283:20 284:7,14
  284:20 287:6,19
  290:24 291:15,16
  291:23 292:15,25
  293:6 295:12
  296:10,23 297:11
  297:17 298:4,12
  299:12,18,21
  300:2,4 301:2,7
  303:8 304:3,9,11
  307:8,22 308:4,8
  308:19 309:3,6,19
  310:8 311:19

312:7,14,19 313:5
  313:9,14,17 314:2
  314:24 316:24
  317:23 318:5,6,16
  321:5,11,23 322:5
  323:9,17 324:12
  324:21 331:15
  332:11 333:9,19
  333:20,24
**unemployment**
  304:14
**unequivocal** 187:9
**unequivocally**
  186:23 187:9
**unexplained**
  179:23
**unfavorable**
  221:14
**unfilled** 261:10,12
**uniform** 16:8 17:5
  173:14
**uniformly** 16:15
**union** 56:22
  334:19
**unique** 16:22 72:9
  99:11 100:12
**united** 1:2 63:15
  288:17
**universal** 233:8
**universe** 55:12,15
  55:16,17,20
**unreasonably**
  235:2
**unscrupulous**
  178:14,24,25
  179:15
**untrue** 197:10
  285:2
**unusual** 181:9
**unvaccinated**
  132:10 259:23

264:8,14,15
  265:14 274:14
  275:10,22 277:13
  305:22 313:23
  316:2,18
**unwilling** 250:3
**upbringing** 187:24
**upheld** 277:23
**uphold** 307:8
  308:7,18
**upload** 51:19
**uploaded** 80:19
**uploading** 135:2
**ups** 142:9
**use** 16:20 21:8
  59:24 104:9 107:6
  108:4 110:13,19
  116:3 138:24
  153:14 178:4
  187:14 188:12
  198:10 204:16,19
  205:2,4,16 206:3,4
  207:13 208:10,15
  209:11 210:2,16
  211:7,16 212:13
  212:15 213:7,12
  213:15 214:5
  217:15 220:10,22
  222:9 230:2
  231:13
**useful** 45:5
**users** 137:20 142:2
**uses** 53:15
**usually** 26:7
  123:17 126:14
  183:22 281:15
**utilize** 53:12
**utilized** 110:22

**v**

**v** 95:19 340:4
**vacancies** 261:15
**vaccinate** 277:2,3
**vaccinated** 132:4
166:19,20,24
168:12,18 176:13
177:9,17,21,21
184:10 232:6,21
245:21 250:4
270:8 274:18
275:10,24
**vaccination** 61:22
63:12 68:4,7 98:7
100:17 119:25
120:18 146:23
148:5 166:11
168:6 170:14
185:20 201:17
232:10 270:11
306:5,23 315:8,12
316:5,19 317:15
323:21 324:5
328:24 329:3,24
**vaccinations** 25:15
166:6 170:15
193:8
**vaccine** 9:3 14:25
17:12 18:20 20:5
21:20 24:12 66:9
76:6,10 118:8
119:12 120:8
121:10,23 167:10
168:14 171:9
173:10,21 175:22
176:14 178:5
179:16 180:8
182:11 187:17
190:21 191:10,25
192:2,12,21
193:15,16 194:3

194:11,14,20
195:2,7 198:10,22
198:25 199:4,5,10
204:14 206:15
216:22 219:10,13
219:16 220:5
221:7 222:2
228:13 229:7
231:13 232:15
233:25 249:14
252:5 275:16
276:24 286:6
291:25 328:13
329:16 330:5,7,12
**vaccine's** 194:15
**vaccines** 122:8
167:16 173:12
175:19 177:25
180:18 181:5
184:6,8,20 187:4
188:7,20 189:13
190:16 197:19,22
212:16 329:19
**valid** 170:25
276:16
**validity** 276:22
**value** 79:23 87:10
**values** 167:6,9
**varied** 10:15
149:20
**variety** 179:19
207:3 234:2
282:17 326:10
**various** 9:15 10:24
12:16 14:12 20:10
24:6 25:9 26:8
36:11,12,20 37:16
38:24 54:15 63:20
69:17 72:16,19
84:12 85:20
119:14 124:15

