# EXHIBIT 1

1    UNITED SATES DISTRICT COURT

2    EASTERN DISTRICT OF NEW YORK

3    - - - - - - - - - - - - - - - - - x

4    LORRAINE MASCIARELLI,

5            Plaintiff,

                         INDEX NO. 22-cv-7553

6

7          -against-

8

9    NEW YORK CITY DEPARTMENT OF
    EDUCATION,

10

              Defendant.

11   - - - - - - - - - - - - - - - - - x
    (Pages 83 through 87 have been designated

12   confidential in separate booklet)

13                 March 25, 2025
                 10:20 a.m.

14

15      VIRTUAL DEPOSITION of KATHERINE G. RODI, on behalf

16   of the Defendant herein, pursuant to Notice, taken

17   before Ceita Lazar, a Stenographic Reporter and

18   Notary Public within and for the State of New York.

19

20

21

22

23           SANDY SAUNDERS REPORTING
        254 South Main Street, Suite 216

24         New City, New York 10956
           (845) 634-7561

25

1      A P P E A R A N C E S:

2

3          THE SCHER LAW FIRM, LLP
                Attorneys for Plaintiff
4                600 Old Country Road
                Garden City, New York 11530
        BY:  AUSTIN GRAFF, ESQ.
5

6          NEW YORK CITY LAW DEPARTMENT
                Attorneys for Defendant
                100 Church Street, New York
7                New York 10007
        BY:  KATHLEEN LINNANE, ESQ.
8                   - and -
                ANDREA MARTIN, ESQ.
9

10

11

12

13

14

15

16          ALSO PRESENT:

17                LORRAINE MASCIARELLI

18

19

20

21

22

23

24

25

1          F E D E R A L   S T I P U L A T I O N S

2

3     IT IS HEREBY STIPULATED AND AGREED by and between

4     the attorneys for the respective parties herein,

5     that filing and sealing be and the same are hereby

6     waived.

7

8     IT IS FURTHER STIPULATED AND AGREED that all

9     objections, except as to the form of the question,

10     shall be reserved to the time of the trial.

11

12     IT IS FURTHER STIPULATED AND AGREED that the within

13     deposition may be signed and sworn to before any

14     officer authorized to administer an oath, with the

15     same force and effect as if signed and sworn to

16     before the Court.

17

18

19

20

21

22

23

24

25

```
1                    K. G. RODI
2              THE REPORTER:  Ms. Linnane,
3         would you like to purchase a
4         copy?
5              MS. LINNANE:  It's my
6         understanding that the attorney
7         taking the deposition shares a
8         courtesy copy.  That's how we
9         usually practice.
10             MR. GRAFF:  That's fine.  I
11        will do.
12             MS. LINNANE:  Thank you,
13        Mr. Graff.
14             THE REPORTER:  My name is
15        Ceita Lazar, court reporter.  The
16        parties are present remotely to
17        take the deposition of Katherine
18        Rodi In the Matter of Lorraine
19        Masciarelli versus New York City
20        Department of Education.
21             I ask that everyone please
22        stay close to the microphone so
23        that I can provide the best
24        transcript possible and also so
25        my interruptions will be minimal.
```

1           K. G. RODI

2              Will counsel please state

3        their name, who they represent,

4        and then I will swear in the

5        witness.

6              MR. GRAFF:  Austin Graff

7        from The Scher Law Firm,

8        representing the plaintiff.

9              MS. LINNANE:  Kathleen

10       Linnane, New York City Law

11       Department for the defendant in

12       this case.

13             MS. MARTIN:  Andrea Martin,

14       New York City Law Department for

15       defendant.

16

17  KATHERINE G. RODI,

18  having been first duly sworn by the

19  Notary Public (CEITA LAZAR), and stating

20  her address as 65 Court Street,

21  Brooklyn, New York, 11201, was examined

22  and testified as follows:

23             MS. LINNANE:  We would like

24       this to be marked confidential

25       for the record, please.

```
 1                    K. G. RODI
 2          Actually, no, it's her work
 3          address.
 4
 5     EXAMINATION
 6     BY MR. GRAFF:
 7          Q. Good morning, Ms. Rodi.  My name
 8      is Austin Graff.  I'm the attorney for
 9      Lorraine Masciarelli.  I'm going to ask
10      you a series of questions today.  If
11      there's something you don't understand
12      or can't -- do not have an answer, if
13      you need me to repeat or rephrase the
14      question, please let me know.  If you
15      respond, I'll take it under belief that
16      you understood the question.  Do you
17      understand that?
18          A. Yes.
19          Q. Please make all your responses
20      verbal, because the court reporter
21      cannot take head nods and hand
22      gestures.  Do you understand that?
23          A. Yes.
24          Q. If -- if you need to take a
25      break at any point, as long as there's
```

```
1              K. G. RODI
2    no pending question, I have no problem
3    taking a break.  Do you understand
4    that?
5         A. Yes.
6         Q. Where are you currently
7    situated?
8         A. At my home.
9         Q. Is there anyone else in the
10   house with you?
11        A. No.
12        Q. Do you have any documents in
13   front of you related to this case?
14        A. No.
15        Q. Is your cell phone nearby?
16        A. Within reach but not in front of
17   me.
18        Q. I just ask if you turn it over
19   or put it further away so you can't see
20   it, so no one can communicate with you.
21        A. Sure.
22        Q. How did you prepare for today's
23   deposition?
24        A. I was prepared by the New York
25   City Law Department.  We met and
```

```
 1              K. G. RODI
 2   reviewed matters that they believe
 3   would be addressed today in this
 4   deposition.
 5        Q. Okay.  I'm going to show you --
 6   tell me when you can see the screen?
 7        A. I can see the screen.
 8        Q. Is this the Notice of Deposition
 9   that I've served upon you regarding
10   this deposition?
11        A. Yes.
12        Q. Have you seen this document
13   before?
14        A. Yes.
15        Q. Are you prepared to answer
16   questions regarding some or all of the
17   topics identified on the Notice of
18   Deposition?
19        A. Yes.
20        Q. Okay.
21            MR. GRAFF:  I'm going to
22        mark that Exhibit A.
23            (Plaintiff's Exhibit A,
24            Notice of Deposition, was
25        marked for identification.)
```

```
1                    K. G. RODI

2        Q. Are you currently employed?

3        A. Yes.

4        Q. Who is your employer?

5        A. The New York City Department of

6   Education in the City of New York.

7        Q. Are you employed by both

8   entities or just one of the entities?

9        A. The Department of Education is

10  under the City of New York.

11       Q. How long have you worked for the

12  New York City Department of Education?

13       A. For 18 years.

14       Q. What is your current title?

15       A. My current title is executive

16  director, Office of Employee Relations.

17       Q. And how long did you have that

18  title?

19       A. Since 2012.

20       Q. What are your duties in that

21  title?

22       A. In that title, I oversee several

23  offices including the Office of

24  Personnel Investigation, the Office of

25  Safety and Health, the employee
```

1                    K. G. RODI

2      relations, the Office of Disability

3      Accommodations, the reassignments and

4      arrest team, and manage other issues

5      related to onboarding, offboarding, and

6      employee relations matters.

7           Q. Since September 21 -- 2021, have

8      you had that same title?

9           A. Yes.

10          Q. Were your job duties in

11     September 2021 similar?

12          A. Yes.

13          Q. Have you ever been a classroom

14     teacher?

15          A. Yes.

16          Q. What did you teach?

17          A. High school history and English.

18          Q. Where did you teach?

19          A. East Rockaway High School.

20          Q. When did you start teaching?

21          A. 1995.

22          Q. How long did you teach?

23          A. For three years.

24          Q. When did you stop teaching?

25          A. 1998.

K. G. RODI

1

2     Q. What made you leave teaching?

3         MS. LINNANE:  Objection.

4         You can answer.

5     A. Decided to try something

6  different.

7     Q. After you stopped teaching, did

8  you immediately begin working for the

9  New York City Department of Education?

10        MS. LINNANE:  Objection.

11        You can answer.

12    A. No.

13    Q. After you ended your teaching,

14  did you go back to school?

15    A. Within a few years, yes.

16    Q. Where did you go back to school?

17    A. I went to law school at American

18  University.

19    Q. What -- where did you graduate

20  high school?

21    A. Sacred Heart Academy in

22  Hempstead, New York.

23    Q. What year did you graduate high

24  school?

25    A. 1990.

```
 1                    K. G. RODI
 2        Q. Where did you go to college?
 3        A. Mount Holyoke College in South
 4   Hadley, Massachusetts.
 5        Q. What year did you graduate?
 6        A. 1994.
 7        Q. What was your major?
 8        A. American Studies.
 9        Q. And you said you went to
10   American University for law school?
11        A. Yes.
12        Q. What year did you graduate
13   American University?
14        A. 2003.
15        Q. Are you a licensed attorney?
16        A. Yes.
17        Q. Are you licensed in New York?
18        A. Yes.
19        Q. In law school, did you take any
20   classes in labor law?
21             MS. LINANNE:  Objection.
22             You can answer.
23        A. I believe so, yes.
24        Q. In law school, did you take any
25   classes in employment law?
```

                          K. G. RODI

1

2                    Ms. LINNANE:  Objection.

3                    You can answer.

4          A. Yes.

5          Q. Do you have any training in

6     human resources?

7          A. Yes.

8          Q. What type of training do you

9     have in human resources?

10         A. I have worked with human

11    resources for the past 18 years.

12    I've attended numerous professional

13    development courses, and I have

14    attended -- and numerous trainings

15    within the DOE.

16         Q. Have you trained employees in

17    human resources?

18         A. Yes.

19         Q. What topics have you trained

20    employees?

21         A. Let's see.  Discipline

22    accommodations, hiring, onboarding,

23    offboarding, all progressive

24    discipline, elements of tenure,

25    elements of -- of leaves, parts about

```
 1                    K. G. RODI
 2     the FMLA laws and policies related to
 3     human resources, and a lot more.
 4          Q. Did you have any training on
 5     Title VII issues?
 6          A. Yes.
 7          Q. Have you trained employees on
 8     Title VII issues?
 9          A. Yes.
10          Q. Do you have any training
11     regarding -- well, do you have any
12     training regarding religious
13     discrimination?
14          A. Yes.
15          Q. What type of training do you
16     have on religious discrimination?
17          A. I went to law school.  I took
18     classes in the First Amendment; I took
19     classes regarding discrimination.  I've
20     also taken numerous professional
21     development courses regarding
22     discrimination, accommodation.  At one
23     point, I oversaw the Office of Equal
24     Opportunity within the DOE.  So I
25     actually have extensive training in --
```

K. G. RODI

1

2    related to religious discrimination.

3         Q. When did you oversee the

4    Department of Education's Equal

5    Employment Office?

6         A. From 2019 -- no, 2018 to 2020 --

7    2020, about there.

8         Q. Were you the director -- were

9    you in charge of the equal employment

10   opportunity during the COVID vaccine

11   mandate implementation?

12        A. No. If the vaccine mandate

13   started in '21, I was no longer

14   overseeing it.

15        Q. Overseeing the Equal Employment

16   Office?

17        A. Correct.

18        Q. Okay.  What role did you play in

19   the implementation of the vaccine

20   mandate?

21        A. I was on the general committee.

22        Q. What does it mean,

23   "the general committee"?

24        A. There was a group of people from

25   HR, the chancellor's office, the health

K. G. RODI

1

2    office, the superintendent's office,

3    the legal office that joined together

4    when we made decisions to -- regarding

5    the -- anything related to the vaccine.

6        Q. What type of decisions did the

7    committee make?

8        A. The -- one of the decisions was

9    the process of how employees would

10    apply for exemptions.  One was the

11    determination that -- that providing

12    exemptions would be an undue burden for

13    the agency, the determination of how

14    just elements of how the exemption

15    process would take place.

16        Q. With respect to determining

17    providing exemptions were undue

18    burdens, was that a decision across the

19    board, or was it an individualized

20    decision made by the committee based

21    upon a person's application?

22        A. It was both.  First, the -- when

23    we were making a decision on how to

24    approach reviewing the applications, we

25    already had thousands of applications.

K. G. RODI

1
2  So, from the start, we knew that we

3  would have to review them or consider

4  them on a whole.  And we realized that

5  having 2,000 or more, and eventually it

6  was over three thousand applications,

7  if we granted those exemptions, that

8  that would be an undue burden.

9       However, we also believed that

10  each applicant deserved the right to

11  have an individual review to make sure

12  that there was nothing that we hadn't

13  considered, that they had appropriately

14  applied to the right place, and that

15  there was -- that there was nothing

16  that we had overlooked.  So while it

17  was a decision overall based on the

18  numbers that we already had, it was

19  every person's application was looked

20  at individually.

21     Q. When did the general committee

22  determine that providing exemptions was

23  an undue burden?

24     A. I don't remember exactly when,

25  but it was -- we had -- if the

```
 1                    K. G. RODI
 2    exemption applications were due in, I
 3    think, it was early September, it was
 4    sometime during that period where we
 5    already -- by the time we met and
 6    talked about how we were going to
 7    approach it, we already had several
 8    thousand applications.
 9         Q. Did the general committee --
10    were there notes taken regarding the
11    general committee meetings?
12         A. Not that I'm aware of.
13         Q. Was there -- were there minutes
14    made of the general committee meeting?
15         A. Not that I'm aware of.
16         Q. Did you take notes regarding the
17    general committee meeting?
18         A. No.
19         Q. So the determination regarding
20    undue burdens was made September,
21    October, would you say, of 2021?
22              MS. LINNANE:  Objection.
23              You can answer.
24         A. Probably -- probably sometime in
25    September.
```

K. G. RODI

1

2      Q. Did you have a role to play in

3   determining whether to grant or deny

4   exemptions?

5      A. Yes.

6      Q. Did you review specific

7   applications for exemptions?

8      A. Yes.

9      Q. And when I talk about

10  exemptions, I'm talking about

11  exemptions from the COVID-19 mandate.

12  Do you understand that?

13     A. Yes.

14     Q. Okay.  Were you able to

15  unilaterally decide on whether to grant

16  or deny an exemption?

17          MS. LINNANE:  Objection.

18          You can answer.

19     A. No. Yes and no.  Yes, if there

20  was something that was for some reason,

21  I had the ability to do it.  I don't

22  think I did it due to the nature of how

23  we were discussing all of the -- all of

24  the applications.  But we -- and I

25  physically denied them in terms of in

```
 1                    K. G. RODI
 2   the SOLAS.  But in terms of making the
 3   decision that -- that all religious
 4   exemption applications would be an
 5   undue burden, that was a group of us.
 6        Q. And that group was the general
 7   committee?
 8        A. Yes.
 9        Q. And that was a decision that all
10   religious exemptions were an undue
11   burden?
12        A. Yes.
13        Q. And you said you reviewed them
14   at the time you were discussing
15   applications.  And you said "we."
16   Who's "we" that were discussing
17   applications?
18        A. My deputy, Mallory Sullivan; my
19   boss at the time, Vicki Bernstein; and
20   occasionally the law department.
21        Q. And your deputy, Mallory
22   Sullivan, she -- is she currently
23   working for the New York City
24   Department of Education?
25        A. Yes.
```

1           K. G. RODI

2       Q. And Vicki Bernstein, who you

3   said was your supervisor, does she

4   currently work for the Department of

5   Education?

6       A. No.

7       Q. And you said she was your

8   supervisor.  What title did she have?

9       A. The chief human resource

10  officer.

11      Q. What role did Ms. Bernstein have

12  in the determinations of whether to

13  grant or deny exemptions?

14      A. Similar to mine.

15      Q. Did she have a final say on yes

16  or no whether to grant an exemption?

17      A. No one really had a final say.

18      Q. If no one had a final say, how

19  was someone either granted or denied an

20  exemption?

21      A. Meaning, no one person had a

22  final say.  It was that -- that there

23  was the determination from the general

24  committee that these were an undue

25  burden.  So it wasn't that Vicki made

K. G. RODI

1    that decision, or I made that decision.

2

3    It was that the decision had been made.

4        Q. And did the general committee

5    review applications of people who

6    sought exemptions before they decided

7    that providing an exemption was an

8    undue burden?

9        A. No.

10       Q. So regardless of what religious

11   belief the person had, it was going to

12   be denied no matter what?

13           MS. LINNANE:  Objection.

14           You can answer.

15       A. Yes.

16       Q. Was there any discussions when

17   examining an application about Catholic

18   applicants?

19       A. No.

20       Q. Was there any discussion

21   regarding the pope's statements

22   regarding the vaccine in -- used to

23   determine whether Catholic applicants

24   received an exemption?