128:5 130:24
147:24 172:5,5,6
172:11 177:22
186:14 201:21
212:22,24 220:25
230:2 231:3
254:18 259:6
269:3 275:15
294:15 334:16
335:9
**vast** 33:2 245:19
253:6
**vehicle** 277:25
278:2
**vendor** 35:24,25
36:2
**verbal** 139:17
**verify** 284:9
**veritext** 4:21
340:3
**versa** 244:25
**verse** 243:5
**versus** 4:17 33:7
149:18
**vice** 244:25
**video** 1:20 4:11,14
22:2 86:3
**videoconference**
1:16,20 71:13
**videographer** 3:13
4:2 5:17 52:10,13
109:11,14 135:25
137:4,21 195:25
196:4 270:17,20
305:4,5,11,14
335:22
**view** 36:7 43:11
45:7 66:20 100:5
119:10 121:18
140:5 148:8,22
169:19 184:5

185:5 186:8
187:16 218:10
**views** 47:23
120:12 121:3
**vii** 58:14 60:14,24
61:25 110:11
201:21 290:4
**violate** 198:17
199:15,17
**violating** 191:9
**virtual** 22:2 25:3
**virtually** 4:6 6:6
33:22 90:15 244:3
**volume** 16:16
**volunteered**
204:21
**volunteering**
211:12
**volunteers** 221:12
**voracity** 193:23
**vote** 36:9 41:3,7
41:21 42:5,8,9
73:23 80:16 85:10
90:23 123:14
138:20 139:7
145:24 151:5
152:15,16,20,22
152:25 153:6
168:4 170:16
**voted** 30:6,7,11
41:7,9,9 101:23,25
102:6 151:23,24
152:3,10 153:4
265:25 327:23,24
**voter** 101:18,22
102:4 122:4,5
123:13 169:8,12
169:16 172:18
174:3 182:3
**voter's** 123:19

**voters** 42:14
  101:15 121:25
  128:20,22 169:17
  171:4,12
**votes** 28:4,5 39:14
  39:20 40:17,23
  41:11 81:22 102:2
  102:24 116:7,7
  139:9 152:14
  170:17 179:14
  258:25
**voting** 71:10 81:5
  81:6,7 104:10
  139:2,25 146:7
  151:22
**vulnerable** 310:5

## w

**w** 336:2
**wait** 80:16 110:5
  137:25 152:23
**waive** 105:16
**waived** 183:23
**walk** 81:4
**want** 16:4 28:22
  30:21 35:3 40:11
  48:9,10 55:8
  58:21 59:24 68:17
  69:4 72:7 80:8
  134:16 135:13
  176:6 211:10
  219:10 235:2
  245:12,20,21
  249:18 271:12,14
  280:2 281:21
  283:13 289:15,17
  305:20 311:3
  316:10 317:7
  334:6
**wanted** 16:20,24
  57:7,8,9 72:11
  73:2 75:17 87:6

101:9 108:10
  127:21 139:24
  141:7,15 142:13
  155:16,17 160:13
  160:18 218:14
  265:21 266:11
  268:15 271:5
  283:7 305:18
**wanting** 186:16
**wants** 135:4 164:6
  283:7
**warranted** 23:16
**way** 13:16 28:13
  35:2,5 39:3 41:7
  46:18 47:12,22
  51:15 61:3 63:25
  63:25 64:4,5 65:3
  91:7 92:11 95:4
  97:18 100:13,18
  102:18 105:23
  107:9 119:3
  121:14 124:12
  127:14 128:3
  146:21 148:12,21
  149:5 150:23
  151:10 155:9,10
  157:7 162:15
  169:4,8 170:22
  171:9 174:24,25
  178:10 183:5
  186:12 188:13
  190:11 192:11
  206:20 208:15
  209:12 210:3
  213:4,4 214:20
  215:11 218:8,8,10
  221:16 233:25
  256:4 275:19,19
  286:2 287:9
  295:20 313:22
  330:22 339:18

**ways** 125:23,25
**we've** 26:14 27:19
  31:13 43:22 69:2
  92:24 110:24
  115:13 116:16
  122:16 130:17,25
  162:10 189:7
  201:10 205:23
  215:20 234:16
  259:5 279:25
  283:15,16 288:5
  318:15 319:15
  321:15
**week** 128:12
**weekend** 127:24
**weekly** 70:13,14
  70:24,25 71:4
  72:18 152:12
  153:2
**weigh** 9:18 183:19
  186:15 228:10
  231:6
**weighed** 94:25
  221:9
**weighing** 174:11
  176:25 177:15,22
  229:22
**weight** 131:9,11
**weights** 203:11
**welcome** 52:16
**went** 21:3 48:17
  75:6,10 112:19
  125:21,23 145:19
  146:9 227:16
  290:2
**whatsoever**
  192:14
**whereof** 339:20
**wide** 335:2,3
**willing** 254:5