25       A. No.

```
 1              K. G. RODI
 2       Q. Was there a financial incentive
 3  granted to you to deny vaccine mandate
 4  exemptions?
 5              Ms. LINNANE:  Objection.
 6              You can answer.
 7       A. No.
 8       Q. What was the basis for the
 9  general committee's decision that
10  determined that providing exemptions
11  was an undue burden to all applicants?
12       A. Because we had a school system
13  to run, and kids needed to be back in
14  school.  And kids were not vaccinated
15  at the time, and we needed to protect
16  those children that came back to
17  school.  And we -- particularly on the
18  lower level grades -- we needed
19  teachers to be in the classroom, and we
20  needed people to do their jobs.  And we
21  received applications from every title.
22  We received it from teachers, from
23  custodians, from school food workers,
24  from principals, from assistant
25  principals, from, you know, name the
```

```
 1                   K. G. RODI
 2    person, name the job.  And the fact is
 3    that we needed to run a school system,
 4    and we did not have the staffing
 5    resources to have people not in school
 6    buildings or not be able to go into
 7    school buildings, because, at that
 8    time, if you weren't vaccinated, you
 9    weren't permitted into school
10    buildings.
11         So we didn't have the ability to
12    put people in remote places, because we
13    had kids physically in buildings.  You
14    can't -- you can't do online learning
15    with little kids.  You can't do
16    plumbing remotely.  You can't do school
17    food remotely.  So it was absolutely
18    necessary for us to return kids to
19    school, to return to education, to have
20    people in person.  And to have three
21    thousand people or -- or that not
22    working would've been an undue burden
23    to the agency.
24         Q. Did the general committee
25    consider testing and masking as an
```

```
 1                  K. G. RODI
 2   accommodation for those who had
 3   religious objections?
 4              MS. LINNANE:  Objection.
 5              You can answer.
 6       A. It wasn't an option, because
 7   they -- the -- there was a mandate from
 8   the Department of Health that if you
 9   were not vaccinated, you were not
10   permitted in buildings.  So it didn't
11   matter if you masked and tested.  You
12   still weren't allowed in the buildings.
13       Q. Were employees of that three
14   thousand or how many sought exemptions
15   granted accommodations?
16              MS. LINNANE:  Objection.
17              You can answer.
18       A. Of the three thousand religious?
19       Q. Religious.
20       A. Not by the DOE.
21       Q. Who granted them?
22              MS. LINNANE:  Objection.
23              You can answer.
24       A. If any of them received an
25   exemption, it was from the arbitrator.
```

1          K. G. RODI

2      Q. The arbitrator, meaning

3  Scheinman Arbitration Mediation

4  Service?

5      A. Yes, correct.

6      Q. Do you know what basis those

7  employees received an accommodation

8  from Scheinman Arbitration Mediation

9  Service?

10          MS. LINNANE:  Objection.

11          You can answer.

12      A. I have no idea.

13      Q. Was there an opinion within the

14  Department of Education regarding those

15  people who did not take the vaccine?

16          MS. LINNANE:  Objection.

17          You can answer.

18      A. No.

19      Q. Did the Department of Education

20  believe that people who did not take

21  the vaccine should've been terminated?

22          MS. LINNANE:  Objection.

23          You can answer.

24      A. I don't understand the question.

25      Q. In your position, was it proper

```
 1                    K. G. RODI
 2     for the employees who did not take the
 3     vaccine to be terminated from their
 4     employment?
 5                    MS. LINNANE:  Objection.
 6                    You can answer.
 7          A. At that time, they couldn't
 8     work, and they were suspended for a
 9     period.  And then there was a point
10     where we couldn't do anything with
11     them, and the mandate was still in
12     place.  And the only option was had was
13     to resign them from the system without
14     any bias so that we could hire other
15     teachers.  Because, again, we had a
16     school to run.  We have schools to run,
17     agency to run.  But that was because we
18     could not bring them into the building.
19     And there's a point where you can't
20     keep them on a suspension forever.
21               A lot of people went and got
22     other jobs, to our understanding.  But
23     in terms of, you know -- it was the
24     option that we had at the time.
25          Q. When you say you resigned them
```

K. G. RODI

1    from the system, do you mean terminate

2

3    them?

4        A. No. We -- it's treated as a

5    resignation in that if they apply to

6    come back, we don't treat them as

7    though they've been terminated.  We

8    treat them as though they resigned.

9        Q. If there's an application to

10   return to work from someone who was --

11   who was resigned from the system, do

12   they have to start at the bottom level

13   of employment, or can they start where

14   they left off?

15              MS. LINANNE:  Objection.

16              You can answer.

17       A. It wholly depends on what

18   agreement they signed.  Everybody left

19   in a different way.  Some people signed

20   forms so that they could be reinstated.

21   Other people just walked away.  Some

22   people resigned on their own before we

23   did a group resignation.  So it's very

24   individual.  If anyone is rehired, we

25   have to, like, basically look for their

                        K. G. RODI
1
2    -- if there's an agreement on them and
3    then act appropriately.
4        Q. What about those employees that
5    were resigned from the system in
6    September of 2022 after the one year
7    period of receiving benefits and being
8    suspended?
9             MS. LINANNE:  Objection.
10            You can answer.
11       A. Again, it depends on what they
12   signed.  It's individual.
13       Q. Do you think the people who had
14   sincere and genuine religious beliefs
15   should've been fired from their
16   employment from the New York City
17   Department of Education?
18            MS. LINANNE:  Objection.
19            You can answer.
20       A. I -- the best option at the time
21   was for us to run an agency.  We could
22   not have unvaccinated employees come
23   into our buildings.  That was not
24   permitted at the time.  And we kept
25   them on with benefits for as long as we

K. G. RODI

could.  And there was a certain point

where we had to hire new people,

because we needed teachers in the

classrooms and custodians and school

food and all of that.  And we had no

other choice.

Q. At some point during the

process, the City changed its rules

regarding entertainers and athletes.

How did that affect the Department of

Education?

MS. LINNANE:  Objection.

You can answer.

A. I don't recall any effect.

Q. Were you provided any training

regarding whether to determine whether

to grant or deny an application for an

exemption?

A. What do you mean?

Q. Well, did anyone tell you --

strike that.

When an application came for a

religious exemption, was it

automatically denied without review?

```
 1                    K. G. RODI
 2              MS. LINNANE:  Objection.
 3              You can answer.
 4         A. Sorry.  No.
 5         Q. Okay.  So when you received an
 6    application for religious exemption,
 7    what did you review to make a
 8    determination whether to grant or deny?
 9         A. We made sure that the person had
10    appropriately applied in the right
11    area.  A number of people would check
12    religious exemption, but they were
13    really looking for a medical exemption.
14              We also made sure that they
15    actually submitted something with their
16    application, because some people
17    included blank sheets of paper.  And,
18    then, if it was a medical -- if it was
19    in the wrong place, we -- we
20    immediately advised them so that they
21    could reapply or reapply in the right
22    place.  If it was a blank piece of
23    paper, we immediately advised them so
24    that they could submit appropriate
25    documentation.
```

K. G. RODI

2    And then, other than that, we

3    then -- we reviewed to make sure they

4    had submitted something to support, you

5    know, that it was religious in nature.

6    We didn't judge what it was.  And even

7    if it was just a piece of paper that

8    they wrote out.  And then we denied

9    their request.

10    Q. So there was no examination of

11    whether or not the person submitting

12    the application had a bona fide

13    religious belief?

14        Ms. LINANNE:  Objection.

15        You can answer.

16    A. No.

17    Q. No, there was no consideration

18    of whether someone had a bona fide

19    religious belief?

20        MS. LINANNE:  Objection.

21        You can answer.

22    A. No.

23    Q. What were you looking for --

24    strike that.

25        Was there any religious belief

```
 1                    K. G. RODI
 2   that would've entitled someone to a
 3   religious exemption?
 4       A. No.
 5       Q. Was it different for a person
 6   who sought a medical exemption or a
 7   medical accommodation?
 8            MS. LINNANE:  Objection.
 9            You can answer.
10       A. There were medical exemptions,
11   and then there were medical
12   accommodations.  Which one are you
13   asking about?
14       Q. Well, let's start with medical
15   exemptions.  Was it any different if
16   anyone sought a medical exemption?
17            MS. LINNANE:  Objection.
18            You can answer.
19       A. Yes.  The medical exemption went
20   to our medical team, which comprised of
21   doctors, and the doctors reviewed those
22   applications.
23       Q. Did the doctors have the right
24   to grant or deny the exemption, or they
25   just made recommendations to someone?
```

```
 1                  K. G. RODI
 2            MS. LINNANE:  Objection.
 3            You can answer.
 4       A. They had the right to approve on
 5   a medical level, and then those were
 6   reviewed by -- by my team.
 7       Q. And, to your memory, were any
 8   medical exemptions that were approved
 9   by a medical doctor denied?
10            MS. LINNANE:  Objection.
11            You can answer.
12       A. Yes.
13       Q. So even though the doctor
14   recommended an exemption, they were
15   still denied?
16            MS. LINNANE:  Objection.
17            You can answer.
18       A. Yes.
19       Q. Now, with respect to medical
20   accommodations, how was that handled?
21            MS. LINNANE:  Objection.
22            You can answer.
23       A. Medical accommodations were
24   handled like we do all accommodations.
25   Medical -- that the person applied
```

```
1                    K. G. RODI
2    through the SOLAS system.  They were
3    given -- they were reviewed by medical
4    to determine if they had a disability.
5    They were given the interactive process
6    to determine what accommodation they
7    would need, and then that accommodation
8    was subsequently implemented, if
9    possible.
10       Q. Do you remember how many medical
11    exemption applications were received?
12            MS. LINNANE:  Objection.
13            You can answer.
14       A. I do not.
15       Q. Do you remember how many medical
16    exemption -- medical exemptions were
17    approved?
18            MS. LINNANE:  Objection.
19            You can answer.
20       A. I do not.
21       Q. Were there any medical
22    exemptions approved?
23            MS. LINNANE:  Objection.
24            You can answer.
25       A. Yes.
```

```
1                      K. G. RODI
2        Q. Do you know how many
3     accommodation requests -- medical
4     accommodation requests were made?
5               MS. LINNANE:  Objection.
6               You can answer.
7        A. I don't recall.
8        Q. Do you remember how many were
9     approved?
10              MS. LINNANE:  Objection.
11              You can answer.
12       A. I don't recall.
13       Q. Were any medical accommodations
14    approved?
15              MS. LINNANE:  Objection.
16              You can answer.
17       A. Yes.
18       Q. Why was there no interactive
19    process for a request for religious
20    exemption?
21              MS. LINNANE:  Objection.
22              You can answer.
23       A. Because there was no requirement
24    for an interactive process.  It was an
25    exemption, not an accommodation.
```

```
 1                    K. G. RODI
 2      Q. What's the difference between an
 3   exemption and an accommodation?
 4              MS. LINNANE:  Objection.
 5              You can answer.
 6      A. An accommodation is outlined
 7   under the ADA.  It's also outlined
 8   under religious discrimination law,
 9   where a person is looking to get an
10   accommodation for either medical or
11   religious reasons in order to access
12   their employment.
13              An exemption is when a person
14   asks to be completely removed from
15   something that is a requirement with no
16   option -- with no other options.
17      Q. Those people who received
18   religious exemptions through Scheinman
19   Arbitration Service, did they receive
20   an exemption or an accommodation?
21              MS. LINNANE:  Objection.
22              You can answer.
23      A. They received an exemption.
24      Q. When they received an exemption,
25   did they -- were they provided another
```

```
 1                    K. G. RODI
 2   place to work or an accommodation
 3   during that school year?
 4             MS. LINNANE:  Objection.
 5             You can answer.
 6       A. They were then provided an
 7   alternate place to work.
 8       Q. So it was -- so they didn't have
 9   to take the vaccine, but they were
10   entitled to work?
11             MS. LINNANE:  Objection.
12             You can answer.
13       A. That was the determination by
14   the arbitrator.
15       Q. So -- so the person was both --
16   received an exemption and an
17   accommodation for the exemption?
18             MS. LINNANE:  Objection.
19             You can answer.
20       A. No, because the -- an
21   accommodation would mean that because
22   of the medical reason, that we had an
23   interactive process.  We worked with
24   them to find out what would be best.
25   But a medical accommodation would be a
```

```
 1              K. G. RODI
 2   person who was able to take the
 3   vaccine, so they were vaccinated, but,
 4   for whatever reason -- for example,
 5   they were immunocompromised.  They
 6   still needed some sort of accommodation
 7   around the elements of COVID, that they
 8   needed, maybe, a plastic wall around
 9   them, or they needed to be masked even
10   though, you know -- and have a face
11   shield or something.
12         The -- with the exemptions, it
13   wasn't about accommodating them.  We
14   literally were directed to find an
15   alternate site.  There was no, like --
16   we were able to treat the group
17   unmasked, which you don't do with an
18   accommodation.
19      Q. What was that last thing, you
20   don't --
21      A. You don't treat them unmasked
22   at that site --
23      Q. Oh, unmasked.
24      A. -- so we could -- we found, you
25   know, two or three large sites, and we
```

1                    K. G. RODI

2    were able to place them in those large

3    sites.

4        Q. And those are the people with

5    the medical exemptions?

6            MS. LINNANE:  Objection.

7            You can answer.

8        A. With medical and religious, the

9    ones that were granted by the

10   arbitrator.

11       Q. Where were -- what locations

12   were they placed?

13           MS. LINNANE:  Objection.

14       You can answer.

15       A. I'm not familiar with all the

16   exact locations.  I just can't remember

17   anymore.  But I know that DOE rented

18   space, like, one in Brooklyn, one in

19   Queens, one in Manhattan for people to

20   be located.

21       Q. And it was rented specifically

22   for exemptions?

23       A. It was rented specifically for

24   the people who had been granted

25   exemptions by the arbitrator.

```
 1                K. G. RODI
 2      (Reporter requested clarification.)
 3              MS. LINNANE:  I said,
 4        objection.
 5              You can answer.  Thank you.
 6        Q. Were any of the medical
 7   exemptions teachers?
 8              MS. LINNANE:  Objection.
 9              You can answer.
10        A. Yes.
11        Q. Do you know how many were
12   teachers?
13              MS. LINNANE:  Objection.
14              You can answer.
15        A. I don't know.
16        Q. How many people were involved in
17   reviewing applications for exemptions?
18        A. For the DOE?
19        Q. For the DOE.
20        A. Three.
21        Q. And that was the three people --
22   you and the other two people you
23   mentioned?
24        A. Yes.
25        Q. How much time did you spend
```

1                    K. G. RODI

2     reviewing individual applications?

3          A. It would depend on the

4     application.  Some people had half a

5     sheet of paper, some people had pages.

6     So it would just be reviewing -- we

7     would review every document they

8     attached just to make sure there was

9     nothing in there that was in the wrong

10    place, and then we would move on.

11         Q. Did each of you review each of

12    the applications, or were you given a

13    portion, and each one was given a

14    portion?

15         A. Each of us had a portion.

16         Q. So out of the three thousand,

17    you probably reviewed about a thousand

18    applications?

19         A. No.  I probably did at least

20    half.

21         Q. Did you do more than anyone

22    else, do you think?

23              MS. LINNANE:  Objection.

24              You can answer.

25         A. Probably.

K. G. RODI

1

2    Q. Was -- from an application, was

3    there a way of knowing who reviewed the

4    application?  Were there notations

5    made?

6    A. No.

7    Q. And just to confirm, masking and

8    testing was never considered as an

9    accommodation for those who sought

10   religious exemptions?

11        MS. LINNANE:  Objection.

12        You can answer.

13   A. Again, anyone who was not

14   vaccinated was not permitted in

15   buildings.  Period.  So it didn't

16   matter if they were masked and tested.

17   They were not permitted in the

18   buildings.  It was not an option.

19   Q. Okay.  Let me know when you see

20   the screen.

21        MS. LINNANE:  Austin, can

22     you make it a little bigger?

23        MR. GRAFF:  Yeah.  I just

24     needed to know that it came on

25     the screen first.

```
 1                K. G. RODI
 2           MS. LINNANE:  Yeah, I see
 3      it.
 4           MR. GRAFF:  Okay.
 5  BY MR. GRAFF:
 6      Q. Ms. Rodi, do you recognize this
 7   document?
 8      A. Not particularly.
 9           MS. LINNANE:  I'm going to
10      ask that we scroll through the
11      whole thing, so we identify
12      whether or not it's been
13      recognized.
14           MR. GRAFF:  Sure.
15  BY MR. GRAFF:
16      Q. Do you recognize this document?
17      A. It looks like many of the
18   documents that were submitted.
19      Q. Do you know if you reviewed
20   Lorraine Masciarelli's application for
21   vaccine mandate -- vaccine exemption?
22      A. I don't know.
23      Q. Is there any way of knowing who
24   reviewed her application?
25      A. No.
```

K. G. RODI

1

2    Q. Once this document came into

3    your office on or about September 10,

4    2021, what was the process?  Where did

5    it go first?

6        A. It first came into the medical

7    office.  Medical made sure that the

8    employee didn't have duplicate

9    applications or that -- and they didn't

10   have a pending leave or anything else

11   that would -- that would automatically

12   disqualify them from submitting an

13   application.  And then it was sent to

14   our office.

15       We would open the application,

16   and we would just make sure that all of

17   the documents were related to the

18   application.

19       Q. So the requests came in on or

20   about September 10, 2021.  When was the

21   meeting with the general committee?