**win** 241:24
**window** 163:24
**wins** 171:19
**withdraw** 60:6
  124:23 221:22
**withdrawn** 97:9
  100:4 212:10
  279:14 281:9
**witness** 4:10 5:18
  5:20 6:14 7:2 8:12
  45:14 46:11,12
  60:5 67:15,18
  83:20 86:8 92:21
  93:8 96:12,15
  97:23 98:23
  102:22 103:4,5
  105:6,18 108:24
  109:3,10 111:24
  112:2,7 113:8
  115:9,10 117:2,12
  118:15 125:5
  127:13 132:7,13
  132:21 165:4
  178:8 210:7,10,12
  224:4 233:2
  246:12 256:5
  259:17 274:20
  275:4 276:3
  286:21 287:12
  288:21 289:3
  297:20 307:18
  326:5 337:3
  339:10,14,20
  340:5
**witnesses** 119:24
**wondering** 42:24
**word** 23:21 26:23
  59:25 64:24 68:19
  68:19 69:3 74:18
  76:2 83:16 88:7
  104:10 143:14,17

143:19 144:9,20
178:14 183:7
223:9,20 224:12
235:13,14 262:23
280:14 335:17
**words** 61:4 68:15
69:4,5 110:19,20
178:21
**work** 16:23 37:10
37:14 38:7,8,10,16
40:22 41:2 62:17
71:2 77:14 78:19
79:6 83:15 86:20
95:2 98:11,15
108:18 112:25
123:8 126:18,21
127:7,9,17,18,21
127:22 128:4,14
128:22 129:8,13
129:18 139:23
140:16,17 148:17
149:6 150:23
151:13,21 212:9
214:17 215:18
221:19 245:21
249:16,19 251:10
258:9 262:7,12,17
262:19 263:2,10
263:12 264:14,15
264:22 265:4,18
270:12 278:15
310:5 311:9
317:19
**worked** 9:8,15,16
37:12 56:11 88:23
92:10
**workers** 262:8
263:3 264:8,14
**workflow** 128:16
**workforce** 300:20

**working** 9:24
10:21 23:21 30:20
35:24 37:13 75:15
127:22 129:19
154:23 171:15
249:25 250:10
258:14 265:18
266:18 303:12
322:10
**workings** 156:23
**workplace** 306:6
310:4,23
**works** 112:18
280:8 295:21
301:24
**workspace** 303:13
**workweek** 127:20
**world** 75:3 207:10
251:3
**worry** 271:10
**wrap** 210:14
**write** 237:7
**writing** 22:19 23:6
49:20 74:21 85:17
86:3 150:10
155:24 156:12,15
161:16 216:6,12
267:2,9,12 282:4
319:21
**writing's** 155:25
**writings** 25:4
217:8 267:4,5,14
337:20
**written** 23:9 49:16
64:4,11 93:16
94:20 153:8 155:7
215:22 258:2
281:10 288:5
337:17
**wrong** 34:18
108:16 110:18

169:17 192:5,17
333:3 334:8
**wrote** 140:22
143:5 186:6
319:18

---
**x**
---

**x** 1:3,15 20:19
27:19 101:23
337:2
**xu** 10:18

---
**y**
---

**y** 27:20 88:8
**yeah** 20:12 21:12
21:25 26:15 53:15
56:10 62:7 65:10
75:22 76:19 78:22
81:13 83:21 84:7
85:6 90:11 97:24
98:21 114:20
118:15 123:5
124:5 127:13
156:25 160:23
185:3 203:20
239:24 249:8
251:14 255:20
260:12,16 272:9
272:11,12 275:13
281:7 287:12
288:21 302:19
308:11 309:8,10
309:16 319:22
325:16 327:5
331:13 332:12
**years** 75:4 214:16
214:16
**york** 1:2,10,11,12
1:12,23 2:7,7,14
2:18,21,21 4:17,19
8:8,15 9:3,19,20
9:21,23 10:6 13:3

19:22 27:10 38:11
54:14 62:23,23
63:23,23 64:15,16
64:19,20 65:3
76:5 82:4 85:9,11
88:9,11 151:4
290:5,5,8,8,16
297:9,9 299:20
302:17,18 336:3
336:22 339:3,8
340:4
**yorkers** 1:3 4:16

---
**z**
---

**z** 5:19 137:6
**zeros** 137:15 150:2
**zoom** 1:16 21:24
43:11 71:12,15

# Federal Rules of Civil Procedure

## Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.