22            MS. LINNANE:  Objection.

23            You can answer.

24       A. We had several meetings.

25       Q. So at the -- when was the

```
 1                    K. G. RODI
 2    meeting where it was determined that
 3    all religious exemptions were going to
 4    be denied based upon an undue burden?
 5              MS. LINNANE:  Objection.
 6              You can answer.
 7       A. I couldn't tell you.
 8       Q. Before the meeting that was held
 9    with the general committee where it was
10    determined that providing an exemption
11    was an undue burden, were applications
12    reviewed?
13              MS. LINNANE:  Objection.
14              You can answer.
15       A. No.  We did not review until we
16    had a conversation with the law
17    department and the general counsel's
18    office as to how -- like, who was going
19    to review them, how they were -- what
20    the approach would be, et cetera.
21       Q. Was that separate or apart from
22    the general committee?
23              MS. LINNANE:  I'm going to
24         caution the witness not to
25         disclose any information that
```

```
 1                   K. G. RODI
 2        could be considered privileged,
 3        the discussions of
 4        attorney-client privilege,
 5        please.
 6               Thank you.
 7        A. It was probably -- there were
 8   probably fewer people at some of the
 9   meetings.
10   BY MR. GRAFF:
11        Q. Which meetings?  The general
12   counsel and law department, or the
13   general committee?
14               MS. LINNANE:  Objection.
15               You can answer.
16        A. With the general counsel and the
17   law department.
18        Q. Who from the law department was
19   at those meetings?
20               MS. LINNANE:  Objection.
21        I'm going to caution the witness
22        not to disclose any information
23        that could be considered
24        privileged under the attorney-
25        client privilege.
```

```
1                    K. G. RODI
2         A. It varied.  Various lawyers from
3      the law department.
4    BY MR. GRAFF:
5         Q. Were any of the attorneys that
6      are currently on this Zoom part of the
7      law department meetings?
8              MS. LINNANE:  Objection.
9          I'm going to caution the witness
10         not to disclose any information
11         that could be considered
12         privileged due to attorney-client
13         privilege.
14         A. No.
15   BY MR. GRAFF:
16         Q. When you say "general counsel,"
17     is there a separate legal department
18     within the Department of Education?
19         A. Yes.
20         Q. And who is -- who was the
21     general counsel then?
22         A. Howard Friedman?
23         Q. Is he currently general counsel?
24         A. No.
25         Q. Would you meet with the law
```

```
1              K. G. RODI
2    department and general counsel in one
3    meeting?
4              MS. LINNANE:  I'm going to
5         caution the witness not to
6         disclose any information that
7         could be considered privileged
8         under the attorney-client
9         privilege.
10        A. Yes.
11   BY MR. GRAFF:
12        Q. And the meetings with the law
13   department and general counsel were
14   different from the meetings of the
15   general committee that you described?
16             MS. LINNANE:  I'm going to
17        caution the witness not to
18        disclose any information that
19        could be considered privileged
20        due to attorney-client privilege.
21        A. Yes.
22   BY MR. GRAFF:
23        Q. Did you participate in the
24   negotiations with the UFT over the
25   implementation of the vaccine mandate?
```

```
 1                    K. G. RODI
 2              MS. LINNANE:  Objection.
 3              You can answer.
 4       A. No.
 5       Q. Do you know who at the UFT --
 6  sorry -- at the New York City
 7  Department of Education represented the
 8  Department of Education in the meetings
 9  with the UFT over the implementation of
10  the vaccine mandate?
11              MS. LINNANE:  Objection.
12              You can answer if you're
13         able.
14       A. I could name maybe one or two,
15  but I couldn't confirm.
16       Q. Do you know -- what are those
17  one or two names that you know of?
18              MS. LINNANE:  Objection.
19              You can answer.
20       A. Vicki Bernstein, my former
21  supervisor, and the general counsel.
22       Q. Howard --
23       A. Howard Friedman, yeah.
24              MR. GRAFF:  I'm just -- this
25         document, dated September 10,
```

```
1                    K. G. RODI
2        2021, I'm going to mark as
3        Exhibit B.
4               (Plaintiff's Exhibit B,
5               Document dated September 10,
6        2021, was marked for
7        identification.)
8        Q. Let me know when you see the
9    next document?
10       A. I see it.
11       Q. Okay.  Do you need me to make it
12   larger?
13       A. No.  I can see it.
14              MR. GRAFF:  Okay.  I'm going
15       to mark this Exhibit C.  It's a
16       September 21, 2021, email.
17              (Plaintiff's Exhibit C,
18              Email dated September 21,
19              2021, was marked for
20              identification.)
21       Q. Do you recognize this document?
22       A. Yes.
23       Q. How do you recognize this
24   document?
25       A. This was the document that was
```

1                    K. G. RODI

2    sent to any person who applied for a

3    religious exemption.

4        Q. Who drafted this language?

5        A. Probably a group of lawyers.

6        Q. Did you participate in the

7    drafting?

8            MS. LINNANE:  Objection.

9        I'm going to direct the witness

10       not to answer any questions with

11       respect to work you did in your

12       representation of the DOE as a

13       DOE attorney.

14   BY MR. GRAFF:

15       Q. Are you not answering because of

16    the privilege?

17       A. Correct.

18            MS. LINNANE:  Yes.

19            MR. GRAFF:  Okay.  I just

20       want to clarify the record.

21   BY MR. GRAFF:

22       Q. It says that the plaintiff

23    failed to meet the criteria for a

24    religious-based accommodation.  It's in

25    the second line of the document.

```
 1                    K. G. RODI
 2          How did the plaintiff fail to
 3     meet the criteria for a religious-
 4     based accommodation?
 5               MS. LINNANE:  Objection.
 6               You can answer if you're
 7          able.
 8          A. That was sent to all employees
 9     that all employees could not be able --
10     were not able to enter the building,
11     and, as such, we could not provide them
12     with a religious accommodation, and,
13     therefore, we had to deny their entire
14     application.
15          Q. It says that "to provide an
16     accommodation would impose an undue
17     hardship, ie, more than a minimal
18     burden on the DOE and it's operations."
19     Do you see that?
20          A. Yes.
21          Q. The recent Supreme Court
22     decision in Groff, G-R-O-F-F, was there
23     any analysis after that decision
24     regarding the undue hardship placed on
25     the DOE?
```

```
1                    K. G. RODI
2            MS. LINNANE:  Objection.
3            You can answer if you're
4       able.
5       A. I don't recall.
6       Q. How was it determined that it
7    would be an undue hardship to place
8    this plaintiff at a different work
9    site?
10           MS. LINNANE:  Objection.
11           You can answer.
12      A. It wasn't determined about this
13   plaintiff or your client.  It was
14   determined about all of the three
15   thousand people who we would have to
16   find an alternate site.  And if, you
17   know, your client is a teacher, it
18   would be even more difficult to find a
19   site for them.  That their essential
20   functions of their job would be to
21   teach students and, particularly, if a
22   person is an elementary schoolteacher
23   or pre-k teacher or a gym teacher or
24   someone where it's vitally important
25   that they have to be with children,
```

```
 1                    K. G. RODI
 2    it's really hard to say that they're
 3    meeting the essential functions of
 4    their job or that they're even doing
 5    their job if they're sitting in a
 6    building someplace else.
 7         Q. Who performed the analysis
 8    regarding the undue hardship that would
 9    be placed on the Department of
10    Education?
11              MS. LINNANE:  Objection.
12              You can answer.
13         A. That was a review with everyone
14    involved, essentially, that looking at
15    the -- the number of people who would
16    need a placement, the roles in which
17    those people -- the roles in which
18    those people performed, the -- the cost
19    at which it would be for the students
20    and, you know, in terms of not getting
21    their primary needs and education.  How
22    much staff we would need to find to
23    cover all of these roles.  And then how
24    much space we would need to find for
25    these people to work.  So that involved
```

```
 1                K. G. RODI

 2    doing an analysis from a lot of

 3    different people.  And we determined

 4    that it was the role of the agency was

 5    to provide education and that if these

 6    folks were not able to be in the

 7    building with -- around students, that

 8    it would then become an undue burden on

 9    the agency to provide those exemptions.

10       Q. So those -- do those employees

11    of the Department of Education who

12    decide not to take the vaccine and were

13    placed on leave, there was staff found

14    to fill those roles, correct?

15              MS. LINNANE:  Objection.

16              You can answer.

17       A. Not necessarily.

18       Q. So the teachers that went on

19    leave pursuant to the arbitration

20    award, their roles were not filled by

21    people at the DOE?

22              MS. LINNANE:  Objection.

23              You can answer.

24       A. It depended on the role,

25    depended on what teachers we could
```

```
1                    K. G. RODI

2    find.  We may have been filled by a

3    substitute, but that's not necessarily

4    the same as a teacher.  And while they

5    were on suspension, they still had a

6    right to their jobs.  So we couldn't

7    replace them with someone who would be

8    qualified at that time.  So,

9    unfortunately, students had, you know,

10   like, random subs in there.  And, you

11   know, we couldn't -- if -- at any

12   point, if anybody who was suspended got

13   the vaccination, they were entitled to

14   come right back to their job.  So we

15   kind of just filled in for a while and

16   -- until someone either made the

17   determination to leave.

18       Q. Did the students' education

19   suffer as a result of that, not knowing

20   whether a teacher was coming back or

21   not?

22            MS. LINNANE:  Objection.

23            You can answer.

24       A. I would assume that there would

25   be some sort of effect on students if
```

```
 1                  K. G. RODI
 2    you're not clear as to, like, the
 3    status of your teacher.
 4        Q. So the -- going back to the
 5    exhibit, the plaintiff's application,
 6    which is Exhibit B, was dated
 7    September 10, 2021, and the denial of
 8    the accommodation was dated
 9    September 21, 2021?
10        A. Uh-hum.
11        Q. In those 11 days, was that when
12    the decision was made to -- by the
13    general committee to deny all
14    exemptions?
15             MS. LINNANE:  Objection.
16             You can answer.
17        A. Again, I don't recall the exact
18    date, but that would -- I would assume
19    it would be sometime in that period.
20             MR. GRAFF:  Exhibit D is --
21         I mean, Exhibit C would be the
22         email?
23             Exhibit D is the Julie
24         Torrey arbitration decision.
25             (Plaintiff's Exhibit D,
```

```
 1                K. G. RODI

 2            Julie Torrey Arbitration

 3         Decision, was marked for

 4         identification.)

 5         Q. Do you recognize this document?

 6   Do you need me to make it bigger?

 7         A. No, I can see it.

 8         Q. Okay.

 9         A. I mean, I've seen other

10   arbitration decisions.  I don't know

11   that I've necessarily seen this one.

12         Q. Did you participate in the

13   arbitration proceedings with the

14   Scheinman Arbitration Mediation

15   Service?

16         A. I did not.

17         Q. Who participated on behalf of

18   the Department of Education in these

19   arbitrations?

20              MS. LINNANE:  Objection.

21              You can answer.

22         A. No one.

23         Q. So it was simply the application

24   and the arbitrator?

25              MS. LINNANE:  Objection.
```

```
                        K. G. RODI
1
2             You can answer.
3        A. Yes.
4        Q. Was there any communications
5   between the department of education and
6   the individual arbitrators regarding
7   the general committee's decision to
8   deny all exemptions?
9             MS. LINNANE:  Objection.
10            You can answer.
11       A. Not to my knowledge.
12       Q. Were they aware -- were the
13  arbitrators aware of the decision by
14  the general committee to deny all
15  exemptions?
16            MS. LINNANE:  Objection.
17            You can answer.
18       A. I have no idea.
19       Q. Do you know how many
20  applications for exemptions were
21  granted through the arbitration
22  process?
23            MS. LINNANE:  Objection.
24            You can answer.
25       A. I don't recall.
```

```
 1                   K. G. RODI
 2        Q. Do you know what criteria the
 3    arbitrator used to determine whether to
 4    grant or deny an exemption?
 5              MS. LINNANE:  Objection.
 6              You can answer.
 7        A. I have no idea.
 8        Q. I'll show you what's going to be
 9    marked as Exhibit E. Do you recognize
10    this document?
11              (Plaintiff's Exhibit E,
12              Renewed application, was
13         marked for identification.)
14        A. No.
15        Q. Were you -- did you have any
16    role in the City of New York reasonable
17    accommodations appeals panel?
18              MS. LINNANE:  Objection.
19              You can answer.
20        A. No.
21        Q. Are you aware of the appeals
22    panel process?
23              MS. LINNANE:  Objection.
24              You can answer.
25        A. I'm aware of the panel.  I'm
```

```
1                    K. G. RODI
2     aware that we supported the process
3     by -- by, like, allowing people to
4     submit part of it through SOLAS.  But
5     that's where our involvement ended.  We
6     had nothing else to do with it.
7         Q. Was there anyone from the
8     Department of Education on the appeals
9     panel?
10              MS. LINNANE:  Objection.
11              You can answer.
12        A. I have no idea.
13        Q. I show you what's marked Exhibit
14    F.  Do you recognize this document?
15              (Plaintiff's Exhibit F,
16              Position Statement, was
17        marked for identification.)
18        A. I recognize that it's a position
19    statement.  I don't, like, recognize it
20    unique to your client.
21        Q. Do you know when this document
22    was created?
23        A. No idea.
24        Q. Did you participate in the
25    drafting of the document?
```

```
 1                    K. G. RODI
 2              MS. LINNANE:  Objection.
 3         I'm going to direct the witness
 4         not to answer with respect to any
 5         work that you did in your role as
 6         an attorney with the DOE due to
 7         attorney-client privilege.
 8   BY MR. GRAFF:
 9         Q. And due to the attorney-client
10    privilege, you're not answering the
11    question, correct?
12         A. Correct.
13         Q. Do you know what the purpose of
14    this document was created for?
15         A. I would assume that if a person
16    was appealing a determination by this
17    agency, that we had the right to submit
18    a position statement about our
19    position.  So that's what I would
20    conclude.
21         Q. Do you know if this document was
22    submitted to the appeals panel?
23              MS. LINNANE:  Objection.
24              You can answer.
25         A. I have no idea.
```

```
 1                    K. G. RODI

 2        Q. Do you know if this is the same

 3    document that was submitted for anyone

 4    requesting a religious exemption except

 5    for the top four lines of the document?

 6              MS. LINNANE:  Objection.

 7              You can answer.

 8        A. I have no idea.

 9        Q. So, in this document, it talks

10    about "the DOE granting an exemption to

11    this employee would create an undue

12    hardship for the DOE for the following

13    reasons."  And that's the bottom of the

14    first page, and it has three bullets on

15    to -- the second page.

16         Were these the reasons why the

17    general committee believed it was an

18    undue burden --

19              MS. LINNANE:  Objection --

20        Q. -- to grant the exemption?

21              MS. LINNANE:  Apologies.  I

22         didn't -- I thought you were

23         done.

24              Objection.

25              You can answer.
```

```
 1                    K. G. RODI
 2              MR. GRAFF:  It's fine.  No
 3         problem.
 4         A. Let's see.  "It would result in
 5    the inability of an employee to perform
 6    the essential functions of the job."
 7    Yeah.  I mean, that's one of the
 8    reasons. "State law --
 9      (Reporter requested clarification.)
10         A. Sorry, I'm just reading these
11    paragraphs.  So the first paragraph
12    would be -- I'll speak in generalities,
13    rather.
14              The first paragraph is
15    consistent with our perspective.  The
16    second is consistent with our
17    limitations.  And the third is
18    consistent with the concern that we
19    have regarding the numbers, the ability
20    to find space, the ability to hire
21    appropriate staff, and the cost that it
22    would have that would negatively impact
23    schools.
24              MS. LINNANE:  Can we just
25         mark for the record before you go
```

```
 1                K. G. RODI

 2        to the next question that this is

 3        the bullets on -- it's Bates

 4        stamped DEFS 000554.

 5               MR. GRAFF:  There's no S in

 6        it, but it's DEF as in Frank.

 7               MS. LINNANE:  DEF.  Sorry.

 8        DEF.

 9               MR. GRAFF:  That's fine.

10   BY MR. GRAFF:

11        Q. So with respect to the first

12    bullet, it says, "other mitigation

13    measures provide insufficient

14    protection particularly when

15    transmission rates remain high."

16            Was there any analysis by the

17    Department of Education regarding other

18    mitigation measures regarding COVID-19?

19               MS. LINNANE:  Objection.

20               You can answer.

21        A. There was constant conversations

22    with the Department of Health.  We

23    would have consulted with the

24    Department of Health and, again, they

25    were not permitted in the building.  It
```

```
 1                    K. G. RODI
 2   doesn't matter.  Even if you said that
 3   if they wore a cone on their head that
 4   that would stop, the policy said if you
 5   were not vaccinated, you could not
 6   enter a school building.  Period.  So
 7   it didn't matter if there were other
 8   mitigation measures.
 9       Q. So it was the policy of the City
10   and then the Department of Education
11   that no matter what religion, religious
12   objection, anything, a person was not
13   going to be able to work in a school
14   building?
15           MS. LINNANE:  Objection.
16           You can answer.
17       A. The policy of the Department of
18   Health was that a person who was not
19   vaccinated was not permitted in a
20   building, whether they worked there or
21   were a parent or were -- they cleaned
22   the basement.  They were not permitted
23   in a school building.  Period.
24       Q. And it didn't matter if they had
25   a religious objection or not?
```

```
 1                    K. G. RODI
 2              MS. LINNANE:  Objection.
 3              You can answer.
 4         A. Again, if they were not
 5    vaccinated.  Period.
 6         Q. Were you involved in any
 7    conversations with the Department of
 8    Health regarding the mandate after --
 9    strike that.
10              Were you involved in any
11    conversations with the Department of
12    Health regarding the vaccine mandate?
13              MS. LINNANE:  Objection.
14         I'm going to caution the witness
15         not to disclose any information
16         that could be considered
17         privileged due to attorney-
18         client privilege in your role as
19         an attorney with the DOE.
20    MR. GRAFF:
21         Q. Are you not answering?
22         A. Correct.
23         Q. Was there an analysis by the
24    Department of Education regarding the
25    science behind other mitigation
```

```
 1                    K. G. RODI
 2   measures?
 3              MS. LINNANE:  Objection.
 4              You can answer.
 5       A. Again, we have a Department of
 6   Health and health advisers that we were
 7   in regular contact with.
 8       Q. The second bullet says that
 9   "state law and applicable collective
10   bargaining agreements, including the
11   operation of seniority systems,
12   generally limit DOE's ability to
13   transfer staff between schools except
14   in limited circumstances not applicable
15   here."  Do you see that?
16       A. In the second bullet or the
17   third bullet?
18       Q. Second bullet.
19       A. Oh, yeah.  Yeah, yeah.
20       Q. Was there any effort by the DOE
21   to negotiate with the UFT to grant the
22   DOE flexibility to transfer staff?
23              MS. LINNANE:  Objection.
24              You can answer.
25       A. I don't know.
```

1              K. G. RODI

2      Q. Do you know how many out of the

3  approximately 3,300 applicants for

4  religious exemption actually had a bona

5  fide religious objection?

6              MS. LINNANE:  Objection.

7              You can answer.

8      A. We didn't make that

9  determination.

10     Q. Were some of the students

11 learning remotely during the '21, '22

12 school year?

13             MS. LINNANE:  Objection.

14             You can answer.

15     A. I believe there were students in

16 special ed programs that remained

17 working remotely -- I mean, studying

18 remotely.

19     Q. And how was it determined who

20 would teach those special ed students

21 studying remotely?

22             MS. LINNANE:  Objection.

23             You can answer.

24     A. They had their same teachers

25 that -- just some of the teachers would

```
 1                    K. G. RODI
 2     come into school and -- because the --
 3     some of the kids -- it would depend on
 4     the kid and if a kid was vulnerable
 5     with their health.  But maybe, like,
 6     the teacher had ten kids in their
 7     class, and three had health
 8     vulnerabilities.  The teacher was still
 9     teaching the other seven kids and then
10     was working with the three kids who
11     could not come into the buildings.
12         Q. Were any teachers teaching
13     remotely during the '21, '22 school
14     year?
15               MS. LINNANE:  Objection.
16               You can answer.
17         A. Yes, a few.
18         Q. Were those because of
19     accommodations for health reasons?
20               MS. LINNANE:  Objection.
21               You can answer.
22         A. Yes.
23         Q. How was it decided who received
24     remote teaching positions?
25         A. Each person would apply for an
```

K. G. RODI

1    accommodation.  They would -- then we

2    would do the interactive process, and

3    if the school could manage them working

4    remotely, that that was a reasonable

5    accommodation for them, then the school

6    would make a decision that they would

7    work remotely.  It would depend on the

8    school; it would depend on the level.

9    It would depend on the job; it would

10   depend on, you know -- in certain

11   situations, the person might be

12   teaching English and social studies in

13   a middle school with a co-teacher.  So

14   that might work.  But then you'd have

15   somebody, say, like, first graders with

16   special needs.  That wouldn't be

17   possible.

18         So it was wholly dependent on

19   the person's program and whether or not

20   the school could figure out a remote

21   accommodation.  And, of course, whether

22   they were -- there was a medical reason

23   that they couldn't come in, not -- that

24   was already determined.

1              K. G. RODI

2       Q. Was that -- were those medical

3   accommodation -- accommodations, were

4   they made at the school level, or were

5   they done in your office?

6              MS. LINNANE:  Objection.

7              You can answer.

8       A. They were done at the school

9   level.

10      Q. The medical accommodation

11  requests, both accommodations and

12  exemptions, were there more of them

13  than religious exemptions --

14             MS. LINNANE:  Objection.

15             You can answer.

16      A. No.

17      Q. -- requests to medical

18  accomodation?

19      A. No.

20    (Reporter requested clarification.)

21      Q. Do you know how many medical

22  accomodation or exemption requests were

23  made?

24             MS. LINNANE:  Objection.

25             You can answer.

K. G. RODI

1    A. I don't know.  I believe it was,

2    like, half.  In terms of requests, I

3    don't know how many were granted.

4    Q. The second paragraph of page DEF

5    000554, at the bottom of the paragraph

6    saying "allowing such employees to

7    remain in school settings unvaccinated

8    even with other safeguards like masking

9    and testing were presented unacceptable

10    risk to school children, staff, and

11    others."  What is the basis for that

12    statement?

13                MS. LINNANE:  Objection.

14                You can answer.

15    A. I don't know.  I mean we had --

16    they -- they weren't permitted in the

17    building.  And, I mean, you could also

18    say that they -- that, you know -- the

19    argument then was that we had

20    unvaccinated kids.  And we didn't want

21    anyone who wasn't vaccinated around the

22    kids.

23    Q. But why address safeguards like

24    masking and testing would present an

```
 1                    K. G. RODI
 2    unacceptable risk when it didn't matter
 3    if they were masking and testing?
 4              MS. LINNANE:  Objection.
 5              You can answer.
 6         A. Because they were vaccinated.
 7         Q. The letter explains -- this
 8    letter explains why the plaintiff was
 9    denied an exemption.  And one of the
10    reasons that is in this letter is that
11    safeguards like masking and testing
12    would present an unacceptable risk to
13    school children, staff, and others.
14    Did the Department of Education do any
15    research regarding masking and testing
16    and how it would affect school
17    children, staff, and others?
18              MS. LINNANE:  Objection.
19              You can answer.
20         A. I can't speak to that.
21         Q. Are you aware of any studies
22    done regarding masking and testing in
23    schools?
24              MS. LINNANE:  Objection.
25              You can answer.
```

```
 1                K. G. RODI
 2       A. I'm not.
 3       Q. Are you aware that all other
 4  school districts in New York State had
 5  masking and testing policies?
 6            MS. LINNANE:  Objection.
 7            You can answer.
 8       A. I didn't -- I'm not familiar
 9  with other school policies.
10       Q. The first line on this last
11  paragraph on 554 says, "Our experience
12  in providing exemptions in accordance
13  with the arbitration award has only
14  confirmed that creating such
15  alternative assignments poses an undue
16  hardship."  Do you see that?
17       A. Yes.
18       Q. The Department of Education
19  didn't provide any exemptions, correct?
20            MS. LINNANE:  Objection.
21            You can answer.
22       A. Correct.
23    (Reporter requested clarification.)
24       Q. So you had no experience in
25  providing exemptions, correct?
```

```
 1                    K. G. RODI
 2              MS. LINNANE:  Objection.
 3              You can answer.
 4        A. No, not correct.  Because by the
 5    time it got to the central committee or
 6    the central appeals board or whatever
 7    it was, we had already had -- the
 8    arbitrator had already approved some
 9    that we had denied.  So we were already
10    scrambling to find places for people to
11    be.
12        Q. Was there one particular
13    arbitrator who granted exemptions?
14              MS. LINNANE:  Objection.
15              You can answer.
16        A. No.  I saw several arbitrators
17    sign off.
18        Q. Do you know the names of those
19    arbitrators?
20              MS. LINNANE:  Objection.
21              You can answer.
22        A. I do not.
23        Q. The top of page DEF 000555 says,
24    "There was simply limited work
25    available for employees to support
```

```
 1                    K. G. RODI
 2    their schools long term from outside
 3    the school building."  Do you see that?
 4         A. Yes.
 5         Q. There was work for these
 6    employees, though, correct?
 7                    MS. LINNANE:  Objection.
 8         A. No.  No.
 9         Q. It says "limited work," so there
10    must have been some kind of work,
11    correct?
12                    MS. LINNANE:  Objection.
13                    You can answer.
14         A. Again, as I referenced before,
15    it wholly depended on what the person
16    was doing.  So if a person was, like,
17    say, a guidance counselor, and they
18    were a guidance counselor on the high
19    school level, and they had to write
20    high school recommendations for
21    college, yeah, they would have limited
22    work to do outside.  But if you take
23    someone who's, like, a kindergarten
24    teacher, what are they doing outside of
25    a school?  Nothing.  They have to be in
```

```
 1                    K. G. RODI
 2    the school.
 3            So, yeah, was there limited work
 4    for certain titles?  Sure.  But not --
 5    it doesn't say each employee has
 6    limited work.  It's like there is
 7    simply limited work available for
 8    employees.
 9        Q. So, for example, the guidance
10    counselor that you cited --
11        A. Yeah.
12        Q. -- why wasn't a guidance
13    counselor granted an exemption if there
14    was limited work that they could do?
15            MS. LINNANE:   Objection.
16        You can answer.
17        A. Because on the whole, we needed
18    as many staff as possible, because we
19    had to run a school.  And a guidance
20    counselor, while they may have limited
21    work, that's not their job to just do
22    that.  They have to be available for
23    students.  They have to be available to
24    meet students.  They have to be
25    available to work with students.  They
```

```
1                      K. G. RODI

2     have to be able to have confidential

3     conversations with students.  They

4     have -- the essential functions of

5     their job may -- some of their work may

6     be able to be done remotely but not all

7     of their work.  That's the nature of

8     their job.

9         Q. The second paragraph on page 555

10    at the bottom, it says, "Accordingly,

11    additional resources have been diverted

12    to train the exempted employees and

13    assign supervisors to oversee their

14    work."  What type of training did

15    exempted employees receive?

16               MS. LINNANE:  Objection.

17               You can answer.

18        A. I know that we had a few

19    employees that were exempted who had

20    jobs that were not office-based jobs,

21    so we would have to train them in, like

22    -- like, let's say they -- we had a

23    number of the exempted people

24    supporting the -- I forget the name of

25    it.  There was this team of people that
```

K. G. RODI

1

2  were -- that were basically like a

3  COVID hotline for principals.  And a

4  bunch of exempted teachers -- I mean,

5  employees were trained to answer those

6  calls.  So I know that they set up a

7  small phone bank to support that for

8  the people that we had to find work

9  for, because none of their work could

10  be remote.

11      Q. Did -- when an employee was

12  granted an exemption through the

13  arbitration process, was there an

14  explanation given to the DOE why this

15  particular employee was granted an

16  exemption?

17          MS. LINNANE:  Objection.

18          You can answer.

19      A. I never saw one.

20          MR. GRAFF:  All right.  I'm

21      going to mark this part of the

22      transcript "Confidential,"

23      because this particular exhibit

24      is confidential.  So we're going

25      to separate this part of the

```
1                    K. G. RODI
2        transcript out when you produce
3        it.  Please produce it separately
4        and apart from the rest of the
5        transcript.  Is that acceptable?
6            MS. LINNANE:  We're going to
7        note our objection.  I don't
8        think it's essential to produce
9        it in any respect.  But I will --
10       I know what you're going to show
11       on the screen given your
12       discussions.  But we will note
13       our objection, due to the
14       confidential nature of this
15       document, that it shouldn't be
16       shown or produced.
17           MR. GRAFF:  And, Ms. Lazar,
18       you've signed the confidentiality
19       agreement?
20           THE REPORTER:  Yes.
21           (The following pages 82
22       through 87 have been designated
23       confidential.)
24
25
```

1          K. G. RODI

2

3

4

5     CONFIDENTIAL IN SPARATE BOOKLE

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          K. G. RODI

2

3

4

5     CONFIDENTIAL IN SPARATE BOOKLE

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    K. G. RODI

2

3

4

5        CONFIDENTIAL IN SPARATE BOOKLE

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           K. G. RODI

2

3

4

5              CONFIDENTIAL IN SPARATE BOOKLE

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                 K. G. RODI

 2

 3

 4

 5      CONFIDENTIAL IN SPARATE BOOKLE

 6

 7

 8    (Conclusion of confidential portion)

 9              MR. GRAFF:  Let's go to this

10       exhibit.  I guess this is Exhibit

11       H --

12       Q. Are you aware that SAMS'

13    arbitrator granted 164 COVID exemptions

14    based on religious reasons?

15              MS. LINNANE:  Objection.

16              You can answer.

17       A. I was not aware of the number.

18       Q. Are you aware that the

19    Department of Education has disclosed

20    that only 145 employees received a

21    religious exemption?

22              MS. LINNANE:  Objection.

23              You can answer.

24       A. I would not know the numbers.

25    To note that the -- the SAMS saying --
```

```
 1                      K. G. RODI
 2    there were SAMS, and then there was the
 3    panel.  So I don't know if anyone got
 4    them from the panel too.
 5         Q. When SAMS granted an
 6    accommodation -- an exemption, excuse
 7    me -- who's role was it to place the
 8    person into a position?
 9              MS. LINNANE:  Objection.
10              You can answer.
11         A. When they received an exemption,
12    their names would be sent to the
13    central -- the team that was handling
14    the placements.  And they would then
15    figure out where they lived, figure out
16    what would be the right place for them
17    to be.  They would call their school
18    and say, hey, this person has an
19    exemption, so they're going to remain
20    on your table of organization.  And
21    you're going to keep doing their
22    attendance and all of that.
23              And then, at that point, if the
24    school said, oh, we have work for them,
25    they would -- they would arrange that.
```

```
 1                    K. G. RODI
 2    But it was all -- there was a central
 3    group in the office that handled it.
 4         Q. Were you involved in that
 5    process?
 6         A. I was not.
 7         Q. Do you know if any classroom
 8    teacher received a religious exemption?
 9              MS. LINNANE:  Objection.
10              You can answer.
11         A. I believe so.
12         Q. And that was one of the either
13    school-based or DOE office-based
14    accommodations?
15              MS. LINNANE:  Objection.
16              You can answer.
17         A. Yes.
18         Q. Do you know if any DOE central
19    office employees received a religious
20    exemption?
21              MS. LINNANE:  Objection.
22              You can answer.
23         A. I -- I can't say for sure,
24    because some titles are education
25    titles, but they work in a central
```

```
 1                    K. G. RODI

 2   office.  I will say that, at one point,

 3   I saw, like, a list of everybody who

 4   had gotten an accommodation, and it was

 5   all over the place.  It was teachers,

 6   guidance counselors, food service

 7   workers, like, custodians, central --

 8   like, it was -- but it could be -- for

 9   example, it could be, like, a teacher

10   assigned got an exemption.  But a

11   teacher assigned works in a central

12   office, so I couldn't -- I mean, it was

13   -- I looked at the list briefly.

14          MR. GRAFF:  Okay.  I'm going

15       to take a five- minute break.  I

16       think I'm almost done.  But I'm

17       going -- right now, it's 11:54.

18       Let's come back at, like, 12:05.

19          MS. LINNANE:  That's fine.

20       Ten minutes is great.

21          MR. GRAFF:  All right.  See

22       you in a few minutes.

23          MS. LINNANE:  All right.

24       Thanks.

25          (A recess was taken.)
```

```
 1                   K. G. RODI
 2             MR. GRAFF:  I just have one
 3        other question.
 4   BY MR. GRAFF:
 5        Q. Ms. Rodi, do you know if any
 6     religious exemptions were granted by
 7     the appeal panel?
 8             MS. LINNANE:  Objection.
 9             You can answer.
10        A. I have no idea.
11             MR. GRAFF:  I don't have any
12        other questions.
13
14        (Time noted: 12:06 p.m. )
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    K. G. RODI

 2              INSTRUCTIONS TO WITNESS

 3

 4          Please read your deposition over

 5    carefully and make any necessary

 6    corrections.  You should state the

 7    reason in the appropriate space on the

 8    errata sheet for any corrections that

 9    are made.

10          After doing so, please sign the

11    errata sheet and date it.

12          You are signing same subject to

13    the changes you have noted on the errata

14    sheet, which will be attached to your

15    deposition.

16          It is imperative that you return

17    the original errata sheet to the

18    deposing attorney within thirty (30)

19    days of receipt of the deposition

20    transcript by you.  If you fail to do

21    so, the deposition transcript may be

22    deemed to be accurate and may be used in

23    court.

24

25
```

```
 1                     K. G. RODI

 2            A C K N O W L E D G E M E N T

 3     STATE OF NEW YORK)

 4                         :SS

 5     COUNTY OF _____)

 6       I, KATHERINE G. RODI, hereby certify

 7     that I have read the transcript of my

 8     testimony taken under oath on

 9     March 25, 2025, that the transcript is a

10     true, complete and correct record of

11     what was asked, answered and said during

12     my testimony under oath, and that the

13     answers on the record as given by me are

14     true and correct, except for the

15     corrections or changes in form or

16     subsTtance, if any, noted in the

17     attached Errata Sheet.

18                  _____

19                     KATHERINE G. RODI

20

21     Signed and subscribed to

22     before me, this _____ day

23     of _____, _____.

24     _____

25         Notary Public
```

```
 1                  K. G. RODI

 2              I    N    D    E    X

 3

 4

 5    EXAMINATION                        6

 6    BY MR. GRAFF:

 7

 8

 9    (Plaintiff's Exhibit A,           8

10    Notice of Deposition, was

11    marked for identification.)

12

13    (Plaintiff's Exhibit B,          51

14    Document dated September 10,

15    2021, was marked for

16    identification.)

17

18    (Plaintiff's Exhibit C,          51

19    Email dated September 21, 2021,

20    was marked for identification.)

21

22    (Plaintiff's Exhibit D,          58

23    Julie Torrey Arbitration

24    Decision, was marked for

25    identification.)
```

```
 1                    K. G. RODI

 2

 3    (Plaintiff's Exhibit E,          61

 4    Renewed application, was marked

 5    for identification.)

 6    (Plaintiff's Exhibit F,          62

 7    Position Statement, was marked

 8    for identification.)

 9

10

11

12

13

14   (Pages 82 through 87 have been

15   designated confidential)

16

17

18

19

20

21

22

23

24

25
```

1

2                C E R T I F I C A T E

3       I, CEITA LAZAR, a stenographic

4    reporter and Notary Public within and

5    for the State of New York, do hereby

6    certify:

7       That the witness(es) whose testimony

8    is hereinbefore set forth was duly sworn

9    by me, and the foregoing transcript is a

10   true record of the testimony given by

11   such witness(es).

12      I further certify that I am not

13   related to any of the parties to this

14   action by blood or marriage, and that I

15   am in no way interested in the outcome

16   of this matter.

17

18

19

20

21   _____

22   CEITA LAZAR
     Dated:  April 9, 2025
23

24

25

```
 1   Errata Sheet

 2

 3   NAME OF CASE: LORRAINE MASCIARELLI -against- NEW YORK CITY DEPARTMENT OF EDUCATION

 4   DATE OF DEPOSITION: 03/25/2025

 5   NAME OF WITNESS: KATHERINE G. RODI

 6   Reason Codes:

 7        1. To clarify the record.

 8        2. To conform to the facts.

 9        3. To correct transcription errors.

10   Page _____ Line _____ Reason _____

11   From _____ to _____

12   Page _____ Line _____ Reason _____

13   From _____ to _____

14   Page _____ Line _____ Reason _____

15   From _____ to _____

16   Page _____ Line _____ Reason _____

17   From _____ to _____

18   Page _____ Line _____ Reason _____

19   From _____ to _____

20   Page _____ Line _____ Reason _____

21   From _____ to _____

22   Page _____ Line _____ Reason _____

23   From _____ to _____

24

25                        _____
```

**Exhibits**

**Ex A -** Katherine Rod i deposition no tice_marked 8:22,23 94:9

**Ex B -** Plaintff's Application_ marked 51:3,4 58:6 94:13

**Ex C -** 9-21-21 Denial of Ac commodation_ marked 51:15, 17 58:21 94:18

**Ex D -** Torrey Arb aw ard_marked 58:20,23,25 94:22

**Ex E -** 5 - 11-19-2021 - Renewed appli cation_marked 61:9,11 95:3

**Ex F -** NYC DOE Posi tion Statement -- 553-555_ marked 62:13, 14,15 95:6

**Ex G -** Redact Confid ential List ( just page 1)_ marked

---

**0**

**000554** 66:4 74:6

**000555** 77:23

---

**1**

**10** 45:3,20 50:25 51:5 58:7

**11** 58:11

**11201** 5:21

**11:54** 90:17

**12:05** 90:18

**145** 87:20

**164** 87:13

**18** 9:13 13:11

**1990** 11:25

**1994** 12:6

**1995** 10:21

**1998** 10:25

---

**2**

**2,000** 17:5

**2003** 12:14

**2012** 9:19

**2018** 15:6

**2019** 15:6

**2020** 15:6,7

**2021** 10:7,11 18:21 45:4,20 51:2,6,16,19 58:7,9

**2022** 29:6

**21** 10:7 15:13 51:16,18 58:9 70:11 71:13

**22** 70:11 71:13

---

**3**

**3,300** 70:3

---

**5**

**554** 76:11

**555** 80:9

---

**6**

**65** 5:20

---

**8**

**82** 82:21

**87** 82:22

---

**A**

**A** 90:25

**ability** 19:21 24:11 65:19,20 69:12

**able** 19:14 24:6 39:2,16 40:2 50:13 53:7,9,10 54:4 56:6 67:13 80:2,6

**absolutely** 24:17

**Academy** 11:21

**acceptable** 82:5

**access** 37:11

**accommodatin g** 39:13

**accommodatio n** 14:22 25:2 26:7 33:7 35:6,7 36:3,4,25 37:3, 6,10,20 38:2,17, 21,25 39:6,18 43:9 52:24 53:4, 12,16 58:8 72:2, 6,22 73:3,10 88:6 90:4

**accommodatio ns** 10:3 13:22 25:15 33:12 34:20,23,24 36:13 61:17 71:19 73:3,11 89:14

**accomodation** 73:18,22

**accordance** 76:12

**Accordingly** 80:10

**across** 16:18

**act** 29:3

**actually** 6:2 14:25 31:15 70:4

**ADA** 37:7

**additional** 80:11

**address** 5:20 6:3 74:24

**addressed** 8:3

**advised** 31:20, 23

**advisers** 69:6

**affect** 30:11 75:16

**after** 11:7,13 29:6 53:23 68:8

**again** 27:15 29:11 43:13 58:17 66:24 68:4 69:5 78:14

**agency** 16:13 24:23 27:17 29:21 56:4,9 63:17

**agreement** 28:18 29:2 82:19

**agreements** 69:10

**all** 6:19 8:16 13:23 19:23 20:3,9 23:11 30:6 34:24 40:15 45:16 46:3 53:8,9 54:14 55:23 58:13 60:8,14 76:3 80:6 81:20 88:22 89:2 90:5, 21,23

**allowed** 25:12

**allowing** 62:3 74:7

**almost** 90:16

**already** 16:25 17:18 18:5,7 72:25 77:7,8,9

**also** 4:24 14:20 17:9 31:14 37:7 74:18

**alternate** 38:7 39:15 54:16

**alternative** 76:15

**Amendment** 14:18

**American** 11:17 12:8,10,13

**an** 6:12 16:12,19 17:8,11,23 19:16 20:4,10 21:16,19,24 22:7,17,24 23:11 24:22,25 25:6,24 26:7,13 28:9 29:2,21 30:18,23 31:5 34:14 36:24,25 37:2,3,6,9,13, 20,23,24 38:2,6, 16,20,22 39:14, 17 43:2,8,18 45:12 46:4,10, 11 53:15,16 54:7,16,22 56:2, 8 61:4 63:6 64:10,11,17 65:5 68:19,23 71:25 74:25 75:9,12 76:15 79:13 81:11,12, 13,15 88:5,6,11, 18 90:4,10

**analysis** 53:23 55:7 56:2 66:16 68:23

**Andrea** 5:13

**another** 37:25

**answer** 6:12 8:15 11:4,11 12:22 13:3 18:23 19:18 22:14 23:6 25:5, 17,23 26:11,17, 23 27:6 28:16 29:10,19 30:14 31:3 32:15,21 33:9,18 34:3,11, 17,22 35:13,19, 24 36:6,11,16,

22 37:5,22 38:5,
12,19 40:7,14
41:5,9,14 42:24
43:12 45:23
46:6,14 47:15
50:3,12,19
52:10 53:6 54:3,
11 55:12 56:16,
23 57:23 58:16
59:21 60:2,10,
17,24 61:6,19,
24 62:11 63:4,
24 64:7,25
66:20 67:16
68:3 69:4,24
70:7,14,23
71:16,21 73:7,
15,25 74:15
75:5,19,25 76:7,
21 77:3,15,21
78:13 79:16
80:17 81:5,18
87:16,23 88:10
89:10,16,22

**answering**
52:15 63:10
68:21

**any** 6:25 7:12
12:19,24 13:5
14:4,10,11
22:16,20 25:24
27:14 30:15,16
32:25 33:15
34:7 35:21
36:13 41:6
44:23 46:25
47:22 48:5,10
49:6,18 52:2,10
53:23 57:11
60:4 61:15 63:4
66:16 68:6,10,
15 69:20 71:12
75:14,21 76:19
82:9 89:7,18

**anybody** 57:12

**anymore** 40:17

**anyone** 7:9
28:24 30:21
33:16 42:21
43:13 62:7 64:3
74:22 88:3

**anything** 16:5
27:10 45:10
67:12

**apart** 46:21 82:4
**Apologies**
64:21
**appealing**
63:16
**appeals** 61:17,
21 62:8 63:22
77:6
**applicable**
69:9,14
**applicant** 17:10
**applicants**
22:18,23 23:11
70:3
**application**
16:21 17:19
22:17 28:9
30:18,23 31:6,
16 32:12 42:4
43:2,4 44:20,24
45:13,15,18
53:14 58:5
59:23 61:12
**applications**
16:24,25 17:6
18:2,8 19:7,24
20:4,15,17 22:5
23:21 33:22
35:11 41:17
42:2,12,18 45:9
46:11 60:20
**applied** 17:14
31:10 34:25
52:2
**apply** 16:10
28:5 71:25
**approach** 16:24
18:7 46:20
**appropriate**
31:24 65:21
**appropriately**
17:13 29:3
31:10
**approve** 34:4
**approved** 34:8
35:17,22 36:9,
14 77:8
**approximately**
70:3

**arbitration**
26:3,8 37:19
56:19 58:24
59:2,10,13,14
60:21 76:13
81:13
**arbitrations**
59:19
**arbitrator** 25:25
26:2 38:14
40:10,25 59:24
61:3 77:8,13
87:13
**arbitrators**
60:6,13 77:16,
19
**area** 31:11
**argument** 74:20
**around** 39:7,8
56:7 74:22
**arrange** 88:25
**arrest** 10:4
**ask** 4:21 6:9
7:18 44:10
**asking** 33:13
**asks** 37:14
**assign** 80:13
**assigned**
90:10,11
**assignments**
76:15
**assistant** 23:24
**assume** 57:24
58:18 63:15
**at** 6:25 7:8 11:17
14:22 17:20
20:14,19 23:15
24:7 27:7,24
28:12 29:20,24
30:8 39:22
42:19 45:25
47:8,19 50:5,6
54:8 55:14,19
56:21 57:8,11
73:4,8 74:6
80:10 88:23
90:2,13,18
**athletes** 30:10

**attached** 42:8
**attendance**
88:22
**attended** 13:12,
14
**attorney** 4:6 6:8
12:15 52:13
63:6 68:19
**attorney-** 47:24
68:17
**attorney-client**
47:4 48:12 49:8,
20 63:7,9
**attorneys** 48:5
**Austin** 5:6 6:8
43:21
**automatically**
30:25 45:11
**available** 77:25
79:7,22,23,25
**award** 56:20
76:13
**aware** 18:12,15
60:12,13 61:21,
25 62:2 75:21
76:3 87:12,17,
18
**away** 7:19 28:21

**B**

**back** 11:14,16
23:13,16 28:6
57:14,20 58:4
90:18
**bank** 81:7
**bargaining**
69:10
**based** 16:20
17:17 46:4 53:4
87:14
**basement**
67:22
**basically** 28:25
81:2
**basis** 23:8 26:6
74:12

**Bates** 66:3
**because** 6:20
23:12 24:7,12
25:6 27:15,17
30:4 31:16
36:23 38:20,21
52:15 71:2,18
75:6 77:4 79:17,
18 81:9,23
89:24
**become** 56:8
**been** 5:18 10:13
22:3 24:22
26:21 28:7
29:15 40:24
44:12 57:2
78:10 80:11
82:22
**before** 8:13 22:6
28:22 46:8
65:25 78:14
**begin** 11:8
**behalf** 59:17
**behind** 68:25
**being** 29:7
**belief** 6:15
22:11 32:13,19,
25
**beliefs** 29:14
**believe** 8:2
12:23 26:20
70:15 74:2
89:11
**believed** 17:9
64:17
**benefits** 29:7,
25
**Bernstein**
20:19 21:2,11
50:20
**best** 4:23 29:20
38:24
**between** 37:2
60:5 69:13
**bias** 27:14
**bigger** 43:22
59:6

Index: blank–counsel

**blank** 31:17,22

**board** 16:19
77:6

**bona** 32:12,18
70:4

**BOOKLE** 83:5
84:5 85:5 86:5
87:5

**boss** 20:19

**both** 9:7 16:22
38:15 73:11

**bottom** 28:12
64:13 74:6
80:10

**break** 6:25 7:3
90:15

**briefly** 90:13

**bring** 27:18

**Brooklyn** 5:21
40:18

**building** 27:18
53:10 55:6 56:7
66:25 67:6,14,
20,23 74:18
78:3

**buildings** 24:6,
7,10,13 25:10,
12 29:3 43:15,
18 71:11

**bullet** 66:12
69:8,16,17,18

**bullets** 64:14
66:3

**bunch** 81:4

**burden** 16:12
17:8,23 20:5,11
21:25 22:8
23:11 24:22
46:4,11 53:18
56:8 64:18

**burdens** 16:18
18:20

**but** 7:16 17:25
19:24 20:2
27:17,22 31:12
38:9,25 39:3
40:17 50:15
57:3 58:18 62:4

66:6 71:5 72:15
74:24 78:22
79:4 80:6 82:9,
12 89:2,25 90:8,
10,16

---

### C

**call** 88:17

**calls** 81:6

**came** 23:16
30:23 43:24
45:2,6,19

**can** 4:23 7:20
8:6,7 11:4,11
12:22 13:3
18:23 19:18
22:14 23:6 25:5,
17,23 26:11,17,
23 27:6 28:13,
16 29:10,19
30:14 31:3
32:15,21 33:9,
18 34:3,11,17,
22 35:13,19,24
36:6,11,16,22
37:5,22 38:5,12,
19 40:7,14 41:5,
9,14 42:24
43:12,21 45:23
46:6,14 47:15
50:3,12,19
51:13 53:6 54:3,
11 55:12 56:16,
23 57:23 58:16
59:7,21 60:2,10,
17,24 61:6,19,
24 62:11 63:24
64:7,25 65:24
66:20 67:16
68:3 69:4,24
70:7,14,23
71:16,21 73:7,
15,25 74:15
75:5,19,25 76:7,
21 77:3,15,21
78:13 79:16
80:17 81:18
87:16,23 88:10
89:10,16,22

**can't** 6:12 7:19
24:14,15,16
27:19 40:16
75:20 89:23

**cannot** 6:21

**case** 5:12 7:13

**Catholic** 22:17,
23

**caution** 46:24
47:21 48:9 49:5,
17 68:14

**ceita** 4:15 5:19

**cell** 7:15

**central** 77:5,6
88:13 89:2,18,
25 90:7,11

**certain** 30:2
72:11 79:4

**cetera** 46:20

**chancellor's**
15:25

**changed** 30:9

**charge** 15:9

**check** 31:11

**chief** 21:9

**children** 23:16
54:25 74:11
75:13,17

**choice** 30:7

**circumstances**
69:14

**cited** 79:10

**City** 4:19 5:10,
14 7:25 9:5,6,
10,12 11:9
20:23 29:16
30:9 50:6 61:16
67:9

**clarification**
41:2 65:9 73:20
76:23

**clarify** 52:20

**class** 71:7

**classes** 12:20,
25 14:18,19

**classroom**
10:13 23:19
89:7

**classrooms**

30:5

**cleaned** 67:21

**clear** 58:2

**client** 47:25
54:13,17 62:20
68:18

**close** 4:22

**co-teacher**
72:14

**collective** 69:9

**college** 12:2,3
78:21

**come** 28:6
29:22 57:14
71:2,11 72:24
90:18

**coming** 57:20

**committee**
15:21,23 16:7,
20 17:21 18:9,
11,14,17 20:7
21:24 22:4
24:24 45:21
46:9,22 47:13
49:15 58:13
60:14 64:17
77:5

**committee's**
23:9 60:7

**communicate**
7:20

**communicatio
ns** 60:4

**completely**
37:14

**comprised**
33:20

**concern** 65:18

**conclude** 63:20

**conclusion**
87:8

**cone** 67:3

**confidential**
5:24 80:2 81:22,
24 82:14,23
83:5 84:5 85:5
86:5 87:5,8

**confidentiality**
82:18

**confirm** 43:7
50:15

**confirmed**
76:14

**consider** 17:3
24:25

**consideration**
32:17

**considered**
17:13 43:8 47:2,
23 48:11 49:7,
19 68:16

**consistent**
65:15,16,18

**constant** 66:21

**consulted**
66:23

**contact** 69:7

**conversation**
46:16

**conversations**
66:21 68:7,11
80:3

**copy** 4:4,8

**correct** 15:17
26:5 52:17
56:14 63:11,12
68:22 76:19,22,
25 77:4 78:6,11

**cost** 55:18 65:21

**could** 27:14,18
28:20 29:21
30:2 31:21,24
39:24 47:2,23
48:11 49:7,19
50:14 53:9,11
56:25 67:5
68:16 71:11
72:4,21 74:18
79:14 81:9 90:8,
9

**couldn't** 27:7,
10 46:7 50:15
57:6,11 72:24
90:12

**counsel** 5:2
47:12,16 48:16,

21,23 49:2,13
50:21

**counsel's**
46:17

**counselor**
78:17,18 79:10,
13,20

**counselors**
90:6

**course** 72:22

**courses** 13:13
14:21

**court** 4:15 5:20
6:20 53:21

**courtesy** 4:8

**cover** 55:23

**COVID** 15:10
39:7 81:3 87:13

**COVID-19**
19:11 66:18

**create** 64:11

**created** 62:22
63:14

**creating** 76:14

**criteria** 52:23
53:3 61:2

**current** 9:14,15

**currently** 7:6
9:2 20:22 21:4
48:6,23

**custodians**
23:23 30:5 90:7

———————

**D**

**date** 58:18

**dated** 50:25
51:5,18 58:6,8

**days** 58:11

**decide** 19:15
56:12

**decided** 11:5
22:6 71:23

**decision** 16:18,
20,23 17:17
20:3,9 22:2,3

23:9 53:22,23
58:12,24 59:3
60:7,13 72:7

**decisions** 16:4,
6,8 59:10

**DEF** 66:6,7,8
74:5 77:23

**defendant** 5:11,
15

**DEFS** 66:4

**denial** 58:7

**denied** 19:25
21:19 22:12
30:25 32:8 34:9,
15 46:4 75:9
77:9

**deny** 19:3,16
21:13 23:3
30:18 31:8
33:24 53:13
58:13 60:8,14
61:4

**department**
4:20 5:11,14
7:25 9:5,9,12
11:9 15:4 20:20,
24 21:4 25:8
26:14,19 29:17
30:11 46:17
47:12,17,18
48:3,7,17,18
49:2,13 50:7,8
55:9 56:11
59:18 60:5 62:8
66:17,22,24
67:10,17 68:7,
11,24 69:5
75:14 76:18
87:19

**depend** 42:3
71:3 72:8,9,10,
11

**depended**
56:24,25 78:15

**dependent**
72:19

**depends** 28:17
29:11

**deposition** 4:7,
17 7:23 8:4,8,
10,18,24

**deputy** 20:18,21

**described**
49:15

**deserved** 17:10

**designated**
82:22

**determination**
16:11,13 18:19
21:23 31:8
38:13 57:17
63:16 70:9

**determinations**
21:12

**determine**
17:22 22:23
30:17 35:4,6
61:3

**determined**
23:10 46:2,10
54:6,12,14 56:3
70:19 72:25

**determining**
16:16 19:3

**development**
13:13 14:21

**didn't** 24:11
25:10 32:6 38:8
43:15 45:8,9
64:22 67:7,24
70:8 74:21 75:2
76:8,19

**difference** 37:2

**different** 11:6
28:19 33:5,15
49:14 54:8 56:3

**difficult** 54:18

**direct** 52:9 63:3

**directed** 39:14

**director** 9:16
15:8

**disability** 10:2
35:4

**discipline**
13:21,24

**disclose** 46:25
47:22 48:10
49:6,18 68:15

**disclosed**
87:19

**discrimination**
14:13,16,19,22
15:2 37:8

**discussing**
19:23 20:14,16

**discussion**
22:20

**discussions**
22:16 47:3
82:12

**disqualify**
45:12

**districts** 76:4

**diverted** 80:11

**doctor** 34:9,13

**doctors** 33:21,
23

**document** 8:12
42:7 44:7,16
45:2 50:25 51:5,
9,21,24,25
52:25 59:5
61:10 62:14,21,
25 63:14,21
64:3,5,9 82:15

**documentation**
31:25

**documents**
7:12 44:18
45:17

**DOE** 13:15
14:24 25:20
40:17 41:18,19
52:12,13 53:18,
25 56:21 63:6
64:10,12 68:19
69:20,22 81:14
89:13,18

**DOE's** 69:12

**does** 15:22 21:3

**doesn't** 67:2
79:5

**doing** 55:4 56:2
78:16,24 88:21

**don't** 6:11 17:24
19:21 26:24

28:6 30:15 36:7,
12 39:17,20,21
41:15 44:22
54:5 58:17
59:10 60:25
62:19 69:25
74:2,4,16 82:7
88:3

**done** 64:23
73:5,8 75:22
80:6 90:16

**drafted** 52:4

**drafting** 52:7
62:25

**due** 18:2 19:22
48:12 49:20
63:6,9 68:17
82:13

**duly** 5:18

**duplicate** 45:8

**during** 15:10
18:4 30:8 38:3
70:11 71:13

**duties** 9:20
10:10

———————

**E**

**each** 17:10
42:11,13,15
71:25 79:5

**early** 18:3

**East** 70:16,20

**ed** 70:16,20

**education** 4:20
9:6,9,12 11:9
20:24 21:5
24:19 26:14,19
29:17 30:12
48:18 50:7,8
55:10,21 56:5,
11 57:18 59:18
60:5 62:8 66:17
67:10 68:24
75:14 76:18
87:19 89:24

**Education's**
15:4

**effect** 30:15
57:25

**effort** 69:20

**either** 21:19
37:10 57:16
89:12

**elementary**
54:22

**elements**
13:24,25 16:14
39:7

**else** 7:9 42:22
45:10 55:6 62:6

**email** 51:16,18
58:22

**employed** 9:2,7

**employee** 9:16,
25 10:6 45:8
64:11 65:5 79:5
81:11,15

**employees**
13:16,20 14:7
16:9 25:13 26:7
27:2 29:4,22
53:8,9 56:10
74:7 77:25 78:6
79:8 80:12,15,
19 81:5 87:20
89:19

**employer** 9:4

**employment**
12:25 15:5,9,15
27:4 28:13
29:16 37:12

**ended** 11:13
62:5

**English** 10:17
72:13

**enter** 53:10 67:6

**entertainers**
30:10

**entire** 53:13

**entities** 9:8

**entitled** 33:2
38:10 57:13

**equal** 14:23
15:4,9,15

**essential** 54:19
55:3 65:6 80:4
82:8

**essentially**
55:14

**et** 46:20

**even** 32:6 34:13
39:9 54:18 55:4
67:2 74:9

**eventually** 17:5

**ever** 10:13

**every** 17:19
23:21 42:7

**everybody**
28:18 90:3

**everyone** 4:21
55:13

**exact** 40:16
58:17

**exactly** 17:24

**examination**
6:5 32:10

**examined** 5:21

**examining**
22:17

**example** 39:4
79:9 90:9

**except** 64:4
69:13

**excuse** 88:6

**executive** 9:15

**exempted**
80:12,15,19,23
81:4

**exemption**
16:14 18:2
19:16 20:4
21:16,20 22:7,
24 25:25 30:19,
24 31:6,12,13
33:3,6,16,19,24
34:14 35:11,16
36:20,25 37:3,
13,20,23,24
38:16,17 44:21
46:10 52:3 61:4
64:4,10,20 70:4
73:22 75:9
79:13 81:12,16
87:21 88:6,11,
19 89:8,20

90:10

**exemptions**
16:10,12,17
17:7,22 19:4,7,
10,11 20:10
21:13 22:6 23:4,
10 25:14 33:10,
15 34:8 35:16,
22 37:18 39:12
40:5,22,25 41:7,
17 43:10 46:3
56:9 58:14 60:8,
15,20 73:12,13
76:12,19,25
77:13 87:13

**exhibit** 8:22,23
51:3,4,15,17
58:5,6,20,21,23,
25 61:9,11
62:13,15 81:23
87:10

**experience**
76:11,24

**explains** 75:7,8

**explanation**
81:14

**extensive** 14:25

---

**F**

**face** 39:10

**fact** 24:2

**fail** 53:2

**failed** 52:23

**familiar** 40:15
76:8

**few** 11:15 71:17
80:18 90:22

**fewer** 47:8

**fide** 32:12,18
70:5

**figure** 72:21
88:15

**fill** 56:14

**filled** 56:20
57:2,15

**final** 21:15,17,
18,22

**financial** 23:2

**find** 38:24 39:14
54:16,18 55:22,
24 57:2 65:20
77:10 81:8

**fine** 4:10 65:2
66:9 90:19

**fired** 29:15

**Firm** 5:7

**first** 5:18 14:18
16:22 43:25
45:5,6 64:14
65:11,14 66:11
72:16 76:10

**five-** 90:15

**flexibility** 69:22

**FMLA** 14:2

**folks** 56:6

**following** 64:12
82:21

**follows** 5:22

**food** 23:23
24:17 30:6 90:6

**forever** 27:20

**forget** 80:24

**former** 50:20

**forms** 28:20

**found** 39:24
56:13

**four** 64:5

**Frank** 66:6

**Friedman** 48:22
50:23

**from** 5:7 15:6,24
17:2 19:11
21:23 23:21,22,
23,24,25 25:7,
25 26:8 27:3,13
28:2,10,11 29:5,
15,16 37:14
43:2 45:12
46:21 47:18
48:2 49:14 56:2
62:7 78:2 82:4
88:4

**front** 7:13,16

**functions** 54:20
55:3 65:6 80:4

**further** 7:19

---

**G**

**G-R-O-F-F**
53:22

**general** 15:21,
23 17:21 18:9,
11,14,17 20:6
21:23 22:4 23:9
24:24 45:21
46:9,17,22
47:11,13,16
48:16,21,23
49:2,13,15
50:21 58:13
60:7,14 64:17

**generalities**
65:12

**generally** 69:12

**genuine** 29:14

**gestures** 6:22

**get** 37:9

**getting** 55:20

**given** 35:3,5
42:12,13 81:14
82:11

**go** 11:14,16 12:2
24:6 45:5 65:25
87:9

**going** 6:9 8:5,21
18:6 22:11 44:9
46:3,18,23
47:21 48:9 49:4,
16 51:2,14 52:9
58:4 61:8 63:3
67:13 68:14
81:21,24 82:6,
10 88:19,21
90:14,17

**Good** 6:7

**got** 27:21 57:12
77:5 88:3 90:10

**gotten** 90:4

**graders** 72:16

**grades** 23:18

**graduate** 11:19, 23 12:5,12

**Graff** 4:10,13 5:6 6:6,8 8:21 43:23 44:4,5,14, 15 47:10 48:4, 15 49:11,22 50:24 51:14 52:14,19,21 58:20 63:8 65:2 66:5,9,10 68:20 81:20 82:17 87:9 90:14,21

**grant** 19:3,15 21:13,16 30:18 31:8 33:24 61:4 64:20 69:21

**granted** 17:7 21:19 23:3 25:15,21 40:9, 24 60:21 74:4 77:13 79:13 81:12,15 87:13 88:5

**granting** 64:10

**great** 90:20

**Groff** 53:22

**group** 15:24 20:5,6 28:23 39:16 52:5 89:3

**guess** 87:10

**guidance** 78:17,18 79:9, 12,19 90:6

**gym** 54:23

**H**

**Hadley** 12:4

**hadn't** 17:12

**half** 42:4,20 74:3

**hand** 6:21

**handled** 34:20, 24 89:3

**handling** 88:13

**hard** 55:2

**hardship** 53:17, 24 54:7 55:8

64:12 76:16

**has** 64:14 76:13 79:5 87:19 88:18

**having** 5:18 17:5

**he** 48:23

**head** 6:21 67:3

**health** 9:25 15:25 25:8 66:22,24 67:18 68:8,12 69:6 71:5,7,19

**Heart** 11:21

**held** 46:8

**Hempstead** 11:22

**her** 5:20 6:2 44:24

**here** 69:15

**hey** 88:18

**high** 10:17,19 11:20,23 66:15 78:18,20

**hire** 27:14 30:3 65:20

**hiring** 13:22

**history** 10:17

**Holyoke** 12:3

**home** 7:8

**hotline** 81:3

**house** 7:10

**how** 4:8 7:22 9:11,17 10:22 16:9,13,14,23 18:6 19:22 21:18 25:14 30:11 34:20 35:10,15 36:2,8 41:11,16,25 46:18,19 51:23 53:2 54:6 55:21, 23 60:19 70:2, 19 71:23 73:21 74:4 75:16

**Howard** 48:22 50:22,23

**However** 17:9

**HR** 15:25

**human** 13:6,9, 10,17 14:3 21:9

**I**

**I'LL** 6:15 61:8 65:12

**I'VE** 8:9 13:12 14:19 59:9,11

**idea** 26:12 60:18 61:7 62:12,23 63:25 64:8

**identification** 8:25 51:7,20 59:4 61:13 62:17

**identified** 8:17

**identify** 44:11

**ie** 53:17

**immediately** 11:8 31:20,23

**immunocompr omised** 39:5

**impact** 65:22

**implementatio n** 15:11,19 49:25 50:9

**implemented** 35:8

**important** 54:24

**impose** 53:16

**inability** 65:5

**incentive** 23:2

**included** 31:17

**including** 9:23 69:10

**individual** 17:11 28:24 29:12 42:2 60:6

**individualized** 16:19

**individually**

17:20

**information** 46:25 47:22 48:10 49:6,18 68:15

**insufficient** 66:13

**interactive** 35:5 36:18,24 38:23 72:3

**interruptions** 4:25

**into** 24:6,9 27:18 29:23 45:2,6 71:2,11 88:8

**Investigation** 9:24

**involved** 41:16 55:14,25 68:6, 10 89:4

**involvement** 62:5

**issues** 10:4 14:5,8

**its** 30:9

**J**

**job** 10:10 24:2 54:20 55:4,5 57:14 65:6 72:10 79:21 80:5,8

**jobs** 23:20 27:22 57:6 80:20

**joined** 16:3

**judge** 32:6

**Julie** 58:23 59:2

**just** 7:18 9:8 16:14 28:21 32:7 33:25 40:16 42:6,8 43:7,23 45:16 50:24 52:19 57:15 65:10,24 70:25 79:21

**K**

**Katherine** 4:17 5:17

**Kathleen** 5:9

**keep** 27:20 88:21

**kept** 29:24

**kid** 71:4

**kids** 23:13,14 24:13,15,18 71:3,6,9,10 74:21,23

**kind** 57:15 78:10

**kindergarten** 78:23

**knew** 17:2

**know** 6:14 23:25 26:6 27:23 32:5 36:2 39:10,25 40:17 41:11,15 43:19,24 44:19, 22 50:5,16,17 51:8 54:17 55:20 57:9,11 59:10 60:19 61:2 62:21 63:13,21 64:2 69:25 70:2 72:11 73:21 74:2,4,16,19 77:18 80:18 81:6 82:10 87:24 88:3 89:7, 18

**knowing** 43:3 44:23 57:19

**knowledge** 60:11

**L**

**labor** 12:20

**language** 52:4

**large** 39:25 40:2

**larger** 51:12

**last** 39:19 76:10

law 5:7,10,14
7:25 11:17
12:10,19,20,24,
25 14:17 20:20
37:8 46:16
47:12,17,18
48:3,7,25 49:12
65:8 69:9

laws 14:2

lawyers 48:2
52:5

Lazar 4:15 5:19
82:17

learning 24:14
70:11

least 42:19

leave 11:2 45:10
56:13,19 57:17

leaves 13:25

left 28:14,18

legal 16:3 48:17

let 6:14 43:19
51:8

let's 13:21 33:14
65:4 80:22 87:9
90:18

letter 75:7,8,10

level 23:18
28:12 34:5 72:9
73:4,9 78:19

licensed 12:15,
17

like 4:3 5:23
28:25 34:24
39:15 40:18
44:17 46:18
57:10 58:2 62:3,
19 71:5 72:16
74:3,9,24 75:11
78:16,23 79:6
80:21,22 81:2
90:3,7,8,9,18

limit 69:12

limitations
65:17

limited 69:14
77:24 78:9,21
79:3,6,7,14,20

LINANNE 12:21
28:15 29:9,18
32:14,20

line 52:25 76:10

lines 64:5

Linnane 4:2,5,
12 5:9,10,23
11:3,10 13:2
18:22 19:17
22:13 23:5 25:4,
16,22 26:10,16,
22 27:5 30:13
31:2 33:8,17
34:2,10,16,21
35:12,18,23
36:5,10,15,21
37:4,21 38:4,11,
18 40:6,13 41:3,
8,13 42:23
43:11,21 44:2,9
45:22 46:5,13,
23 47:14,20
48:8 49:4,16
50:2,11,18 52:8,
18 53:5 54:2,10
55:11 56:15,22
57:22 58:15
59:20,25 60:9,
16,23 61:5,18,
23 62:10 63:2,
23 64:6,19,21
65:24 66:7,19
67:15 68:2,13
69:3,23 70:6,13,
22 71:15,20
73:6,14,24
74:14 75:4,18,
24 76:6,20 77:2,
14,20 78:7,12
79:15 80:16
81:17 82:6
87:15,22 88:9
89:9,15,21
90:19,23

list 90:3,13

literally 39:14

little 24:15 43:22

lived 88:15

located 40:20

locations
40:11,16

long 6:25 9:11,
17 10:22 29:25

78:2

longer 15:13

look 28:25

looked 17:19
90:13

looking 31:13
32:23 37:9
55:14

looks 44:17

Lorraine 4:18
6:9 44:20

lot 14:3 27:21
56:2

lower 23:18

---

## M

made 11:2 16:4,
20 18:14,20
21:25 22:2,3
31:9,14 33:25
36:4 43:5 45:7
57:16 58:12
73:4,23

major 12:7

make 6:19 16:7
17:11 31:7 32:3
42:8 43:22
45:16 51:11
59:6 70:8 72:7

making 16:23
20:2

Mallory 20:18,
21

manage 10:4
72:4

mandate 15:11,
12,20 19:11
23:3 25:7 27:11
44:21 49:25
50:10 68:8,12

Manhattan
40:19

many 25:14
35:10,15 36:2,8
41:11,16 44:17
60:19 70:2
73:21 74:4
79:18

mark 8:22 51:2,
15 65:25 81:21

marked 5:24
8:25 51:6,19
59:3 61:9,13
62:13,17

Martin 5:13

Masciarelli
4:19 6:9

Masciarelli's
44:20

masked 25:11
39:9 43:16

masking 24:25
43:7 74:9,25
75:3,11,15,22
76:5

Massachusetts
12:4

matter 4:18
22:12 25:11
43:16 67:2,7,11,
24 75:2

matters 8:2
10:6

may 57:2 79:20
80:5

maybe 39:8
50:14 71:5

me 6:13,14 7:17
8:6 43:19 51:8,
11 59:6 88:7

mean 15:22
28:2 30:20
38:21 58:21
59:9 65:7 70:17
74:16,18 81:4
90:12

meaning 21:21
26:2

measures
66:13,18 67:8
69:2

Mediation 26:3,
8 59:14

medical 31:13,
18 33:6,7,10,11,
14,16,19,20
34:5,8,9,19,23,

25 35:3,10,15,
16,21 36:3,13
37:10 38:22,25
40:5,8 41:6
45:6,7 72:23
73:2,10,17,21

meet 48:25
52:23 53:3
79:24

meeting 18:14,
17 45:21 46:2,8
49:3 55:3

meetings 18:11
45:24 47:9,11,
19 48:7 49:12,
14 50:8

memory 34:7

mentioned
41:23

met 7:25 18:5

microphone
4:22

middle 72:14

might 72:12,15

mine 21:14

minimal 4:25
53:17

minute 90:15

minutes 18:13
90:20,22

mitigation
66:12,18 67:8
68:25

more 14:3 17:5
42:21 53:17
54:18 73:12

morning 6:7

Mount 12:3

move 42:10

Mr 4:10,13 5:6
6:6 8:21 43:23
44:4,5,14,15
47:10 48:4,15
49:11,22 50:24
51:14 52:14,19,
21 58:20 63:8
65:2 66:5,9,10
68:20 81:20

82:17 87:9
90:14,21

**Ms** 4:2,5,12 5:9,
13,23 6:7 11:3,
10 12:21 13:2
18:22 19:17
21:11 22:13
23:5 25:4,16,22
26:10,16,22
27:5 28:15 29:9,
18 30:13 31:2
32:14,20 33:8,
17 34:2,10,16,
21 35:12,18,23
36:5,10,15,21
37:4,21 38:4,11,
18 40:6,13 41:3,
8,13 42:23
43:11,21 44:2,6,
9 45:22 46:5,13,
23 47:14,20
48:8 49:4,16
50:2,11,18 52:8,
18 53:5 54:2,10
55:11 56:15,22
57:22 58:15
59:20,25 60:9,
16,23 61:5,18,
23 62:10 63:2,
23 64:6,19,21
65:24 66:7,19
67:15 68:2,13
69:3,23 70:6,13,
22 71:15,20
73:6,14,24
74:14 75:4,18,
24 76:6,20 77:2,
14,20 78:7,12
79:15 80:16
81:17 82:6,17
87:15,22 88:9
89:9,15,21
90:19,23

**much** 41:25
55:22,24

**must** 78:10

**my** 4:5,14,25 6:7
7:8 9:15 20:18
34:6 50:20
60:11

**N**

**name** 4:14 5:3
6:7 23:25 24:2

50:14 80:24

**names** 50:17
77:18 88:12

**nature** 19:22
32:5 80:7 82:14

**nearby** 7:15

**necessarily**
56:17 57:3
59:11

**necessary**
24:18

**need** 6:13,24
35:7 51:11
55:16,22,24
59:6

**needed** 23:13,
15,18,20 24:3
30:4 39:6,8,9
43:24 79:17

**needs** 55:21
72:17

**negatively**
65:22

**negotiate** 69:21

**negotiations**
49:24

**never** 43:8
81:19

**new** 4:19 5:10,
14,21 7:24 9:5,
6,10,12 11:9,22
12:17 20:23
29:16 30:3 50:6
61:16 76:4

**next** 51:9 66:2

**no** 6:2 7:2,11,14,
20 11:12 15:6,
12,13 18:18
19:19 21:6,16,
17,18,21 22:9,
12,19,25 23:7
26:12,18 28:4
30:6 31:4 32:10,
16,17,22 33:4
36:18,23 37:15,
16 38:20 39:15
42:19 43:6
44:25 46:15
48:14,24 50:4
51:13 59:7,22

60:18 61:7,14,
20 62:12,23
63:25 64:8 65:2
66:5 67:11
73:16,19 76:24
77:4,16 78:8

**nods** 6:21

**none** 81:9

**not** 6:12 7:16
18:12,15 23:14
24:4,5,6,21
25:9,20 26:15,
20 27:2,18
29:22,23 32:11
35:14,20 36:25
40:15 43:13,14,
17,18 44:8,12
46:15,24 47:22
48:10 49:5,17
52:10,15 53:9,
10,11 55:20
56:6,12,17,20
57:3,19,21 58:2
59:16 60:11
63:4,10 66:25
67:5,12,18,19,
22,25 68:4,15,
21 69:14 71:11
72:20,24 76:2,8
77:4,22 79:4,21
80:6,20 87:17,
24 89:6

**Notary** 5:19

**notations** 43:4

**note** 82:7,12
87:25

**notes** 18:10,16

**nothing** 17:12,
15 42:9 62:6
78:25

**Notice** 8:8,17,24

**now** 34:19 90:17

**number** 31:11
55:15 80:23
87:17

**numbers** 17:18
65:19 87:24

**numerous**
13:12,14 14:20

**O**

**objection** 11:3,
10 12:21 13:2
18:22 19:17
22:13 23:5 25:4,
16,22 26:10,16,
22 27:5 28:15
29:9,18 30:13
31:2 32:14,20
33:8,17 34:2,10,
16,21 35:12,18,
23 36:5,10,15,
21 37:4,21 38:4,
11,18 40:6,13
41:4,8,13 42:23
43:11 45:22
46:5,13 47:14,
20 48:8 50:2,11,
18 52:8 53:5
54:2,10 55:11
56:15,22 57:22
58:15 59:20,25
60:9,16,23 61:5,
18,23 62:10
63:2,23 64:6,19,
24 66:19 67:12,
15,25 68:2,13
69:3,23 70:5,6,
13,22 71:15,20
73:6,14,24
74:14 75:4,18,
24 76:6,20 77:2,
14,20 78:7,12
79:15 80:16
81:17 82:7,13
87:15,22 88:9
89:9,15,21

**objections** 25:3

**occasionally**
20:20

**October** 18:21

**off** 28:14 77:17

**offboarding**
10:5 13:23

**office** 9:16,23,
24 10:2 14:23
15:5,16,25 16:2,
3 45:3,7,14
46:18 73:5 89:3,
19 90:2,12

**office-based**
80:20 89:13

**officer** 21:10

**offices** 9:23

**oh** 39:23 69:19
88:24

**Okay** 8:5,20
15:18 19:14
31:5 43:19 44:4
51:11,14 52:19
59:8 90:14

**on** 8:17 14:4,7,
16 15:21 16:23
17:4,17 19:15
21:15 23:17
27:20 28:17,22
29:2,11,25 34:4
42:3,10 43:24
45:3,19 48:6
53:18,24 55:9
56:8,13,18,24,
25 57:5,25
59:12 62:8
64:14 66:3 67:3
71:3 72:8,9,10,
11,19 76:10,11
78:15,18 79:17
80:9 82:11
87:14 88:20

**onboarding**
10:5 13:22

**Once** 45:2

**one** 7:20 9:8
14:22 16:8,10
21:17,18,21
29:6 33:12
40:18,19 42:13
49:2 50:14,17
59:11,22 65:7
75:9 77:12
81:19 89:12
90:2

**ones** 40:9

**online** 24:14

**only** 27:12 76:13
87:20

**open** 45:15

**operation** 69:11

**operations**
53:18

**opinion** 26:13

**opportunity**

14:24 15:10

**option** 25:6
27:12,24 29:20
37:16 43:18

**options** 37:16

**order** 37:11

**organization**
88:20

**other** 10:4
27:14,22 28:21
30:7 32:2 37:16
41:22 59:9
66:12,17 67:7
68:25 71:9 74:9
76:3,9

**others** 74:12
75:13,17

**our** 27:22 29:23
33:20 45:14
62:5 63:18
65:15,16 76:11
82:7,13

**out** 32:8 38:24
42:16 70:2
72:21 82:2
88:15

**outlined** 37:6,7

**outside** 78:2,22,
24

**over** 7:18 17:6
49:24 50:9 90:5

**overall** 17:17

**overlooked**
17:16

**oversaw** 14:23

**oversee** 9:22
15:3 80:13

**overseeing**
15:14,15

**own** 28:22

**P**

**page** 64:14,15
74:5 77:23 80:9

**pages** 42:5
82:21

**panel** 61:17,22,
25 62:9 63:22
88:3,4

**paper** 31:17,23
32:7 42:5

**paragraph**
65:11,14 74:5,6
76:11 80:9

**paragraphs**
65:11

**parent** 67:21

**part** 48:6 62:4
81:21,25

**participate**
49:23 52:6
59:12 62:24

**participated**
59:17

**particular** 77:12
81:15,23

**particularly**
23:17 44:8
54:21 66:14

**parties** 4:16

**parts** 13:25

**past** 13:11

**pending** 7:2
45:10

**people** 15:24
22:5 23:20 24:5,
12,20,21 26:15,
20 27:21 28:19,
21,22 29:13
30:3 31:11,16
37:17 40:4,19,
24 41:16,21,22
42:4,5 47:8
54:15 55:15,17,
18,25 56:3,21
62:3 77:10
80:23,25 81:8

**perform** 65:5

**performed**
55:7,18

**period** 18:4 27:9
29:7 43:15
58:19 67:6,23
68:5

**permitted** 24:9
25:10 29:24
43:14,17 66:25
67:19,22 74:17

**person** 21:21
22:11 24:2,20
31:9 32:11 33:5
34:25 37:9,13
38:15 39:2 52:2
54:22 63:15
67:12,18 71:25
72:12 78:15,16
88:8,18

**person's** 16:21
17:19 72:20

**Personnel** 9:24

**perspective**
65:15

**phone** 7:15 81:7

**physically**
19:25 24:13

**piece** 31:22 32:7

**place** 16:15
17:14 27:12
31:19,22 38:2,7
40:2 42:10 54:7
88:7,16 90:5

**placed** 40:12
53:24 55:9
56:13

**placement**
55:16

**placements**
88:14

**places** 24:12
77:10

**plaintiff** 5:8
52:22 53:2 54:8,
13 75:8

**plaintiff's** 8:23
51:4,17 58:5,25
61:11 62:15

**plastic** 39:8

**play** 15:18 19:2

**please** 4:21 5:2,
25 6:14,19 47:5
82:3

**plumbing** 24:16

**point** 6:25 14:23
27:9,19 30:2,8
57:12 88:23
90:2

**policies** 14:2
76:5,9

**policy** 67:4,9,17

**pope's** 22:21

**portion** 42:13,
14,15 87:8

**poses** 76:15

**position** 26:25
62:16,18 63:18,
19 88:8

**positions** 71:24

**possible** 4:24
35:9 72:18
79:18

**practice** 4:9

**pre-k** 54:23

**prepare** 7:22

**prepared** 7:24
8:15

**present** 4:16
74:25 75:12

**presented**
74:10

**primary** 55:21

**principals**
23:24,25 81:3

**privilege** 47:4,
25 48:13 49:9,
20 52:16 63:7,
10 68:18

**privileged** 47:2,
24 48:12 49:7,
19 68:17

**probably** 18:24
42:17,19,25
47:7,8 52:5

**problem** 7:2
65:3

**proceedings**
59:13

**process** 16:9,
15 30:9 35:5

36:19,24 38:23
45:4 60:22
61:22 62:2 72:3
81:13 89:5

**produce** 82:2,3,
8

**produced** 82:16

**professional**
13:12 14:20

**program** 72:20

**programs**
70:16

**progressive**
13:23

**proper** 26:25

**protect** 23:15

**protection**
66:14

**provide** 4:23
53:11,15 56:5,9
66:13 76:19

**provided** 30:16
37:25 38:6

**providing**
16:11,17 17:22
22:7 23:10
46:10 76:12,25

**Public** 5:19

**purchase** 4:3

**purpose** 63:13

**pursuant** 56:19

**put** 7:19 24:12

**Q**

**qualified** 57:8

**Queens** 40:19

**question** 6:14,
16 7:2 26:24
63:11 66:2

**questions** 6:10
8:16 52:10

**R**

**random** 57:10

**rates** 66:15

**rather** 65:13

**reach** 7:16

**reading** 65:10

**realized** 17:4

**really** 21:17
31:13 55:2

**reapply** 31:21

**reason** 19:20
38:22 39:4
72:23

**reasonable**
61:16 72:5

**reasons** 37:11
64:13,16 65:8
71:19 75:10
87:14

**reassignments**
10:3

**recall** 30:15
36:7,12 54:5
58:17 60:25

**receive** 37:19
80:15

**received** 22:24
23:21,22 25:24
26:7 31:5 35:11
37:17,23,24
38:16 71:23
87:20 88:11
89:8,19

**receiving** 29:7

**recent** 53:21

**recess** 90:25

**recognize** 44:6,
16 51:21,23
59:5 61:9 62:14,
18,19

**recognized**
44:13

**recommendati
ons** 33:25 78:20

**recommended**
34:14

**record** 5:25
52:20 65:25

**referenced**
78:14

**regarding** 8:9,
16 14:11,12,19,
21 16:4 18:10,
16,19 22:21,22
26:14 30:10,17
53:24 55:8 60:6
65:19 66:17,18
68:8,12,24
75:15,22

**regardless**
22:10

**regular** 69:7

**rehired** 28:24

**reinstated**
28:20

**related** 7:13
10:5 14:2 15:2
16:5 45:17

**relations** 9:16
10:2,6

**religion** 67:11

**religious** 14:12,
16 15:2 20:3,10
22:10 25:3,18,
19 29:14 30:24
31:6,12 32:5,13,
19,25 33:3
36:19 37:8,11,
18 40:8 43:10
46:3 52:3 53:12
64:4 67:11,25
70:4,5 73:13
87:14,21 89:8,
19

**religious-** 53:3

**religious-
based** 52:24

**remain** 66:15
74:8 88:19

**remained** 70:16

**remember**
17:24 35:10,15
36:8 40:16

**remote** 24:12
71:24 72:21
81:10

**remotely** 4:16

24:16,17 70:11,
17,18,21 71:13
72:5,8 80:6

**removed** 37:14

**Renewed** 61:12

**rented** 40:17,21,
23

**repeat** 6:13

**rephrase** 6:13

**replace** 57:7

**reporter** 4:2,14,
15 6:20 41:2
65:9 73:20
76:23 82:20

**represent** 5:3

**representation**
52:12

**represented**
50:7

**representing**
5:8

**request** 32:9
36:19

**requested** 41:2
65:9 73:20
76:23

**requesting**
64:4

**requests** 36:3,4
45:19 73:11,17,
22 74:3

**requirement**
36:23 37:15

**research** 75:15

**resign** 27:13

**resignation**
28:5,23

**resigned** 27:25
28:8,11,22 29:5

**resource** 21:9

**resources** 13:6,
9,11,17 14:3
24:5 80:11

**respect** 16:16
34:19 52:11
63:4 66:11 82:9

**respond** 6:15

**responses** 6:19

**rest** 82:4

**result** 57:19
65:4

**return** 24:18,19
28:10

**review** 17:3,11
19:6 22:5 30:25
31:7 42:7,11
46:15,19 55:13

**reviewed** 8:2
20:13 32:3
33:21 34:6 35:3
42:17 43:3
44:19,24 46:12

**reviewing**
16:24 44:17
42:2,6

**right** 17:10,14
31:10,21 33:23
34:4 57:6,14
63:17 81:20
88:16 90:17,21,
23

**risk** 74:11 75:2,
12

**Rockaway**
10:19

**Rodi** 4:1,18 5:1,
17 6:1,7 7:1 8:1
9:1 10:1 11:1
12:1 13:1 14:1
15:1 16:1 17:1
18:1 19:1 20:1
21:1 22:1 23:1
24:1 25:1 26:1
27:1 28:1 29:1
30:1 31:1 32:1
33:1 34:1 35:1
36:1 37:1 38:1
39:1 40:1 41:1
42:1 43:1 44:1,6
45:1 46:1 47:1
48:1 49:1 50:1
51:1 52:1 53:1
54:1 55:1 56:1
57:1 58:1 59:1
60:1 61:1 62:1
63:1 64:1 65:1
66:1 67:1 68:1
69:1 70:1 71:1

**respond** 6:15

72:1 73:1 74:1
75:1 76:1 77:1
78:1 79:1 80:1
81:1 82:1 83:1
84:1 85:1 86:1
87:1 88:1 89:1
90:1

**role** 15:18 19:2
21:11 56:4,24
61:16 63:5
68:18 88:7

**roles** 55:16,17,
23 56:14,20

**rules** 30:9

**run** 23:13 24:3
27:16,17 29:21
79:19

**S**

**Sacred** 11:21

**safeguards**
74:9,24 75:11

**Safety** 9:25

**said** 12:9 20:13,
15 21:3,7 41:3
67:2,4 88:24

**same** 10:8 57:4
64:2 70:24

**SAMS** 87:25
88:2,5

**SAMS'** 87:12

**saw** 77:16 81:19
90:3

**say** 18:21 21:15,
17,18,22 27:25
48:16 55:2
72:16 74:19
78:17 79:5
80:22 88:18
89:23 90:2

**saying** 74:7
87:25

**says** 52:22
53:15 66:12
69:8 76:11
77:23 78:9
80:10

**Scheinman**

26:3,8 37:18
59:14

**Scher** 5:7

**school** 10:17,19
11:14,16,17,20,
24 12:10,19,24
14:17 23:12,14,
17,23 24:3,5,7,
9,16,19 27:16
30:5 38:3 67:6,
13,23 70:12
71:2,13 72:4,6,
9,14,21 73:4,8
74:8,11 75:13,
16 76:4,9 78:3,
19,20,25 79:2,
19 88:17,24

**school-based**
89:13

**schools** 27:16
65:23 69:13
75:23 78:2

**schoolteacher**
54:22

**science** 68:25

**scrambling**
77:10

**screen** 8:6,7
43:20,25 82:11

**scroll** 44:10

**second** 52:25
64:15 65:16
69:8,16,18 74:5
80:9

**see** 7:19 8:6,7
13:21 43:19
44:2 51:8,10,13
53:19 59:7 65:4
69:15 76:16
78:3 90:21

**seen** 8:12 59:9,
11

**seniority** 69:11

**sent** 45:13 52:2
53:8 88:12

**separate** 46:21
48:17 81:25

**separately** 82:3

**September**

10:7,11 18:3,20,
25 29:6 45:3,20
50:25 51:5,16,
18 58:7,9

**series** 6:10

**served** 8:9

**service** 26:4,9
37:19 59:15
90:6

**set** 81:6

**settings** 74:8

**seven** 71:9

**several** 9:22
18:7 45:24
77:16

**shares** 4:7

**she** 20:22 21:3,
7,8,15

**sheet** 42:5

**sheets** 31:17

**shield** 39:11

**should've**
26:21 29:15

**shouldn't** 82:15

**show** 8:5 61:8
62:13 82:10

**shown** 82:16

**sign** 77:17

**signed** 28:18,19
29:12 82:18

**similar** 10:11
21:14

**simply** 59:23
77:24 79:7

**Since** 9:19 10:7

**sincere** 29:14

**site** 39:15,22
54:9,16,19

**sites** 39:25 40:3

**sitting** 55:5

**situated** 7:7

**situations**
72:12

**small** 81:7

**social** 72:13

**SOLAS** 20:2
35:2 62:4

**some** 8:16
19:20 28:19,21
30:8 31:16 39:6
42:4,5 47:8
57:25 70:10,25
71:3 77:8 78:10
80:5 89:24

**somebody**
72:16

**someone** 21:19
28:10 32:18
33:2,25 54:24
57:7,16 78:23

**someplace**
55:6

**something** 6:11
11:5 19:20
31:15 32:4
37:15 39:11

**sometime** 18:4,
24 58:19

**sorry** 31:4 50:6
65:10 66:7

**sort** 39:6 57:25

**sought** 22:6
25:14 33:6,16
43:9

**South** 12:3

**space** 40:18
55:24 65:20

**SPARATE** 83:5
84:5 85:5 86:5
87:5

**speak** 65:12
75:20

**special** 70:16,
20 72:17

**specific** 19:6

**specifically**
40:21,23

**spend** 41:25

**staff** 55:22
56:13 65:21

69:13,22 74:11
75:13,17 79:18

**staffing** 24:4

**stamped** 66:4

**start** 10:20 17:2
28:12,13 33:14

**started** 15:13

**state** 5:2 65:8
69:9 76:4

**statement**
62:16,19 63:18
74:13

**statements**
22:21

**stating** 5:19

**status** 58:3

**stay** 4:22

**still** 25:12 27:11
34:15 39:6 57:5
71:8

**stop** 10:24 67:4

**stopped** 11:7

**Street** 5:20

**strike** 30:22
32:24 68:9

**students** 54:21
55:19 56:7 57:9,
25 70:10,15,20
79:23,24,25
80:3

**students'** 57:18

**studies** 12:8
72:13 75:21

**studying** 70:17,
21

**submit** 31:24
62:4 63:17

**submitted**
31:15 32:4
44:18 63:22
64:3

**submitting**
32:11 45:12

**subs** 57:10

**subsequently**

35:8

**substitute** 57:3

**such** 53:11 74:7
76:14

**suffer** 57:19

**Sullivan** 20:18,
22

**superintendent
's** 16:2

**supervisor**
21:3,8 50:21

**supervisors**
80:13

**support** 32:4
77:25 81:7

**supported** 62:2

**supporting**
80:24

**Supreme** 53:21

**sure** 7:21 17:11
31:9,14 32:3
42:8 44:14 45:7,
16 79:4 89:23

**suspended**
27:8 29:8 57:12

**suspension**
27:20 57:5

**swear** 5:4

**sworn** 5:18

**system** 23:12
24:3 27:13 28:2,
11 29:5 35:2

**systems** 69:11

---

**T**

**table** 88:20

**take** 4:17 6:15,
21,24 12:19,24
16:15 18:16
26:15,20 27:2
38:9 39:2 56:12
78:22 90:15

**taken** 14:20
18:10 90:25

**taking** 4:7 7:3

talk 19:9

talked 18:6

talking 19:10

talks 64:9

teach 10:16,18,
22 54:21 70:20

teacher 10:14
54:17,23 57:4,
20 58:3 71:6,8
78:24 89:8 90:9,
11

teachers 23:19,
22 27:15 30:4
41:7,12 56:18,
25 70:24,25
71:12 81:4 90:5

teaching 10:20,
24 11:2,7,13
71:9,12,24
72:13

team 10:4 33:20
34:6 80:25
88:13

tell 8:6 30:21
46:7

ten 71:6 90:20

tenure 13:24

term 78:2

terminate 28:2

terminated
26:21 27:3 28:7

terms 19:25
20:2 27:23
55:20 74:3

tested 25:11
43:16

testified 5:22

testing 24:25
43:8 74:10,25
75:3,11,15,22
76:5

than 32:2 42:21
53:17 73:13

Thank 4:12 41:5
47:6

Thanks 90:24

that's 4:8,10
57:3 62:5 63:19
64:13 65:7 66:9
79:21 80:7
90:19

their 5:3 23:20
27:3 28:22,25
29:15 31:15
32:9 37:12
53:13 54:19,20
55:4,5,21 56:20
57:6,14 67:3
70:24 71:5,6
78:2 79:21 80:5,
7,8,13 81:9
88:12,17,21

them 17:3,4
19:25 20:13
25:21,24 27:11,
13,18,20,25
28:3,6,8 29:2,25
31:20,23 38:24
39:9,13,21 40:2
45:12 46:19
53:11 54:19
57:7 72:4,6
73:12 80:21
88:4,16,24

then 5:4 27:9
29:3 31:18 32:2,
3,8 33:11 34:5
35:7 38:6 42:10
45:13 48:21
55:23 56:8
67:10 71:9 72:2,
6,15 74:20 88:2,
14,23

there 7:9 15:7,
24 17:12,15
18:10,13 19:19
21:22 22:16,20
23:2 25:7 26:13
27:9 30:2 32:10,
17,25 33:10,11
35:21 36:18,23
39:15 42:8,9
43:3,4 44:23
47:7 48:17
53:22 56:13
57:10,24 60:4
62:7 66:16,21
67:7,20 68:23
69:20 70:15
72:23 73:12
77:12,24 78:5,9
79:3,6,13 80:25

81:13 88:2 89:2

there's 6:11,25
27:19 28:9 29:2
66:5

therefore 53:13

these 21:24
55:23,25 56:5
59:18 64:16
65:10 78:5

they 5:3 8:2
17:13 22:6 25:7
27:7,8 28:5,8,
12,13,14,18,20
29:11 31:12,14,
20,24 32:3,8
33:24 34:4,14
35:2,3,4,5,6
37:19,23,24,25
38:6,8,9 39:3,5,
7,9 40:12 42:7
43:16,17 45:9
46:19 54:25
57:4,5,13 60:12
66:24 67:3,20,
21,22,24 68:4
70:24 72:2,7,23,
24 73:4,5,8
74:17,19 75:3,6
78:17,19,21,24,
25 79:14,20,22,
23,24,25 80:3,
22 81:6 88:11,
14,15,17,25
89:25

they're 55:2,4,5
88:19

they've 28:7

thing 39:19
44:11

think 18:3 19:22
29:13 42:22
82:8 90:16

third 65:17
69:17

those 17:7
23:16 25:2 26:6,
14 29:4 33:21
34:5 37:17 40:2,
4 43:9 47:19
50:16 55:17,18
56:9,10,14
58:11 70:20
71:18 73:2

77:18 81:5

though 28:7,8
34:13 39:10
78:6

thought 64:22

thousand 17:6
18:8 24:21
25:14,18 42:16,
17 54:15

thousands
16:25

three 10:23 17:6
24:20 25:13,18
39:25 41:20,21
42:16 54:14
64:14 71:7,10

through 35:2
37:18 44:10
60:21 62:4
81:12 82:22

time 18:5 20:14,
19 23:15 24:8
27:7,24 29:20,
24 41:25 57:8
77:5

title 9:14,15,18,
21,22 10:8 14:5,
8 21:8 23:21

titles 79:4
89:24,25

today 6:10 8:3

today's 7:22

together 16:3

too 88:4

took 14:17,18

top 64:5 77:23

topics 8:17
13:19

Torrey 58:24
59:2

train 80:12,21

trained 13:16,
19 14:7 81:5

training 13:5,8
14:4,10,12,15,
25 30:16 80:14

trainings 13:14

transcript 4:24
81:22 82:2,5

transfer 69:13,
22

transmission
66:15

treat 28:6,8
39:16,21

treated 28:4

try 11:5

turn 7:18

two 39:25 41:22
50:14,17

type 13:8 14:15
16:6 80:14

---

**U**

UFT 49:24 50:5,
9 69:21

Uh-hum 58:10

unacceptable
74:10 75:2,12

under 6:15 9:10
37:7,8 47:24
49:8

understand
6:11,17,22 7:3
19:12 26:24

understanding
4:6 27:22

understood
6:16

undue 16:12,17
17:8,23 18:20
20:5,10 21:24
22:8 23:11
24:22 46:4,11
53:16,24 54:7
55:8 56:8 64:11,
18 76:15

unfortunately
57:9

unilaterally
19:15

unique 62:20

**University**
11:18 12:10,13

**unmasked**
39:17,21,23

**until** 46:15
57:16

**unvaccinated**
29:22 74:8,21

**up** 81:6

**upon** 8:9 16:21
46:4

**used** 22:22 61:3

**usually** 4:9

---

**V**

**vaccinated**
23:14 24:8 25:9
39:3 43:14 67:5,
19 68:5 74:22
75:6

**vaccination**
57:13

**vaccine** 15:10,
12,19 16:5
22:22 23:3
26:15,21 27:3
38:9 39:3 44:21
49:25 50:10
56:12 68:12

**varied** 48:2

**Various** 48:2

**verbal** 6:20

**versus** 4:19

**very** 28:23

**Vicki** 20:19
21:2,25 50:20

**VII** 14:5,8

**vitally** 54:24

**vulnerabilities**
71:8

**vulnerable** 71:4

---

**W**

**walked** 28:21

**wall** 39:8

**want** 52:20
74:21

**wasn't** 21:25
25:6 39:13
54:12 74:22
79:12

**way** 28:19 43:3
44:23

**we're** 81:24 82:6

**well** 14:11 30:21
33:14

**went** 11:17 12:9
14:17 27:21
33:19 56:18

**were** 10:10 15:8
16:17,23 18:2,6,
10,13 19:14,23
20:10,14,16
21:24 23:14
25:9,13 27:8
29:5 30:16
31:12 32:23
33:10,11 34:5,7,
8,14,23 35:2,3,
5,11,16,21 36:4,
8,13 37:25 38:6,
9 39:3,5,14,16
40:2,9,11,12
41:6,11,16
42:12 43:4,16,
17 44:18 45:17
46:3,11,19 47:7
48:5 49:13
53:10 56:6,12,
20 57:5,13
60:12,20 61:15
64:16,22 66:25
67:5,7,21,22
68:4,6,10 69:6
70:10,15 71:12,
18 72:23 73:2,3,
4,8,12,22 74:4,
10 75:3,6 77:9
78:18 80:19,20
81:2,5 88:2 89:4

**weren't** 24:8,9
25:12 74:17

**what** 9:14,20
10:16 11:2,19,
23 12:5,7,12
13:8,19 14:15
15:18,22 16:6

21:8,11 22:10,
12 23:8 26:6
28:17 29:4,11
30:20 31:7 32:6,
23 35:6 38:24
39:19 40:11
45:4 46:19
50:16 56:25
61:2 63:13,19
67:11 74:12
78:15,24 80:14
82:10 88:16

**what's** 37:2
61:8 62:13

**whatever** 39:4
77:6

**when** 8:6 10:20,
24 15:3 16:4,22
17:21,24 19:9
22:16 27:25
30:23 31:5
37:13,24 43:19
45:20,25 48:16
51:8 58:11
62:21 66:14
75:2 81:11 82:2
88:5,11

**where** 7:6 10:18
11:16,19 12:2
18:4 27:10,19
28:13 30:3 37:9
40:11 45:4 46:2,
9 54:24 62:5
88:15

**whether** 19:3,
15 21:12,16
22:23 30:17
31:8 32:11,18
44:12 57:20
61:3 67:20
72:20,22

**which** 33:12,20
39:17 47:11
55:16,17,19
58:6

**while** 17:16
57:4,15 79:20

**who** 5:3 9:4 21:2
22:5 25:2,21
26:15,20 27:2
28:10,11 29:13
33:6 37:17 39:2
40:24 43:3,9,13
44:23 46:18

47:18 48:20
50:5 52:2,4
54:15 55:7,15
56:11 57:7,12
59:17 67:18
70:19 71:10,23
74:22 77:13
80:19 90:3

**who's** 20:16
78:23 88:7

**whole** 17:4
44:11 79:17

**wholly** 28:17
72:19 78:15

**why** 36:18 64:16
74:24 75:8
79:12 81:14

**with** 7:10,20
13:10 16:16
24:15 27:10
29:25 31:15
33:14 34:19
37:15,16 38:23
39:12,17 40:4,8,
15 45:21 46:9,
16 47:16 48:25
49:12,24 50:9
52:10 53:12
54:25 55:13
56:7 57:7 59:13
62:6 63:4,6
65:15,16,18
66:11,22,23
68:7,11,19 69:7,
21 71:5,10
72:14,16 74:9
76:9,13 79:25
80:3

**within** 7:16
11:15 13:15
14:24 26:13
48:18

**without** 27:13
30:25

**witness** 5:5
46:24 47:21
48:9 49:5,17
52:9 63:3 68:14

**wore** 67:3

**work** 6:2 21:4
27:8 28:10 38:2,
7,10 52:11 54:8
55:25 63:5

67:13 72:8,15
77:24 78:5,9,10,
22 79:3,6,7,14,
21,25 80:5,7,14
81:8,9 88:24
89:25

**worked** 9:11
13:10 38:23
67:20

**workers** 23:23
90:7

**working** 11:8
20:23 24:22
70:17 71:10
72:4

**works** 90:11

**would** 4:3 5:23
8:3 16:9,12,15
17:3,8 18:21
20:4 31:11 35:7
38:21,24,25
42:3,6,7,10
45:11,15,16
46:20 48:25
53:16 54:7,15,
18,20 55:8,15,
19,22,24 56:8
57:7,24 58:18,
19,21 63:15,19
64:11 65:4,12,
22 66:23 67:4
70:20,25 71:3,
25 72:2,3,7,8,9,
10 74:25 75:12,
16 78:21 80:21
87:24 88:12,14,
16,17,25

**would've** 24:22
33:2

**wouldn't** 72:17

**write** 78:19

**wrong** 31:19
42:9

**wrote** 32:8

---

**Y**

**yeah** 43:23 44:2
50:23 65:7
69:19 78:21
79:3,11

**year**  11:23 12:5,
12 29:6 38:3
70:12 71:14

**years**  9:13
10:23 11:15
13:11

**yes**  6:18,23 7:5
8:11,14,19 9:3
10:9,12,15
11:15 12:11,16,
18,23 13:4,7,18
14:6,9,14 19:5,
8,13,19 20:8,12,
25 21:15 22:15
26:5 33:19
34:12,18 35:25
36:17 41:10,24
48:19 49:10,21
51:22 52:18
53:20 60:3
71:17,22 76:17
78:4 82:20
89:17

**York**  4:19 5:10,
14,21 7:24 9:5,
6,10,12 11:9,22
12:17 20:23
29:16 50:6
61:16 76:4

**you'd**  72:15

**you're**  50:12
53:6 54:3 58:2
63:10 82:10
88:21

**you've**  82:18

**your**  6:19 7:15
9:4,14,20 10:10
11:13 12:7
20:21 21:3,7
26:25 34:7 45:3
52:11 54:13,17
58:3 62:20 63:5
68:18 73:5
82:11 88:20

---

**Z**

---

**Zoom**  48:6